**25-1005**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

JESSICA SWEENEY, et al

*Plaintiffs-Appellants,*

v.

UNIVERSITY OF COLORADO HEALTH AUTHORITY

*Defendants-Appellees.*

On Appeal from the United States District Court, District of Colorado
The Honorable Nina Y. Wang

District Court Case No. 1:23-cv-2451-NYM-MDB

---

**PLAINTIFFS-APPELLANTS' APPENDIX**
**VOL. 1 OF 3**

---

David Joseph Schexnaydre
Schexnaydre Law Firm, LLC
2895 Hwy 190, Ste 212
Mandeville, LA 70471
Phone: 985-292-2020
Email:
david@schexnaydre.com

*Attorneys for Appellants*

# TABLE OF CONTENTS
## VOLUME 1 OF 3

District Court Docket Sheet, Case No. 1:23-cv-2451 .........................4

Doc 1, Complaint.................................................................22

Doc 1-2, Exhibit A – CDC Provider Agreement ..............................123

Doc 1-3, Exhibit B – 12-10-2020 EUA Letter..................................131

Doc 1-4, Exhibit C – UC Health Vaccine Mandate ..........................140

Doc 1-5, Exhibit D – Online Acknowledgment Box........................142

Doc 1-6, Exhibit E – Thalheimer Exemption Form .........................143

Doc 1-7, Exhibit F – CDPHE Part 12 Rules.....................................144

Doc 46, MTD by CDPHE.......................................................156

Doc 46-1, Exhibit A – Chart of Hospitalizations.............................186

Doc 46-2, Exhibit B – Emergency Rules by Board of Health..........191

Doc 46-3, Exhibit C – 8-23-2021 EUA Letter..................................192

Doc 46-4, Exhibit D – 8-23-2021 Comirnaty Approval Letter ........205

Doc 46-5, Exhibit E – Declaration of Tammy Adams......................216

Doc 47, Motion to Dismiss by UCHA ............................................218

Doc 48, Opposition to CDPHE MTD..............................................259

## VOLUME 2 OF 3

Doc 48-1, Exhibit A – CDPHE Website .............................................4

Doc 48-2, Exhibit B – Declaration of Peter Marks ...........................30

Doc 48-3, Exhibit C – CDC Vaccine Related Codes ........................... 83

Doc 49, Opposition to UCHA MTD ................................................... 89

Doc 50, UCHA Reply Memo ........................................................... 116

Doc 50-1, Exhibit A – *Roberts* Decision ......................................... 132

Doc 51, CDPHE Reply Memo .......................................................... 160

Doc 58, Order Granting Defendants' MTD ..................................... 172

Doc 59, Final Judgment ................................................................... 216

Doc 60, Rule 59(e) Motion to Alter or Amend ............................... 218

**VOLUME 3 OF 3**

Doc 60-1, Proposed Amended Complaint with Changes .................... 4

Doc 60-2, Proposed Amended Complaint, Clean ............................ 164

Doc 60-4, Exhibit B – State Health Order ....................................... 176

Doc 60-7, Exhibit E – DoD Purchase Letter ................................... 178

Doc 60-8, Exhibit F – CDC Playbook .............................................. 187

Doc 61, CDPHE Opposition to Rule 59 Motion .............................. 214

Doc 62, UCHA Opposition to Rule 59 Motion ................................ 237

Doc 63, Plaintiffs' Reply Memorandum on Rule 59 Motion .......... 245

Doc 64, Order Denying Rule 59 Motion .......................................... 258

Doc 65, Notice of Appeal ................................................................. 259

APPEAL,JD4,MJ CIV PP,NDISPO,STAYED,TERMED

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:23-cv-02451-NYW-MDB

| | |
|---|---|
| Sweeney et al v. University of Colorado Hospital Authority et al | Date Filed: 09/20/2023 |
| Assigned to: Judge Nina Y. Wang | Date Terminated: 07/12/2024 |
| Referred to: Magistrate Judge Maritza Dominguez Braswell | Jury Demand: Plaintiff |
| Case in other court:  United States Court of Appeals, Tenth Circuit, 25-01005 | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights Act | |

### Plaintiff

**Jessica Sweeney**                    represented by **David J. Schexnaydre**
                                                      Schexnaydre Law Firm, LLC
                                                      2895 Highway 190
                                                      Suite 212
                                                      Mandeville, LA 70471
                                                      985-292-2020
                                                      Fax: 985-235-1089
                                                      Email: david@schexnaydre.com
                                                      *ATTORNEY TO BE NOTICED*

### Plaintiff

**Roxie Blue**                         represented by **David J. Schexnaydre**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

### Plaintiff

**Erica Bode**                         represented by **David J. Schexnaydre**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

### Plaintiff

**Amber Cano**                         represented by **David J. Schexnaydre**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

### Plaintiff

**Julie Deters-Frank**                 represented by **David J. Schexnaydre**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

APP 004

**Plaintiff**

Karen Donelson                                represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Jennifer Eddins                               represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Polly Goodwin                                 represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Gabriel Hergenreter                           represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Mary Lou Howard                               represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Gwenn Hren                                    represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

John Lansford                                 represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Jaime Montgomery                              represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Erin Phipps                                   represented by   **David J. Schexnaydre**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

APP 005

**Kinga Shelton**                         represented by    **David J. Schexnaydre**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*


<u>**Plaintiff**</u>

**Stephanie Silvers**                     represented by    **David J. Schexnaydre**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*


<u>**Plaintiff**</u>

**Patricia Spoerl**                       represented by    **David J. Schexnaydre**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*


<u>**Plaintiff**</u>

**Loni Thalheimer**                       represented by    **David J. Schexnaydre**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*


<u>**Plaintiff**</u>

**Alisha Torbeck**                        represented by    **David J. Schexnaydre**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*



V.

<u>**Defendant**</u>

**University of Colorado Hospital**       represented by    **Aja Rose Robbins**
**Authority**                                              Holland & Hart LLP
                                                           555 17th Street
                                                           Suite 3200
                                                           Denver, CO 80202
                                                           970-769-2090
                                                           Email: arrobbins@hollandhart.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Andrew Christopher Lillie**
                                                           Holland & Hart LLP
                                                           P. O. Box 8749
                                                           555 17th Street
                                                           Suite 3200
                                                           Denver, CO 80201-8749
                                                           303-295-8121
                                                           Email: aclillie@hollandhart.com
                                                           *ATTORNEY TO BE NOTICED*

**Christopher M. Jackson**
Holland & Hart LLP
P. O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201-8749
303-295-8000
Fax: 303-975-5396
Email: cmjackson@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Nathan Alexander Lilly**
Holland & Hart LLP
555 17th Street
Suite 3200
Denver, CO 80202
303-295-8247
Fax: 303-374-7365
Email: nalilly@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Nicholas W. Katz**
Holland & Hart LLP
555 17th Street
Suite 3200
Denver, CO 80202
303-295-8539
Email: nwkatz@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Elizabeth Concordia**
represented by **Aja Rose Robbins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Christopher Lillie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher M. Jackson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan Alexander Lilly**
(See above for address)
*ATTORNEY TO BE NOTICED*

APP 007

                                                            **Nicholas W. Katz**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Margaret Reidy**                              represented by  **Aja Rose Robbins**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Andrew Christopher Lillie**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Christopher M. Jackson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Nathan Alexander Lilly**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Nicholas W. Katz**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Randle**                              represented by  **Aja Rose Robbins**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Andrew Christopher Lillie**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Christopher M. Jackson**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Nathan Alexander Lilly**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Nicholas W. Katz**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

APP 008

**Jill Hunsaker Ryan**                                     represented by     **Christopher J. L. Diedrich**
                                                                              Colorado Department of Law
                                                                              Ralph L. Carr Colorado Judicial Center
                                                                              1300 Broadway
                                                                              8th Floor
                                                                              Denver, CO 80203
                                                                              720-508-6406
                                                                              Email: christopher.diedrich@coag.gov
                                                                              *ATTORNEY TO BE NOTICED*

                                                                              **Lauren Eileen Davison**
                                                                              Colorado Attorney General's Office
                                                                              Ralph L. Carr Colorado Judicial Center
                                                                              1300 Broadway
                                                                              Denver, CO 80203
                                                                              720-508-6631
                                                                              Fax: 720-508-6032
                                                                              Email: Lauren.Davison@coag.gov
                                                                              *ATTORNEY TO BE NOTICED*

                                                                              **Ryan K. Lorch**
                                                                              Colorado Attorney General's Office
                                                                              Ralph L. Carr Colorado Judicial Center
                                                                              1300 Broadway
                                                                              Denver, CO 80203
                                                                              720-508-6000
                                                                              Email: ryan.lorch@coag.gov
                                                                              *ATTORNEY TO BE NOTICED*

**Defendant**
**D. Randy Kuykendall**                                    represented by     **Christopher J. L. Diedrich**
                                                                              (See above for address)
                                                                              *ATTORNEY TO BE NOTICED*

                                                                              **Lauren Eileen Davison**
                                                                              (See above for address)
                                                                              *ATTORNEY TO BE NOTICED*

                                                                              **Ryan K. Lorch**
                                                                              (See above for address)
                                                                              *ATTORNEY TO BE NOTICED*

**Defendant**
**Patricia Hammon**                                        represented by     **Christopher J. L. Diedrich**
                                                                              (See above for address)
                                                                              *ATTORNEY TO BE NOTICED*

APP 009

**Lauren Eileen Davison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan K. Lorch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Raymond Estacio**                           represented by   **Christopher J. L. Diedrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Eileen Davison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan K. Lorch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel Pastula**                            represented by   **Christopher J. L. Diedrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Eileen Davison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan K. Lorch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shawn Turk**                                represented by   **Christopher J. L. Diedrich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Eileen Davison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan K. Lorch**
(See above for address)

APP 010

*ATTORNEY TO BE NOTICED*

**Defendant**

**Tom Butts**                           represented by **Christopher J. L. Diedrich**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Lauren Eileen Davison**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Ryan K. Lorch**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Evelinn Borrayo**                     represented by **Christopher J. L. Diedrich**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Lauren Eileen Davison**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Ryan K. Lorch**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Kendall Alexander**                   represented by **Christopher J. L. Diedrich**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Lauren Eileen Davison**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Ryan K. Lorch**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/20/2023 | 1 | COMPLAINT against All Defendants (Filing fee $ 402,Receipt Number ACODC-9304889)Attorney David J. Schexnaydre added to party Roxie Blue(pty:pla), Attorney David J. Schexnaydre added to party Erika Bode(pty:pla), Attorney David J. |

APP 011

|  |  | Schexnaydre added to party Amber Cano(pty:pla), Attorney David J. Schexnaydre added to party Julie Deters-Frank(pty:pla), Attorney David J. Schexnaydre added to party Karen Donelson(pty:pla), Attorney David J. Schexnaydre added to party Jennifer Eddins(pty:pla), Attorney David J. Schexnaydre added to party Polly Goodwin(pty:pla), Attorney David J. Schexnaydre added to party Hren Gwenn(pty:pla), Attorney David J. Schexnaydre added to party Gabriel Hergenreter(pty:pla), Attorney David J. Schexnaydre added to party Mary Lou Howard(pty:pla), Attorney David J. Schexnaydre added to party John Lansford(pty:pla), Attorney David J. Schexnaydre added to party Jaime Montgomery(pty:pla), Attorney David J. Schexnaydre added to party Erin Phipps(pty:pla), Attorney David J. Schexnaydre added to party Kinga Shelton(pty:pla), Attorney David J. Schexnaydre added to party Patricia Spoerl(pty:pla), Attorney David J. Schexnaydre added to party Silvers Stephanie(pty:pla), Attorney David J. Schexnaydre added to party Jessica Sweeney(pty:pla), Attorney David J. Schexnaydre added to party Loni Thalheimer(pty:pla), Attorney David J. Schexnaydre added to party Alisha Torbeck(pty:pla), filed by Jennifer Eddins, Patricia Spoerl, Roxie Blue, Jessica Sweeney, Loni Thalheimer, Silvers Stephanie, Erin Phipps, Mary Lou Howard, Hren Gwenn, Jaime Montgomery, Karen Donelson, Erika Bode, Gabriel Hergenreter, John Lansford, Kinga Shelton, Polly Goodwin, Amber Cano, Alisha Torbeck, Julie Deters-Frank. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit CDC Provider Agreement, # 3 Exhibit FDA Scope of Authorization Letter to Pfizer, # 4 Exhibit UCHealth COVID-19 Vaccine Mandate, # 5 Exhibit Online Acknowledgement Box, # 6 Exhibit Thalheimer Exemption Request Form Redacted, # 7 Exhibit CDPHE Part 12 Rules)(Schexnaydre, David) (Entered: 09/20/2023) |
| 09/20/2023 | 2 | Case assigned to Magistrate Judge Maritza Dominguez Braswell. Text Only Entry. (blaws) (Entered: 09/21/2023) |
| 09/20/2023 | 3 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (blaws) (Entered: 09/21/2023) |
| 09/26/2023 | 4 | ORDER SETTING INITIAL CASE DEADLINES. Consent Form due by 11/15/2023. Proposed Scheduling Order due 11/15/2023. By Magistrate Judge Maritza Dominguez Braswell on 9/26/2023. (evaug) (Entered: 09/26/2023) |
| 11/08/2023 | 5 | WAIVER OF SERVICE Returned Executed by Mary Lou Howard, Karen Donelson, Erin Phipps, Jaime Montgomery, Gwenn Hren, Jessica Sweeney, Kinga Shelton, Patricia Spoerl, Loni Thalheimer, Amber Cano, Roxie Blue, John Lansford, Polly Goodwin, Jennifer Eddins, Erica Bode, Stephanie Silvers, Gabriel Hergenreter, Alisha Torbeck, Julie Deters-Frank. University of Colorado Hospital Authority waiver sent on 11/1/2023, answer due 1/2/2024. (Schexnaydre, David) (Entered: 11/08/2023) |
| 11/08/2023 | 6 | WAIVER OF SERVICE Returned Executed by Mary Lou Howard, Karen Donelson, Erin Phipps, Jaime Montgomery, Gwenn Hren, Jessica Sweeney, Kinga Shelton, Patricia Spoerl, Loni Thalheimer, Amber Cano, Roxie Blue, John Lansford, Polly Goodwin, Jennifer Eddins, Erica Bode, Stephanie Silvers, Gabriel Hergenreter, Alisha Torbeck, Julie Deters-Frank. Michael Randle waiver sent on 11/1/2023, answer due 1/2/2024. (Schexnaydre, David) (Entered: 11/08/2023) |

| 11/08/2023 | 7 | WAIVER OF SERVICE Returned Executed by Mary Lou Howard, Karen Donelson, Erin Phipps, Jaime Montgomery, Gwenn Hren, Jessica Sweeney, Kinga Shelton, Patricia Spoerl, Loni Thalheimer, Amber Cano, Roxie Blue, John Lansford, Polly Goodwin, Jennifer Eddins, Erica Bode, Stephanie Silvers, Gabriel Hergenreter, Alisha Torbeck, Julie Deters-Frank. Margaret Reidy waiver sent on 11/1/2023, answer due 1/2/2024. (Schexnaydre, David) (Entered: 11/08/2023) |
|---|---|---|
| 11/08/2023 | 8 | WAIVER OF SERVICE Returned Executed by Mary Lou Howard, Karen Donelson, Erin Phipps, Jaime Montgomery, Gwenn Hren, Jessica Sweeney, Kinga Shelton, Patricia Spoerl, Loni Thalheimer, Amber Cano, Roxie Blue, John Lansford, Polly Goodwin, Jennifer Eddins, Erica Bode, Stephanie Silvers, Gabriel Hergenreter, Alisha Torbeck, Julie Deters-Frank. Elizabeth Concordia waiver sent on 11/1/2023, answer due 1/2/2024. (Schexnaydre, David) (Entered: 11/08/2023) |
| 11/08/2023 | 9 | NOTICE of Entry of Appearance by Nicholas W. Katz on behalf of Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital AuthorityAttorney Nicholas W. Katz added to party Elizabeth Concordia(pty:dft), Attorney Nicholas W. Katz added to party Michael Randle(pty:dft), Attorney Nicholas W. Katz added to party Margaret Reidy(pty:dft), Attorney Nicholas W. Katz added to party University of Colorado Hospital Authority(pty:dft) (Katz, Nicholas) (Entered: 11/08/2023) |
| 11/08/2023 | 10 | NOTICE of Entry of Appearance by Andrew Christopher Lillie on behalf of Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital AuthorityAttorney Andrew Christopher Lillie added to party Elizabeth Concordia(pty:dft), Attorney Andrew Christopher Lillie added to party Michael Randle(pty:dft), Attorney Andrew Christopher Lillie added to party Margaret Reidy(pty:dft), Attorney Andrew Christopher Lillie added to party University of Colorado Hospital Authority(pty:dft) (Lillie, Andrew) (Entered: 11/08/2023) |
| 11/08/2023 | 11 | NOTICE of Entry of Appearance by Aja Rose Robbins on behalf of Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital AuthorityAttorney Aja Rose Robbins added to party Elizabeth Concordia(pty:dft), Attorney Aja Rose Robbins added to party Michael Randle(pty:dft), Attorney Aja Rose Robbins added to party Margaret Reidy(pty:dft), Attorney Aja Rose Robbins added to party University of Colorado Hospital Authority(pty:dft) (Robbins, Aja) (Entered: 11/08/2023) |
| 11/08/2023 | 12 | NOTICE of Entry of Appearance by Nathan Alexander Lilly on behalf of Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital AuthorityAttorney Nathan Alexander Lilly added to party Elizabeth Concordia(pty:dft), Attorney Nathan Alexander Lilly added to party Michael Randle(pty:dft), Attorney Nathan Alexander Lilly added to party Margaret Reidy(pty:dft), Attorney Nathan Alexander Lilly added to party University of Colorado Hospital Authority(pty:dft) (Lilly, Nathan) (Entered: 11/08/2023) |
| 11/08/2023 | 13 | NOTICE of Entry of Appearance by Christopher M. Jackson on behalf of Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital AuthorityAttorney Christopher M. Jackson added to party Elizabeth Concordia(pty:dft), |

| | | Attorney Christopher M. Jackson added to party Michael Randle(pty:dft), Attorney Christopher M. Jackson added to party Margaret Reidy(pty:dft), Attorney Christopher M. Jackson added to party University of Colorado Hospital Authority(pty:dft) (Jackson, Christopher) (Entered: 11/08/2023) |
|---|---|---|
| 11/09/2023 | [14](#) | NOTICE of Entry of Appearance by Lauren Eileen Davison on behalf of Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean TurkAttorney Lauren Eileen Davison added to party Kendall Alexander(pty:dft), Attorney Lauren Eileen Davison added to party Evelinn Borrayo(pty:dft), Attorney Lauren Eileen Davison added to party Tom Butts(pty:dft), Attorney Lauren Eileen Davison added to party Raymond Estacio(pty:dft), Attorney Lauren Eileen Davison added to party Jill Hunsaker Ryan(pty:dft), Attorney Lauren Eileen Davison added to party D. Randy Kuykendall(pty:dft), Attorney Lauren Eileen Davison added to party Daniel Pastula(pty:dft), Attorney Lauren Eileen Davison added to party Sean Turk(pty:dft) (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | [15](#) | NOTICE of Entry of Appearance by Christopher J. L. Diedrich on behalf of Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean TurkAttorney Christopher J. L. Diedrich added to party Kendall Alexander(pty:dft), Attorney Christopher J. L. Diedrich added to party Evelinn Borrayo(pty:dft), Attorney Christopher J. L. Diedrich added to party Tom Butts(pty:dft), Attorney Christopher J. L. Diedrich added to party Raymond Estacio(pty:dft), Attorney Christopher J. L. Diedrich added to party Jill Hunsaker Ryan(pty:dft), Attorney Christopher J. L. Diedrich added to party D. Randy Kuykendall(pty:dft), Attorney Christopher J. L. Diedrich added to party Daniel Pastula(pty:dft), Attorney Christopher J. L. Diedrich added to party Sean Turk(pty:dft) (Diedrich, Christopher) (Entered: 11/09/2023) |
| 11/09/2023 | [16](#) | NOTICE of Entry of Appearance by Ryan K. Lorch on behalf of Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean TurkAttorney Ryan K. Lorch added to party Kendall Alexander(pty:dft), Attorney Ryan K. Lorch added to party Evelinn Borrayo(pty:dft), Attorney Ryan K. Lorch added to party Tom Butts(pty:dft), Attorney Ryan K. Lorch added to party Raymond Estacio(pty:dft), Attorney Ryan K. Lorch added to party Jill Hunsaker Ryan(pty:dft), Attorney Ryan K. Lorch added to party D. Randy Kuykendall(pty:dft), Attorney Ryan K. Lorch added to party Daniel Pastula(pty:dft), Attorney Ryan K. Lorch added to party Sean Turk(pty:dft) (Lorch, Ryan) (Entered: 11/09/2023) |
| 11/09/2023 | [17](#) | WAIVER OF SERVICE Returned Executed by Jill Hunsaker Ryan. Jill Hunsaker Ryan waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | [18](#) | WAIVER OF SERVICE Returned Executed by D. Randy Kuykendall. D. Randy Kuykendall waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | [19](#) | WAIVER OF SERVICE Returned Executed by Daniel Pastula. Daniel Pastula waiver |

APP 014

| | | |
|---|---|---|
| | | sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | 20 | WAIVER OF SERVICE Returned Executed by Evelinn Borrayo. Evelinn Borrayo waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | 21 | WAIVER OF SERVICE Returned Executed by Kendall Alexander. Kendall Alexander waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | 22 | WAIVER OF SERVICE Returned Executed by Raymond Estacio. Raymond Estacio waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | 23 | WAIVER OF SERVICE Returned Executed by Sean Turk. Sean Turk waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/09/2023 | 24 | WAIVER OF SERVICE Returned Executed by Tom Butts. Tom Butts waiver sent on 9/27/2023, answer due 11/27/2023. (Davison, Lauren) (Entered: 11/09/2023) |
| 11/13/2023 | 25 | Unopposed MOTION to Stay *discovery and all proceedings pending immunity determinations* by Defendants Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean Turk. (Davison, Lauren) (Entered: 11/13/2023) |
| 11/13/2023 | 26 | MINUTE ORDER: In light of the Unopposed Joint Motion to Stay Discovery and all Proceedings Pending Immunity Determinations, the deadline to file a Proposed Scheduling Order is vacated. The deadline to file a magistrate judge consent form remains as previously set. By Magistrate Judge Maritza Dominguez Braswell on 11/13/2023. Text Only Entry (mdblc1) (Entered: 11/13/2023) |
| 11/14/2023 | 27 | NOTICE OF CASE ASSOCIATION by Nicholas W. Katz on behalf of Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital Authority (Katz, Nicholas) (Entered: 11/14/2023) |
| 11/14/2023 | 28 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck All parties do not consent.. (Schexnaydre, David) (Entered: 11/14/2023) |
| 11/15/2023 | 29 | CASE REASSIGNED pursuant to 28 Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Judge Nina Y. Wang and drawn to Magistrate Judge Maritza Dominguez Braswell. All future pleadings should be designated as 23-cv-02451-NYW. (Text Only Entry) (cmadr, ) (Entered: 11/15/2023) |
| 11/15/2023 | 30 | ORDER REFERRING CASE: This case is referred to Magistrate Judge Maritza Dominguez Braswell for **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1) (A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. |

APP 015

| | | |
|---|---|---|
| | | 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, and (3) hear and determine pretrial matters, including discovery and other non-dispositive motions. Court-sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the request of the parties by motion, this Court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. Alternatively, the Magistrate Judge, at her discretion, may convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. **Counsel for the Parties and all counsel who may later enter an appearance shall review and familiarize themselves with the undersigned's Practice Standards, as well as the Practice Standards of the assigned Magistrate Judge.** By Judge Nina Y. Wang on 11/15/2023. Text Only Entry (nywlc2, ) (Entered: 11/15/2023) |
| 11/15/2023 | 31 | MEMORANDUM regarding 25 Unopposed MOTION to Stay *discovery and all proceedings pending immunity determinations* filed by Evelinn Borrayo, Jill Hunsaker Ryan, Daniel Pastula, Kendall Alexander, Tom Butts, Raymond Estacio, Sean Turk, D. Randy Kuykendall. Motion referred to Magistrate Judge Maritza Dominguez Braswell. By Judge Nina Y. Wang on 11/15/2023. Text Only Entry (nywlc2, ) (Entered: 11/15/2023) |
| 11/17/2023 | 32 | NOTICE of Entry of Appearance by Lauren Eileen Davison on behalf of Patricia HammondAttorney Lauren Eileen Davison added to party Patricia Hammond(pty:dft) (Davison, Lauren) (Entered: 11/17/2023) |
| 11/17/2023 | 33 | Joint MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint,,,,,,,, *Unopposed* by Defendants Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Patricia Hammond, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean Turk. (Davison, Lauren) (Entered: 11/17/2023) |
| 11/17/2023 | 34 | NOTICE of Entry of Appearance by Ryan K. Lorch on behalf of Patricia HammondAttorney Ryan K. Lorch added to party Patricia Hammond(pty:dft) (Lorch, Ryan) (Entered: 11/17/2023) |
| 11/17/2023 | 35 | NOTICE of Entry of Appearance by Christopher J. L. Diedrich on behalf of Patricia HammondAttorney Christopher J. L. Diedrich added to party Patricia Hammond(pty:dft) (Diedrich, Christopher) (Entered: 11/17/2023) |
| 11/17/2023 | 36 | MEMORANDUM regarding 33 Joint MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint, *Unopposed* filed by Evelinn Borrayo, Jill Hunsaker Ryan, Daniel Pastula, Kendall Alexander, Tom Butts, Raymond Estacio, Sean Turk, D. Randy Kuykendall, Patricia Hammond. Motion referred to Magistrate Judge Maritza Dominguez Braswell. By Judge Nina Y. Wang on 11/17/2023. Text Only Entry (nywlc2, ) (Entered: 11/17/2023) |
| 11/17/2023 | 37 | MINUTE ORDER granting Defendants' 33 Unopposed Joint Motion for Extension of Time to Respond to Complaint. Defendants shall answer or otherwise respond to the 1 |

APP 016

| | | Complaint on or before January 12, 2024. By Magistrate Judge Maritza Dominguez Braswell on 11/17/2023. Text Only Entry(mdblc1) (Entered: 11/17/2023) |
|---|---|---|
| 11/21/2023 | 38 | MINUTE ORDER granting the 25 Unopposed Joint Motion to Stay Discovery and All Proceedings Pending Immunity Determinations. For good cause shown, and in light of Plaintiffs' lack of opposition, this matter is stayed pending a determination regarding Defendants' forthcoming motions to dismiss. *See String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 1:02-cv-01934-LTB-PA, 2006 WL 894955 (D. Colo. Mar. 30, 2006).<br><br>The Court also discloses that Magistrate Judge Dominguez Braswell was previously employed by the Colorado Attorney General's Office. She does not believe it will impact her ability to be fair and impartial in this matter. By Magistrate Judge Maritza Dominguez Braswell on 11/21/2023. Text Only Entry(mdblc1) (Entered: 11/21/2023) |
| 11/27/2023 | 39 | WAIVER OF SERVICE Returned Executed by Mary Lou Howard, Karen Donelson, Erin Phipps, Jaime Montgomery, Gwenn Hren, Jessica Sweeney, Kinga Shelton, Patricia Spoerl, Loni Thalheimer, Amber Cano, Roxie Blue, John Lansford, Polly Goodwin, Jennifer Eddins, Erica Bode, Stephanie Silvers, Gabriel Hergenreter, Alisha Torbeck, Julie Deters-Frank. Patricia Hammond waiver sent on 9/27/2023, answer due 1/12/2024. (Schexnaydre, David) (Entered: 11/27/2023) |
| 12/06/2023 | 40 | NOTICE OF CASE ASSOCIATION *Related Cases* by Lauren Eileen Davison on behalf of Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Patricia Hammond, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean Turk (Davison, Lauren) (Entered: 12/06/2023) |
| 01/04/2024 | 41 | Unopposed MOTION for Leave to File Excess Pages *For Motion to Dismiss* by Defendants Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital Authority. (Attachments: # 1 Proposed Order (PDF Only) Order Granting Unopposed Motion to Extend Page Limit for Motion to Dismiss)(Katz, Nicholas) (Entered: 01/04/2024) |
| 01/04/2024 | 42 | MINUTE ORDER: The 41 UCHA Defendants' Unopposed Motion to Extend Page Limit for Motion to Dismiss is **GRANTED**. The UCHA Defendants are granted leave to file a motion to dismiss not to exceed 28 pages. In addition, Plaintiffs may file a response to the UCHA Defendants' forthcoming motion to dismiss not to exceed 28 pages. By Judge Nina Y. Wang on 01/04/2024. Text Only Entry (nywlc2, ) (Entered: 01/04/2024) |
| 01/05/2024 | 43 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES :re: 41 Unopposed MOTION for Leave to File Excess Pages *For Motion to Dismiss* filed by attorney Nicholas W. Katz. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (norlin, ) (Entered: 01/05/2024) |
| 01/08/2024 | 44 | MOTION for Leave to File Excess Pages by Defendants Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Patricia Hammond, Jill Hunsaker Ryan, D. |

APP 017

| | | Randy Kuykendall, Daniel Pastula, Sean Turk. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order)(Davison, Lauren) (Entered: 01/08/2024) |
|---|---|---|
| 01/08/2024 | 45 | MINUTE ORDER: The 44 CDPHE Defendants' Unopposed Motion to Exceed Page Limit for Motion to Dismiss is **GRANTED**. The CDPHE Defendants may file a motion to dismiss not to exceed 28 pages. Any response filed by Plaintiffs may not exceed 28 pages. By Judge Nina Y. Wang on 01/08/2024. Text Only Entry (nywlc2, ) (Entered: 01/08/2024) |
| 01/12/2024 | 46 | MOTION to Dismiss *Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)* by Defendants Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Patricia Hammond, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean Turk. (Attachments: # 1 Exhibit A. Chart of Hospitalizations, # 2 Exhibit B. Board of Health Emergency Rule Justification, # 3 Exhibit C. August 23rd EUA, # 4 Exhibit D. August 23, 2021 COMINRNATY Authorization, # 5 Exhibit E. Declaration of Tammy Adams)(Davison, Lauren) (Entered: 01/12/2024) |
| 01/12/2024 | 47 | MOTION to Dismiss by Defendants Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital Authority. (Jackson, Christopher) (Entered: 01/12/2024) |
| 02/02/2024 | 48 | BRIEF in Opposition to 46 MOTION to Dismiss *Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)* filed by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck. (Attachments: # 1 Exhibit CDPHE Website 09-21, # 2 Exhibit Peter Marks Declaration, # 3 Exhibit CDC Vaccine Codes)(Schexnaydre, David) (Entered: 02/02/2024) |
| 02/02/2024 | 49 | BRIEF in Opposition to 47 MOTION to Dismiss filed by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck. (Schexnaydre, David) (Entered: 02/02/2024) |
| 02/16/2024 | 50 | BRIEF in Support of 47 MOTION to Dismiss *UCHA Defendants' Reply in Support of Their Motion to Dismiss* filed by Defendants Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital Authority. (Attachments: # 1 Exhibit Ex. A - Roberts v. Shriners Hosps. for Child., No. 23-cv-295 (E.D. Wash. Feb. 8, 2024)) (Jackson, Christopher) (Entered: 02/16/2024) |
| 02/16/2024 | 51 | REPLY to Response to 47 MOTION to Dismiss *by CDPHE Defendants* filed by Defendants Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Patricia Hammond, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Sean Turk. (Davison, Lauren) (Entered: 02/16/2024) |
| 02/26/2024 | 52 | NOTICE of Supplemental Authorities re: 47 MOTION to Dismiss by Defendants Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital |

| | | |
|---|---|---|
| | | Authority (Attachments: # 1 Exhibit A Third Circuit Opinion)(Lilly, Nathan) (Entered: 02/26/2024) |
| 02/28/2024 | 53 | RESPONSE to 52 Notice of Supplemental Authorities, by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck. (Attachments: # 1 Exhibit FDA EUA Guidance, # 2 Exhibit Fact Sheet for Recipients and Caregivers)(Schexnaydre, David) (Entered: 02/28/2024) |
| 02/29/2024 | 54 | MINUTE ORDER: This matter is before the Court on the 52 UCHA Defendants' Notice of Supplemental Authority and the 53 Response thereto. The Parties are advised that any additional submission of supplemental authority shall be limited to the case title, citation, date of decision, and a single-sentence reference to the issue to which the Party believes the new decision pertains (including a citation to the location in previously filed briefing where the issue has been raised). The Parties shall not engage in substantive argument concerning the supplemental authority or file any responsive briefing absent leave of Court. By Judge Nina Y. Wang on 02/29/2024. Text Only Entry (nywlc2, ) (Entered: 02/29/2024) |
| 03/19/2024 | 55 | NOTICE of Supplemental Authorities by Defendants Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital Authority (Attachments: # 1 Exhibit A - Roberts v. Inslee)(Katz, Nicholas) (Entered: 03/19/2024) |
| 07/06/2024 | 56 | NOTICE of Supplemental Authorities re: 49 Brief in Opposition to Motion, 48 Brief in Opposition to Motion,, by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck (Attachments: # 1 Exhibit Health Freedom v. Carvalho)(Schexnaydre, David) (Entered: 07/06/2024) |
| 07/06/2024 | 57 | NOTICE of Supplemental Authorities *[CORRECTED]* re: 49 Brief in Opposition to Motion, 48 Brief in Opposition to Motion,, by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck (Attachments: # 1 Exhibit Health Freedom v. Carvalho)(Schexnaydre, David) (Entered: 07/06/2024) |
| 07/12/2024 | 58 | ORDER granting 46 Motion to Dismiss. Granting 47 Motion to Dismiss. SO ORDERED by Judge Nina Y. Wang on 7/12/2024.(rkeec) (Entered: 07/12/2024) |
| 07/12/2024 | 59 | FINAL JUDGMENT by Clerk in favor of University of Colorado Hospital Authority, D. Randy Kuykendall, Daniel Pastula, Elizabeth Concordia, Evelinn Borrayo, Jill Hunsaker Ryan, Kendall Alexander, Margaret Reidy, Michael Randle, Patricia Hammon, Raymond Estacio, Shawn Turk, Tom Butts against Alisha Torbeck, Amber Cano, Erica Bode, Erin Phipps, Gabriel Hergenreter, Gwenn Hren, Jaime Montgomery, |

APP 019

| | | |
|---|---|---|
| | | Jennifer Eddins, Jessica Sweeney, John Lansford, Julie Deters-Frank, Karen Donelson, Kinga Shelton, Loni Thalheimer, Mary Lou Howard, Patricia Spoerl, Polly Goodwin, Roxie Blue, Stephanie Silvers by Judge Nina Y. Wang on 7/12/2024. (rkeec) (Entered: 07/12/2024) |
| 08/08/2024 | 60 | MOTION to Alter Judgment re 58 Order on Motion to Dismiss, by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck. (Attachments: # 1 Proposed Document Proposed Amended Complaint with Changes, # 2 Proposed Document Proposed Amended Complaint - Clean, # 3 Exhibit UC Health Mandate, # 4 Exhibit Part 12 Rules, # 5 Exhibit 12-11-2020 EUA Letter, # 6 Exhibit 8-23-21 EUA Letter, # 7 Exhibit DoD Purchase Letter, # 8 Exhibit CDC Playbook, # 9 Exhibit CDC Provider Agreement)(Schexnaydre, David) (Entered: 08/08/2024) |
| 08/29/2024 | 61 | RESPONSE to 60 MOTION to Alter Judgment re 58 Order on Motion to Dismiss, filed by Defendants Kendall Alexander, Evelinn Borrayo, Tom Butts, Raymond Estacio, Patricia Hammon, Jill Hunsaker Ryan, D. Randy Kuykendall, Daniel Pastula, Shawn Turk. (Davison, Lauren) (Entered: 08/29/2024) |
| 08/29/2024 | 62 | BRIEF in Opposition to 60 MOTION to Alter Judgment re 58 Order on Motion to Dismiss, filed by Defendants Elizabeth Concordia, Michael Randle, Margaret Reidy, University of Colorado Hospital Authority. (Jackson, Christopher) (Entered: 08/29/2024) |
| 09/13/2024 | 63 | REPLY to Response to 60 MOTION to Alter Judgment re 58 Order on Motion to Dismiss, filed by Plaintiffs Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Jessica Sweeney, Loni Thalheimer, Alisha Torbeck. (Schexnaydre, David) (Entered: 09/13/2024) |
| 12/09/2024 | 64 | ORDER The Court has reviewed the Motion, the related briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth herein, the Motion to Alter Order is respectfully **DENIED**. By Judge Nina Y. Wang on 12/9/2024.(norlin, ) (Entered: 12/09/2024) |
| 01/06/2025 | 65 | NOTICE OF APPEAL as to 59 Clerk's Judgment,, 64 Order on Motion to Alter Judgment, 58 Order on Motion to Dismiss, by Plaintiffs Jessica Sweeney, Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Loni Thalheimer, Alisha Torbeck (Filing fee $ 605, Receipt Number ACODC-10070325) (Schexnaydre, David) (Entered: 01/06/2025) |
| 01/06/2025 | 66 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 65 Notice of Appeal,, filed by Erin Phipps, Stephanie Silvers, Amber Cano, Gabriel Hergenreter, Roxie Blue, John Lansford, Patricia Spoerl, Gwenn Hren, Kinga Shelton, Jaime Montgomery, Julie Deters-Frank, Mary Lou Howard, Loni Thalheimer, Jennifer |

APP 020

| | | |
|---|---|---|
| | | Eddins, Karen Donelson, Polly Goodwin, Alisha Torbeck, Erica Bode, Jessica Sweeney to the U.S. Court of Appeals. ( FPD, Fee paid,) (Attachments: # 1 Preliminary Record) (norlin, ) (Entered: 01/07/2025) |
| 01/07/2025 | 67 | USCA Case Number 25-1005 for 65 Notice of Appeal,, filed by Erin Phipps, Stephanie Silvers, Amber Cano, Gabriel Hergenreter, Roxie Blue, John Lansford, Patricia Spoerl, Gwenn Hren, Kinga Shelton, Jaime Montgomery, Julie Deters-Frank, Mary Lou Howard, Loni Thalheimer, Jennifer Eddins, Karen Donelson, Polly Goodwin, Alisha Torbeck, Erica Bode, Jessica Sweeney. (norlin, ) (Entered: 01/07/2025) |
| 01/17/2025 | 68 | TRANSCRIPT ORDER FORM re 65 Notice of Appeal,, by Plaintiffs Jessica Sweeney, Roxie Blue, Erica Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Loni Thalheimer, Alisha Torbeck (Schexnaydre, David) (Entered: 01/17/2025) |
| 01/17/2025 | 69 | LETTER TO USCA and all counsel certifying the record is complete as to 65 Notice of Appeal,, filed by Erin Phipps, Stephanie Silvers, Amber Cano, Gabriel Hergenreter, Roxie Blue, John Lansford, Patricia Spoerl, Gwenn Hren, Kinga Shelton, Jaime Montgomery, Julie Deters-Frank, Mary Lou Howard, Loni Thalheimer, Jennifer Eddins, Karen Donelson, Polly Goodwin, Alisha Torbeck, Erica Bode, Jessica Sweeney. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 25-1005) Text Only Entry (norlin, ) (Entered: 01/17/2025) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 03/01/2025 08:12:32 | | |
| PACER Login: | dschexnaydre | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:23-cv-02451-NYW-MDB |
| Billable Pages: | 17 | Cost: | 1.70 |

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

| | | |
|---|---|---|
| JESSICA SWEENEY, *et al,* | * | |
| | * | |
| *Plaintiffs*, | * | |
| | * | |
| VERSUS | * | CIVIL ACTION |
| | * | |
| UNIVERSITY OF COLORADO HOSPITAL | * | |
| AUTHORITY, ELIZABETH CONCORDIA, | * | |
| MARGARET REIDY, MICHAEL RANDLE, | * | |
| JILL HUNSAKER RYAN, D. RANDY | * | |
| KUYKENDALL, PATRICIA HAMMOND, | * | |
| RAYMOND ESTACIO, DANIEL PASTULA, | * | |
| SEAN TURK,TOM BUTTS, EVELINN | * | |
| BORRAYO, KENDALL ALEXANDER | * | |
| | * | |
| *Defendants*, | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**COMPLAINT**
**(JURY TRIAL REQUESTED)**

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Jessica Sweeney, *et al*, (hereinafter "Plaintiffs"), who file this Complaint against Defendants, the University of Colorado Hospital Authority ("UCHA"); its policymakers, the CEO Elizabeth Concordia and Chief Medical Officer (CMO) Margaret Reidy, MD, in their individual and representative capacities; Jill Hunsaker Ryan, the Executive Director of the Colorado Department of Public Health & Environment (CDPHE), in her official and individual capacities; D. Randy Kuykendall, the Director of Health Facilities and Emergency Medical Services Division of CDPHE, in his official and individual capacities; the CDPHE Board Members as Defendants pertinent herein are Patricia Hammond, Raymond Estacio, Daniel Pastula, Sean Turk, Tom Butts, Evelinn

1

Borrayo, and Kendall Alexander, in their official and individual capacities and collectively referred to as "Board Members," (hereinafter "Defendants"), presenting allegations and causes of action as follows:

## DESCRIPTION OF CAUSE OF ACTION

**This is a §1983 case seeking redress from Defendants for the deprivation of Plaintiffs' Constitutional and federally secured right to refuse an EUA investigational drug without incurring a penalty or loss of benefits to which Plaintiffs were otherwise entitled.**

This lawsuit is being brought under 42 U.S.C. §1983 seeking redress for deprivation of rights granted to Plaintiffs by the United States Constitution, 21 U.S.C. §360bbb-3, 42 USC §247d-6d, 45 CFR Part 46, 18 U.S.C. §242, ICCPR Treaty, and the common laws of the State of Colorado to hold accountable UCHA, a State Actor at all times pertinent herein, via its policymakers, the CEO Elizabeth Concordia, its Chief Medical Officer (CMO) Margaret Reidy, MD, and the Colorado Department of Public Health & Environment, via its Executive Director, its Director of Health Facilities and Emergency Medical Services Division, and its Board Members for damages arising out of their unconstitutional, unlawful, malicious, unequal and contractually violative COVID-19 investigational drug mandate. Special laws apply to CDPHE's and CEO Concordia's vaccine mandates because the FDA defines the drugs at issue as "investigational with no license for any indication." And even though Defendants' mandates were instituted during and in response to a pandemic emergency, as the U.S. Supreme Court noted since the beginning of the pandemic: **"even in a pandemic, the Constitution cannot be put away and forgotten."** *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020).

## **TABLE OF CONTENTS**

Description of Cause of Action                                                                        2

Table of Contents                                                                                           3

I.        Introduction                                                                                        4

II.       Jurisdiction and Venue                                                                     6

III.      Plaintiffs                                                                                            7

IV.      Defendants                                                                                        9

V.       History and Facts                                                                             12

VI.      The Belmont Report                                                                         14

VII.     45 CFR Part 46                                                                              16

VIII.    Legally Effective Informed Consent                                             20

IX.      COVID-19 Research Activities                                                     22

X.       ICCPR Treaty                                                                                30

XI.      21 U.S.C. §360bbb-3 (aka Section 564)                                     33

XII.     HHS EUA Precedent                                                                     39

XIII.    Judicial EUA Precedent                                                                40

XIV.    Federal Wide Assurance (FWA)                                                 41

XV.     PREP Act & 21 U.S.C. §360bbb-3 (EUA Statute) – Preemption of State Law   44

XVI.    CDC Covid-19 Vaccination Program Provider Agreement        50

XVII.   Statement of Facts                                                                        54

XIX.     Legal Claims                                                                                  81

Count One: 42 U.S.C. § 1983 – Deprivation of Legally Effective Informed Consent   82

Count Two: 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights        84

APP 024

Count Three: 42 U.S.C. § 1983 – Deprivation of Due Process Rights    85

Count Four: 42 U.S.C. §1983-Deprivation of Rights Under the Spending Clause    87

Count Five – Unconstitutional Conditions Doctrine – 42 U.S.C. § 1983    90

Count Six – PREP Act – 42 U.S.C. § 1983    92

Count Seven – Breach of Contract, Third Party Beneficiary    95

Count Eight – Colorado State Common Law Employment Torts    96

Count Nine – Extreme and Outrageous Conduct    98

Count Ten – Implied Private Right of Action 21 U.S.C. §360bbb-3    98

XX.    Damages Recoverable and Demanded    99

XXI.    Jury Trial Demand    100

## I.    Introduction

1.    In early 2020, the nation and the world faced a novel coronavirus called SARS-CoV-2, which caused the highly contagious disease COVID-19.

2.    On January 31, 2020, the Secretary of Health and Human Services (HHS) declared a public health emergency. The President declared a national emergency on March 13, 2020, of which led to the development of investigational new drugs designed to perform as a vaccine from the virus, i.e., cause the body to produce antibodies to the virus so that the person is immune from infection when exposed to the true virus.

3.    To implement the nationwide distribution and administration of these investigational new drugs, the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization pursuant to 21 U.S.C. 360bbb-3 (Section 564 of the Food, Drug & Cosmetic Act.)

4.    The FDA made clear on its website:

4

APP 025

> FDA believes that terms and conditions of an EUA issued under Section 564 preempt state or local law, both legislative requirement and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564…In an emergency, it is critical that the conditions that are part of the EUA or an order or waiver issued pursuant to section 564A – those that FDA has determined to be necessary or appropriate to protect public health – be strictly followed, and no additional conditions be imposed.

5.      In August 2020, the Centers for Disease Control (CDC) published the transcript of a meeting of the Advisory Committee on Immunizations and Respiratory Diseases, at which Dr. Amanda Cohn stated (@1:14:40):

> I just wanted to add that, just wanted to remind everybody, that **under an Emergency Use Authorization, an EUA, vaccines are not allowed to be mandatory**. So, early in the vaccination phase, individuals will have to be **consented** and **they won't be able to be mandated.** (Emphasis added)

6.      In July of 2021, the CDPHE usurped the authority of the United States Congress by issuing an official proclamation in defiance of federal law when it mandated the use of investigational new drugs by healthcare workers.  Additionally, the CDPHE engaged in outrageous tyrannical conduct by mandating that healthcare facilities deny employment to healthcare workers who exercised their federally secured right to refuse investigational drugs.

7.      UCHA, UCHealth CEO Elizabeth Concordia, as UCHealth's policymaker, and CMO Margaret Reidy, MD, decided that the suffering of the few was justified by the windfall such suffering had on UCHealth's financial bottom line. Thus, UCHealth prescribed its own "required conditions" in defiance of Congress and the rights of individuals under Defendants' authority as secured by the Constitution.

8.      In July 2021, CEO Concordia issued a despicable illegal mandate that shocked the conscience. During the height of the pandemic, when hospitalization rates soared, and SARS-CoV-2 variants abounded, and in direct contravention to federal law governing investigational drugs,

CEO Concordia subjected "a workforce of more than 30,000 people" to investigational drug use under threat of penalty and outside of their free will and voluntary consent. Should those individuals not comply with CEO Concordia's fraudulent usurpation of authority, they would be segregated, penalized, humiliated, terminated, and denied unemployment benefits, thus depriving Plaintiffs of their Constitutional and federally secured right to refuse an investigational drug without penalty.

9.      The CDPHE used its office as official cover in hopes of obtaining for itself immunity from liability in future legal actions.  Similarly, attempting to hide behind the PREP Act as a liability cover, UCHA and UCHealth, its policymaker, CEO Concordia and CMO Reidy willfully chose to engage in violations of federal law.

## II.      Jurisdiction and Venue

10.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.     The civil rights portions of this action raise federal questions under the Spending Clause and the Fourteenth Amendment to the U.S. Constitution.

12.     This Court has original jurisdiction under 42 U.S.C. §§ 1983 and 1988.

13.     This Court has the authority to award costs and reasonable attorney's fees under 42 U.S.C. § 1988.

14.      This court has supplemental jurisdiction over Plaintiffs' state law claims.

15.     This Court has personal jurisdiction over Defendants as they are domiciled within this Court's jurisdictional boundaries.

16.     This Court has subject matter jurisdiction over the parties because all acts complained of herein were committed by Defendants in the State of Colorado and caused damage and/or deprivation to the Plaintiffs listed herein.

17.     Venue is proper in this court because all events underlying the claims in this Complaint occurred in the State of Colorado, which is situated within this Court's jurisdiction, and all Defendants reside in the State of Colorado.

### III.     Plaintiffs

18.     The following individuals are plaintiffs herein:

18.1.   Plaintiff, Jessica Sweeney, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.2.   Plaintiff, Roxie Blue, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.3.   Plaintiff, Erika Bode, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.4.   Plaintiff, Amber Cano, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.5.   Plaintiff, Julie Deters-Frank, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.6     Plaintiff, Karen Donelson, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

APP 028

18.7.    Plaintiff, Jennifer Eddins, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.8.    Plaintiff, Polly Goodwin, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.9.    Plaintiff, Gabriel Hergenreter, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.10.   Plaintiff, Mary Lou Howard, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.11.   Plaintiff, Gwenn Hren, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.12.   Plaintiff, John Lansford, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.13.   Plaintiff, Jaime Montgomery, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.14.   Plaintiff, Erin Phipps, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in

Colorado.

18.15.  Plaintiff, Kinga Shelton, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.16.  Plaintiff, Stephanie Silvers, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.17.  Plaintiff, Patricia Spoerl, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.18.  Plaintiff, Loni Thalheimer, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

18.19.  Plaintiff, Alisha Torbeck, is an adult individual who all times pertinent resided in the State of Colorado, and was previously an employee of UCHealth or one of its DBA entities in Colorado.

### IV.     Defendants

19.     The following are named as defendants herein:

19.1.    Defendant, University of Colorado Hospital Authority ("UCHA") is a political subdivision of the State of Colorado that formed a joint venture with the non-profit company Poudre Valley Medical Group, LLC, called UCHealth Medical Group. UCHA is a body corporate and political subdivision of the State of Colorado pursuant to C.R.S. § 23-21-503. UCHealth Medical Group is wholly owned by Poudre Valley Health Care Inc., d/b/a Poudre

Valley Health System ("PVHS"). Together, UCHA and PVHS formed University of Colorado Health (UCHealth), a Colorado non-profit corporation. All of these entities operate under the umbrella of "UCHealth," but Plaintiffs were employed expressly with the University of Colorado Hospital Authority (UCHA).  Because UCHA and UCHealth are alter egos of one another and any and all actions alleged herein against one are alleged against the other.

19.2.    Defendant, Elizabeth Concordia, was at all times pertinent the President and Chief Executive Officer of UCHealth. Ms. Concordia is named as a defendant in her official and individual capacities.

19.3.    Defendant, Margaret Reidy, MD, was at all times pertinent the Chief Medical Officer of UCHealth and a signatory to the CDC Vaccine Program Provider Agreement on behalf of herself and UCHealth. Dr. Reidy is named as a defendant in her official and individual capacities.

19.4.    Defendant, Michael Randle, MD, was at all times pertinent the Chief Executive Officer of UCHealth Medical Group and a signatory to the CDC Vaccine Program Provider Agreement on behalf of himself and UCHealth. Mr. Randle is named as a defendant in his official and individual capacities.[1]

19.5.    Defendant, Jill Hunsaker Ryan, was at all times pertinent the Executive Director of the Colorado Department of Public Health & Environment (CDPHE). Ms. Ryan is named as a defendant in her official and individual capacities.

19.6.    Defendant, D. Randy Kuykendall, was at all times pertinent the Director of Health Facilities and Emergency Medical Services Division of the Colorado Department of Public Health & Environment.  Mr. Kuykendall is named as a defendant in his official and individual

---

[1] Elizabeth Concordia, Michael Randle, Margaret Reidy, and UCHA are collectively referred to as "UCHA Defendants."

capacities.

19.7.    **Defendant,** Patricia Hammond, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.8.    **Defendant,** Raymond Estacio, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.9.    **Defendant,** Daniel Pastula, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.10.  **Defendant,** Sean Turk, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.11.  **Defendant,** Tom Butts, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.12.  **Defendant,** Evelinn Borrayo, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules

related to Colorado public health, among other duties, and is named in her official and individual capacities.

19.13.  **Defendant**, Kendall Alexander, was at all times pertinent a Member of the Colorado Department of Public Health and Environment's Board of Health, which promulgates rules related to Colorado public health, among other duties, and is named in her official and individual capacities.[2]

## V.      History and Facts

20.    Plaintiffs make no assertions regarding whether it is lawful for a public or private entity to mandate taking a ***licensed*** vaccine. Plaintiffs' allegations herein only relate to Defendants' mandating the use of drugs, biologics, and devices under 21 U.S.C. §360bbb-3 and the PREP Act.

21.    Plaintiffs adamantly assert that an individual has the absolute Constitutional and federally secured right to refuse the administration of an Emergency Use Authorization (EUA) drug (e.g., Pfizer BioNTech COVID-19 Vaccine), biologic, or device (e.g., EUA testing articles and masks) or a "covered countermeasure" under PREP Act immunity without incurring a penalty or losing a benefit to which they are otherwise entitled and that such a right is not dependent upon a person seeking a religious or medical exemption.

22.    Because the EUA statute was created to allow the Secretary of HHS to authorize the use of a product for a purpose for which it is not already licensed, 21 U.S.C. §360bbb-3 products fall under the investigational or experimental classification by statute.[3]

---

[2] Jill Hunsaker Ryan, D. Randy Kuykendall, and the individual members of the Board of Health are collectively referred to as "CDPHE Defendants."
[3] 21 U.S.C. §360bbb-3(a)(2)(A) and (B)

23.     This classification was illustrated in the May 10, 2021, Scope of Authorization letter issued to Pfizer, Inc. wherein the FDA advised Pfizer that its product is "an investigational vaccine not licensed for any indication." The same is true for the Moderna and Jannsen injections.

24.     Because EUA products are, by definition, used only during times of emergency, the laws regulating these products are not litigated as much as more commonly used statutes, so a brief recitation of the origin and history of these laws should prove helpful.

25.     The laws regulating the investigational new drug (IND) industry were largely created after Senator Edward Kennedy held live hearings in 1973 detailing the industry's abuses against the American people. In 1974, Congress enacted the National Research Act[4] in response to those hearings, establishing laws, regulations, and mandatory guidelines to protect Americans from future abuses. However, the industry has been internally regulated and enforced via various federal and state agencies since 1974.  This internal enforcement has denied the judiciary from acquiring knowledge of the laws discussed herein. To ensure Plaintiffs secure equitable justice, the court is provided with an understanding of those laws that have been so well hidden from so many people during the COVID-19 pandemic.

26.     The 1974 National Research Act established the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research[5] (hereinafter referred to as the "Commission").

27.     Congress required the Commission to:

   A.     "conduct a comprehensive investigation and study to identify the basic ethical principles which should underlie the conduct of biomedical and behavioral research involving human subjects,"

---

[4] Public Law 93-348-July 12, 1974 National Research Act
[5] Title II of the National Research Act - https://www.govinfo.gov/content/pkg/STATUTE-88/pdf/STATUTE-88-Pg342.pdf

    B.   "develop guidelines which should be followed in such research to assure that it is conducted in accordance with such principles," and

    C.   "make recommendations to the [HHS] Secretary" for "such administrative action as may be appropriate to apply such guidelines to biomedical and behavioral research conducted or supported under programs administered by the Secretary."

28.    Congress further required the Commission to consider "the nature and definition of informed consent in various research settings."[6]

29.    On April 18, 1979, the Commission published its findings in the Federal Register in a report titled, "The Belmont Report."[7]

## VI.   The Belmont Report

30.    The Belmont Report outlined what the Commission considered "the nature and definition of informed consent" as follows:

    A.   "An autonomous person is an individual capable of deliberation about personal goals and acting under the direction of such deliberation. To respect autonomy is to give weight to autonomous persons 'considered opinions and choices while refraining from obstructing their actions…" (Emphasis added);

    B.   "To show lack of Respect for an autonomous agent is to repudiate that person's considered judgments, to deny an individual the freedom to act on those considered judgments…"(Emphasis added);

    C.   "Respect for persons requires subjects, to the degree that they are capable, be given the opportunity to choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied" (Emphasis added).

---

[6] National Research Act Title II - PROTECTION OF HUMAN SUBJECTS OF BIOMEDICAL AND BEHAVORIAL RESEARCH Part A Section 202. (a)(1)(B)(iv)

[7] The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. - Belmont Report. Colorado, DC: U.S. Department of Health and Human Services,1979

31.     The Belmont Report defined those adequate standards of informed consent as follows:

    A.   An agreement to participate in research constitutes valid consent <u>only if voluntarily given</u>. <u>This element</u> of informed consent <u>requires conditions free of coercion and undue influence</u>; (Emphasis added)

    B.   Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance;

    C.   Undue influence, by contrast, occurs through an offer of an excessive, unwarranted, inappropriate, or improper reward or other overture in order to obtain compliance. Also, inducements that would ordinarily be acceptable may become undue influences if the subject is especially vulnerable;

    D.   Unjustifiable pressures usually occur when persons in positions of authority or commanding influence -- <u>especially where possible sanctions are involved</u> -- urge a course of action for a subject," (emphasis added), and;

    E.   …undue influence would include actions such as manipulating a person's choice through the controlling influence of a close relative and threatening to withdraw health services to which an individual would otherwise be entitled.

32.     The Commission determined that if an individual is under outside pressure to participate in an investigational medical activity, then obtaining that individual's informed consent was legally impossible.

33.     Congress mandated in the National Research Act that "[i]f the Secretary determines that administrative action recommended by the Commission should be undertaken by him, he shall undertake such action as expeditiously as is feasible."

34.     Congress required the HHS Secretary to act upon the Commission's recommendations as outlined in the Belmont Report by establishing regulations to protect humans

involved in biomedical research activities. **Therefore, given the complexity, the intent of Congress was not to draft those laws but to allow the HHS Secretary to promulgate regulations on its behalf** to protect humans involved with investigational drugs. Therefore, these regulations are unique in that they were expressly requested by Congress to fulfill the intent of Congress via the National Research Act.

35.     In the early 1980s, HHS acted upon the Commission's recommendations, stating, "Based on the Belmont Report and other work of the National Commission, HHS revised and expanded its regulations for protecting human subjects…The HHS regulations are codified at 45 Code of Federal Regulations (CFR) 46, subparts A through D."[8]

## VII.   45 CFR Part 46

36.     45 CFR Part 46 is entitled, "Protection of Human Subjects." Subpart A is entitled, "Basic HHS Policy for Protection of Human Research Subjects" and establishes that (a) the policy (for protection of human research subjects) "applies to **all research[9]** <u>involving human subjects</u> conducted, supported, or otherwise subject to regulation <u>by any Federal department or agency...</u>" (Emphasis added).[10]

37.     HHS designed a very broad definition of research when, at 45 CFR § 46.102 (Definitions): "Research means a systematic investigation, including research development, testing, and evaluation, <u>designed to develop or contribute to generalizable knowledge</u>. Activities

---

[8] 45 CFR 46 FAQs. HHS.gov. Published 2018. Accessed May 18, 2023.
 https://www.hhs.gov/ohrp/regulations-and-policy/guidance/faq/45-cfr-46/index.html
[9] Research under 45 CFR Part 46 includes clinical trials but is not limited in scope to only clinical trials. College students studying medical charts of patients constitutes "research" requiring 45 CFR Part 46 adherence.
[10] 45 CFR 46.101(a)

that meet this definition constitute research for purposes of this policy, <u>whether or not</u> they are conducted or supported under a program that is considered research for other purposes"[11] (emphasis added). Research under this policy includes medical chart reviews by students or periodic studies of medical products under 21 U.S.C. §360bb-3 authorization.[12]

38.     A "human subject" is broadly defined as (1) a living individual, (2) from whom data is obtained and used,[13] and (3) from whom identifiable private information is known.[14]

39.     HHS regulations define[15] the term "human subject" at 45 CFR 46.102(e) as follows:

(1) ***Human subject*** means a living individual about whom an investigator (whether professional or student) conducting research:

> (i) Obtains information or biospecimens through intervention or interaction with the individual, and, uses, studies, or analyzes the information or biospecimens; or
>
> (ii) Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.

(2) ***Intervention*** includes physical procedures by which information or biospecimens are gathered (*e.g.,* venipuncture) and manipulations of the subject or the subject's environment that are performed for research purposes.

(3) ***Interaction*** includes communication or interpersonal contact between investigator and subject.

(4) ***Private information*** includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information that has been provided for specific purposes by an individual and that the individual can reasonably expect will not be made public (e.g., a medical record).

---

[11] 45 CFR 46.102(l)
[12] https://www.hhs.gov/ohrp/sites/default/files/human-subject-regulations-decision-charts-2018-requirements.pdf
[13] 45 CFR 46.102(e)(1)(i)
[14] 45 CFR 46.102(e)(1)(ii)
[15] "Coded Private Information or Biospecimens Used in Research (2018)." HHS.gov. Published January 19, 2018. https://www.hhs.gov/ohrp/coded-private-information-or-biospecimens-used-research.html#:~:text=Identifiable%20private%20information%20is%20private,is%20associated%20with%20the%20information (Last accessed June 5, 2023)

(5) *Identifiable private information* is private information for which the identity of the subject is or may readily be ascertained by the investigator or is associated with the information.

(6) *An identifiable biospecimen* is a biospecimen for which the identity of the subject is or may readily be ascertained by the investigator or is associated with the biospecimen. (Emphasis in original.)

40.      Congress drafted broad definitions for "research" and "subjects" to comply with the recommendations of the Belmont Report, which declared that "the general rule is that if there is any element of research in an activity, that activity should undergo review (third-party review to ensure the health and rights of involved individuals are protected) for the protection of human subjects"[16] (emphasis added).

41.      Therefore, if individuals are administered an investigational medical product and their private identifiable information is collected along with the details about their interaction with the product, and that information is monitored, studied, or analyzed for purposes of adding to the generalizable knowledge of the product, then the activity meets the definition of "research," requiring 45 CFR Part 46 compliance when the federal government is involved.

42.      HHS ensured that all research activities involving the federal government must comply with Belmont Report's ethical requirements: (1) "Department or agency heads retain final judgment as to whether a particular activity is covered by this policy, and this judgment shall be exercised consistent with the ethical principles of the Belmont Report"[17] (emphasis added), (2) if

---

[16] The Belmont Report Part A: Boundaries Between Practice & Research. "Research and practice may be carried on together when research is designed to evaluate the safety and efficacy of a therapy. This need not cause any confusion regarding whether or not the activity requires review; the general rule is that if there is any element of research in an activity, that activity should undergo review for the protection of human subjects."
[17] 45 CFR § 46.101(c)

the activity is considered exempt from the policy, then "the alternative procedures to be followed are consistent with the principles of the Belmont Report."[18]

43.    Congress expressly prohibits the federal government from administering an investigational product to an individual without complying with the Belmont Report's ethical principles and 45 CFR § 46.101, et *seq.*

44.    Placing an individual under a "sanction" for refusing an EUA drug, biologic, or device patently violates the ethical principles of the Belmont Report.

45.    The intent of Congress was to give the Belmont Report the force of law through 45 CFR § 46.101, et *seq.* and the Federal Wide Assurance agreement (see discussion, *infra*) for the explicit purpose of protecting humans when they are offered a federally funded EUA investigational product.

46.    To further protect Americans from medical research abuses in the future, Congress declared that, "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied."[19] (45 CFR § 46.122)

47.    Moreover, Congress also prohibited the United States Military from abusing individuals again by enacting 10 U.S.C. § 980(a), which provides in pertinent part, "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless — (1) the informed consent of the subject is obtained in advance."

---

[18] 45 CFR § 46.101(i)
[19] All COVID-19 EUA drugs and their administration have been fully funded by the federal government, requiring 45 CFR Part 46 adherence.

48.     Therefore, pursuant to 45 CFR § 46.101, et *seq*., "research" occurs when an individual is administered an investigational drug, the individual's private identifiable information is known, and data collected regarding their interaction with the drug is added to the generalizable knowledge about the drug.

49.     The COVID-19 CDC Vaccination Program is a research activity requiring 45 CFR § 46.101, et *seq*. compliance as well as each COVID-19 EUA's Scope of Authorization. (See *infra*)

50.     At no time may the federal government offer or administer an investigational medical product to an individual if their "legally effective informed consent" is not obtained in advance.

## VIII.   Legally Effective Informed Consent

51.     45 CFR § 46.116 sets forth the Belmont Report's "adequate standards" of informed consent[20], and they include, but are not limited to:

(a)(1)   Before involving a human subject in research covered by this policy, an investigator <u>shall obtain the legally effective informed consent</u> of the subject or the subject's legally authorized representative; (Emphasis added)

(a)(2)   An investigator shall seek informed consent <u>only under circumstances</u> that provide the prospective subject or the legally authorized representative sufficient opportunity to discuss and consider whether or not to participate and that minimize the possibility of coercion or undue influence; (Emphasis added)

(a)(3)   The information that is given to the subject or the legally authorized representative shall be in language understandable to the subject;

(a)(4)   The prospective subject or the legally authorized representative must be provided with the information that a reasonable person would want to have in order to make an informed decision about

---

[20] The Belmont Report and 45 CFR §46.116 contain the only definition for what Congress deems legally effective informed consent. Therefore, when statutes explicitly or implicitly mandate a person to give their legally effective informed consent, these definitions must be understood as the intent of Congress for compliance purposes.

whether to participate, and an opportunity to discuss that information;

(a)(5)    Informed consent must begin with a concise and focused presentation of the key information that is most likely to assist a prospective subject or legally authorized representative in understanding the reasons why one might or might not want to participate in the research;

(a)(6)    No informed consent may include any exculpatory language through which the subject or the legally authorized representative is made to waive or appear to waive any of the subject's legal rights;

(a)(7)    For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs…;"

(a)(8)    A statement that participation is voluntary, refusal to participate <u>will involve no penalty or loss of benefits to which the subject is otherwise entitled</u>, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled" (Emphasis added).

52.    Legally Effective Informed Consent, according to the Belmont Report, can be broken down into its basic formula as:

(1) the individual <u>must not be</u> under outside pressure to participate,

(2) the only reason an individual participates is that he or she believes the product may benefit their personal health goals, and

(3) the conditions of 1 and 2 are established before the individual participates in the investigational product.

53.    Only when authorities comply with 45 CFR § 46.101, et *seq.* and the ethical principles of the Belmont Report can an opportunity exist for an individual to give their legally effective informed consent according to 45 CFR § 46.116(a)(1).

54.    Informed Consent must be legally effective and prospective, according to HHS.

55.     45 CFR Part 46 applies to all federal agencies, departments, and the military (45 CFR § 46.101(a)). Additionally, twenty federal agencies incorporated 45 CFR Part 46 specifically into their regulatory framework.[21]

56.     Through the Federal Wide Assurance (FWA) agreement (see *infra*), all U.S. States and Territories (i.e., state health agencies have FWA agreements) have agreed to obtain the legally effective informed consent of individuals when involving them in investigational medical products.

57.     Consensual medical experimentation involving investigational medical products can only exist under conditions that ensure individuals are free from outside pressures to participate.

58.     Therefore, individuals have the explicit right to refuse an investigational drug, biologic, or device without incurring a penalty or loss of benefits to which they are otherwise entitled.

59.     When Defendants penalized Plaintiffs for refusing to inject a 21 U.S.C. §360bbb-3 investigational drug into their bodies, Defendants breached their fiduciary and statutory duties to obtain Plaintiffs' legally effective informed consent. (See, *infra*)

## IX.     COVID-19 Research Activities

60.     CDPHE and UCHA Defendants are in a symbiotic relationship to conduct 45 CFR § 46.101, et *seq*. research activities pertaining to COVID-19 EUA drugs, biologics, and devices on behalf of the federal government. Moreover, they are in a symbiotic relationship to obtain legally

---

[21] https://www.hhs.gov/ohrp/regulations-and-policy/regulations/common-rule/index.html

effective informed consent from individuals offered participation in those experimental medical products.

61.     The federal government's Executive Branch purchased all COVID-19 EUA drugs (see, *infra*) and, in conjunction with HHS[22] and the CDC, developed research activities that States and CDC Vaccination Program Providers must conduct on its behalf.

62.     Drugs, biologics, and devices authorized under 21 U.S.C. §360bbb-3 (see discussion, *infra*) are classified by the FDA as investigational (experimental)[23],[24] according to their labeling. They have no legal indication to treat, cure, or prevent any disease according to their labeling.

63.     Moreover, if a product is already licensed by the FDA for the intended use under the declared emergency, the FDA is prohibited from issuing an EUA. (21 U.S.C. §360bbb-3(c)(3))

64.     The only COVID-19 drugs made available to Plaintiffs are classified by the FDA as investigational new drugs. No FDA-licensed COVID-19 vaccines have been introduced into commerce for general commercial marketing since the declaration of the pandemic in March 2020, through the filing of this Complaint.

65.     A "marketed drug" is not the same as an "investigational drug."

---

[22] The EUA Scope of Authorization assigns research activities to the person acting on behalf of the manufacturer of the drug (the federal government who purchased all of the inventory), and to "emergency stakeholders," and "health care providers."

[23] Investigational new drug means, "A substance that has been tested in the laboratory and has been approved by the U.S. Food and Drug Administration (FDA) for testing in people…Also called experimental drug, IND, investigational agent, and investigational drug." NCI Dictionary of Cancer Terms. National Cancer Institute. Published 2023. Accessed June 25, 2023. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/investigational-new-drug

[24] 21 CFR 312.3 21 CFR 312.3 (Definitions and Interpretations): See "Investigational new drug" and "Clinical investigation" Note that "clinical investigation" is distinct from "clinical trial." While all clinical trials are clinical investigations, not all clinical investigations are clinical trials.

66.    A "marketed drug" is one that is licensed by the FDA for general commercial marketing and approved with an indication and usage for the treatment of a particular disease, which, via federal statute, EUA medical countermeasure products must not be. (See 21 USC 355a, *et seq*, 21 USC 360bbb-3(a)(2)(a,b))

67.    Investigational new drugs are legally regulated entirely differently than licensed drugs. The FDA declared in its August 23, 2021 EUA to Pfizer that "Pfizer-BioNTech COVID-19 Vaccine" drug is legally distinct from its licensed "COMIRNATY" drug[25].

68.    The distinction lies within the drug's classifications as assigned to them by the FDA.  Those distinctions have <u>significant</u> legal consequences for the end user. (See discussion, *infra*)

69.    EUA drugs, by their statutory definitions, are not licensed by the FDA for general commercial marketing and have no legal indication to treat, cure, or prevent any known disease.

70.    Investigational drug "means a new drug or biological drug that is used in a clinical investigation." (21 CFR 312.3 "Investigational new drug")

71.    Clinical investigation "means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, <u>an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice</u>." (21 CFR 312.3 "Clinical investigation") (Emphasis added).

---

[25] See Exhibit B, FDA EUA Pfizer August 23, 2021

72.     Only the FDA is authorized by Congress to assign a drug, biologic, or device its classification for purposes of regulation.

73.     Drugs are governed by their classification according to their labeling and not by their formulation.

74.     Congress explicitly enacted laws governing investigational new drugs to prevent the executive branch from continuing its history of abusing the rights of individuals who participate in investigational medical products.

75.     On December 11, 2020, the FDA issued to Pfizer-BioNTech the first COVID-19 EUA for its investigational drug (officially named Pfizer-BioNTech COVID-19 Vaccine[26]), and the FDA confirmed that Pfizer's product "is an investigational vaccine not licensed for any indication."[27]

76.     On December 18, 2020, the FDA issued to ModernaTX, Inc., an EUA for its investigational drug (officially named Moderna COVID-19 Vaccine), and the FDA confirmed that Moderna's product "is an investigational vaccine not licensed for any indication."[28]

77.     On February 27, 2021, the FDA issued to Janssen Biotech, Inc., an EUA for its investigational drug (officially named Janssen COVID-19 Vaccine), and the FDA confirmed that Janssen's product "is an investigational vaccine not licensed for any indication."[29]

---

[26] *Id.* The FDA improperly allowed Pfizer to add the word "Vaccine" to its investigational name.  The court should not confuse this name to mean the drug's legal indication. Pfizer-BioNTech COVID-19 Vaccine is an investigational drug having no legal indication to treat, cure, or prevent any known disease.  The FDA classified the drug as an "investigational new drug."
[27] 86 Fed.Reg. 5200, Jan. 19, 2021
[28] 86 Fed.Reg. 5211, Jan. 19, 2021
[29] 86 Fed.Reg. 28608, May 27, 2021

78.     21 U.S.C. §360bbb-3 requires the Secretary of HHS to "[a]ppropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the product (research activity)."

79.     The Secretary establishes the conditions under which the research activities will occur in each EUA letter, known as the Scope of Authorization.

80.     As an example, on January 19, 2021[30] the Secretary established mandatory conditions that Pfizer and emergency stakeholders (distributors, manufacturers, etc.) must follow, which involve 45 CFR 46 research activities.

81.     Under the EUA's "Conditions of Authorization," the Secretary mandates in part:

* * *

F.     Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):

•     Serious adverse events
•     Cases of Multisystem Inflammatory Syndrome in children and adults
•     Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer, Inc.

G.     Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals, within 15 days after the last day of a month…Each periodic safety report is required to contain descriptive information which includes:

•     A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations

---

[30] Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability. Federal Register. Published January 19, 2021. Accessed June 7, 2023. https://www.federalregister.gov/documents/2021/01/19/2021-01022/authorizations-of-emergency-use-of-two-biological-products-during-the-covid-19-pandemic-availability

(e.g., pregnant women), and adverse events of special interest.

- • Newly identified safety concerns in the interval.

* * *

N. Pfizer Inc. will conduct post-authorization observational study(ies) to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19. The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (16 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities.

* * *

T. Vaccination providers administering Pfizer-BioNTech COVID-19 Vaccine must report the following information…to VAERS…:

- • Serious adverse events
- • Cases of Multisystem Inflammatory Syndrome in children and adults
- • Cases of COVID-19 that result in hospitalization or death

82. VAERS reported 1,562,008 entries from December 2020 through May 26, 2023, including 35,272 deaths (1.6 per hour) and 263,462 (12.11 per hour) serious injuries. These numbers demonstrate historical entries for a drug and the vast involvement of the medical community to add to the "generalizable knowledge" of the product.

83. Healthcare providers and Pfizer, Moderna, and Janssen must identify the person receiving the product, monitor their involvement with the product, and report whether or not they had an adverse reaction to the product for the express purpose of adding to the generalizable knowledge of the product.

84.      COVID-19 drug manufacturers and government agencies use collected data to add to the generalizable knowledge about the product.  These conditions meet 45 CFR 46, FWA, and the Belmont Report definitions of research activities.

85.      The CDC Provider Agreement (see discussion, *infra*), EUA authorizations, and CDC's Advisory Committee on Immunization Practices (ACIP) recommendations demonstrate how the nationwide COVID-19 vaccination program is to be systematically investigated.

86.      The federal government purchased all COVID-19 drugs and created the CDC COVID-19 Vaccination Provider Agreement for the administration of its property to individuals desiring to participate in the product. The Provider Agreement establishes additional research activities that Defendants must conduct on the government's behalf and "must administer COVID-19 Vaccine in accordance with all requirements and recommendations of CDC and CDC's Advisory Committee on Immunization Practices (ACIP)."

87.      ACIP's Morbidity and Mortality Weekly Report from September 2021 confirms that in addition to "initial clinical trial data, ACIP…considered…real-world vaccine effectiveness studies, and post-authorization vaccine safety monitoring," information came from entities that executed the CDC Vaccine Provider Agreement and submitted the below-described information because the ONLY way to have authority to administer the COVID-19 Vaccines is by executing the CDC Vaccine Provider Agreement.[31] The use of this information by ACIP demonstrates how the data collected "contributes to generalizable knowledge."

---

[31] ACIP, Morbidity and Mortality Weekly Report, "Use of Pfizer-BioNTech COVID-19 Vaccine in Persons Aged ≥ 16 Years: Recommendations of the Advisory Committee on Immunization Practices – United States, September 2021", Vol.70, No.38, p. 1344.

88.    The ACIP recommendations[32] referenced in Footnote 1 of the CDC Provider

Agreement[33] instruct Defendants to:

    A.    Provide an EUA Fact Sheet to potential recipients before being administered the drug.

    B.    Counsel potential vaccine recipients about expected systemic and local reactogenicity.

    C.    Follow additional clinical considerations, including details of administration and use in special populations (e.g., persons who are pregnant or immunocompromised or who have severe allergies) based on advice from the CDC (https://www.cdc.gov/vaccines/covid-19/info-by-manufacturer/ pfizer/clinical-considerations.html)

    D.    Adverse events that occur in a recipient after receipt of COVID-19 vaccine should be reported to the Vaccine Adverse Events Reporting System (VAERS).

    E.    Report vaccination administration errors, serious adverse events, cases of multisystem inflammatory syndrome, and cases of COVID-19 that result in hospitalization or death after administration of COVID-19 vaccine under EUA.

    F.    Report any clinically significant adverse event, whether or not it is clear that a vaccine caused the adverse event.

    G.    Inform vaccine recipients about V-Safe, the CDC's vaccine safety monitoring system that the CDC says "helps us monitor the safety of COVID-19 vaccines for everyone."[34]

89.    The CDC Provider Agreement further instructs Defendants:

    A.    Within 24 hours of administering a dose of COVID-19 Vaccine, record in the vaccine recipient's record and report required information to the relevant state, local or territorial public health authority.

---

[32] *Id.*, at 1347.

[33] The CDC Provider Agreement, at p.2, makes the ACIP Recommendations mandatory by the following language: "This agreement expressly incorporates all recommendations, requirements, and other guidance that this agreement specifically identifies through footnoted weblinks. Organization must monitor such identified guidance for updates. Organization must comply with such updates."  See Exhibit A, CDC COVID-19 Vaccination Program Provider Agreement (hereinafter "Provider Agreement").

[34] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/pdfs/v-safe-information-sheet-508c.pdf

    B.   Submit Vaccine-Administration Data through either (1) the immunization information system (IIS) of the state or local territorial jurisdiction or (2) another system designated by CDC according to CDC documentation and data requirements.

    C.   Organization must preserve the record for at least 3 years following vaccination, or longer if required by state, local, or territorial law. Such records must be available to any federal, state, local, or territorial public health department to the extent authorized by law.

    D.   Report the number of doses of COVID-19 Vaccine that were unused, spoiled, expired, or wasted as required by the relevant jurisdiction.

    E.   Provide a completed COVID-19 vaccination record card to every COVID-19 vaccine recipient.

90.    Based on the detailed, organized, and methodical way HHS and the CDC structured the nationwide COVID-19 Vaccination Program, it meets the criteria for "a systematic investigation…<u>designed to develop or contribute to generalizable knowledge</u>."

91.    It cannot be reasonably argued that the required research activities under each COVID-19 EUA's Scope of Authorization and the CDC COVID-19 Vaccination Program Provider Agreement do not meet the conditions requiring 45 CFR § 46.101, et *seq*. compliance.

## X.    ICCPR Treaty

92.    In 1992, the United States Senate ratified the International Covenant on Civil and Political Rights Treaty (ICCPR).[35] Article VII states, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, <u>no one shall be subjected without his free consent to medical or scientific experimentation.</u>" (Emphasis added)

93.    Subjected means to be under the rule of law by one's authority.

---

[35] Treaty Document 95-20 - INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS. (2023, May 19). https://www.congress.gov/treaty-document/95th-congress/20/all-info

APP 051

94.     Free consent means to be free from outside pressures to participate.

95.     The U.S. Senate issued a resolution stating, "That the United States considers itself bound by Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States."[36]

96.     The U.S. Senate considered it to be a violation of Article 7 of the ICCPR Treaty and the 5th Amendment's Due Process Clause if individuals were forced to forfeit liberty and property without due process for refusing medical experimentation.  The Senate also considered it to be a violation of Article 7 of the ICCPR Treaty and the 14th Amendment's Equal Protection Clause when individuals who refused medical experimentation were treated differently than those who accepted medical experimentation.

97.     The United States Senate stated that Articles One through Twenty-Seven of the ICCPR Treaty are not "self-executing" but "that it is the view of the United States that States Party to the Covenant should, wherever possible, refrain from imposing any restrictions or limitations on the exercise of the rights recognized and protected by the Covenant, even when such restrictions and limitations are permissible under the terms of the Covenant."

98.     Treatment by authorities debasing an individual's liberty, autonomy, and human dignity for the express purpose of coercing that individual to surrender their Constitutional rights,

---

[36] See "Resolution" - Treaty Document 95-20 - INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS. Congress.gov. Published 2023. Accessed June 5, 2023. https://www.congress.gov/treaty-document/95th-congress/20/all-info

leading to feelings of fear, anguish, and inferiority, meets the international definition of cruel, inhumane, and degrading treatment or punishment.[37]

99.     Whereas the "United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment" treaty deals specifically with physical torture or the threat of physical torture, Article VII of the ICCPR Treaty speaks to the political actions of governments and the laws of governments leading to a loss of rights, safety, and liberty, or the feelings that such actions will lead to those losses.

100.    The UN Human Rights Committee spoke to Article IV of the ICCPR Treaty regarding the derogation of rights when states declare an emergency. "Article 4, paragraph 2, of the Covenant explicitly prescribes that no derogation from the following articles may be made: article 6 (right to life), article 7 (prohibition of torture or cruel, inhuman or degrading punishment, or of medical or scientific experimentation without consent.)"[38] (Emphasis added.)

101.    Article 4.2 of the ICCPR Treaty established the restriction of derogation of informed consent rights as a peremptory norm.  Although Article VII of the ICCPR Treaty does not provide a private right of action, it is nonetheless enforceable under 42 U.S.C. § 1983 because the treaty contains unambiguous rights enforceable language specific to the individual involved in experimental medical products or processes.

---

[37] "Treatment that humiliates or debases an individual, showing a lack of respect for, or diminishing, their human dignity, or when it arouses feelings of fear, anguish or inferiority capable of breaking an individual's moral and physical resistance." - degrading treatment or punishment. Published 2023. Accessed June 6, 2023. https://home-affairs.ec.europa.eu/networks/european-migration-network-emn/emn-asylum-and-migration-glossary/glossary/degrading-treatment-or-punishment_en

[38] "No justification or extenuating circumstances may be invoked to excuse a violation of article 7 for any reasons, including those based on an order from a superior officer or public authority." - Human Rights Committee in its General Comment No. 20 on article 7 (A/44/40)

## XI.      21 U.S.C. §360bbb-3 (aka Section 564)

102.      Congress expressly prohibits any manufacturer from introducing into commerce a drug, biologic, or medical device not licensed by the FDA for general commercial marketing (21 U.S.C. §355(a)) to ensure individuals are not subjected to medical experimentation outside of their free consent and or harmed by medical products not effectively researched for safety and efficacy.

103.      Investigational drugs, biologics, and devices are strictly controlled by Congress. Only authorized persons may access, distribute, and administer the investigational products and only under the prescribed conditions established by Congress.

104.      However, over time, Congress recognized the need to allow individuals to access unlicensed products for emergency, compassionate, and educational purposes (also known as "expanded access protocols"). Therefore, Congress established 21 U.S. Code §360bbb *et seq*., titled "Expanded Access to Unapproved Therapies and Diagnostics."

105.      Numerous conditions must be met before the legal administration of products authorized pursuant to the section can occur. The overriding requirement, irrespective of the authorized expanded access protocol, is that the individual must give their legally effective informed consent, whether the consent is under written or verbal conditions.  This requirement means the authority sponsoring the product or acting on behalf of the sponsor must ensure the individual consenting to participate is under no outside pressure to do so.

106.      Making it patently clear of their intent to protect Individuals from medical research abuses, Congress enacted legislation prohibiting federal funding for research activities if the informed consent obtained from the individual is not legally effective nor prospective for the civilian (45 CFR § 46.122) and for the military (10 U.S.C. §980).

107.     The Food, Drug, and Cosmetic Act "FDCA"), 21 U.S.C §360bbb-3 authorizes the HHS Secretary to grant emergency expanded access protocols to (1) FDA-licensed products for unlicensed uses or (2) products the FDA has not licensed for general commercial marketing.

108.     Congress <u>requires</u> the HHS Secretary to establish "appropriate conditions designed to ensure that individuals to whom the product is administered are informed" of:

(ii)(II)     the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown;

(ii)(III)    the option to accept or refuse administration of the product;

(ii)(III)    the consequences, if any, of refusing administration of the product, and

(ii)(III)    the alternatives to the product that are available and of their benefits and risks.[39]

109.     Informing the individual of the product risks, alternatives, benefits, and health consequences provides that individual with the quality information required to give legally effective informed consent.[40]

110.     Congress requires healthcare professionals to inform the individual of "the option to accept or refuse administration of the product," meaning the healthcare professional is required by Congress to inform the individual of his or her <u>legal rights</u> under 21 U.S.C. §360bbb-3 before participating in the product or activity.

---

[39] 21 U.S.C. 360bbb-3(e)(1)(A)
[40] The requirements of informing the subject of risks, benefits, alternatives, and health consequences, and that the Secretary has authorized the use of the investigational drug mirrors 45 CFR §46.116 requirements.

111.    A legal right is a power held by an individual resulting from a constitution, statute, regulation, or judicial precedent of which no other authority may interfere unless prescribed in law.

112.    There are two legal rights conferred upon individuals considering whether to participate in a Section 564 medical countermeasure product, which are (1) the right to **accept** a Section 564 medical product, and (2) the right to **refuse** to take or use a Section 564 medical product.

113.    The decision belongs exclusively to the individual, and it must be under conditions free of outside pressures. If individuals are under outside pressure to participate, then it is legally impossible for them to give their free consent; thus, their rights have been infringed upon.

114.    There are three specific persons upon whom Congress confers a right under 21 U.S.C. §360bbb-3, which are:

A.    the HHS Secretary, who is empowered to authorize access to investigational drugs, biologics, or medical devices and the conditions under which that access can occur,

B.    the healthcare professional who is authorized to inform the individual of their Section 564 legal rights and to administer Section 564 medical products, and

C.    the individual who is authorized to accept or refuse Section 564 medical products.

115.    Congress established a required condition that "[w]ith respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section

as the Secretary finds necessary or appropriate to protect the public health." (21 USC 360bbb-3(e))

116.     Additionally, Congress conferred authority onto the Secretary so that he may "appropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, and the circumstances under which, the product may be administered with respect to such use."

117.     These "appropriate conditions" and the "circumstances" are outlined in the Emergency Use Authorization (EUA) letter issued to the manufacturer of the emergency medical countermeasure under the "Scope of Authorization."

118.     Therefore, the Scope of Authorization contained in each EUA letter has the force of law as it establishes the conditions under which the emergency activities can occur, prescribing duties for the manufacturer and rights of all persons involved in the administrative process of the product.

119.     The Secretary determined that the COVID-19 pandemic required healthcare workers to provide individuals contemplating the use of one of the EUA products with a drug fact sheet *before the product is administered* to act as a function of informed consent.  In other words, the Secretary thought it was practical that every person be afforded this right and, as such, mandated that requirement under the Scope of Authorization for each EUA.

120.     To ensure individuals are protected when they are offered EUA medical products, Congress was explicit in that "[n]othing in this section [21 U.S.C. 360bbb-3] provides the

Secretary <u>any authority to require any person to carry out any activity</u> that becomes lawful pursuant to an authorization under this section (21 U.S.C. 360bbb-3(l))." (Emphasis added)

121.     For purposes of the case at bar, the "activity that becomes lawful pursuant to an authorization under this section" is the administration of the EUA COVID-19 investigational injections manufactured by Pfizer, Moderna, and Johnson & Johnson/Jannsen or the required use of EUA testing articles and masks.

122.     Therefore, the Secretary may grant access to unlicensed medical products for use under the declared emergency, but the Secretary may not require any person to manufacture, distribute, store, administer, or receive the product.

123.     The Secretary may not delegate his authority, so by extension, any person participating in a 21 U.S.C. §360bbb-3 activity is also restricted by Congress from requiring any other person to participate in "any activity that becomes lawful pursuant to an authorization under" 21 U.S.C. §360bbb-3.

124.     **Congress, therefore, prohibits governments (e.g., governors, mayors, school boards) and voluntary participants (e.g., hospitals, manufacturers, doctors) from having the authority to require any person to participate in any 21 U.S.C. §360bbb-3 activity at any time, under any statute, regulation, or state policy or custom.**

125.     The explicit purpose of this statutory restriction is to ensure that no person is under a "sanction," "coercion," "undue influence," or "unjustifiable pressure"[41] to participate. If individuals are under those pressures, then no federal funds could be expended for the

---

[41] The Belmont Report's conditions that would nullify legally effective informed consent.

administration of a COVID-19 EUA product, nor could any healthcare provider acting on behalf of the federal government obtain an individual's Legally Effective Informed Consent.

126.    The individual has the right to accept the product, and the healthcare professional has the authority to administer the product. Still, neither is required to act on the demands of the other. Congress established a guideline requiring both the healthcare professional and the individual to mutually agree to the process to meet the legal requirement of 21 U.S.C. §360bbb-3.

127.    The purpose of this requirement is to ensure that the individual receives a quality standard of healthcare even under emergency conditions because not everyone is a proper candidate to take or use an investigational medical countermeasure.

128.    Therefore, if the HHS Secretary is the only person authorized to establish the conditions under which persons can access 21 U.S.C. §360bbb-3 medical countermeasures and not even he can mandate participation, **then Defendants had no authority to amend the Scope of Authorization and require that which Congress prohibits**.

129.    Therefore, when Defendants established a policy requiring individuals under their authority to become vaccinated against the COVID-19 virus, they were required by federal law to ensure that (1) licensed products existed to meet the legal requirements of the mandate, and (2) Plaintiffs were to be informed that they were under no obligation to inject an unlicensed COVID-19 EUA investigational drug into their body, nor would they incur a penalty or lose a benefit when refusing to do so.  Defendants did neither.

## XII.    HHS EUA Precedent

130.    On January 28, 2005, HHS issued the first EUA[42] under its new Section 564 authority (i.e., 21 USC 360bbb-3). The military requested EUA protocols for Anthrax Vaccine Adsorbed (AVA), to be utilized by civilians and service members. HHS stated, "The issuance of this Authorization for the emergency use of AVA is the first time that the EUA authority is being used. FDA intends to explain clearly the reasons for each issuance, termination, or revocation of an EUA. The agency wishes to make its decision-making understandable to help ensure that members of the public, and particularly those individuals who may be eligible to receive a medical product authorized for emergency use, are informed about the basis of an EUA determination."

131.    HHS mandated that individuals participating in the AVA investigational product must be informed of the following statements:

     A.    Individuals (service members and civilians) who refuse anthrax vaccination will not be punished. (Emphasis added)

     B.    Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice.

     C.    Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation based on refusal of anthrax vaccination.

     D.    There may be no penalty or loss of entitlement for refusing anthrax vaccination,

     E.    This information shall read in the trifold brochure provided to potential vaccine recipients as follows: You may refuse anthrax vaccination under the EUA, and you will not be punished. No disciplinary action or adverse personnel action will be taken. You will not be processed for separation, and you will still be deployable.

---

[42] https://www.govinfo.gov/content/pkg/FR-2005-02-02/pdf/05-2028.pdf

APP 060

There will be no penalty or loss of entitlement for refusing anthrax vaccination.[43]

132. The explicit instructions in the EUA language directly relate to AVA's classification as an investigational new drug not licensed by the FDA for any legal indication. Moreover, the language was designed to ensure that healthcare professionals could obtain the legally effective informed consent of the individual because it expressly informed the individual that no "sanction" would be imputed for refusal, thus nullifying all outside pressures to participate. No amendments to Section 564 have altered its requirements since HHS issued this first EUA.

133. The reason HHS was crystal clear about an individual's right to refuse an investigational drug was to respect court orders and the express authority of individuals to choose the available statutory options.

## XIII.   Judicial EUA Precedent

134. On October 27, 2004, U.S. District Court Judge Sullivan spoke to the individual's authority to refuse investigational drugs without consequence when he held in *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004), that:

A. Congress has prohibited the administration of investigational drugs to service members without their consent. This Court will not permit the government to circumvent this requirement; and,

B. Unless and until FDA properly classifies AVA [an anthrax vaccine] as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants 'use of AVA on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. §1107. Accordingly, the involuntary anthrax vaccination program, as applied to all persons, is rendered illegal absent informed consent or a Presidential waiver." (Emphasis added.)

---

[43] Federal Register/Vol. 70, No. 21/Wednesday, February 2, 2005/Notices 5455 IV Conditions of Authorization

135.    Immediately upon Judge Sullivan's ruling, the Department of Defense ended all punitive activities against service members and civilian employees because the federal court affirmed the individual's statutory authority to refuse investigational drugs without consequence. Except for 10 U.S.C. § 1107, the laws leading Judge Sullivan to his ruling apply to individuals irrespective of civilian or military service.  No laws have changed to negate Judge Sullivan's 2004 ruling.

136.    Judge Sullivan added clarity to the importance of what was argued before the court by stating: "The Court is persuaded that the right to bodily integrity and the importance of complying with legal requirements, even in the face of requirements that may potentially be inconvenient or burdensome, are among the highest public policy concerns one could articulate." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004).

137.    *Doe* and the HHS provide judicial and administrative precedent affirming the right of individuals to refuse investigational products without incurring a penalty or losing a benefit to which they are otherwise entitled. Nothing in the law has changed to nullify that right since those precedents were firmly established.

## XIV.    Federal Wide Assurance (FWA)

138.    In 2001, HHS created the Office of Human Rights Protection (OHRP), which established the Federal Wide Assurance (FWA) agreement. The FWA is an agreement by entities conducting business with HHS to comply with 45 CFR 46 and the Belmont Report's ethical guidelines.

139.    HHS states, "The Federal Wide Assurance (FWA) is an assurance of compliance with the U.S. federal regulations for the protection of human subjects in research. It is approved

by the Office for Human Research Protections (OHRP) for all human subjects research conducted or supported by the U.S. Department of Health and Human Services (HHS). The FWA is also approved by OHRP for federal wide use, which means that other U.S. federal departments and agencies that have adopted the U.S. Federal Policy for the Protection of Human Subjects (also known as the Common Rule) may rely upon the FWA for the research they conduct or support. An FWA is the only type of assurance currently accepted and approved by OHRP. It is required whenever an Institution becomes engaged in human subjects research conducted or supported by any U.S. federal department or agency that has adopted the Common Rule…"[44]

140.    The OHRP assigns an FWA identification number to entities (hereinafter referred to as "Contracting Provider") that fulfill application requirements. An FWA identification number is issued only after the legally binding agreement between the Contracting Provider and the United States government has been signed.

141.    The FWA's main purpose is to benefit a third-party beneficiary because the FWA agreement authorizes the Contracting Provider to participate in federally funded programs involving humans with investigational drugs if, and only if, the Contracting Provider agrees to protect the health and legal rights of the third-party beneficiaries (i.e., humans who are administered investigational drugs, biologics, or devices under the research conditions described above).

142.    The fact that the entire FWA agreement hinges upon the intended rights of third-party beneficiaries means that Contracting Providers have a fiduciary duty to the third-party beneficiaries under the terms of the FWA agreement.

---

[44] Office for Human Research Protections. Federal Wide Assurance Instructions. HHS.gov. Published January 7, 2011. Last accessed May 19, 2023.

143.     The intended benefit to the third-party beneficiary is the right to accept or refuse participation in investigational products, clinical trials, and other research activities without fearing consequences for refusal and to know that independent Institutional Review Boards will provide oversight, ensuring their health, safety, and rights are protected.

144.     Although the third-party beneficiaries are not signatories to the contract, they are the intended third-party beneficiaries of the agreement, and their rights were violated the moment Defendants penalized Plaintiffs for refusing to take EUA products (i.e., investigational drugs, and testing articles).

145.     The FWA agreement requires the Contracting Provider to ensure that no third-party beneficiary is under outside pressure to participate in an investigational drug, biologic, or medical device.

146.     The FWA agreement requires Defendants to assure potential participants that they will not incur a penalty or lose a benefit to which they are otherwise entitled when refusing participation.[45]

147.     The duty placed upon the Contracting Provider is owed to those who refuse as well as those who accept the administration of investigational drugs.

148.     Therefore, when Defendants punished Plaintiffs (third-party beneficiaries) for refusing the administration of an investigational drug, they:

    A.      activated the terms and conditions of the contract,

    B.      violated the terms of the contract, causing injury to the legal rights of the third-party beneficiary,

---

[45] "The Federal Wide Assurance (FWA) is the only type of assurance currently accepted and approved by OHRP. Through the FWA, an institution commits to HHS that it will comply with the requirements in the HHS Protection of Human Subjects regulations at 45 CFR part 46." - HHS.  45 CFR 46.116(b)(8) requires the individual to be informed they will not be penalized for refusing participation in a research activity.

C.        created a cause of action for breach of fiduciary duty in favor of the third-party beneficiary.

149.     The Fourteenth Amendment's Equal Protection Clause provides additional protections by requiring all persons involved in federally funded COVID-19 countermeasure programs to be treated equally before the law, irrespective of the chosen option.

## XV.    PREP Act & 21 U.S.C. §360bbb-3 (EUA Statute) – Preemption of State Law

150.     In 2005, Congress passed the Public Readiness and Emergency Preparedness Act, hereafter referred to as the PREP Act (42 USC 247d-6d and 42 USC 247d-6e), to provide immunities for persons volunteering for "covered" activities. In accordance therewith, the HHS Secretary issued a COVID-19 PREP Act declaration in February 2020.[46]

151.     The first provision of the PREP Act (42 USC 247d-6d) is entitled "Targeted liability protections for pandemic and epidemic products and security countermeasures."

152.     The second provision of the PREP Act (42 USC 247d-6e) is entitled "Covered countermeasure process."

153.     Congress expressly crafted language preempting state and local law conflicting with the PREP Act (42 USC 247d-6d(b)(8)), which provides, in pertinent part:

(8) Preemption of State law

During the effective period of a declaration under subsection (b)…no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the…administration…of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 et seq.].

[46] 85 FR 15198

154.     Congress expressly established that participation in the administration of the covered countermeasure (i.e., any EUA COVID-19 investigational drug) shall be voluntary. Specifically, Congress stated the following at 42 USC 247d-6e(c), in pertinent part:

> (c) Voluntary program
>
> The Secretary shall ensure that a State, local, or Department of Health and Human Services plan to administer or use a covered countermeasure is consistent with any declaration under 247d–6d of this title…and that potential participants are educated with respect to contraindications, <u>the voluntary nature of the program</u>, and the availability of potential benefits and compensation under this part. [Emphasis added.]

155.     The CDC COVID-19 Vaccination Provider Program exclusively utilizes "the relevant state, local, or territorial immunization's cooperative agreement with CDC" as the means to distribute the federal government's "covered countermeasure[s]" (COVID-19 EUA drugs) (see, *infra*).

156.     Therefore, when the State voluntarily agreed to use its immunization program to distribute the federal government's property, it was required to ensure all participants were only involved under strictly voluntary conditions.

157.     Congress informed the State that if it planned to "administer or use a covered countermeasure," then it may not "establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that…is different from, or is in conflict with…**any matter included in a requirement** applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act."

158.     One such **matter included in a requirement applicable to the covered countermeasure** is contained in 21 U.S.C. §360bbb-3 (the Emergency Use Authorization statute)

whereby Congress, in unambiguous rights-conferring language, conferred upon the individual considering participation in a "covered countermeasure" may choose to "accept" or "refuse" participation.[47]

159.    Therefore, by the express language of the PREP Act, and its incorporation of the option to choose contained in the EUA statute, and also based on the Supremacy Clause in the U.S. Constitution, any State laws, ordinances, regulations, or customs that are "different" from or in "conflict" with an individual's authority to freely choose to accept or refuse participation in the medical countermeasure are preempted.

160.    Therefore, States are preempted by Congress from mandating participation in a PREP Act "covered countermeasure."

161.    Similarly, the State and private employers in that State are prohibited from enforcing any at-will employment doctrine when employees refuse participation in a "covered countermeasure" because using the threat of penalty of loss of employment benefits, or even employment itself, "conflict[s]" with the employee's federally secured right to accept or refuse participation in the covered countermeasure (e.g., drugs, biologics, masks, testing articles, etc.) without consequence.[48]

162.    The purpose of informing the individual of "the significant known…risks of such use, and of the extent to which such benefits and risks"[49] and of "the alternatives to the product that is available and of their benefits and risks"[50] is because the individual is not only consenting to be *irreparably* injected with an investigational drug but to also participate in a legally binding agreement under the terms and conditions established by Congress.

---

[47] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)
[48] *Id.*
[49] (21 U.S.C. §360bbb-3(e)(1)(A)(ii)(II))
[50] (21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III))

163.   Individuals who consent to receive one of the COVID-19 EUA investigational drugs must agree to the following terms and conditions, including but not limited to:

A.   forfeiture of civil litigation rights resulting from injuries;[51]

B.   allowing their private identifiable information to be collected and used for a variety of purposes by unknown persons;[52]

C.   allowing their involvement with the EUA product to be cataloged by various persons for unknown purposes,

D.   allowing the data collected about their adverse events to be utilized by researchers for unknown purposes and eternity,[53]

E.   assuming greater risks to their safety, health, and legal rights.[54]

164.   The FDA issued an opinion[55] regarding federal preemption of the State's authority to interfere with 21 U.S.C. §360bbb-3 (aka section 564):

> FDA anticipates that conflicts between federal and state law may arise when FDA acts under sections 564, 564A, and 564B if states have existing requirements governing the shipment, holding, dispensing, administration, or labeling of unapproved medical products or approved medical products for unapproved uses. Courts have stated that the Supremacy Clause of the U.S. Constitution can operate to nullify both state legislative requirements and state common-law duties. Under the legal principles of implied conflict preemption, courts have found state law preempted where it is impossible to comply with both federal and state law, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Consistent with this case law, section 4(a) of Executive Order 13132 states that "[a]gencies shall construe... a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority

---

[51] PREP Act forfeits all civil actions for damages in most situations.

[52] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Agreement requires manufacturers and/or emergency stakeholders to obtain private identifiable information.

[53] Each EUA and/or the CDC COVID-19 Vaccination Program Provider Agreement requires manufacturers and/or emergency stakeholders to monitor, report and study a variety of adverse reactions to EUA products.

[54] Section 564 (21 U.S.C. 360bbb-3) requires potential recipients to be made aware of the risks, alternatives, and the fact that the product is only authorized by the Secretary under emergency conditions.  These elements provide potential recipients with the required information to make a quality and legally effective decision to consent.  Therefore, consent means the individual agrees to assume more than minimal risk as defined above.

[55] "Emergency Use Authorization of Medical Products and Related Authorities," Section VII. U.S. Food and Drug Administration. Published 2022. Accessed June 6, 2023.
 https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities#preemption

conflicts with the exercise of Federal authority under the Federal statute." <u>FDA states that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564.</u> Similarly, an order or waiver issued under section 564A and pre-positioning under section 564B preempt state or local law, both legislative requirements and common-law duties, <u>that impose different or additional requirements related to the activity authorized under sections 564A or 564B. To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency</u> (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and "conflicts with the exercise of Federal authority under [§ 564]." The same rationale applies to an order or waiver issued under section 564A and pre-positioning of an MCM under section 564B. (Emphasis added)

165.    The Supreme Court has long held that "the test of applicability of state laws [conflicting with the Supremacy Clause] is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act."[56]

166.    21 U.S.C. §360bbb-3 and the PREP Act can only be executed by the United States HHS Secretary under the prescribed conditions established by Congress.

167.    The State and subordinate private parties may only participate in "covered countermeasures" and the use of 21 U.S.C. §360bbb-3 medical products by volunteering to adhere to the conditions established by the HHS Secretary under the respective statutes, which includes the federal statutory requirement to obtain Plaintiffs' legally effective informed consent when considering participation in programs authorized by the above statutes.

168.    If Defendants can punish Plaintiffs for *refusing* to participate in using a 21 U.S.C. §360bbb-3 product, they must also have the authority to punish Plaintiffs *accepting* the product.

---

[56] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947)

In such a scenario, one can easily see that Plaintiffs are damned if they accept and damned if they refuse because the option no longer belongs to the Plaintiffs; rather, it belongs to Defendants disagreeing with the Plaintiffs' choice. Granting Defendants that power deprives Plaintiffs of their Constitutional rights (Equal Protection of Laws and Due Process) and undermines the authority of Congress to determine the conditions under which access to unlicensed drugs, biologics, and devices can occur.

169.     Moreover, should Defendants be allowed to interfere in the Federal Acts by penalizing Plaintiffs for refusing to participate, and Plaintiffs are injured, having no judicial recourse for remedy, then Plaintiffs are deprived of their Due Process rights resulting from the sustained losses of their injury. Should a person be informed of the risks of participating in a covered countermeasure and still choose to participate, resulting in injury, then courts are satisfied that their Due Process rights are not violated when denied judicial relief under the statute's immunity clauses because they were made aware of the risks and consequences prospectively.

170.     This irrefutable fact is why Congress preempts the State and Defendants (as State Actors) from having any authority to interfere with the right of Plaintiffs to either accept or refuse participation in "medical countermeasures" under 21 U.S.C. §360bbb-3 and "covered countermeasures" under the PREP Act.

171.     In the case at bar, Defendants' use of the state at-will employment doctrine to terminate Plaintiffs' employment as a penalty for refusing administration of an EUA investigational drug conflicts with the federal law's goal of ensuring that only truly willing participants are involved in the use of "covered countermeasures" and 21 U.S.C. §360bbb-3 medical products, and as a result of that conflict, the State's at-will employment doctrine is

preempted for purposes of the administration of those countermeasures. It is thereby inapplicable as a defense to Defendants' unlawful actions described herein by Plaintiffs.

### XVI.   CDC COVID-19 Vaccination Program Provider Agreement

172.     The Centers for Disease Control (CDC) states that "[a]t this time, **all COVID-19 vaccine in the United States has been purchased by the U.S. government** (USG) for administration exclusively by providers enrolled in the CDC COVID-19 Vaccination Program and remains U.S. government property until administered to the recipient. Only healthcare professionals enrolled through a health practice or organization as vaccination providers in the CDC COVID-19 Vaccination Program (and authorized entities engaged in shipment for the Program) are authorized to lawfully possess, distribute, deliver, administer, receive shipments of, or use USG-purchased COVID-19 vaccine. Other possession, distribution, delivery, administration, shipment receipt, or use of COVID-19 vaccine outside the parameters of the Program constitutes, at a minimum, theft under 18 U.S.C. § 641, and violation of other federal civil and criminal laws. Violators are subject to prosecution to the full extent of the law."  [See Exhibit A, Provider Agreement]

173.     Although the program states it is a "Vaccination Program" (hereinafter referred to as "CDC Vaccination Program"), the federal government has not distributed any FDA-licensed COVID-19 vaccines. Instead, it has relied exclusively on unlicensed COVID-19 EUA drugs for the program's administration.

174.     Before the CDC accepts a person or entity as a Provider in the CDC Vaccination Program, that person or entity is required to sign the CDC COVID-19 Vaccination Program Provider Agreement (See Exhibit A, Provider Agreement).

175.     The Provider Agreement informs the person or entity that, "Your Organization's chief medical officer (or equivalent) and chief executive officer (or chief fiduciary)—collectively, Responsible Officers—must complete and sign the CDC COVID-19 Vaccination Program Provider Requirements and Legal Agreement (Section A)"  (See Exhibit A, Provider Agreement.)

176.     The Provider Agreement requires the organization to assign a person or persons who will be under a legal obligation to ensure the program is carried out effectively, declaring, "For the purposes of this agreement, in addition to Organization, Responsible Officers named below will also be accountable for compliance with the conditions specified in this agreement. The individuals listed below must provide their signature after reviewing the agreement requirements."

177.     "This program is a part of collaboration under the relevant state, local, or territorial immunization's cooperative agreement with CDC. To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements…" (Emphasis added).

178.     Therefore, the CDC clearly states that the Provider Agreement works in conjunction with "relevant state" and other municipality immunization agreements. This requirement denotes state action involving private parties acting in the capacity of a state actor.

179.     HHS requires any entity conducting business with its organization to submit and be approved for a Federal Wide Assurance agreement (see discussion, *supra*) in advance of participating in any program involving humans with investigational drugs under its authority.  The fact that the medical products in question are under an EUA does not exempt entities conducting business with HHS from first agreeing to obtain an FWA before participation. This fact is why the

CDC chose only to distribute the program via the State's existing immunization program. Each state already has an HHS FWA agreement in place.

180.    The Executive Branch of the government is required to comply with 21 U.S.C. §360bbb-3's requirements and all other laws and regulations protecting humans involved in investigational medical products under emergency access protocols.

181.    When the Executive Branch chose to purchase all COVID-19 vaccines (i.e., licensed and unlicensed COVID-19 drugs), it was required to ensure that all applicable laws associated with each drug's classification were adhered to by all volunteering participants.

182.    The Executive Branch chose to establish the Provider Agreement as the mechanism to ensure those legal obligations were followed.

183.    While the Provider Agreement does not replace the laws and regulations governing any EUA drug classification, it adds an extra layer of legal obligations required of volunteer participants.

184.    The Provider Agreement requires that all volunteer participants:

    A.    "must provide an approved Emergency Use Authorization (EUA) fact sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative,"

    B.    "Organization must report moderate and severe adverse events following vaccination to the Vaccine Adverse Event Reporting System (VAERS),"

    C.    "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine,"

    D.    "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws."

185.     The EUA Fact Sheet is required because the Executive Branch of the government is the sole sponsor of EUA products,[57] and federal law requires them to obtain the legally effective informed consent of each individual before the administration of the product. Moreover, the HHS Secretary requires each recipient to be given the Fact Sheet for each EUA COVID-19 investigational drug from which the federal branch of government cannot exempt itself. The required Fact Sheet acts as a function of the "informed consent" process for persons ascertaining whether or not they will participate in the EUA product.

186.     The Executive Branch is required to report adverse events as part of the government's COVID-19 Vaccination Program because federal law requires this of every EUA product, which the HHS Secretary echoed in each of the EUA letters issued to pharmaceutical companies. Moreover, the requirement to monitor, collect, and report, adverse reactions (research activities) from the drugs' use denotes how these products are governed by 45 CFR 46, requiring both IRB and Belmont Report compliance.

187.     The requirement that the "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws" is because federal law declares:

    A.     "This policy does not affect any state or local laws or regulations (including tribal law passed by the official governing body of an American Indian or Alaska Native tribe) that may otherwise be applicable and that provide additional protections for human subjects" (45 CFR 46.101(f));

    B.     Additionally, federal law declares, "The informed consent requirements in this policy are not intended to preempt any applicable Federal, state, or local laws (including tribal laws passed by the official governing body of an American Indian or Alaska Native tribe) that require additional information to be disclosed in

---

[57] The Federal government chose to purchase and retain ownership of all EUA COVID-19 drugs. However, that ownership does not negate their legal obligations under Section 564.

order for informed consent to be legally effective" (45 CFR 46.116(i));

C.   This policy does not affect any foreign laws or regulations that may otherwise be applicable and that provide additional protections to human subjects of research (45 CFR 46.101(g)).

188.   The Provider Agreement required Defendants to acknowledge the law before acceptance, as follows: "By signing this form, I certify that all relevant officers, directors, employees, and agents of Organization involved in handling COVID-19 Vaccine understand and will comply with the agreement requirements listed above…" (Emphasis added)

189.   Therefore, State governments and their authorized private parties agreed to participate in a joint effort to conduct research activities and obtain the legally effective informed consent of individuals on behalf of the United States Government when signing the CDC COVID-19 Vaccination Program Provider Agreement.

## XVII.  Statement Of Facts

190.   At all times pertinent, Plaintiffs were employed as healthcare workers by UCHA. UCHA is vested with the authority and responsibility of managing the affairs, control, direction, and disposition of UCHealth and Poudre Valley Medical Group, LLC.

191.   At all times pertinent, Plaintiffs were licensed by the State of Colorado, having the authority to deny Plaintiffs the right to engage in employment in their chosen profession by depriving them of their respective State licenses.

192.   At all times pertinent, Defendants acted under color of state law.

193.   Defendants' actions described herein led to a deprivation of Plaintiffs' Constitutional and statutory rights, causing financial damages and severe emotional distress.

194.   On July 28, 2021, UCHA issued a new employment requirement stating in part:

(1) "In the same way that influenza vaccination has been mandated in past years, all employees, employed provider, appointed medical staff,

volunteers, students, vendors and contractors who come into our facilities will be required to be vaccinated against COVID-19 or receive a valid exemption from employee health. Everyone must be compliant with the policy by **October 1**. Being fully vaccinated means completing the full vaccination series (which includes two doses of the Pfizer or Moderna vaccines, or one dose of the J&J vaccine), or receiving an approved exemption."

(2) "If you believe that you have a valid medical or religious reason to decline vaccination, please visit the vaccine policy page on The Source to learn more and contact employee health. Importantly, anyone who receives an exemption will be required to wear a mask at all times in UCHealth facilities and be tested weekly for COVID-19."

(3) Here are important dates you should be aware of:

August 13 – Last day to get the first Pfizer vaccine dose to have time to get the second dose by September 3.

August 22 – Vaccination deadline to receive $500 bonus on Sept. 3, 2021 for anyone who did not receive the bonus on July 23.

September 3 – Any employees who are not in compliance with the UCHealth vaccine policy will receive notification of disciplinary action.

October 1 – Contractors, vendors and volunteers will not be allowed to enter UCHealth facilities unless they are in compliance with the vaccine policy.

October 31 – Any employees who remain out of compliance will face disciplinary action up to and including termination. [58]

195.    The requirement to wear a "mask" and engage in a "weekly test" required Plaintiffs to participate in the use of PREP Act and EUA products outside of their free consent in violation of their statutory rights and deprived their Equal Protection of Laws as guaranteed under the Fourteenth Amendment because the policy did not require the same activities of employees who agreed to participate in products authorized under one of the above statutes.

196.    On July 28th, 2021, and through the filing of this complaint, all COVID-19 drugs that the FDA has licensed and introduced into commerce have either been under 21 U.S.C.

---

[58] See Exhibit C, UCHealth COVID-19 Vaccine Mandate

§360bbb-3 or the PREP Act. Therefore, it is irrefutable that Defendants relied exclusively on 21 U.S.C. §360bbb-3 products for complying with its vaccine, testing, and masking mandates.

197.    As of July 28th, 2021, the only COVID-19 drugs available to Defendants and Plaintiffs were classified by the FDA as investigational new drugs under 21 U.S.C. §360bbb-3 authorization (see paragraphs 75-78).

198.    Investigational new drugs[59] (IND) have no FDA-licensed legal indication to treat, cure, or prevent any known disease and are experimental by their very nature.[60]

199.    INDs are not FDA-licensed as "vaccines."

200.    Therefore, it is an indisputable fact that UCHA's policy unlawfully required Plaintiffs to inject an unlicensed investigational new drug into their bodies before October 1, 2021, as a condition for Plaintiffs to avoid "fac[ing] disciplinary action up to and including termination" in their chosen healthcare profession.

201.    Moreover, it is indisputable that Defendants misrepresented the classification of available drugs to Plaintiffs, never referred to the available drugs as investigational, and only referred to them as having an FDA-licensed classification as a vaccine. The purpose of these misrepresentations is that the laws associated with a drug's classification have significant legal ramifications for the Plaintiffs (see, *infra*), a fact Defendants hid from Plaintiffs to compel participation.

---

[59] Investigational drug "means a new drug or biological drug that is used in a clinical investigation." (21 CFR 312.3 "Investigational new drug") Clinical investigation "means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice." (21 CFR 312.3 "Clinical investigation") (Emphasis added).

[60] Investigational new drug means, "A substance that has been tested in the laboratory and has been approved by the U.S. Food and Drug Administration (FDA) for testing in people…Also called experimental drug, IND, investigational agent, and investigational drug." NCI Dictionary of Cancer Terms. National Cancer Institute. Published 2023. Accessed June 25, 2023. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/investigational-new-drug

202.    UCHA used its financial position to place Plaintiffs under moral duress[61] in hopes of causing them to surrender their Constitutional and statutory rights, as most other employees had already capitulated to that duress.

203.    Therefore, the policy was illegal because it required Plaintiffs to inject an unlicensed investigational drug into their bodies as a condition for continuing employment, to forego wearing a mask under PREP Act authority, and to forego unwanted medical examinations utilizing testing articles under 21 U.S.C. §360bbb-3 and the PREP Act.[62]

204.    The policy was illegal because it required Plaintiffs to seek an exemption to have the right to "decline" the product without consequence, a right they already possessed by federal statute.

205.    The policy breached UCHealth's CDC COVID-19 Vaccination Program Provider Agreement because it violated many of Plaintiffs' third-party beneficiary rights set forth in the Provider Agreement, such as the right to consider participation by obtaining medical counseling from participating providers without incurring a fee and the right to consider that participation without fearing or being subjected to "sanctions," "coercion," or "undue influence."[63]

206.    Before the CDC accepts an entity as a Provider in the CDC COVID-19 Vaccination Program, that entity, its CEO, and its Chief Medical Officer (or equivalent) must sign the CDC COVID-19 Vaccination Program Provider Agreement.

---

[61] Moral duress consists of imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessity or weakness of another. *Lafayette Dramatic Productions v. Ferentz*, 306 Mich. 193, 9 N.W.2d 57, 66; See also Black's Law Dictionary, Sixth Edition, p. 1008.

[62] The policy violated 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), 45 CFR § 46.116, 45 CFR § 46.122, the Belmont Report, Article VII of the ICCPR Treaty, 10 U.S.C. §980, CDC COVID-19 Vaccination Providers Program Agreement, Federal Wide Assurance Agreement.

[63] The CDC contract explicitly states that it requires adherence to 21 U.S.C. §360bbb-3, which must adhere to 45 CFR 46 and the Belmont Report because of the required medical research activities. Therefore, by extension, the provider must ensure that the Plaintiffs are not under outside pressures to participate in the CDC COVID-19 Vaccination Providers Program Agreement.

207.    The Provider Agreement informed UCHA that "Your Organization's chief medical officer (or equivalent) and chief executive officer (or chief fiduciary)—collectively, Responsible Officers—must complete and sign the CDC COVID-19 Vaccination Program Provider Requirements and Legal Agreement (Section A)"  (See Exhibit A, Provider Agreement.)

208.    The Provider Agreement requires the Organization to assign a person or persons who will be under a legal obligation to ensure the program is carried out effectively, declaring, "For the purposes of this agreement, in addition to Organization, Responsible Officers named below will also be accountable for compliance with the conditions specified in this agreement. The individuals listed below must provide their signature after reviewing the agreement requirements."

209.    The CDC informed UCHA that "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine."[64]

210.    One of the requirements of any EUA is the required condition of UCHA "to ensure that individuals to whom the product is administered are informed— of the option to accept or refuse administration of the product." See 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

211.    As established by a valid act of Congress, this provision requires UCHA to inform Plaintiffs of their legal rights when considering participation in any medical countermeasure under 21 U.S.C. §360bbb-3. This legal requirement is mandatory before the administration of any medical countermeasure by UCHA. It is the primary means by which UCHA obtains Plaintiffs' legally effective informed consent because it informs Plaintiffs that they will not incur a penalty

---

[64] See 12(a) in the Provider Agreement.

or loss of benefits to which they are otherwise entitled[65] should they choose not to participate in the 21 U.S.C. §360bbb-3 countermeasure.

212.     Additionally, the CDC contract requires adherence to 21 U.S.C. §360bbb-3, which must adhere to 45 CFR § 46.101, *et seq.* and the Belmont Report because of the required medical research activities. Therefore, by extension, the Provider must ensure that Plaintiffs are not under outside pressures to participate in the CDC COVID-19 Vaccination Program as outlined in 45 CFR § 46.116 and the Belmont Report (informed consent).

213.     At all times pertinent, the UCHealth Defendants concealed Plaintiffs' legal rights under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) in their COVID-19 vaccine policies. The purpose of the concealment was to cause Plaintiffs to surrender their Constitutional and statutory rights.

214.     UCHA, Ms. Concordia, Ms. Reidy, and Mr. Randle are legally sophisticated in the laws associated with investigational new drugs and knew in advance that individuals could not come under a mandate to inject an IND into their body as a condition to enjoy the privilege of the State, conduct commerce, or continue employment at UCHealth.

215.     UCHealth Defendants currently conduct an estimated 592 clinical investigations and trials,[66] all requiring Institutional Review Board review and adherence to 45 CFR § 46.101, *et seq.* and the Belmont Report.

216.     Many of UCHA's research projects utilize INDs requiring adherence to the same legal obligations, and for decades, UCHealth has used INDs in their various hospital departments in an attempt to treat life-threatening situations under the various expanded access protocols under 21 U.S.C. §360bbb *et seq.*

---

[65] 45 CFR § 46.116
[66] A quick search for "all" revealed 592 current studies. - Clinical trials. UCHealth. Published August 7, 2023. Accessed September 6, 2023. https://www.uchealth.org/clinical-trials/

217.     In light of their extensive knowledge and experience, when UCHealth Defendants referred to their policy as a "vaccination policy," they knew it was misleading because as of the date of the issuance of their "vaccination policy," no COVID-19 drug manufacturer had received a marketing license from the FDA, meaning the available COVID shots were investigational and subject to the consent requirements of the federal statutes discussed herein.

218.     Well before the COVID-19 pandemic began, UCHealth was assigned Federal Wide Assurance Agreement number 00023003 by HHS after UCHealth assured HHS that UCHealth would comply with 45 CFR § 46.101, *et seq.* and the Belmont Report when involving individuals with investigational medical products funded by federal dollars or issued under federal authority. This assurance means UCHealth promised not to place individuals under "sanctions," "coercion," "undue influence," or "unjustifiable pressures" to participate in the use of an investigational new drug, biologic, or device when federal funding or authority is involved.[67]

219.     Therefore, when UCHealth stated, "In the same way that influenza vaccination has been mandated in past years, all…who come into our facilities will be required to be vaccinated against COVID-19," it ignored its knowledge that an FDA-licensed influenza vaccine is subject to different laws than those that govern the use of drugs that are not licensed by the FDA, such as the COVID EUA investigational drugs, and misrepresented the truth to Plaintiffs, all with the goal of coercing them into capitulating to their demands.

220.     UCHealth is prohibited by Congress, its FWA agreement, 21 U.S.C. §360bbb-3, the PREP Act, Article VII of the ICCPR Treaty, its IRB, and its signed CDC COVID-19 Vaccination Program Provider Agreement from requiring any person to participate in any IND.

---

[67] The Belmont Report (informed consent), 45 CFR §46.116

221.    It is indisputable that on July 28, 2021, the FDA had not licensed any COVID-19 drug as a vaccine and that although the FDA has licensed two drugs as a vaccine against the Coronavirus, the manufacturers of those drugs (i.e., Pfizer-BioNTech, Moderna) refused to ship them.

222.    Therefore, either UCHealth has always mandated the use of INDs, or the only INDs it has ever mandated are the COVID-19 INDs, and it intentionally mispresented facts to the Plaintiffs in hopes of causing Plaintiffs confusion regarding their right to refuse an investigational new drug.

223.    Plaintiffs are accustomed to helping staff obtain informed consent from patients undergoing treatment with investigational new drugs, so the intentional misrepresentation of facts that the experimental drugs would be mandated "in the same way" as licensed drugs had always been was presented to Plaintiffs for the express purpose of causing them to unintentionally participate in the Federal Government's medical research activity, which is an outrageous act that shocks the conscience in modern society.

224.    21 U.S.C. §355(a) states that "no person shall introduce or deliver for introduction into interstate commerce any new drug unless an approval of an [FDA marketing] application." (Emphasis added).

225.    Congress carved out exemptions to the 21 U.S.C. §355(a) restriction under 21 U.S.C. §360bbb *et seq.*[68] The exemptions allow individuals access to unlicensed drugs and biologics under compassionate, educational, or emergency conditions.

---

[68] 21 U.S.C. §360bbb is titled, "Expanded Access to Unapproved Therapies and Diagnostics" and 21 U.S.C. §360bbb(a) states, "The Secretary may, under appropriate conditions determined by the Secretary, authorize the shipment of investigational drugs or investigational devices for the diagnosis, monitoring, or treatment of a serious disease or condition in emergency situations."

226.    Congress established **a required condition** before expanded access protocols could be issued under 21 U.S.C. §360bbb-3[69], "[w]ith respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), **shall**, for a person who carries out any activity for which the authorization is issued, **establish such conditions** on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health." (21 USC 360bbb-3(e)) (emphasis added)

227.    Congress also conferred authority onto the Secretary that he may "appropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, **and the circumstances under which**, the product may be administered with respect to such use." (21 U.S.C. §360bbb-3(e)(1)(B)(ii)) (Emphasis added).

228.    However, because all COVID-19 drug EUAs must comply with 45 CFR § 46.101, *et seq.*[70] and the Belmont Report, Congress informed UCHealth Defendants that "[n]othing in this section provides the Secretary **any authority to require any person to carry out any activity** that becomes lawful pursuant to an authorization under this section (21 U.S.C. 360bbb-3(l))" (Emphasis added).

229.    In other words, the HHS Secretary may grant expanded access to unlicensed investigational new drugs (Pfizer-BioNTech COVID-19 Vaccine). Still, the Secretary is not authorized to require any person to manufacture, distribute, administer, or receive the EUA

---

[69] There are various expanded access protocols offered under 21 U.S.C. §360bbb *et seq.* and 21 U.S.C. §360bbb-3 is unique in that it is granted for large populations only under the statute's prescribed conditions.

[70] 45 CFR §46.122 "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied." "Research means a systematic investigation, including research development, testing, and evaluation, <u>designed to develop or contribute to generalizable knowledge</u>. Activities that meet this definition constitute research for purposes of this policy, <u>whether or not</u> they are conducted or supported under a program that is considered research for other purposes." - 45 CFR §46.102(1) (emphasis added)

product. Moreover, Congress did not authorize the HHS Secretary to delegate his authority to another person. By extension, UCHA's involvement in a 21 U.S.C. §360bbb-3 activity also restricts them from requiring anyone to participate, a fact they were intimate with.

230.   This fact is why the CDC required UCHA and its executive leaders to sign its contract promising that it would abide by 21 U.S.C. §360bbb-3. UCHA cannot produce a treaty, statute, regulation, or contract providing it authority to mandate what Congress or the HHS Secretary prohibits.

231.   The Supremacy Clause of the U.S. Constitution dictates that UCHA may not amend 21 U.S.C. §360bbb-3 to establish conditions contrary to that federal law.

232.   The restriction by Congress that no person can require any other person to participate in medical countermeasures ensures that healthcare professionals have complete authority to provide a quality standard of care[71] to individuals considering participation because not every person is a quality candidate to participate in an IND. Therefore, medical professionals, not political bureaucrats or a company's human resources department, have the necessary medical knowledge to understand when and when not to administer an emergency medical countermeasure to a patient.

233.   Moreover, the restriction of the HHS Secretary's authority ensures the Federal Government, as well as the State Government through the Provider Agreement, obtains the Plaintiffs' legally effective informed consent since no person can be penalized for refusing to participate.

---

[71] "The standard of care is the benchmark that determines whether professional obligations to patients have been met. Failure to meet the standard of care is negligence, which can carry significant consequences for clinicians." Vanderpool D. The Standard of Care. *Innovations in clinical neuroscience*. 2021;18(7-9):50-51. Accessed September 9, 2023.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8667701/#:~:text=The%20standard%20of%20care%20is,carry%20significant%20consequences%20for%20clinicians.

234.   UCHA Defendants, acted under color of law when depriving Plaintiffs of their Constitutional and Statutory rights when issuing the COVID-19 vaccination policy through which the deprivations occurred.

235.   UCHA Defendants are the policymakers that either developed the COVID-19 policy, issued the policy, enforced the policy, and or signed the CDC COVID-19 Vaccination Program Provider Agreement promising not to develop such a policy.

236.   UCHA Defendants are responsible for ensuring compliance with UCHealth's Federal Wide Assurance and its Institutional Review Board legal obligations.

237.   At all times pertinent, UCHA Defendants, acted on a State custom that allows persons in authority to ignore the federal statutory rights of individuals to refuse the administration of COVID-19 INDs without incurring a penalty or loss of benefits to which they are otherwise entitled.[72]

238.   UCHA Defendants, acted on a State policy[73] (see, *infra*) mandating healthcare facilities to prohibit Plaintiffs from engaging in employment in their chosen profession should they

---

[72] The Supreme Court noted in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) that the "Petitioner will have established a claim under § 1983 for violation of her equal protection rights if she proves that she was refused service by respondent because of a state-enforced custom…" (emphasis added)

[73] Although UCHA is a political subdivision, Defendants might argue that their actions should not be considered state action. Therefore, Plaintiffs assert that at all times pertinent, UCHA was engaged in state action, acting under color of state law. As the court held in *Modaber v. Culpeper Memorial Hospital, Inc.,* 674 F.2d 1023 (4th Cir. 1982): "we must inquire 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself.'" *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *accord, Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978). In holding that a privately-owned utility's termination of service is not "state action", the Court in *Jackson* makes it clear that state involvement without state responsibility cannot establish this nexus. *See* 419 U.S. 358, 95 S.Ct. 457. A state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest. It acts in an exclusively state capacity when it "exercises powers traditionally exclusively reserved to the state[,]" 419 U.S. 352, 95 S.Ct. 454; for the state's direct benefit when it shares the rewards and responsibilities of a private venture with the state, *see id.,* 357-58, 95 S.Ct. 456-57, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 723-24, 81 S.Ct. 856, 860-61, 6 L.Ed.2d 45 (1961); and at the state's specific behest when it does a particular act which the state has directed or encouraged."

refuse to inject an unlicensed investigational drug into their bodies outside of their free will and voluntary consent.[74]

239.   At all times pertinent, UCHA Defendants, knew that the State policy and their COVID-19 vaccination policy violated federal law, contractual agreements, and Plaintiffs' rights. However, choosing to conspire with the State for greed (COVID-19 Vaccination Program cash cow), UCHA Defendants willfully and with moral turpitude [75] deprived Plaintiffs of their Constitutional and statutory rights.

240.   Plaintiffs were required to wear a mask or participate in unwanted medical testing only because of choosing a federally secured right (21 U.S.C. §360bbb-3) with which UCHA Defendants disagreed, while other employees choosing to inject such drugs into their bodies were not required to test or wear a mask, violating Plaintiffs' Equal Protection of Laws as guaranteed to them under the Fourteenth Amendment.

241.   UCHA Defendants, did not provide Plaintiffs with either their substantive or procedural due process rights as guaranteed to them under the Fourteenth Amendment before depriving them of their liberty (freedom from masking and testing policies as enjoyed by other employees) and property (e.g., wages, benefits, retirement funds).

242.   At all times pertinent, UCHA Defendants refused to acknowledge Plaintiff's statutory rights to refuse mandated products without consequence, which nullified Due Process.

243.   UCHA Defendants engaged in significant coercive measures by allowing Plaintiffs to submit only for a religious or medical exemption via an online process under duress.

---

[74] "[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Dennis v. Sparks*, 449 U.S. 24 (1980)
[75] "This phrase is used to describe the violation of decent, moral, and honest behavior and an act of depravity or vileness." Black's Law Dictionary 2nd Ed.

244.    The online process required Plaintiffs to check a box[76] indicating that they would "comply with UCHealth Vaccination Policy," which changed frequently, and that they "agree" to "wear a mask" if the exemption is granted.  Checking the box, however, was mandatory, and one could not submit an exemption without checking that box, yet UCHealth adamantly refused Plaintiffs any other means to submit an exemption. In other words, UCHealth created a coercive scheme that forced Plaintiffs to involuntarily agree to unconstitutional conditions to participate in UCHealth's exemption process. The process is a violation of federal statute because it discriminates against Plaintiffs' Fourteenth Amendment rights by requiring Plaintiffs to barter their rights as a condition to enjoy a privilege of the State. Moreover, UCHA and its Policymakers violated 21 U.S.C. §360bbb-3 via the process because it established participation conditions not authorized by Congress.

245.    Plaintiff Loni Thalheimer submitted a paper version of her UCHealth COVID-19 Vaccine Medical Exemption and Release Form along with a written religious exemption request.[77] Still, she was informed by UCHealth that she was not allowed to submit her exemptions outside of the online portal and that she could only submit one, not both.  Confused, Mrs. Thalheimer submitted her religious exemption online and then mailed in her medical exemption.

246.    Having personal knowledge of Mrs. Thalheimer's medical condition, her doctor issued an exemption, believing the COVID-19 drugs could have severe physical consequences for Mrs. Thalheimer's health, yet UCHealth refused to acknowledge the medical exemption because UCHA Defendants cared more about their agenda than Mrs. Thalheimer's rights, safety, and health, which they had a duty to protect.

---

[76] See Exhibit D, Online Acknowledgement Box.
[77] See Exhibit E, Affidavit of Loni Thalheimer.

247.     UCHealth informed Mrs. Thalheimer that they would only accept either a religious or a medical exemption, but not both, and only those exemptions submitted via the online portal requiring her to surrender her Constitutional and statutory rights before submitting said request.

248.     Therefore, not only did UCHA and its Policymakers fraudulently require that which Congress prohibits (i.e., injection of unlicensed drugs), but they also refused to accept a valid medical exemption from Mrs. Thalheimer's medical professional stating that the drug could cause Mrs. Thalheimer severe harm because she did not submit that exemption via the online portal which required her to agree to a deprivation of her Constitutional rights before having the right to submit. Although Mrs. Thalheimer mailed a medical exemption via a signed affidavit, UCHA ignored her medical condition with wanton disregard for her rights, safety, and health. Such tyrannical actions demonstrate outrageous conduct by which a normal person would be highly offended.

249.     UCHA Defendants, issued and enforced a COVID-19 vaccination policy to intentionally inflict emotional distress upon Plaintiffs – individuals who built their lives in Colorado and spent decades sweating, crying, and laboring over Colorado residents, providing life-saving medical care selflessly.

250.     Plaintiffs' dreams, goals, and financial futures depended upon UCHA complying with federal law and its contractual obligations regarding their employment. Still, Plaintiffs' aspirations were destroyed by UCHealth Defendants' moral, turpitude and complete and wanton disregard for the U.S. Constitution, their FWA and CDC COVID-19 Vaccination Program contractural duties, 21 U.S.C. §360bbb-3 protocols, and the ethical principles of the Belmont Report they pledged to abide by.

251.    The COVID-19 INDs have caused historic numbers of severe adverse reactions of which Plaintiffs were first-hand witnesses, and UCHA's Policy caused Plaintiffs severe fear that they would either lose access to living wages or become victims of one of the COVID-19 drugs' adverse reactions, causing Plaintiffs to be angered by UCHA's Policymakers' willful and wanton disregard for Plaintiffs' rights, safety, and health.

252.    Plaintiffs could not understand why UCHealth required informed consent from patients for COVID-19 drugs but not from them. Therefore, the anger over the loss of Constitutional rights and fear of losing their livelihoods, dreams, goals, and ability to work in their chosen profession caused Plaintiffs to experience life-altering emotional distress.

253.    UCHA Defendants breached their duties under:

(1) Federal Wide Assurance agreement,

(2) institutional review board,

(3) 45 CFR § 46.101, *et seq.*,

(4) 21 U.S.C. §360bbb-3,

(5) the PREP Act,

(6) CDC COVID-19 Vaccination Program Provider Agreement,

(7) Article VII of the ICCPR Treaty,

(8) the Belmont Report, and

(9) for refusing to obtain Plaintiffs' legally effective informed consent.

254.    UCHA Defendants deprived Plaintiffs of their Fourteenth Amendment rights to Equal Protection of Laws and Due Process.

255.    UCHA Defendants placed Plaintiffs under moral duress, undue influence, and unjustifiable pressures[78] when using their position of influence (financial and authority) to compel participation in an unlicensed drug outside of Plaintiffs' free will and voluntary consent, a most severe charge of moral turpitude that Congress has spent more than 50 years attempting to eradicate from the healthcare industry.

256.    UCHA Defendants issued a policy that placed Plaintiffs under moral duress to participate in a legally binding agreement outside of their free consent, having potentially severe legal consequences for Plaintiffs (see paragraph 163).

257.    The potential participation by Plaintiffs in the use of 21 U.S.C. §360bbb-3 and PREP Act drugs only offered via the CDC COVID-19 Vaccination Program was meant to financially benefit UCHA. UCHA unjustly enriched itself by misrepresenting its authority to company employees as if they had the legal authority to mandate participation in COVID-19 INDs despite never claiming that right for any other IND. Under fraudulent pretense, that mandate caused most employees to capitulate their Constitutional and statutory rights, unjustly enriching UCHA.

258.    To ensure maximum compliance with UCHA's unlawful vaccination policy, CEO Elizabeth Concordia applied maximum pressure on Plaintiffs to set them as an example to other employees considering their 21 U.S.C. §360bbb-3 rights because UCHA Defendants' attitude was that employees must obey illegal edicts or face the employment and benefits firing squad, Constitution be damned.

---

[78] UCHA unjustly enticed Plaintiffs to participate in the federal government's CDC COVID-19 Vaccination Program research activity by offering them $500 in bonus pay, which violates legally effective informed consent requirements. "Unjustifiable pressures usually occur when persons in positions of authority or commanding influence -- especially where possible sanctions are involved -- urge a course of action for a subject." - The Belmont Report

259.     UCHA Defendants issued a policy unlawfully mandating that Plaintiffs inject an unlicensed drug under 21 U.S.C. §360bbb-3 and the PREP Act into their bodies, and if they refused, they must wear a mask and take tests as a form of punishment.

260.     Then, once CDPHE issued its policy mandating that UCHA terminate the employment of any person refusing to inject an unlicensed drug into their body, UCHA utilized that policy to financially destroy the lives of Plaintiffs by depriving them of living wages.

261.     UCHA had contracts, agreements, and federal laws to which they were legally bound. Those federal laws and contracts superseded CDPHE's authority, and UCHA knew that the State policy was illegal because it conflicted with every federal law UCHA had operated under for decades.

262.     At all times pertinent, UCHA could have, and should have, informed CDPHE that their policy violated known federal law, and compliance with that policy meant UCHA would commit fraud against the federal government and deprive Plaintiffs of their Constitutional and statutory rights. However, UCHA Defendants chose to act in concert with the State of Colorado when depriving Plaintiffs of their Constitutional and statutory rights for financial greed instead of complying with their legal obligations.

263.     The State of Colorado willfully participated in the CDC COVID-19 Vaccination Program Provider Agreement[79] and allowed UCHA to participate on behalf of the State of Colorado and the Federal Government.  Therefore, by extension, UCHA was also under a legal obligation to comply with 45 C.F.R. 46 §101, *et. seq* and the Belmont Report when administrating and administering the Federal Government's property (COVID-19 EUA drugs).

---

[79] "This program is a part of **collaboration** under the relevant state, local, or territorial immunization's cooperative agreement with CDC. To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements…" (emphasis added). – See Exhibit A, Provider Agreement

264.    On August 30, 2021, CDPHE Director, Jill Hunsaker Ryan, and CDPHE's Director of Health Facilities, D. Randy Kuykendall issued a direct request to the CDPHE Board Members to vote on amending the State's licensure standards under 6 CCR 1011-1, Chapter 2 pertaining to healthcare facilities. D. Randy Kuykendall requested the new rules on behalf of CDPHE's executive team, stating, "the Department requests the Board adopt the following regulations requiring all licensed healthcare facilities to ensure their eligible employees, direct contractors, and support staff are fully vaccinated against COVID-19."

265.    The Board, accepting the request by Ms. Ryan and Mr. Kuykendall, voted on and approved the new Part 12 rules[80], which interfered with Plaintiffs' right to exercise their 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III)[81] option and to enjoy employment in their chosen profession without consequence, thereby violating their Fourteenth Amendment Equal Protection and Due Process rights.

266.    The new "Part 12" rules amended the State's licensing requirements for healthcare facilities, stating in part:

> (12.2.1) "Each facility shall develop and implement a policy and procedure to ensure 100% of employees, direct contractors, and support staff have obtained full COVID-19 vaccination status in accordance with the schedule below."

> (12.2.1(a)) "All employees, direct contractors, and support staff must have received their first dose of the COVID-19 vaccination no later than September 30, 2021."

> (12.2.1(b)) "All employees, direct contractors, and support staff must have received their second dose of the COVID-19 vaccination (if applicable) no later than October 31, 2021."

> (12.2.1(c)) "All employees, direct contractors, and support staff must obtain a subsequent, or booster, dose of the COVID-19 vaccination should one be

---

[80] See Exhibit F, CDPHE Part 12 Rules
[81] 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III): "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

recommended by the Advisory Committee on Immunization Practices (ACIP), in accordance with the recommended timelines."

(12.2.1(e)) "On or after October 31, 2021, each facility shall ensure all newly hired employees, direct contractors, or support staff members have obtained full COVID-19 vaccination status, in accordance with this Part 12."

(12.2.4) "Each facility shall maintain the following documentation that may be examined by the Department, at any time, for purposes of verifying compliance with this Part 12. (A) Proof of immunization, as defined at 6 CCR 1011-1, Chapter 2, Part 1.51, or (B) A medical exemption signed by a physician, physician assistant, advanced practice nurse, or certified nurse midwife licensed in the State of Colorado stating that the COVID19 vaccination for the employee, direct contractor, or support staff is medically contraindicated as described in the product labeling approved or authorized by the FDA, or (C) Documentation of a religious exemption, as defined by facility policy."

267.    CDPHE Defendants knew they could not require facilities to "ensure 100% of employees, direct contractors, and support staff have obtained full COVID-19 vaccination" by "October 31, 2021."

268.    As previously discussed, no COVID-19 drug has been licensed by the FDA with a legal indication as a "vaccine" that has also been introduced into commerce for general commercial marketing. Therefore, it is an irrefutable fact that CDPHE Defendants mandated facilities to require individuals under their authority to have an unlicensed investigational drug injected into their bodies as a condition to continue employment after October 31, 2021.

269.    **No person has legal authority to require anyone to inject an unlicensed investigational drug into their body as a condition for anything. This statement is irrefutable by the Constitution, statute, treaty, or regulation.  Moreover, no person has legal authority to require anyone to participate in a product or activity under PREP Act immunity.**

270.   CDPHE Defendants knew the laws and regulations associated with the investigational new drug classification and how those laws restricted them from enacting mandatory deadlines that relied exclusively on unlicensed investigational drugs for compliance.

271.   HHS assigned CDPHE its Federal Wide Assurance number 00003044, indicating that CDPHE pledged never to place an individual under a "sanction" for refusing to participate in an unlicensed investigational medical product. Their assurance includes a pledge (duties) to abide by 45 C.F.R. 46 §101, *et. seq* and the Belmont Report when involving individuals with investigational new drugs (e.g., Pfizer-BioNTech COVID-19 Vaccine).

272.   CDPHE also voluntarily agreed to comply with the terms and conditions of the CDC COVID-19 Vaccination Program Provider Agreement and knew that "facilities" that signed the CDC contract could not be required to mandate the use of COVID-19 INDs to Plaintiffs.

273.   CDPHE Defendants enacted a rule that, as applied, required CDC COVID-19 Vaccination Program Providers to commit fraud against the Federal Government.

274.   Number 12(a) of the CDC contract states, "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine," which means that Colorado, CDPHE, and facilities (e.g., UCHealth) are prohibited from amending the conditions that the HHS Secretary established for any EUA, and they must also obtain individuals' legally effective informed consent before administering an EUA product to those individuals.

275.   Sanctions for refusing to inject an EUA drug into one's anatomy nullify legally effective informed consent and thus are fraud when healthcare facilities bill the U.S. Government for shots administered to employees under duress.

276.    The Provider Agreement warned CDPHE Defendants that "Non-compliance with the terms of Agreement may result in suspension or termination from the CDC COVID-19 Vaccination Program and criminal and civil penalties under federal law, including but not limited to the False Claims Act, 31 U.S.C. § 3729 *et seq*., and other related federal laws, 18 U.S.C. §§ 1001, 1035, 1347, 1349."

277.    The Part 12 rules, as applied, misrepresent CDPHE Defendants' authority because they mandate that healthcare facilities must participate in the use of EUA drugs. In turn, the facilities must also mandate individuals under their authority to participate in the use of EUA drugs. The rules, as applied, are illegal[82] and unconstitutional and tempt facilities under CDPHE's authority to commit fraud against the United States Federal Government by ignoring the authority of the HHS Secretary and requiring that which the Secretary and Congress prohibit.

278.    UCHA informed Plaintiffs that, by "October 31, 2021" "Per the Colorado Board of Health Rules requirements - All health care workers, support staff, and direct contractors must receive the COVID-19 vaccine. This applies to all CDPHE-regulated healthcare facilities. The UCHealth requirement dates will not change."

279.    Therefore, when CDPHE Defendants enacted a rule requiring facilities to ensure 100% of individuals under their authority receive an injection of an unlicensed investigational COVID-19 drug before October 31, 2021, those rules led to the deprivation of Plaintiffs' Constitutional and federal statutory rights, which caused severe financial and emotional distress injuries.

---

[82] No person may establish conditions for accessing unlicensed drugs other than the HHS Secretary and not even the Secretary has the authority to compel participation.

280.     Part 12 Rules violate the well-established Unconstitutional Conditions Doctrine. The Supreme Court held that a person "may not barter away his life or his freedom, or his substantial rights." *Home Ins. Co. of New York v. Morse*, 87 U.S. 455, 451 (1874)

281.     The Federal Government owns or funds all COVID-19 drugs and issued explicit requirements to Defendants that persons must be allowed to accept or refuse those products without consequence.

282.     The Federal Government entered into an agreement with the State of Colorado whereby the State would utilize its existing immunization program to approve, supervise, and ensure state-authorized healthcare facilities and workers comply with the government's mandate.

283.     The CDC enacted a Vaccination Program requiring Colorado Healthcare Facilities and Providers to sign and follow should they participate in the joint action with the Federal and State Governments.

284.     That process required all Defendants to ensure persons were under the Equal Protection of Laws, and if not, then Due Process was the reason for that unequal application. Therefore, when all Defendants issued policies demanding Plaintiffs to surrender their 21 U.S.C. §360bbb-3 right to refuse as a condition to continue employment in their chosen profession, that requirement established an Unconstitutional Condition.

285.     The Fifth and Fourteenth Amendments of the U.S. Constitution are **required** duties of Defendants; they are not conditional, nor were Defendants authorized by any law to alter the Amendments by fiat rule. The U.S. Court held in *Frost & Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583, 593-94 (1926)* that a State "may not impose conditions which require the relinquishment of constitutional rights."

286.     The State of Colorado, and UCHA, a political subdivision of the State, unassailably imposed conditions requiring Plaintiffs to relinquish their constitutional rights as a condition to continue employment in their chosen profession.

287.     CDPHE Defendants did not deny access to living wages when it came to healthcare facilities or their employees who chose the 21 U.S.C. §360bbb-3 option to ***accept*** administration of an EUA product, but they did with respect to those who chose to ***refuse*** administration of an EUA product.

288.     The option to choose is a power held by Plaintiffs that the State is **Constitutionally required** to protect equally. CDPHE Defendants knew of the 21 U.S.C. §360bbb-3 option and knew that no law allowed them to ignore that federal obligation when they issued Part 12 Rules.

289.     CDPHE Defendants misrepresented their authority when enacting 12.1.1: "The statutory authority for the promulgation of these rules is set forth in Section 25-1.5-102, 25- 1.5-103, and 25-3-103, C.R.S.". CDPHE had no authority to enact rules amending 21 U.S.C. §360bbb-3 and citing state law as the means to bypass the Supremacy Clause of the U.S. Constitution was nothing more than a fraudulent attempt by CDPHE Defendants to deprive Plaintiffs of their legal authority.

290.     When the Board voted on the new Part 12 rules, they usurped the authority of the U.S. Congress by amending federal laws and establishing conditions requiring that which Congress prohibits, mainly mandatory participation by healthcare facilities and workers in "covered countermeasures"[83] and or drugs, biologics, or devices[84] under emergency expanded access protocols.

---

[83] 42 U.S.C. § 247d-6d(a)(1)
[84] 21 U.S.C. §360bbb-3(a)(1)

291.    Moreover, Congress preempted, and the Supremacy Clause preempts, the authority of CDPHE Defendants from establishing conditions that conflict with or are different from any requirement under the PREP Act or any matter under 21 U.S.C. §360bbb-3. (42 USC 247d-6d(b)(8))

292.    The Part 12 rules deprived Plaintiffs of their 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) option to refuse, which automatically demoted Plaintiffs to second-class citizens because CDPHE Defendants refused to protect Plaintiffs' Fourteenth Amendment Equal Protection and Due Process rights. CDPHE Board Members declared by their vote that they would determine who would enjoy Fourteenth Amendment protections, not the United States Constitution, and any person choosing a 21 U.S.C. §360bbb-3 option they disagree with shall not be treated equally before the law.

293.    The Part 12 rules amended Article VII of the ICCPR Treaty by subjecting Plaintiffs to medical experimentation outside their free consent.

294.    The Part 12 rules amended the CDC COVID-19 Vaccination Program Provider Agreement the State willfully participated in by not adhering to Section 12(a) of the Provider Agreement requiring that "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine."

295.    The Part 12 rules amend 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) in violation of the U.S. Constitution and demonstrates CDPHE Defendants' breach of duty to Plaintiffs under the CDC Covid-19 Vaccination Program Provider Agreement.

296.    The Part 12 rules breach CDPHE Defendants' duties to Plaintiffs under CDPHE's Federal Wide Assurance agreement.

297.     The Part 12 rules breach CDPHE Defendants' duties to Plaintiffs under 21 U.S.C. §360bbb-3.

298.     The Part 12 rules breach CDPHE Defendant's duties to Plaintiffs under the PREP Act.

299.     The Part 12 rules breach CDPHE Defendants' duties to Plaintiffs under the Fourteenth Amendment (Equal Protection and Due Process).

300.     The Part 12 rules caused medical facilities to breach their institutional review board duties to Plaintiffs under 45 C.F.R. § 46.101, *et seq.*

301.     The Part 12 rules caused medical facilities to breach their duties to Plaintiffs under their Federal Wide Assurance agreements.

302.     The Part 12 rules caused medical facilities to breach their duties to Plaintiffs under their signed CDC COVID-19 Vaccination Program Provider Agreement.

303.     The wanton disregard for Plaintiffs' health and safety by CDPHE Defendants is demonstrated in their rule that they would only accept "A medical exemption signed by the physician…in the State of Colorado stating that the COVID-19 vaccination for the employee…is medically contraindicated as described in the product labeling approved or authorized by the FDA."

304.     Investigational new drugs are not labeled for their contraindications because they are investigational, and they have no legal indication to treat, cure, or prevent any known disease, nor are they labeled safe or effective. Manufacturers of INDs are prohibited from promoting their INDs as being safe or effective (21 CFR 312.7(a)) and have not been licensed to promote their IND drug with a legal indication.

305.    There are 19,000 FDA-licensed drugs, and when CDPHE enacted its new rules, three mRNA investigational COVID-19 drugs were available to Plaintiffs. Investigational New Drugs' formulations are continually amended from their resulting experiments. Therefore, at a minimum, there were more than one trillion unknown potential contraindications[85] that mere months of research could not have effectively exposed or accounted for. For this reason, the FDA prohibited CDPHE, and anyone else, from requiring any person to involuntarily participate in one of the three COVID-19 EUA investigational new drugs. An individual's own healthcare provider alone has the professional insight and knowledge of that individual's health to ascertain their viable participation in using an investigational new drug. CDPHE ignored the standard of care rules and established conditions contrary to ethical medicine and professionalism.

306.    Moreover, since no licensed drugs existed with a label containing the required proof of contraindications, no medical exemption could be accepted as valid by any facility. In other words, CDPHE Defendants established a requirement that could not be met, and that had potentially deadly consequences for individuals, demonstrating the moral turpitude of Defendants Ms. Ryan, Mr. Kuykendall, and Board Members.

307.    CDPHE Defendants also referred to the available COVID-19 EUA drugs as "vaccines," although the FDA only classified them as INDs. Thus, the CDPHE Defendants' goal of intentionally misrepresenting facts was to convince Colorado healthcare facilities that these

---

[85] 19,000 licensed drugs are in the marketplace. The average number of medications Americans take is four (Team S. Prescription drug statistics 2023. The Checkup. Published September 2021. Accessed September 17, 2023. https://www.singlecare.com/blog/news/prescription-drug-statistics/#:~:text=How%20many%20prescriptions%20does%20the,at%20least%20one%20prescription%20medication.). There are 21 major chronic diseases in the U.S. (Chronic Conditions | CMS. Cms.gov. Published 2020. Accessed September 17, 2023. https://www.cms.gov/data-research/statistics-trends-and-reports/chronic-conditions/chronic-conditions). 19,000 drugs interacting with just one mRNA drug contain more than 37,146, followed by 5,715 zeros potential adverse reactions. When taking into account the 21 major chronic diseases that the drug could cause an adverse reaction to, the number is as numerous as the stars. This fact is why it takes a drug years to come to market and years longer to be marketed as a vaccine. This fact is also the reason why Pfizer and Moderna refused to ship their COVID-19 drugs outside of absolute immunity.

EUAs could be mandated as if they were licensed drugs and to give cover for the healthcare facilities to operate illegally and defy the U.S. Congress at the expense of Plaintiffs' Constitutional and statutory rights.

308.   At all times pertinent, CDPHE Defendants refused even to acknowledge that 21 U.S.C. §360bbb-3 existed, despite it being the **only** federal statute authorizing healthcare facilities and workers to administer the COVID-19 EUA drugs.

309.   CDPHE Defendants refused to discuss, inform, train, or educate the medical community about their legal obligation to ensure that healthcare workers administering the drugs must inform recipients of their legal rights to accept or refuse the product without penalty. CDPHE Defendants intentionally refrained from fulfilling their duties under 21 U.S.C. §360bbb-3 because the statute proves their actions were illegal, capricious, and violated the rights of medical facilities and healthcare workers[86] licensed by the State of Colorado.

310.   The Part 12 Rules mandate that Plaintiffs enter into a legally binding agreement under the terms and conditions established in 21 U.S.C. §360bbb-3 and the PREP Act outside of their free consent (see, *supra*).

311.   At all times pertinent, CDPHE Defendants did not inform Plaintiffs that to participate in the use of an EUA COVID-19 drug under PREP Act immunity meant they must voluntarily agree to forfeit their legal rights to judicial relief should they incur a physical injury from the drug's use or its administration.

---

[86] Healthcare facilities and their employees have the right to administer 21 U.S.C. §360bbb-3 medical products based on their standard of healthcare. The State of Colorado ignored 21 U.S.C. §360bbb-3(l) and unlawfully removed that right by mandating that which Congress prohibits.

312.    Moreover, CDPHE Defendants did not inform Plaintiffs that they must allow medical researchers to utilize data resulting from their involvement with the drug for unknown purposes for eternity if they chose to participate.

313.    Lastly, CDPHE Defendants never informed healthcare facilities that their employees had the right to refuse any product under 21 U.S.C. §360bbb-3 authorization or any covered countermeasure under the PREP Act without incurring a penalty or loss of benefits.

314.    By direct extension, this intentional dereliction of duty by CDPHE Defendants led to the deprivation of Plaintiffs Constitutional and statutory rights when UCHA Defendants acted on the State policy.  That loss of rights led to severe financial damages and traumatic emotional distress.

315.    Issuing rules requiring a person to inject unlicensed investigational drugs used only in experimental conditions having more than one trillion unknown contraindications and knowing they were prohibited from issuing such a mandate under color of law demonstrates a most severe debased moral character. The loss of liberty, property, and life that might come from CDPHE Defendants' Part 12 Rules was apparently never part of their discussion.

316.    The actions of CDPHE Defendants were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

## XIX.  Legal Claims

317.    The facts described above constitute a deprivation of several of the rights guaranteed to Plaintiffs by the United States Constitution, federal statutes, and treaties. These deprivations are actionable under 42 U.S.C. § 1983 because the Defendants acted under color of state law when issuing their COVID-19 vaccination requirements and administrating the CDC

COVID-19 Vaccination Program pursuant to the CDC COVID-19 Vaccination Program Provider Agreement and the federal statutes cited therein.

318.    Court precedent demonstrates that federal statutes and regulations with rights conferring language are enforceable under 42 U.S.C. §1983.[87]

319.    Defendants were, and are, restricted from attempting to use state law to amend the above-referenced statutes, regulations, treaties, agreements, and contracts due to the Supremacy Clause Doctrine. The Supremacy Clause Doctrine, and the express preemption language in the PREP Act and 21 U.S.C. §360bbb-3, restrict public and private employers from using state laws to require individuals to participate in any EUA or PREP Act activity or use any EUA or PREP Act product. This extends to any at-will employment law, doctrine, or custom an employer would otherwise claim as the right to interfere in the CDC Vaccination Program, 21 U.S.C. §360bbb-3, or PREP Act protocols and to amend conditions established by Congress for Plaintiffs' benefit.

## COUNT ONE

### 42 U.S.C. § 1983 – Deprivation of Legally Effective Informed Consent

320.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

321.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, 10 U.S.C. § 980, EUA Scope of Authorization letters, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

---

[87] *Maine v. Thiboutot*, 448 U.S. 1 (1980), the court held that "Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the §1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." See also, *Health and Hospital Corporation of Marion Cty. V. Talevski.*

322.    21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) (the EUA statute) contains a required condition of the Secretary "to ensure that individuals to whom the product is administered are informed — 'of the option to accept or refuse administration of the product.'"

323.    21 U.S.C. §360bbb-3, the CDC COVID-19 Vaccination Program Provider Agreement, and each EUA's Scope of Authorization contains research conditions for COVID-19 medical products meeting 45 CFR 46.102(l)'s definition of research requiring adherence to 45 CFR § 46.101[88] *et seq.*

324.    "Before involving a human subject in research covered by this policy, an investigator shall obtain the legally effective informed consent of the subject or the subject's legally authorized representative." 45 CFR 46.116(a)(1)

325.    45 CFR § 46.116 and the Belmont Report contain the only known definition of legally effective informed consent.

326.    45 CFR 46.116(b)(8) states: "A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."

327.    The Belmont Report, having the force of law,[89] declares, "An agreement to participate in research constitutes a valid consent only if voluntarily given. This element of informed consent requires conditions free of coercion and undue influence" and "Respect for persons requires that subjects, to the degree that they are capable, be given the opportunity to

---

[88] "This policy applies to all research involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency" 45 CFR 46.101(a).
[89] 45 CFR § 46.101(c), 45 CFR 46.101(i), 45 CFR § 46.122

choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied."

328.    Defendants breached their duties to establish "adequate standards" of informed consent when applying "sanctions," "coercion," "undue influence," and "unjustifiable pressures" on Plaintiffs to participate in COVID-19 investigational new drugs and devices (e.g., masks, testing articles). At all times pertinent, Defendants did not obtain Plaintiffs' legally effective informed consent.

329.    Article VII of the ratified International Covenant on Civil and Political Rights (ICCPR) Treaty affirms that "…no one shall be subjected without his free consent to medical or scientific experimentation."

330.    The Defendants' actions described above, individually and/or collectively, acting under color of state law, and in deprivation of the Constitutional rights and rights secured by the above federal statutes, regulations, and treaty, unlawfully subjected Plaintiffs to the use of investigational medical products under threat of penalty outside of their legally effective informed consent as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT TWO

### 42 U.S.C. § 1983 – Deprivation of Equal Protection Rights

331.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

332.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of

Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

333.    The Fourteenth Amendment to the U.S. Constitution guarantees equal protection of the laws.

334.    At all times pertinent, Defendants intentionally only penalized individuals who exercised their federally secured right to refuse administration of a product under the PREP Act or an EUA drug (e.g., Pfizer-BioNTech COVID-19 Vaccine), biologic, or device (e.g., masks, COVID-19 testing articles) thereby applying the laws unequally to and depriving Plaintiffs, of their Constitutional Equal Protection Rights.

335.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the Plaintiffs of their equal protection rights as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT THREE

### 42 U.S.C. § 1983 – Deprivation of Constitutional Due Process Rights

336.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

337.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

338.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees the right to due process of law before infringing a citizen's interest in life, liberty, or property.

339.    At all times pertinent, Defendants, having knowledge of Plaintiffs' Constitutional and federally secured right to refuse administration of EUA drugs and medical products, intentionally ignored those rights in an attempt to increase the number of participants in the CDC COVID-19 Vaccination Program for purposes of greed, resulting in the deprivation of Plaintiffs' substantive and procedural Due Process rights.

340.    "The fundamental requisite of due process of law is the opportunity to be heard." *Louisville & Nashville R. Co. v. Schmidt*, 177 U. S. 230, 177 U. S. 236.  Defendants did not provide Plaintiffs with a date, time, place, or procedure to defend their right to refuse injection of an unlicensed drug before depriving them of their liberty and property.

341.    Defendants' requirement that Plaintiffs inject unlicensed drugs into their bodies as a condition to sell their labor "is not a legitimate exercise of the police power of the State, but an unreasonable, unnecessary and arbitrary interference with the right and liberty of the individual to contract in relation to labor, and, as such, it is in conflict with, and void under, the Federal Constitution." *Lochner v. New York*, 198 U.S. 45 (1905)

342.    Plaintiffs have the Constitutional right "to present [their] case and have its merits fairly judged." *Logan v. Zimmerman Brush Co*., 455 U.S. 422 (1982). At all times pertinent, Defendants refused to acknowledge Plaintiffs' Constitutional and Statutory rights, thereby nullifying impartiality.

343.    The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, have deprived the

Plaintiffs of their substantive and procedural due process rights as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## **COUNT FOUR**

### **42 U.S.C. § 1983 - Deprivation of Rights Under the Spending Clause**

344.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

345.    The laws cited in the CDC COVID-19 Vaccination Program Provider Agreement, 45 CFR §46.122, 10 U.S.C. §980, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

346.    In *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), "the Court has found that spending legislation gave rise to rights enforceable under §1983 only in *Wright* v. *Roanoke Redevelopment and Housing Authority,* 479 U. S. 418, 426, 432, and *Wilder* v. *Virginia Hospital Assn.,* 496 U. S. 498, 522523, where statutory provisions explicitly conferred specific monetary entitlements upon the plaintiffs, and there was no sufficient administrative means of enforcing the requirements against defendants that failed to comply." See also, *Health and Hospital Corporation of Marion County v. Talevski*, *supra*, 599 U.S. ____ (2023)

347.    The federal government appropriated funds to the Department of Defense to enter into contracts with the manufacturers of the EUA investigational drugs to purchase 100% of the products and to distribute them to the Organizations that signed the CDC COVID-19 Vaccination Program Provider Agreement.

348.    The federal government funds any charges associated with the administration of the COVID-19 EUA shots via Medicare.[90]

---

[90] https://www.medicare.gov/medicare-coronavirus

349.    In the case at bar, the "specific monetary entitlement" to Plaintiffs, and any potential recipient, is that the EUA investigational drugs and their administrative costs are free of charge to the recipients.

350.    45 CFR §46.122 provides: "Federal funds administered by a Federal department or agency may not be expended for research involving human subjects unless the requirements of this policy have been satisfied."

351.    10 U.S.C. §980 states: "Funds appropriated to the Department of Defense may not be used for research involving a human being as an experimental subject unless – the subject's informed consent is obtained in advance…"

352.    Only Organizations who agreed to participate in the CDC Vaccination Program can bill the government for administering the shots.

353.    The EUA statute and the PREP Act lack any enforcement scheme for a breach of a potential recipient's right to refuse administration of an EUA investigational drug without penalty that would preclude §1983 enforcement.

354.    Agreement Requirement Number 3 on the CDC Provider Agreement states, "Organization must not sell or seek reimbursement for COVID-19 Vaccine and any adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provides without cost to Organization."

355.    Agreement Requirement Number 4 states, "Organization must administer COVID-19 Vaccine regardless of the vaccine recipient's ability to pay COVID-19 Vaccine administration fees."

356.    These two provisions establish a specific monetary entitlement to the individual.

357.   Agreement Requirement Number 5 states, "Before administering COVID-19 Vaccine, Organization must provide an approved Emergency Use Authorization (EUA) Fact Sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative."

358.   Agreement Requirement Number 5 complies with funding restrictions established by Congress in, 45 CFR § 46.122 and 10 U.S.C. § 980.

359.   The compliance is found in the EUA Fact Sheet, notating the individual's right to refuse the administration of the product. This express right is the fundamental requirement in obtaining the legally effective informed consent of the individual.

360.   Whether for civilians under 45 CFR § 46.122 or personnel under 10 U.S.C. § 980, Congress created a specific monetary entitlement for individuals considering whether or not to participate in a federally funded research activity. That entitlement means they have the explicit right to be informed of the risks, benefits, and alternatives to the research product and then consider whether to participate without incurring a fee or being under outside pressure to participate.

361.   This monetary entitlement is most apparent in the CDC COVID-19 Vaccination Program Provider Agreement. An individual can seek out a participating COVID-19 Program healthcare professional, obtain medical counseling, ask questions, and read literature. If they choose not to participate, they will not incur a fee from the professional for the administrative time spent considering whether or not to participate since the healthcare professional must inform them of their legal right to refuse under 21 U.S.C. §360bbb-3.

362.   The healthcare professional agreed to comply with the legally effective consent requirements via Agreement Number 12 on the CDC COVID-19 Vaccination Program Provider Agreement mandating that (1) "Organization must comply with all applicable requirements as set

forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine," and (2) "Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws."

363.     The "all applicable requirements as set forth by the U.S. Food and Drug Administration, including…any EUA" extends to 21 USC 360bbb-3 (Section 564), 45 CFR 46, the FWA, the IRB, the ICCPR Treaty, and the Scope of Authorization letter.

364.     Defendants were under explicit legal obligations to comply with 45 CFR § 46.122, 10 U.S.C. § 980 via their FWA agreement and their CDC COVID-19 Vaccination Program participation.

365.     Therefore, the laws cited in CDC COVID-19 Vaccination Program Provider Agreement, 21 U.S.C. §360bbb-3, 45 CFR § 46.122, and 10 U.S.C. §980 clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983 when federal funds are expended under those provisions of law.

366.     The Defendants' actions described above, individually and/or collectively, and in deprivation of the rights and privileges secured by the Constitution and the above statutes and regulations, refused to obtain the legally effective informed consent of the Plaintiffs in violation of spending legislation as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT FIVE

### Unconstitutional Conditions Doctrine - 42 U.S.C. § 1983

367.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

368.    The CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR §46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

369.    "…the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence (emphasis added)". *Frost Trucking Co. v. R.R. Com*, 271 U.S. 583, 593-94 (1926)

370.    CDPHE Defendants' Part 12 Rules informed healthcare facilities they would lose their government-issued license to operate[91] should they allow Plaintiffs to exercise their 21 U.S.C. §360bbb-3 right to refuse injection of an unlicensed investigational new drug.

371.    By nexus, the Part 12 Rules established a condition requiring Plaintiffs to surrender their equal protection and due process rights before they could engage in the Constitutionally protected activity of selling their labor to Colorado healthcare facilities, violating the well-established Unconstitutional Conditions Doctrine.

372.    UCHA Defendants enacted policies requiring Plaintiffs to surrender their Fourteenth Amendment rights (e.g., required to utilize EUA masks and tests) as a condition to

---

[91] 6 CCR 1011-1 Chapter 2.11.1(A)(8)

submit an exemption request. Additionally, Plaintiffs were not allowed to continue employment unless they voluntarily surrendered their Constitutional protections.

373.     The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, manipulated the Constitutional rights of Plaintiffs out of existence as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

<div align="center">

**COUNT SIX**

**PREP Act - 42 U.S.C. § 1983**

</div>

374.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

375.     The PREP Act, the CDC COVID-19 Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR Part 46, the Belmont Report, 21 U.S.C. §360bbb-3, Article VII of the ICCPR Treaty, Federal Wide Assurance, the EUA Scope of Authorization letter, and the Fourteenth Amendment clearly and unambiguously create rights enforceable pursuant to 42 U.S.C. § 1983.

376.     The PREP Act provides certain immunities to "covered countermeasures" when the HHS Secretary determines there is a public health emergency and makes a declaration of that emergency through the publication in the Federal Register specifying the conditions by which the covered countermeasure and covered persons can participate and the use of such covered countermeasure.[92]

377.     Congress preempted the State of Colorado and its political subdivisions from establishing laws (Part 12 Rules) and continuing in effect with existing ones (at-will employment

---

[92] 42 USC 247d-6d(b)(1)

doctrine) that would otherwise interfere with Plaintiffs' authority with respect to "conduct undertaken" concerning "any matter included in a requirement applicable" to a "covered countermeasure" under the PREP Act or 21 U.S.C. §360bbb-3 including the required condition that Plaintiffs be informed of their legal right to either accept or refuse said countermeasure.[93],[94]

378.    Congress was explicit that the HHS Secretary must establish conditions ensuring that "potential participants are educated with respect to…the voluntary nature of the program…"[95]

379.    The "program" consists of those agreeing to manufacture, distribute, administer ("covered person"), and receive[96] ("covered individual") the product.

380.    Congress expressly restricted the HHS Secretary from having any authority to require any person to participate in any activity involving a "drug," "biologic," or "device" under 21 U.S.C. §360bbb-3[97] or any "covered countermeasure" under the PREP Act. By extension, any person authorized to participate in the program is also restricted from mandating participation.

381.    The State of Colorado and the UCHA political subdivision established laws and policies that conflicted with the PREP Act and 21 U.S.C. §360bbb-3 when they required Plaintiffs to participate in the use of a covered countermeasure under threat of penalty. Moreover, Defendants engaged in policy-making and conduct that conflicted with the PREP Act and the Fifth and Fourteenth Amendments of the United States Constitution.

382.    Mandatory participation in PREP Act covered countermeasures is a severe violation of the Constitution's Due Process guarantees.

---

[93] 21 U.S.C. 301 is the Federal Food, Drug and Cosmetic Act, which ranges from §301 to §399, and thus includes 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).
[94] 42 USC 247d-6d(b)(8)
[95] 42 USC 247d-6e(c)
[96] 42 U.S.C. §247d-6e(e)(2)
[97] 21 U.S.C. §360bbb-3(l) – "Nothing in this section provides the Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section…"

383.    No person can be required to enter into a legally binding agreement requiring the forfeiture of legal rights under threat of penalty.

384.    The terms and conditions associated with the PREP Act and 21 U.S.C. §360bbb-3 represent a legally binding agreement as established by the U.S. Congress.  Those terms require Plaintiffs to forfeit their right to seek judicial relief from injuries sustained from the use of the countermeasure and injuries sustained from the countermeasure's administration. The agreement also requires Plaintiffs to divulge their private health information and private identity and assume greater risks to their health, safety, and legal rights.

385.    Defendants' pronouncement that Plaintiffs must participate in covered countermeasures prospectively denies Plaintiffs their due process rights should they incur injury because the PREP Act denies them access to judicial relief for those injuries.

386.    CDPHE Defendants' Part 12 Rules violated Plaintiffs' rights to accept or refuse participation in PREP Act covered countermeasures without pressure or influence being placed upon them.

387.    UCHA Defendants issued policies requiring participation in investigational drugs, testing articles, masks, and other devices under threat of penalty, violating Plaintiffs' right to voluntary participation and due process rights.

388.    Defendants changing the voluntary nature of the program into an involuntary program endangers the immunities of existing covered countermeasures established by the HHS Secretary. Defendants' interference is a direct assault on the Constitutional rights of Plaintiffs, which opens the doors to legal remedies not envisioned by Congress but required of the Constitution for resulting injuries sustained by individuals when under threat of penalty to participate.

389.   The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty, deprived the Constitutional and federal legal rights of Plaintiffs as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

<div align="center">

**COUNT SEVEN**

**Breach of Contract, Third Party Beneficiary**

</div>

390.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

391.   The CDC COVID Vaccination Program Provider Agreement, and the implementing statutes and regulations found at 45 CFR 46, 21 U.S.C. §360bbb-3, Title 21 of the US Code, the EUA Scope of Authorization letter clearly and unambiguously create third-party beneficiary rights.

392.   The primary third-party beneficiary right intended for Plaintiffs is the freedom to consider participation in a federally funded EUA (drug, biologic, or device), PREP Act, or other emergency medical countermeasure products or activities that are free from "sanctions," "coercion," "undue influence," "unjustifiable pressures to participate. The other third-party benefit intended for Plaintiffs is that they must not fear the loss of benefits to which they are otherwise entitled when considering participation.  Defendants issued a policy that was an "overt threat of harm"[98] to the financial and emotional well-being of Plaintiffs for the express purpose of coercing them to participate in the CDC COVID-19 Vaccination Program outside of their free will and voluntary consent.

---

[98] "Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance." — The Belmont Report

393.    The Defendants' actions described above, individually and/or collectively, and in breach of the CDC COVID-19 Vaccination Program Provider Agreement, deprived the Plaintiffs of the benefits intended to be conferred upon them through the terms and conditions of the CDC COVID Vaccination Program Provider Agreement as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## COUNT EIGHT

## Colorado State Common Law Employment Torts

394.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

395.    The Supremacy Clause, PREP Act, and 21 U.S.C. §360bbb-3 preempt State laws conflicting with the United States Government's emergency medical countermeasure objectives, including Colorado State's at-will employment laws.

396.    Defendants lacked authority to condition employment upon Plaintiffs participating in a 21 U.S.C. §360bbb-3 medical countermeasure or any product or activity under PREP Act authority.

397.    Defendants intentionally and unlawfully misrepresented their authority to Plaintiffs to cause them to surrender their constitutional and statutory rights.

398.    Defendants engaged in acts of coercion, undue influence, and retaliation, creating a hostile work environment.

399.    Defendants placed Plaintiffs under moral duress, knowing they exclusively relied on Defendants for access to living wages.

400.    Defendants segregated Plaintiffs under discriminatory acts upon Plaintiffs exercising their absolute right to refuse investigational new drugs.

401.    Defendants unlawfully altered Plaintiffs' employment schedules under coercive acts to punish them for exercising their absolute right to refuse investigational new drugs.

402.    Defendants attempted to coerce Plaintiffs to waive their federally secured right to refuse EUA investigational products and engage in a legally binding agreement under the terms and conditions (21 U.S.C. §360bbb-3 and PREP Act) established by the United States Congress outside their free will and voluntary consent.

403.    Defendants' actions demonstrate moral turpitude against Plaintiffs' rights, safety, and health.

404.    Defendants willfully and intentionally placed Plaintiffs under historic public and private pressure to enter into a legally binding agreement outside of their free will and voluntary consent.

405.    UCHA Defendants used fraud and deception to justify terminating Plaintiffs.[99]

406.    Defendants unlawfully terminated Plaintiffs' employment when Plaintiffs exercised their legal right to refuse 21 U.S.C. §360bbb-3 and PREP Act countermeasures.[100]

407.    The plaintiffs did not knowingly submit to the deprivation of labor, wages, or employment.

408.    The Defendants' actions, individually and/or collectively, and in derogation of Colorado's common laws, deprived the intended benefits conferred upon the Plaintiffs when enjoying employment in the State of Colorado as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

---

[99] *Wisehart v. Meganck*, 66 P.3d 124 (Colo. App. 2002)

[100] An employer may not terminate or constructively terminate an employee exercising a specific statutory right that is a matter of serious public concern.  The forfeiture of rights under the PREP Act is a serious public concern.  — *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992). See, *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540 (Colo. 1997), *Rocky Mtn. Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519 (Colo. 1996), *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496 (Colo. App. 2008)

## COUNT NINE

### Extreme and Outrageous Conduct

409.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

410.    When the United States Congress refused to allow Defendants to apply consequences to Plaintiffs refusing to participate in the use of COVID-19 investigational drugs, Defendants engaged in a scorched earth policy. They inflicted, with malicious intent, severe emotional distress to the fullest extent that one in their positions of authority and power could inflict to the detriment of Plaintiffs' emotional well-being.

411.    Extreme and Outrageous Conduct is proven by (1) demonstrating that Defendants engaged in extreme and outrageous conduct, (2) Defendants' actions caused severe emotional distress, and (3) Defendants intentionally or recklessly caused the emotional distress.[101]

412.    The Defendants' conduct committed with gross negligence, reckless, or intent, as described above in the complaint, gives rise to a claim of Extreme and Outrageous Conduct under the common law of the State of Colorado against the Defendants for the damages described in Paragraphs 417 through 422, *infra*.

## COUNT TEN

### Implied Private Right of Action 21 U.S.C. §360bbb-3

413.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 319, as if fully set forth herein.

---

[101] *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970); *Espinosa v. Sheridan United Tire*, 655 P.2d 424 (Colo. App. 1982); *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999); *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877 (Colo. 1994); *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977 (Colo. App. 2011); *Green v. Qwest Servs. Corp.*, 155 P.3d 383 (Colo. App. 2006)

414.     Should the court not agree that UCHealth was engaged in State Action, Plaintiffs claim that 21 U.S.C. §360bbb-3 contains an implied private right of action pursuant to *Cannon v. University of Chicago*, 441 U.S. 677 (1979), *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990), and *Cort v. Ash*, 422 U.S. 66 (1975).

415.     The Defendants' actions described above, individually and/or collectively, and in derogation of the Constitution and the above statutes, regulations, and treaty have deprived the Plaintiffs of their explicit right to refuse the administration of an emergency use authorized drug and/or medical product without penalty as described in the above facts, thereby causing them damages described in Paragraphs 417 through 422, *infra*.

## XX.  Damages Recoverable and Demanded

416.     The following paragraphs are hereby incorporated by reference into Counts One through Ten, as if set forth here *in extenso*.

417.     As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Plaintiffs have suffered past damages and will suffer future damages, both compensatory and general, including, but not limited to, front and back pay; loss of benefits; loss of accumulated sick pay; loss of retirement accounts; lost earnings on retirement funds; vacation time, compensatory time, and paid time off; negative tax consequences (in the event of a lump sum award), including related accountant fees; attorney's fees; emotional distress; mental, psychological and physical harm; loss of income; loss of enjoyment of life; for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, and all other damages that this Court deems necessary and proper.

418.     When the Defendants' behavior reaches a sufficient threshold, punitive damages are recoverable in § 1983 cases. *Smith v. Wade*, 461 U.S. 30 (1983).  Because Defendants' actions

were intentional and willful, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

419.    Because Defendants' actions involved reckless or callous indifference to the Plaintiffs' federally protected rights, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

420.    Because Defendants' actions were motivated by evil motive or intent, Plaintiffs are entitled to, and hereby demand, an award of punitive damages against each and every Defendant in an amount sufficient to deter them, individually and collectively, from repeating their unconstitutional actions. *Smith v. Wade*, 461 U.S. 30 (1983)

421.    Plaintiffs seek recovery of attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976 and 42 U.S.C. § 1988, and under any other provision of law or basis.

422.    Plaintiffs seek recovery of all court costs and out-of-pocket litigation expenses, including but not limited to expert fees, and legal interest on any amount of damages awarded.

## XXI.  Jury Trial Demand

423.    Plaintiffs are entitled to, and hereby demand, a trial by jury on all issues of fact herein.

WHEREFORE, Plaintiffs pray that Defendants be served with a copy of this Complaint and be duly cited to appear and answer same, and after due proceedings are had, there be judgment herein against the Defendants awarding Plaintiffs all damages claimed herein, plus legal interest,

taxable costs, expert fees, and attorney's fees, and all other relief determined to be just and equitable by this Court.

        Respectfully submitted,

**SCHEXNAYDRE LAW FIRM**

BY:   /s/ *David J. Schexnaydre*
DAVID J. SCHEXNAYDRE, T.A.
Louisiana Bar Roll #: 21073
2895 Highway 190 • Suite 212
Mandeville, Louisiana 70471
Telephone: (985) 292-2020
Fax: (985) 235-1089
Email: david@schexnaydre.com
Lead Counsel for Plaintiffs

# CDC COVID-19 Vaccination Program Provider Agreement



**Please complete Sections A and B of this form as follows:**

The Centers for Disease Control and Prevention (CDC) greatly appreciates your organization's (Organization) participation in the CDC COVID-19 Vaccination Program. Your Organization's chief medical officer (or equivalent) <u>and</u> chief executive officer (or chief fiduciary)—collectively, Responsible Officers—must complete and sign the *CDC COVID-19 Vaccination Program Provider Requirements and Legal Agreement* (Section A). *CDC COVID-19 Vaccination Program Provider Profile Information* (Section B) must be completed for each vaccination Location covered under the Organization listed in Section A.

## Section A. COVID-19 Vaccination Program Provider Requirements and Legal Agreement

| ORGANIZATION IDENTIFICATION |  |
|---|---|
| Organization's legal name: |  |
| Number of affiliated vaccination locations covered by this agreement: _____ |  |
| Organization telephone number: | Email *(must be monitored and will serve as dedicated contact method for the COVID-19 Vaccination Program)*: |
| Organization address: |  |

| RESPONSIBLE OFFICERS |
|---|
| For the purposes of this agreement, in addition to Organization, Responsible Officers named below will also be accountable for compliance with the conditions specified in this agreement. The individuals listed below must provide their signature after reviewing the agreement requirements. |

| Chief Medical Officer (or Equivalent) Information | | |
|---|---|---|
| Last name | First name | Middle initial |
| Title | Licensure (state and number) | |
| Telephone number: | Email: | |
| Address: | | |

| Chief Executive Officer (or Chief Fiduciary) Information | | |
|---|---|---|
| Last name | First name | Middle initial |
| Telephone number: | Email: | |
| Address: | | |

<span style="color:red">*Exhibit A*</span>

# CDC COVID-19 Vaccination Program Provider Agreement

| AGREEMENT REQUIREMENTS | |
|---|---|
| | I understand this is an agreement between Organization and CDC. This program is a part of collaboration under the relevant state, local, or territorial immunization's cooperative agreement with CDC. |

I understand this is an agreement between Organization and CDC. This program is a part of collaboration under the relevant state, local, or territorial immunization's cooperative agreement with CDC.

To receive one or more of the publicly funded COVID-19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no cost, Organization agrees that it will adhere to the following requirements:

| 1. | Organization must administer COVID-19 Vaccine in accordance with all requirements and recommendations of CDC and CDC's Advisory Committee on Immunization Practices (ACIP).[1] |
|---|---|
| 2. | Within 24 hours of administering a dose of COVID-19 Vaccine and adjuvant (if applicable), Organization must record in the vaccine recipient's record and report required information to the relevant state, local, or territorial public health authority. Details of required information (collectively, Vaccine-Administration Data) for reporting can be found on CDC's website.[2] <br><br> Organization must submit Vaccine-Administration Data through either (1) the immunization information system (IIS) of the state and local or territorial jurisdiction or (2) another system designated by CDC according to CDC documentation and data requirements.[2] <br><br> Organization must preserve the record for at least 3 years following vaccination, or longer if required by state, local, or territorial law. Such records must be made available to any federal, state, local, or territorial public health department to the extent authorized by law. |
| 3. | Organization must not sell or seek reimbursement for COVID-19 Vaccine and any adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provides without cost to Organization. |
| 4. | Organization must administer COVID-19 Vaccine regardless of the vaccine recipient's ability to pay COVID-19 Vaccine administration fees. |
| 5. | Before administering COVID-19 Vaccine, Organization must provide an approved Emergency Use Authorization (EUA) fact sheet or vaccine information statement (VIS), as required, to each vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative. |
| 6. | Organization's COVID-19 vaccination services must be conducted in compliance with CDC's Guidance for Immunization Services During the COVID-19 Pandemic for safe delivery of vaccines.[3] |
| 7. | Organization must comply with CDC requirements for COVID-19 Vaccine management. Those requirements include the following: <br> a) Organization must store and handle COVID-19 Vaccine under proper conditions, including maintaining cold chain conditions and chain of custody at all times in accordance with the manufacturer's package insert and CDC guidance in CDC's Vaccine Storage and Handling Toolkit[4], which will be updated to include specific information related to COVID-19 Vaccine; <br> b) Organization must monitor vaccine-storage-unit temperatures at all times using equipment and practices that comply with guidance located in CDC's Vaccine Storage and Handling Toolkit[4]; <br> c) Organization must comply with each relevant jurisdiction's immunization program guidance for dealing with temperature excursions; |

This agreement expressly incorporates all recommendations, requirements, and other guidance that this agreement specifically identifies through footnoted weblinks. Organization must monitor such identified guidance for updates. Organization must comply with such updates.

[1] https://www.cdc.gov/vaccines/hcp/acip-recs/index.html
[2] https://www.cdc.gov/vaccines/programs/iis/index.html
[3] https://www.cdc.gov/vaccines/pandemic-guidance/index.html
[4] https://www.cdc.gov/vaccines/hcp/admin/storage-handling.html

APP 124

# CDC COVID-19 Vaccination Program Provider Agreement

|  |  |
|---|---|
|  | d)  Organization must monitor and comply with COVID-19 Vaccine expiration dates; and<br>e)  Organization must preserve all records related to COVID-19 Vaccine management for a minimum of 3 years, or longer if required by state, local, or territorial law. |
| **8.** | Organization must report the number of doses of COVID-19 Vaccine and adjuvants that were unused, spoiled, expired, or wasted as required by the relevant jurisdiction. |
| **9.** | Organization must comply with all federal instructions and timelines for disposing COVID-19 vaccine and adjuvant, including unused doses.[5] |
| **10.** | Organization must report moderate and severe adverse events following vaccination to the Vaccine Adverse Event Reporting System (VAERS).[6] |
| **11.** | Organization must provide a completed COVID-19 vaccination record card to every COVID-19 Vaccine recipient, the adult caregiver accompanying the recipient, or other legal representative. Each COVID-19 Vaccine shipment will include COVID-19 vaccination record cards. |
| **12.** | a)  Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine.<br>b)  Organization must administer COVID-19 Vaccine in compliance with all applicable state and territorial vaccination laws. |

By signing this form, I certify that all relevant officers, directors, employees, and agents of Organization involved in handling COVID-19 Vaccine understand and will comply with the agreement requirements listed above and that the information provided in sections A and B is true.

The above requirements are material conditions of payment for COVID-19 Vaccine-administration claims submitted by Organization to any federal healthcare benefit program, including but not limited to Medicare and Medicaid, or submitted to any HHS-sponsored COVID-19 relief program, including the Health Resources & Services Administration COVID-19 Uninsured Program. Reimbursement for administering COVID-19 Vaccine is not available under any federal healthcare program if Organization fails to comply with these requirements with respect to the administered COVID-19 Vaccine dose. Each time Organization submits a reimbursement claim for COVID-19 Vaccine administration to any federal healthcare program, Organization expressly certifies that it has complied with these requirements with respect to that administered dose.

Non-compliance with the terms of Agreement may result in suspension or termination from the CDC COVID-19 Vaccination Program and criminal and civil penalties under federal law, including but not limited to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and other related federal laws, 18 U.S.C. §§ 1001, 1035, 1347, 1349.

By entering Agreement, Organization does not become a government contractor under the Federal Acquisition Regulation.

Coverage under the Public Readiness and Emergency Preparedness (PREP) Act extends to Organization if it complies with the PREP Act and the PREP Act Declaration of the Secretary of Health and Human Services.[7]

---

[5] The disposal process for remaining unused COVID-19 Vaccine and adjuvant may be different from the process for other vaccines; unused vaccines must remain under storage and handling conditions noted in Item 7 until CDC provides disposal instructions; website URL will be made available.

[6] https://vaers.hhs.gov/reportevent.html

[7] *See* Pub. L. No. 109-148, Public Health Service Act §§ 319F-3 and 319F-4, 42 U.S.C. § 247d-6d and 42 U.S.C. § 247d-6e; 85 Fed. Reg. 15,198, 15,202 (March 17, 2020).

APP 125

# CDC COVID-19 Vaccination Program Provider Agreement

| **Chief Medical Officer (or Equivalent)** | | |
|---|---|---|
| Last name | First name | Middle initial |
| Signature: | | Date: |

| **Chief Executive Officer (or Chief Fiduciary)** | | |
|---|---|---|
| Last name | First name | Middle initial |
| Signature: | | Date: |

*For official use only:*
*VTrckS ID for this Organization, if applicable: _____*

*Vaccines for Children (VFC) PIN, if applicable: _____     Other PIN (e.g., state, 317): _____*

*IIS ID, if applicable: _____*

*Unique COVID-19 Organization ID (Section A)*: _____*

*\*The jurisdiction's immunization program is required to create a unique COVID-19 ID for the organization named in Section A that includes the awardee jurisdiction abbreviation (e.g., an organization located in Georgia could be assigned "GA123456A"). This ID is needed for CDC to match Organizations (Section A) with one or more Locations (Section B). These unique identifiers are required even if there is only one location associated with an organization.*

APP 126

## Section B. CDC COVID-19 Vaccination Program Provider Profile Information

**Please complete and sign this form for your Organization location. If you are enrolling on behalf of one or more other affiliated Organization vaccination locations, complete and sign this form for each location. Each individual Organization vaccination location must adhere to the requirements listed in Section A.**

| **ORGANIZATION IDENTIFICATION FOR INDIVIDUAL LOCATIONS** | |
|---|---|
| Organization location name: | Will another Organization location order COVID-19 vaccine for this site?<br>☐  Yes; provide Organization name:<br>_____<br>☐  No |

| **CONTACT INFORMATION FOR LOCATION'S PRIMARY COVID-19 VACCINE COORDINATOR** | | |
|---|---|---|
| Last name: | First name: | Middle initial: |
| Telephone: | Email: | |

| **CONTACT INFORMATION FOR LOCATION'S BACK-UP COVID-19 VACCINE COORDINATOR** | | |
|---|---|---|
| Last name: | First name: | Middle initial: |
| Telephone: | Email: | |

| **ORGANIZATION LOCATION ADDRESS FOR RECEIPT OF COVID-19 VACCINE SHIPMENTS** | | | |
|---|---|---|---|
| Street address 1: | Street address 2: | | |
| City: | County: | State: | ZIP: |
| Telephone: | Fax: | | |

| **ORGANIZATION ADDRESS OF LOCATION WHERE COVID-19 VACCINE WILL BE ADMINISTERED (IF DIFFERENT FROM RECEIVING LOCATION)** | | | |
|---|---|---|---|
| Street address 1: | Street address 2: | | |
| City: | County: | State: | ZIP: |
| Telephone: | Fax: | | |

| **DAYS AND TIMES VACCINE COORDINATORS ARE AVAILABLE FOR RECEIPT OF COVID-19 VACCINE SHIPMENTS** | | | | |
|---|---|---|---|---|
| Monday | Tuesday | Wednesday | Thursday | Friday |
| AM: | AM: | AM: | AM: | AM: |
| PM: | PM: | PM: | PM: | PM: |

*For official use only:*
*VTrckS ID for this location, if applicable: _____*          *Vaccines for Children (VFC) PIN, if applicable: _____*

*IIS ID, if applicable: _____*     *Unique COVID-19 Organization ID (from Section A): _____*     *Unique Location ID**: _____*

**The jurisdiction's immunization program is required to create an additional unique Location ID for each location completing Section B. The number will include the awardee jurisdiction abbreviation. For example, if an organization (Section A) in Georgia (e.g., GA123456A), has three locations (main location plus two additional) completing section B, they could be numbered as GA123456B1, GA123456B2, and GA123456B3.*

<span style="color:red">APP 127</span>

# CDC COVID-19 Vaccination Program Provider Profile Information

**COVID-19 VACCINATION PROVIDER TYPE FOR THIS LOCATION  (SELECT ONE)**

- ☐ Commercial vaccination service provider
- ☐ Corrections/detention health services
- ☐ Health center – community (non-Federally Qualified Health Center/non-Rural Health Clinic)
- ☐ Health center – migrant or refugee
- ☐ Health center – occupational
- ☐ Health center – STD/HIV clinic
- ☐ Health center – student
- ☐ Home health care provider
- ☐ Hospital
- ☐ Indian Health Service
- ☐ Tribal health
- ☐ Medical practice – family medicine
- ☐ Medical practice – pediatrics
- ☐ Medical practice – internal medicine
- ☐ Medical practice – OB/GYN
- ☐ Medical practice – other specialty
- ☐ Pharmacy – chain
- ☐ Pharmacy – independent
- ☐ Public health provider – public health clinic
- ☐ Public health provider – Federally Qualified Health Center
- ☐ Public health provider – Rural Health Clinic
- ☐ Long-term care – nursing home, skilled nursing facility, federally certified
- ☐ Long-term care – nursing home, skilled nursing facility, non-federally certified
- ☐ Long-term care – assisted living
- ☐ Long-term care – intellectual or developmental disability
- ☐ Long-term care – combination (e.g., assisted living and nursing home in same facility)
- ☐ Urgent care
- ☐ Other (Specify: _____)

**SETTING(S) WHERE THIS LOCATION WILL ADMINISTER COVID-19 VACCINE (SELECT ALL THAT APPLY)**

- ☐ Childcare or daycare facility
- ☐ College, technical school, or university
- ☐ Community center
- ☐ Correctional/detention facility
- ☐ Health care provider office, health center, medical practice, or outpatient clinic
- ☐ Hospital (i.e., inpatient facility)
- ☐ In-home
- ☐ Long-term care facility (e.g., nursing home, assisted living, independent living, skilled nursing)
- ☐ Pharmacy
- ☐ Public health clinic (e.g., local health department)
- ☐ School (K – grade 12)
- ☐ Shelter
- ☐ Temporary or off-site vaccination clinic – point of dispensing (POD)
- ☐ Temporary location – mobile clinic
- ☐ Urgent care facility
- ☐ Workplace
- ☐ Other (Specify: _____)

**APPROXIMATE NUMBER OF PATIENTS/CLIENTS ROUTINELY SERVED BY THIS LOCATION**

Number of children 18 years of age and younger: _____ *(Enter "0" if the location does not serve this age group.)*
- ☐ Unknown

Number of adults 19 – 64 years of age: _____ *(Enter "0" if the location does not serve this age group.)*
- ☐ Unknown

Number of adults 65 years of age and older: _____ *(Enter "0" if the location does not serve this age group.)*
- ☐ Unknown

Number of unique patients/clients seen per week, on average: _____
- ☐ Unknown
- ☐ Not applicable (e.g., for commercial vaccination service providers)

**INFLUENZA VACCINATION CAPACITY FOR THIS LOCATION**

Number of influenza vaccine doses administered during the peak week of the 2019–20 influenza season:
_____ *(Enter "0" if no influenza vaccine doses were administered by this location in 2019-20)*
- ☐ Unknown

APP 128

# CDC COVID-19 Vaccination Program Provider Profile Information

**POPULATION(S) SERVED BY THIS LOCATION (SELECT ALL THAT APPLY)**

- ☐ General pediatric population
- ☐ General adult population
- ☐ Adults 65 years of age and older
- ☐ Long term care facility residents (nursing home, assisted living, or independent living facility)
- ☐ Health care workers
- ☐ Critical infrastructure/essential workers (e.g., education, law enforcement, food/agricultural workers, fire services)
- ☐ Military – active duty/reserves
- ☐ Military – veteran
- ☐ People experiencing homelessness
- ☐ Pregnant women
- ☐ Racial and ethnic minority groups
- ☐ Tribal communities
- ☐ People who are incarcerated/detained
- ☐ People living in rural communities
- ☐ People who are under-insured or uninsured
- ☐ People with disabilities
- ☐ People with underlying medical conditions* that are risk factors for severe COVID-19 illness
- ☐ Other people at higher-risk for COVID-19 (Specify: _____)

**DOES YOUR ORGANIZATION CURRENTLY REPORT VACCINE ADMINISTRATION DATA TO THE STATE, LOCAL, OR TERRITORIAL IMMUNIZATION INFORMATION SYSTEM (IIS)?**

- ☐ Yes [List IIS Identifier: _____]
- ☐ No
- ☐ Not applicable

If "No," please explain planned method for reporting vaccine administration data to the jurisdiction's IIS or other designated system as required:

If "Not applicable," please explain:

**ESTIMATED NUMBER OF 10-DOSE MULTIDOSE VIALS (MDVs) YOUR LOCATION IS ABLE TO STORE DURING PEAK VACCINATION PERIODS (E.G., DURING BACK-TO-SCHOOL OR INFLUENZA VACCINE SEASON) AT THE FOLLOWING TEMPERATURES:**

| | | |
|---|---|---|
| Refrigerated (2°C to 8°C): | ☐ No capacity | ☐ Approximately _____ additional 10-dose MDVs |
| Frozen (-15° to -25°C): | ☐ No capacity | ☐ Approximately _____ additional 10-dose MDVs |
| Ultra-frozen (-60° to -80°C): | ☐ No capacity | ☐ Approximately _____ additional 10-dose MDVs |

**STORAGE UNIT DETAILS FOR THIS LOCATION**

| List brand/model/type of storage units to be used for storing COVID-19 vaccine at this location: | I attest that each unit listed will maintain the appropriate temperature range indicated above: (*please sign and date*) |
|---|---|
| 1. *Example: CDC & Co/Red series two-door/refrigerator* <br> 2. <br> 3. <br> 4. <br> 5. | <br><br> Medical/pharmacy director or location's vaccine coordinator signature <br><br> Date |

---

* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html

# CDC COVID-19 Vaccination Program Provider Profile Information

**PROVIDERS PRACTICING AT THIS FACILITY** *(additional spaces for providers at end of form)*

**Instructions:** *List below all licensed healthcare providers at this location who have <u>prescribing</u> authority (i.e., MD, DO, NP, PA, RPh).*

| Provider Name | Title | License No. |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

APP 130



December 11, 2020

Pfizer Inc.
Attention: Ms. Elisa Harkins
500 Arcola Road
Collegeville, PA 19426

Dear Ms. Harkins:

This letter is in response to a request from Pfizer Inc. that the Food and Drug Administration (FDA) issue an Emergency Use Authorization (EUA) for emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of Coronavirus Disease 2019 (COVID-19) for individuals 16 years of age and older, as described in the Scope of Authorization (Section II) of this letter, pursuant to Section 564 of the Federal Food, Drug, and Cosmetic Act (the FD&C Act or the Act) (21 U.S.C. 360bbb-3).

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Act, the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes COVID-19.[1] On the basis of such determination, the Secretary of HHS on March 27, 2020, declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to Section 564 of the Act, subject to terms of any authorization issued under that section.[2]

Pfizer-BioNTech COVID-19 Vaccine is for use for active immunization to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older. The vaccine contains a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2 formulated in lipid particles. It is an investigational vaccine not licensed for any indication.

FDA reviewed safety and efficacy data from an ongoing phase 1/2/3 trial in approximately 44,000 participants randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control. The trial has enrolled participants 12 years of age and older. FDA's review has considered the safety and effectiveness data as they relate to the request for emergency use authorization in individuals 16 years of age and older. FDA's review of the available safety data

---

[1] U.S. Department of Health and Human Services, *Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*. February 4, 2020.

[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 18250 (April 1, 2020).

**Exhibit B**

Page 2 – Pfizer Inc.

from 37,586 of the participants 16 years of age and older, who were followed for a median of two months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA. FDA's analysis of the available efficacy data from 36,523 participants 12 years of age and older without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirm the vaccine was 95% effective (95% credible interval 90.3, 97.6) in preventing COVID-19 occurring at least 7 days after the second dose (with 8 COVID-19 cases in the vaccine group compared to 162 COVID-19 cases in the placebo group). Based on these data, and review of manufacturing information regarding product quality and consistency, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective. Additionally, it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 16 years of age and older. Finally, on December 10, 2020, the Vaccines and Related Biological Products Advisory Committee voted in agreement with this conclusion.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19, as described in the Scope of Authorization section of this letter (Section II) and subject to the terms of this authorization.

## I.      Criteria for Issuance of Authorization

I have concluded that the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 when administered as described in the Scope of Authorization (Section II) meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

1.  SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2.  Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19, and that, when used under the conditions described in this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks; and

3.  There is no adequate, approved, and available alternative to the emergency use of Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19. [3]

## II.     Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

---

[3] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

Page 3 – Pfizer Inc.

- Pfizer Inc. will supply Pfizer-BioNTech COVID-19 Vaccine either directly or through authorized distributor(s)[4], who will distribute to emergency response stakeholders[5] as directed by the U.S. government, including the Centers for Disease Control and Prevention (CDC) and/or other designee, for use consistent with the terms and conditions of this EUA;
- The Pfizer-BioNTech COVID-19 Vaccine covered by this authorization will be administered by vaccination providers[6] and used only to prevent COVID-19 in individuals ages 16 and older; and
- Pfizer-BioNTech COVID-19 Vaccine may be administered by a vaccination provider without an individual prescription for each vaccine recipient.

**Product Description**

The Pfizer-BioNTech COVID-19 Vaccine is supplied as a frozen suspension in multiple dose vials; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. After dilution, each vial contains 5 doses of 0.3 mL per dose. The Pfizer-BioNTech COVID-19 Vaccine does not contain a preservative.

Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine contains 30 mcg of a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2. Each dose of the Pfizer-BioNTech COVID-19 Vaccine also includes the following ingredients: lipids (0.43 mg (4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg

---

[4] "Authorized Distributor(s)" are identified by Pfizer Inc. or, if applicable, by a U.S. government entity, such as the Centers for Disease Control and Prevention (CDC) and/or other designee, as an entity or entities allowed to distribute authorized Pfizer-BioNTech COVID-19 Vaccine.

[5] For purposes of this letter, "emergency response stakeholder" refers to a public health agency and its delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundary lines (e.g., city, county, tribal, territorial, State, or Federal), or functional (e.g., law enforcement or public health range) or sphere of authority to administer, deliver, or distribute vaccine in an emergency situation. In some cases (e.g., depending on a state or local jurisdiction's COVID-19 vaccination response organization and plans), there might be overlapping roles and responsibilities among "emergency response stakeholders" and "vaccination providers" (e.g., if a local health department is administering COVID-19 vaccines; if a pharmacy is acting in an official capacity under the authority of the state health department to administer COVID-19 vaccines). In such cases, it is expected that the conditions of authorization that apply to emergency response stakeholders and vaccination providers will all be met.

[6] For purposes of this letter, "vaccination provider" refers to the facility, organization, or healthcare provider licensed or otherwise authorized by the emergency response stakeholder (e.g., non-physician healthcare professionals, such as nurses and pharmacists pursuant to state law under a standing order issued by the state health officer) to administer or provide vaccination services in accordance with the applicable emergency response stakeholder's official COVID-19 vaccination and emergency response plan(s) and who is enrolled in the CDC COVID-19 Vaccination Program. For purposes of this letter, "healthcare provider" also refers to a person authorized by the U.S. Department of Health and Human Services (e.g., under the PREP Act Declaration for Medical Countermeasures against COVID-19) to administer FDA-authorized COVID-19 vaccine (e.g., qualified pharmacy technicians and State-authorized pharmacy interns acting under the supervision of a qualified pharmacist). See, e.g., HHS. *Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration.* 85 FR 79190 (December 9, 2020).

Page 4 – Pfizer Inc.

2[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (0.9% Sodium Chloride Injection) contributes an additional 2.16 mg sodium chloride per dose.

The dosing regimen is two doses of 0.3 mL each, 3 weeks apart.

The manufacture of the authorized Pfizer-BioNTech COVID-19 Vaccine is limited to those facilities identified and agreed upon in Pfizer's request for authorization.

The Pfizer-BioNTech COVID-19 Vaccine vial label and carton labels are clearly marked for "Emergency Use Authorization."  The Pfizer-BioNTech COVID-19 Vaccine is authorized to be distributed, stored, further redistributed, and administered by emergency response stakeholders when packaged in the authorized manufacturer packaging (i.e., vials and cartons), despite the fact that the vial and carton labels may not contain information that otherwise would be required under the FD&C Act.

Pfizer-BioNTech COVID-19 Vaccine is authorized for emergency use with the following product-specific information required to be made available to vaccination providers and recipients, respectively (referred to as "authorized labeling"):

- Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers): Emergency Use Authorization (EUA) of Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)

- Fact Sheet for Recipients and Caregivers: Emergency Use Authorization (EUA) of Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19) in Individuals 16 Years of Age and Older

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine, when used to prevent COVID-19 and used in accordance with this Scope of Authorization (Section II), outweigh its known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that Pfizer-BioNTech COVID-19 Vaccine (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

Page 5 – Pfizer Inc.

The emergency use of Pfizer-BioNTech COVID-19 Vaccine under this EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III). Subject to the terms of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), Pfizer-BioNTech COVID-19 Vaccine is authorized to prevent COVID-19 in individuals 16 years of age and older as described in the Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

## III.   Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

Pfizer Inc. and Authorized Distributor(s)

A.  Pfizer Inc. and authorized distributor(s) will ensure that the authorized Pfizer-BioNTech COVID-19 Vaccine is distributed, as directed by the U.S. government, including CDC and/or other designee, and the authorized labeling (i.e., Fact Sheets) will be made available to vaccination providers, recipients, and caregivers consistent with the terms of this letter.

B.  Pfizer Inc. and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until delivered to emergency response stakeholders' receipt sites.

C.  Pfizer Inc. will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., emergency response stakeholders, authorized distributors, and vaccination providers) involved in distributing or receiving authorized Pfizer-BioNTech COVID-19 Vaccine. Pfizer Inc. will provide to all relevant stakeholders a copy of this letter of authorization and communicate any subsequent amendments that might be made to this letter of authorization and its authorized labeling.

D.  Pfizer Inc. may develop and disseminate instructional and educational materials (e.g., video regarding vaccine handling, storage/cold-chain management, preparation, disposal) that are consistent with the authorized emergency use of the vaccine as described in the letter of authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs during an emergency. Any instructional and educational materials that are inconsistent with the authorized labeling are prohibited.

E.  Pfizer Inc. may request changes to this authorization, including to the authorized Fact Sheets for Pfizer-BioNTech COVID-19 Vaccine, that do not alter the analysis of benefits and risks that underlies this authorization and FDA may determine that such changes may be permitted without amendment of this EUA. That determination must be made by joint decision of the Office of Vaccines Research and Review (OVRR)/Center for Biologics Evaluation and Research (CBER), the Preparedness and Response Team (PREP)/Office of the Center Director (OD)/CBER, and the

Page 6 – Pfizer Inc.

Office of Counterterrorism and Emerging Threats (OCET)/Office of the Chief Scientist/Office of the Commissioner (OCS).

F.  Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):
- Vaccine administration errors whether or not associated with an adverse event;
- Serious adverse events (irrespective of attribution to vaccination);
- Cases of Multisystem Inflammatory Syndrome in children and adults; and
- Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer Inc.

These reports should be submitted to VAERS as soon as possible but no later than 15 calendar days from initial receipt of the information by Pfizer Inc.

G.  Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals, within 15 days after the last day of a month, beginning after the first full calendar month after authorization. Each periodic safety report is required to contain descriptive information which includes:
- A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations (e.g., pregnant women), and adverse events of special interest.
- Newly identified safety concerns in the interval; and
- Actions taken since the last report because of adverse experiences (for example, changes made to Healthcare Providers Administering Vaccine (Vaccination Providers) Fact Sheet, changes made to studies or studies initiated).

H.  No changes will be implemented to the description of the product, manufacturing process, facilities, or equipment without notification to and concurrence by the Agency.

I.  All manufacturing facilities will comply with Current Good Manufacturing Practice requirements.

J.  Pfizer Inc. will submit to the EUA file Certificates of Analysis (CoA) for each drug product lot at least 48 hours prior to vaccine distribution. The CoA will include the established specifications and specific results for each quality control test performed on the final drug product lot.

K.  Pfizer Inc. will submit to the EUA file quarterly manufacturing reports that include a listing of all Drug Substance and Drug Product lots produced after issuance of this authorization. This report must include lot number, manufacturing site, date of manufacture, and lot disposition, including those lots that were quarantined for investigation or those lots that were rejected. Information on the reasons for lot quarantine or rejection must be included in the report. The first report is due July 2021.

Page 7 – Pfizer Inc.

L.  Pfizer Inc. and authorized distributor(s) will maintain records regarding release of Pfizer-BioNTech COVID-19 Vaccine for distribution (i.e., lot numbers, quantity, release date).

M.  Pfizer Inc. and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

N.  Pfizer Inc. will conduct post-authorization observational study(ies) to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19. The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (16 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities. The study(ies) should be conducted in large scale databases with an active comparator. Pfizer Inc. will provide protocols and status update reports to the IND 19736 with agreed-upon study designs and milestone dates.

Emergency Response Stakeholders

O.  Emergency response stakeholders will identify vaccination sites to receive authorized Pfizer-BioNTech COVID-19 Vaccine and ensure its distribution and administration, consistent with the terms of this letter and CDC's COVID-19 Vaccination Program.

P.  Emergency response stakeholders will ensure that vaccination providers within their jurisdictions are aware of this letter of authorization, and the terms herein and any subsequent amendments that might be made to the letter of authorization, instruct them about the means through which they are to obtain and administer the vaccine under the EUA, and ensure that the authorized labeling [i.e., Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Fact Sheet for Recipients and Caregivers] is made available to vaccination providers through appropriate means (e.g., e-mail, website).

Q.  Emergency response stakeholders receiving authorized Pfizer-BioNTech COVID-19 Vaccine will ensure that appropriate storage and cold chain is maintained.

Vaccination Providers

R.  Vaccination providers will administer the vaccine in accordance with the authorization and will participate and comply with the terms and training required by CDC's COVID-19 Vaccination Program.

S.  Vaccination providers will provide the Fact Sheet for Recipients and Caregivers to each individual receiving vaccination and provide the necessary information for receiving their second dose.

Page 8 – Pfizer Inc.

T.  Vaccination providers administering Pfizer-BioNTech COVID-19 Vaccine must report the following information associated with the administration of Pfizer-BioNTech COVID-19 Vaccine of which they become aware to VAERS in accordance with the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers):
- Vaccine administration errors whether or not associated with an adverse event
- Serious adverse events (irrespective of attribution to vaccination)
- Cases of Multisystem Inflammatory Syndrome in children and adults
- Cases of COVID-19 that result in hospitalization or death

Complete and submit reports to VAERS online at https://vaers.hhs.gov/reportevent.html or by calling 1-800-822-7967. The VAERS reports should include the words "Pfizer-BioNTech COVID-19 Vaccine EUA" in the description section of the report. To the extent feasible, report to Pfizer Inc. by contacting 1-800-438-1985 or by providing a copy of the VAERS form to Pfizer Inc.; Fax: 1-866-635-8337.

U.  Vaccination providers will conduct any follow-up requested by the U.S government, including CDC, FDA, or other designee, regarding adverse events to the extent feasible given the emergency circumstances.

V.  Vaccination providers will monitor and comply with CDC and/or emergency response stakeholder vaccine management requirements (e.g., requirements concerning obtaining, tracking, and handling vaccine) and with requirements concerning reporting of vaccine administration data to CDC.

W.  Vaccination providers will ensure that any records associated with this EUA are maintained until notified by FDA. Such records will be made available to CDC, and FDA for inspection upon request.

Conditions Related to Printed Matter, Advertising, and Promotion

X.  All descriptive printed matter, advertising, and promotional material, relating to the use of the Pfizer-BioNTech COVID-19 Vaccine shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in section 502(a) and (n) of the FD&C Act and FDA implementing regulations.

Y.  All descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech COVID-19 Vaccine clearly and conspicuously shall state that:
- This product has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 16 years of age and older; and

Page 9 – Pfizer Inc.

- The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner.

## IV.    Duration of Authorization

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____
RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Enclosures

**From:** Elizabeth B. Concordia <ceolizconcordia@uchealth.org>
**Sent:** Wednesday, July 28, 2021 2:33:49 PM
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

**Subject:** UCHealth vaccine policy – COVID-19 vaccine mandate

To view this email as a web page, go here.

uchealth

July 28, 2021

Dear Colleagues,

After fighting COVID-19 for more than a year, and as we see the more contagious and serious Delta variant now spreading across the U.S., it is clear that vaccination against this disease is essential to protect you, your coworkers, your family members, and our patients and visitors.

About 340 million vaccine doses have now been administered across the nation, and 3.8 billion doses have been provided to people around the world. Data from millions of vaccinations show that the vaccines are both safe and highly effective at preventing serious COVID-19 cases, hospitalizations and death – even against the dangerous variants of the virus that are now circulating.

Providing the highest level of safety for our patients, staff and providers is always the top priority for UCHealth, so UCHealth is expanding its vaccination policy to include mandatory COVID-19 vaccination.

In the same way that influenza vaccination has been mandated in past years, all employees, employed provider, appointed medical staff, volunteers, students, vendors and contractors who come into our facilities will be required to be vaccinated against COVID-19 or receive a valid exemption from employee health. Everyone must be compliant with the policy by **October** 1. Being fully vaccinated means completing the full vaccination series (which includes two doses of the Pfizer or Moderna vaccines, or one dose of the J&J vaccine), or receiving an approved exemption.

APP 140          **Exhibit C**

If you believe that you have a valid medical or religious reason to decline vaccination, please visit the vaccine policy page on The Source to learn more and contact employee health. Importantly, anyone who receives an exemption will be required to wear a mask at all times in UCHealth facilities and be tested weekly for COVID-19.

Here are important dates you should be aware of:

- August 13 – Last day to get the first Pfizer vaccine dose to have time to get the second dose by September 3.
- August 22 – Vaccination deadline to receive $500 bonus on Sept. 3, 2021 for anyone who did not receive the bonus on July 23.
- September 3 – Any employees who are not in compliance with the UCHealth vaccine policy will receive notification of disciplinary action.
- October 1 – Contractors, vendors and volunteers will not be allowed to enter UCHealth facilities unless they are in compliance with the vaccine policy.
- October 1 – Any employees who remain out of compliance will face disciplinary action up to and including termination.

If you were vaccinated outside of UCHealth or during a clinical trial, please confirm that your documentation is correct in My Health Connection by clicking the link for your COVID-19 information on the landing page within your account. If you do not see your **entire vaccination series**, please submit your vaccination information to employee health at system.employeehealth@uchealth.org.

As always, your dedication to keeping our patients and staff healthy and preventing the spread of COVID-19 is appreciated. If you have any questions or concerns, please do not hesitate to contact system.employeehealth@uchealth.org.

Thank you for your commitment to our patients. You make extraordinary possible, each and every day.

Sincerely,

Liz

**Elizabeth B. Concordia**
UCHealth President and CEO

5:20

AA  🔒 forms.office.com

8. I understand employee health and/or HR Compliance will be reviewing this form, and any supporting documentation, to determine whether approving your exemption request is justified.

*

○ I Understand

9. By clicking submit, I agree that if my exemption is approved, I will comply with the UCHealth Vaccination Policy. Additionally, I understand that by remaining unvaccinated I am required to wear a mask at all times while on UCHealth property, including shuttles and outdoor areas. The only exemption to the masking requirement is while eating meals, but a 6-foot distance from others must be maintained.

Submit

ok.office.com/mail/inbox/id/AAQkADIzMzI1YzQ4LTNjZDMtNDQ1NC05Z...   11/9/2

**Exhibit D**

uchealth

## UCHealth COVID-19 Vaccine Medical Exemption and Release Form

I work in a health care environment and I may place patients, visitors, coworkers and others at work at risk should I contract COVID-19, and may be contagious whether or not I become symptomatic.

My employer or affiliated health facility, UCHealth and or/ University of Colorado Denver (UCD), has mandated that I receive one of the vaccination(s) listed below in order to protect myself, visitors, coworkers and the patients I serve.

I believe I have a medical exemption to receiving the vaccinations listed below and request your documentation in support of my requested exemption.

Loni, Theltheimer

| Loni, Thelmer _____ | ███████████████ | |
| --- | --- | --- |
| Employee Name (print) | Employee/ Staff ID number | Employee Phone Number |
| _(signature)_ | PVH SACI/PACU/ODSC | 8/5/21 |
| Signature | Department | Date Signed |

**To be completed the employee's health care provider (MD, DO, NP, PA only):**

**Please review safety, allergy and information regarding exemptions to the COVID-19 vaccination series at the following links.**
*COVID-19 Vaccines While Pregnant or Breastfeeding*
*Safety of COVID-19 Vaccines | CDC*
*Frequently Asked Questions about COVID-19 Vaccination | CDC*

**We will accept pregnancy as a temporary exemption while each of the COVID-19 vaccines are under emergency use authorization. Please indicate estimated date of conception (EDC) and document verified pregnancy.**

1. Pfizer/Moderna vaccine series:
   a. Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to vaccine components
   b. Allergy to specific component of the vaccine (please specify: _____ )
2. Astra Zeneca/Johnson and Johnson vaccine series:
   a. Personal history of Guillain-Barre Syndrome within 6 weeks of receiving any vaccine.
   b. Severe allergic reaction (e.g, anaphylaxis after a previous dose or to vaccine components
   c. Allergy to specific component of the vaccine (please specify: _____ )
3. For any COVID-19 vaccination series:
   a. Documented Pregnancy (please indicate EDC: _____ )
   b. Lactation alone is not a category for exemption.
4. Other condition -- please provide documentation and indicate whether employee's medical contraindication is permanent or temporary and timeframe for re-evaluation if less than 1 year.

Loni has underlying autoimmune conditions - ███████ & ███████
vaccination reactions in the Past with flares of her autoimmune condition. →
Attach further supporting documentation as appropriate and send to system.employeehealth@uchealth.org

I have evaluated the above UCHealth/UCD staff member and attest that this staff member has a medical contraindication to the vaccine(s) indicated above. I understand that my recommendations will be reviewed and a final decision communicated to the staff member.

Health care provider name (print): ___Sheila Kupersmith FNP-BC___

Health care provider phone: ███████████████

Health care provider license number: ███████████████

Signature of licensed health care provider: _Sheila Kupersmith FNP-BC_   Date: _8/5/21_

Created 7/28/2021

**Exhibit E**



Code of Colorado Regulations
Secretary of State
State of Colorado

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Health Facilities and Emergency Medical Services Division**

**STANDARDS FOR HOSPITALS AND HEALTH FACILITIES CHAPTER 2 – GENERAL LICENSURE STANDARDS**

**6 CCR 1011-1 Chapter 2**

*[Editor's Notes follow the text of the rules at the end of this CCR Document.]*

---

**Emergency rules adopted by the Board of Health on August 30, 2021. Effective August 30, 2021**

Copies of these regulations may be obtained at cost by contacting:
Division Director
Colorado Department of Public Health and Environment
Health Facilities and Emergency Medical Services Division
4300 Cherry Creek Drive South
Denver, Colorado 80246-1530
Main switchboard: (303) 692-2800

Pursuant to section 24-4-103(12.5), C.R.S., the Health Facilities and Emergency Medical Services Division of the Colorado Department of Public Health and Environment maintains copies of the incorporated materials for public inspection during regular business hours. The requirements in Part 3.2.3 do not include any amendments, editions, or changes published after November 1, 2019. Interested persons may obtain certified copies of any non-copyrighted material from the Department at cost upon request. Information regarding how incorporated material may be obtained or examined is available by contacting:

Division Director
Colorado Department of Public Health and Environment
Health Facilities and Emergency Medical Services Division
4300 Cherry Creek Drive South
Denver, Colorado 80246-1530
Main switchboard: (303) 692-2800

Additionally, materials incorporated by reference have been submitted to the state publications depository and distribution center, and are available for interlibrary loans and through the state librarian.

**INDEX**

**Part 1 – Definitions**
**Part 2 – Licensure Process**
**Part 3 – General Building and Fire Safety Provisions**
**Part 4 – Quality Management Program, Occurrence Reporting, Palliative Care**
**Part 5 – Waivers of Regulations for Facilities and Agencies**
**Part 6 – Access to Client Records**
**Part 7 – Client Rights**
**Part 8 – Protection of Clients from Involuntary Restraint or Seclusion**
**Part 9 – Medications, Medical Devices, and Medical Supplies**
**Part 10 – Healthcare-Associated Infection Reporting**
**Part 11 – Influenza Immunization of Employees and Direct Contractors**
**Part 12—COVID-19 Immunization of Employees, Direct Contractors, and Support Staff**

APP 144

**Exhibit F**

## PART 1.    DEFINITIONS

1.1    "Abuse" means the willful infliction of injury, unreasonable confinement, intimidation, or punishment, with resulting physical harm, pain, or mental anguish.

1.2    "Addition" means the addition of more space that was previously not part of the licensed facility. The addition may be new construction or existing structures that are being repurposed for client use.

1.3    "Administrative Officer" means the person appointed by the governing body of the facility or agency who is responsible for the day-to-day management of the facility or agency.

1.4    "Admission" means the acceptance of a person as a client of the facility or agency.

1.5    "Advance Directive" means a written instruction concerning medical treatment decisions to be made on behalf of the adult who provided the instruction in the event that they become incapacitated.

1.6    "Board" means the State Board of Health.

1.7    "Building Permit" means an official document issued by the local building department or other local jurisdiction which authorizes erection, alteration, demolition, and/or moving of buildings and structures.

1.8    "Business Entity" means any organization or enterprise and includes, but is not limited to, a sole proprietor, association, corporation, business trust, joint venture, limited liability company, limited liability partnership, partnership, or syndicate.

1.9    "Campus" means the physical area immediately adjacent to the facility's or agency's main building(s), other areas and structures that are not strictly contiguous to the main building(s) but are located within 250 yards of the main building(s) and any other areas determined by the Department, on an individual case basis, to be part of the facility's or agency's campus.

1.10    "Capacity" means the number of clients to whom a facility or agency is able to provide services. "capacity" is synonymous with the term "bed" as used in this Chapter and elsewhere in 6 CCR 1011-1.

1.11    "Chemical Restraint" means giving an individual medication involuntarily for the purpose of restraining that individual; except that "chemical restraint" does not include the involuntary administration of medication pursuant to section 27-65-111(5), C.R.S., or administration of medication for voluntary or life-saving medical procedures.

1.12    "Client" means any person receiving services from a facility or agency that is subject to licensing pursuant to section 25-3-101, C.R.S. The term "client" is synonymous with the terms "patient", "resident", or "consumer" as used elsewhere in 6 CCR 1011-1.

1.13    "Client Care Advocate" means the person or persons designated by a facility or agency to function as the primary contact to receive complaints from clients regarding services.

1.14    "Client Record" is the documentation of services that are performed for the client by the facility or agency. Client records include such diagnostic documentation as X-rays and EKG's. Client records do not include health care provider office notes, which are the notes of observations about the client made while the client is in a non-hospital setting and maintained in the health care provider's office.

APP 145

*CODE OF COLORADO REGULATIONS*
*Health Facilities and Emergency Medical Services Division*

*6 CCR 1011-1 Chapter 2*

1.15   "Controlling Interest" means the operational direction or management of a facility or agency including but not limited to, the authority, express or reserved, to change the corporate identity of the applicant; the authority to appoint members of the board of directors, board of trustees, or other applicable governing body of the facility or agency; the ability to control any of the assets or other property of the facility or agency or to dissolve or sell the facility or agency.

1.16   "Cost sharing" means the share of cost covered by a client's insurance that the client pays out of pocket. This term includes, but is not limited to deductibles, coinsurance, copayments, or other similar charges.

1.17   "Deficiency" means a failure to fully comply with any statutory and/or regulatory requirements applicable to a licensee.

1.18   "Department" means the Colorado Department of Public Health and Environment.

1.19   "Design Documents" means current construction plans, specifications, and any other information as requested by the Department for a guideline compliance review. Design documents should be completed in a manner consistent with the practice of architecture as found at section 12-25-301, C,R.S., *et seq.* and 4 CCR 730-1, Bylaws and Rules of the State Board of Licensure for Architects, Professional Engineers, and Professional Land Surveyors.

1.20   "Designated Representative" means a designated representative of a client or service provider who is a person so authorized in writing or by court order to act on behalf of the client or service provider. In the case of a deceased client, the personal representative, as defined at section 15-10-201(39), C.R.S., or, if none has been appointed, heirs shall be deemed to be designated representatives of the client.

1.21   "Direct Ownership" means the possession of stock, equity in capital, or any interest greater than 5 percent of the facility or agency.

1.22   "Emergency medical condition" means a medical condition that manifests itself by acute symptoms of sufficient severity, including severe pain, that a prudent layperson with an average knowledge of health and medicine could reasonably expect, in the absence of immediate medical attention, to result in: serious jeopardy to the health of the individual or, with respect to a pregnant woman, the health of the woman or her unborn child; or serious impairment to bodily functions; or serious dysfunction of any bodily organ or part.

1.23   "Emergency services," with respect to an emergency medical condition, means: a medical screening examination that is within the capability of the emergency department of a hospital, including ancillary services routinely available to the emergency department to evaluate the emergency medical condition; and within the capabilities of the staff and facilities available at the hospital, further medical examination and treatment as required to stabilize the patient to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility.

1.24   "Enforcement Activity" means the imposition of remedies such as civil money penalties; appointment of a receiver or temporary manager; conditional licensure; suspension or revocation of a license; a directed plan of correction; intermediate restrictions or conditions, including retaining a consultant, Department monitoring, or providing additional training to employees, owners, or operators; or any other remedy provided by state or federal law or authorized by federal survey, certification, and enforcement regulations and agreements for violations of federal or state law.

APP 146

1.25    "FGI Guidelines" means the Guidelines for Design and Construction of Hospitals, Guidelines for Design and Construction of Outpatient Facilities, and Guidelines for Design and Construction of Residential Health, Care, and Support Facilities, published by the Facilities Guidelines Institute.

1.26    "Grievance" means a written or verbal complaint that is made by a client or the client's designated representative to a facility or agency that cannot be resolved at the time by a staff person. If the complaint involves occurrences specified in section 25-1-124(2), C.R.S., the facility or agency shall report it to the Department, as required by Part 4.2 of these rules.

1.27    "Grievance mechanism" means the process whereby complaints by a client or the client's designated representative may be initiated and resolved by the facility or agency.

1.28    "Guideline compliance review" means the review of design documents submitted to the department, in the format required by the Department, for determination of compliance with FGI Guidelines.

1.29    "Guideline compliance review representative" means a person designated by the licensee or applicant to submit design documents to the Department on behalf of the licensee or applicant.

1.30    "Indirect Ownership" means any ownership interest in a business entity that has an ownership interest in the applicant or licensee, including an ownership interest in any business entity that has an indirect ownership interest in the applicant or licensee.

1.31    "Influenza Season" means November 1 through March 31 of the following year, or as otherwise defined by the Division of Disease Control and Public Health Response within the Department.

1.32    "Influenza Vaccine" means a currently licensed United States Food and Drug Administration approved vaccine product.

1.33    "Informed consent" means:

(a)    An explanation of the nature and purpose of the recommended treatment or procedure in layman's terms and in a form of communication understood by the client or the client's designated representative;

(b)    An explanation of the risks and benefits of a treatment or procedure, the probability of success, mortality risks, and serious side effects;

(c)    An explanation of the alternatives with the risks and benefits of these alternatives;

(d)    An explanation of the risks and benefits if no treatment is pursued;

(e)    An explanation of the recuperative period which includes a discussion of anticipated problems; and

(f)    An explanation that the client, or the client's designated representative, is free to withdraw consent and to discontinue participation in the treatment regimen at any time.

1.34    "In-network" means a facility or agency that is a participating provider, as defined at section 10-16-102(46), C.R.S., in an individual's health insurance plan.

1.35    "Initial license" means the licensing of a facility or agency that is not currently licensed, as well as a licensure change from one type to another.

APP 147

1.36   "Letter of Intent" means the notification provided to the Department related to an application for a license, to make changes to an existing license, to make changes in services provided by the entity, or for any other business reason the Department requests.

1.37   "Licensed independent practitioner" means an individual permitted by law and the facility or agency to independently diagnose, initiate, alter, or terminate health care treatment within the scope of their license.

1.38   "Licensee" means a facility or agency that is required to obtain a license, or a certificate of compliance for governmental entities, from the Department pursuant to section 25-3-101, C.R.S.

1.39   "Management Company" means the person, business entity, or agency that is paid by the licensee and has a contractual agreement with the licensee to manage the day-to-day operation of the facility or agency on behalf of the licensee.

1.40   "Mechanical restraint" means a physical device used to involuntarily restrict the movement of an individual or the movement or normal function of a portion of his or her body. Physical restraints used for fall prevention, including but not limited to raised bed rails, are considered mechanical restraints.

1.41   "Medical device" means an instrument, apparatus, implement, machine, contrivance, implant, or similar or related article that is required to be labeled pursuant to 21 CFR Part 801.

1.42   "Medical supply" means a consumable supply item that is disposable and not intended for reuse.

1.43   "Minor alterations" means building construction projects which are not additions, which do not affect the structural integrity of the building, which do not change functional operation, and/or which do not add beds or capacity above what the facility is limited to under the existing license.

1.44   "Neglect" means the failure to provide goods and services necessary to attain and maintain physical and mental well-being.

1.45   "Out-of-network" means a facility or agency that is not a participating provider, as defined at Section 10-16-102(46), C.R.S.

1.46   "New construction" means the construction of new buildings or newly constructed additions.

1.47   "Palliative Care" means specialized medical care for people with serious illnesses. This type of care is focused on providing clients with relief from the symptoms, pain, and stress of serious illness, whatever the diagnosis. The goal is to improve quality of life for both the client and the individuals who are identified as the client's personal support system. Palliative care is provided by a team of physicians, nurses, and other specialists who work with a client's other health care providers to provide an extra layer of support. Palliative care is appropriate at any age and at any stage in a serious illness and can be provided together with curative treatment. Unless otherwise indicated, the term "palliative care" is synonymous with the terms "comfort care," "supportive care," and similar designations.

1.48   "Pharmacist" means a pharmacist licensed in the State of Colorado.

1.49   "Phased submittal" means the submittal of a subset of the design documents as related to work tasks that are to begin prior to the time that all building details are finalized, in order to allow initial work to start on projects that are complex and long-term in nature.

APP 148

1.50    "Physical restraint" means the use of bodily, physical force to involuntarily limit an individual's freedom of movement; except that "physical restraint" does not include the holding of a child by one adult for the purposes of calming or comforting the child.

1.51    "Proof of Immunization" means an electronic entry in the Colorado Immunization Information System (CIIS) or an immunization record from a licensed healthcare provider who has administered an influenza vaccine to an individual who provides services for the facility or agency, specifying the vaccine administered, name and title of the person who administered the vaccine, address of the location where the vaccine was administered, and the date it was administered.

1.52    "Renovation" means the moving of walls and reconfiguring of existing floor plans. It includes the rebuilding or upgrading of major systems, including but not limited to: heating, ventilation, and electrical systems. It also means the changing of the functional operation of the space. Renovations do not include "minor alterations," as defined herein.

1.53    "Responsible design professional" means a registered architect, licensed professional, or other individual who prepares and signs the design documents submitted to the Department for the guideline compliance review.

1.54    "Restraint" means any method or device used to involuntarily limit freedom of movement, including but not limited to bodily physical force, mechanical devices, or chemicals. "Restraint" includes a chemical restraint, a mechanical restraint, a physical restraint, and/or seclusion.

1.55    "Review" means any type of administrative oversight by the Department including but not limited to, examination of documents, desk audit, complaint investigation, or on-site inspection.

1.56    "Revisit" means a follow-up survey conducted after deficiencies have been cited. The purpose is to determine if the licensee is now in compliance with the applicable state regulations or federal conditions of participation.

1.57    "Seclusion" means the involuntary placement of a person alone in a room from which egress is involuntarily prevented.

1.58    "Service Provider" means an individual who is responsible for a client's care in a facility or agency.

1.59    "Survey" means an inspection of a facility or agency for compliance with applicable state regulations or federal conditions of participation.

1.60    "Tiered Inspection" means an on-site re-licensure survey that has a reduced scope and reviews fewer items for compliance with applicable state regulations than a full re-licensure survey.

## PART 2.    LICENSURE PROCESS

### 2.1    Statutory Authority and Applicability

2.1.1   The statutory authority for the promulgation of these rules is set forth in sections 25-1.5-103 and 25-3-100.5, et seq., C.R.S.

2.1.2   A facility or agency licensed by the Department shall comply with all applicable federal and state statutes and regulations including this Chapter 2. In the event of a discrepancy between the Department's regulations, the more specific standards shall apply.

APP 149

**Part 12.     COVID-19 IMMUNIZATION OF EMPLOYEES, DIRECT CONTRACTORS, AND SUPPORT STAFF**

**12.1     Statutory Authority and Applicability**

12.1.1   The statutory authority for the promulgation of these rules is set forth in Section 25-1.5-102, 25-1.5-103, and 25-3-103, C.R.S.

12.1.2   The requirements of this Part 12 shall be overseen and enforced by the Department in a manner consistent with Parts 2.10 and 2.11 of this Chapter 2 (for all facility and agency types), 6 CCR 1011-1, Chapter 3, Part 2.1.7 (for behavioral health entities), 6 CCR 1011-1, Chapter 7, Part 3.14 (for assisted living residences), and 6 CCR 1011-1, Chapter 26, Part 5.7 (for home care agencies).

**12.2     General Provisions**

12.2.1   Each facility shall develop and implement a policy and procedure to ensure 100% of employees, direct contractors, and support staff have obtained full COVID-19 vaccination status in accordance with the schedule below.

(A)   All employees, direct contractors, and support staff must have received their first dose of the COVID-19 vaccination no later than September 30, 2021.

(B)   All employees, direct contractors, and support staff must have received their second dose of the COVID-19 vaccination (if applicable) no later than October 31, 2021.

(C)   All employees, direct contractors, and support staff must obtain a subsequent, or booster, dose of the COVID-19 vaccination should one be recommended by the Advisory Committee on Immunization Practices (ACIP), in accordance with the recommended timelines.

(D)   An employee, direct contractor, and support staff member who was diagnosed with COVID-19, who received monoclonal antibody treatment, or convalescent plasma treatment shall obtain their vaccination in a timeframe that is in accordance with the recommendations of the Centers for Disease Control (CDC), ACIP, and the individual's licensed independent practitioner.

(E)   On or after October 31, 2021, each facility shall ensure all newly hired employees, direct contractors, or support staff members have obtained full COVID-19 vaccination status, in accordance with this Part 12.

12.2.2   For purposes of this Part 12, an employee, direct contractor, and support staff subject to this Part 12 is defined as an individual who has the potential for exposure to clients of the facility or agency and/or to infectious materials, including bodily substances, contaminated medical supplies and equipment, contaminated environmental surfaces, or contaminated air.

(A)   These individuals may include, but are not limited to: licensed independent practitioners; students and trainees; Individuals who directly contract with the facility or agency to provide services, whether on a permanent or temporary basis; visiting nursing staff; individuals who are affiliated with the facility or agency, but do not receive wages or other remuneration from the facility or agency; and persons not directly involved in client care but are potentially exposed to infectious agents that can be transmitted to and from the individual providing services and clients of the facility or agency.

12.2.3   The policy and procedure shall address, at a minimum, the following topics:

    (A)   A list of the categories or position descriptions of employees, direct contractors, and support staff exempt from the requirement at Part 12.2.1, including justification for that decision.

    (B)   The facility's criteria for accepting or rejecting medical or religious exemptions.

    (C)   Measures taken by the facility to protect clients and members of the public from exposure by unvaccinated individuals, which shall be based on state and national standards and guidelines. The policy shall include, at a minimum, how the facility will implement testing and masking for unvaccinated individuals.

12.2.4   Each facility shall maintain the following documentation that may be examined by the Department, at any time, for purposes of verifying compliance with this Part 12.

    (A)   Proof of immunization, as defined at 6 CCR 1011-1, Chapter 2, Part 1.51, or

    (B)   A medical exemption signed by a physician, physician assistant, advanced practice nurse, or certified nurse midwife licensed in the State of Colorado stating that the COVID-19 vaccination for the employee, direct contractor, or support staff is medically contraindicated as described in the product labeling approved or authorized by the FDA, or

    (C)   Documentation of a religious exemption, as defined by facility policy.

**12.3   Waiver Requests**

    (A)   A facility may seek a waiver of the 100% vaccination requirement at Part 12.2.1 on the basis that one or more individuals have claimed a religious exemption, pursuant to facility policy.

    (B)   All waiver applications shall be submitted in accordance with the process outlined at 6 CCR 1011-1, Chapter 2, Part 5 – Waiver of Regulations for Facilities and Agencies.

**12.4   Reporting Requirements**

12.4.1   Beginning October 1, 2021, each facility shall report its COVID-19 vaccination rate to the department on the 1st and the 15th day of the month.

12.4.2   This information shall be reported in the form and manner specified by the Department.

12.4.3   Each facility shall report the following information to the department:

    (A)   The total number of employees, direct contractors, and support staff, whether or not the individual is subject to the requirements of this part 12.

    (B)   Total number of vaccinated employees, direct contractors, and support staff and the total number of employees, direct contractors, and support staff.

    (C)   Number of medical exemptions claimed by employees, direct contractors, and support staff.

    (D)   Number of religious exemptions claimed by employees, direct contractors, and support staff.

    (E)    Number of employees, direct contractors, and support staff identified by the facility as exempt from the requirements of this part 12.

    (F)    Number of employees, direct contractors, and support staff who have left employment with the facility or agency due to the requirements of this part 12, since the last reporting date.

12.4.4   Information reported to the Department under this Part 12 shall be made publicly available on the Department's website.

*CODE OF COLORADO REGULATIONS*
*Health Facilities and Emergency Medical Services Division*

*6 CCR 1011-1 Chapter 2*

**Appendix A:    Surprise Billing Disclosure**

Surprise Billing -- Know Your Rights

What is surprise billing?

If you are seen by a provider or use services in a facility or agency that is not in your health insurance plan's provider network, referred to as "out-of-network," you may receive a bill for additional costs associated with that care. Out-of-network facilities or agencies often bill you the difference between what your insurer decides is the eligible charge and what the out-of-network provider bills as the total charge. Under Colorado law this is defined as balanced billing and is commonly called surprise billing.

On Jan. 1, 2020, a new state law went into effect to protect you from surprise billing. These protections apply when:

- You receive covered emergency services, other than ambulance services, from an out-of-network provider in Colorado.

- You unintentionally receive covered services from an out-of-network provider at an in-network facility in Colorado.

This law only applies if you have a "CO-DOI" on your health insurance ID card and you are receiving care and services provided at a regulated facility in Colorado.

When you cannot be surprise billed:

Emergency Services
If you are receiving emergency services, you can only be billed for your plan's in-network cost-sharing amounts, which are copayments, deductibles, and/or coinsurance. You cannot be billed for anything else. This applies only to services related to and billed as an "emergency service."

Non-Emergency Services at an In-Network Facility by an Out-of-Network Provider
Facility or agency staff must tell you if you are at an out-of-network location or if they are using out-of-network providers, when known. Staff must also tell you what types of services you will be using that might be provided by an out-of-network provider.

You have the right to request that in-network providers perform all covered medical services. However, you may have to receive medical services from an out-of-network provider if an in-network provider is unavailable. If your insurer covers the service, you can only be billed for your in-network cost-sharing amount, which are copayments, deductibles, and/or coinsurance.

Additional Protections

- Your insurer will pay out-of-network providers and facilities directly.

- Your insurer must count any amount you pay for emergency services or certain out-of-network services toward your in-network deductible and out-of-pocket limit.

- The provider, facility, hospital, or agency must refund any amount you overpay within 60 days of being notified.

- No one, including a provider, hospital, or insurer, can ask you to limit or give up these rights.

APP 153

If you receive services from an out-of-network provider or facility or agency in any other situation, you may still be surprise billed, or you may be responsible for the entire bill. If you intentionally receive non-emergency services from an out-of-network provider or facility, you may also be surprise billed.

If you think you have received a bill for amounts other than your copayments, deductible, and/or coinsurance, please contact the facility's or agency's billing department or the Colorado Division of Insurance at 303-894-7499 or 1-800-930-3745.

_____DATE _____

My signature acknowledges receiving this notice and does not waive my rights under the law.

**Editor's Notes**

6 CCR 1011-1 has been divided into separate chapters for ease of use. Versions prior to 05/01/2009 are located in the main section, 6 CCR 1011-1. Prior versions can be accessed from the All Versions list on the rule's current version page. To view versions effective on or after 05/01/2009, select the desired chapter, for example 6 CCR 1011-1 Chapter 04 or 6 CCR 1011-1 Chapter 18.

**History**

Rule 2.20 eff. 05/21/2007.

Rule 2.20 eff. 08/30/2007.

Rule 5.2 eff. 03/01/2008.

Parts 1, 2, rules 3.2.1, 3.2.5-3.2.7, 3.2.9, 4.101, 4.102, 4.103, 4.104, 4.105, 4.106, 5.2, 5.2.1, 5.4.1-5.4.3, Parts 6-7; Part 9 eff. 04/30/2010. Rule 5.4.4 repealed eff. 04/30/2010.

Rules 1.100-1.101, 1.200 emer. rules eff. 09/15/2010.

Rules 1.100-1.101, 1.200, 2.105(A), 2.3.5(A)(1), 2.3.5(C)(1), 6.104 (1)(b), 6.104 (1)(f)-(f)(iii), 6.201(2) eff. 12/30/2010.

Part 7 eff. 04/30/2011.

Rules 2.3.6, 2.10.5(B)(2), 2.13 eff. 09/30/2011.

Part 10 eff. 03/30/2012.

Rules 2.2.7-2.2.15, 2.7, 2.8.2, 2.10.3-2.10.6, 2.11.2-2.11.4, 4.105(1)(c) eff. 03/17/2013.

Part 1, rules 2.3.1, 2.3.5, 2.4.2, 2.9.1(A), 2.9.6, 2.10.6(A)(1)(b), 3.2.1(5), 4.101(3), 4.103-4.106 eff. 08/14/2013.

Rules 2.2.12-2.2.16, 2.14, 3.3-3.3.1, 5.2.3.4, 5.2.5-5.3, 5.4.2 eff. 03/02/2014.

Rules 3.1, 5.2.3.4 eff. 12/15/2014.

Rules 4.103(4)(b), 7.200-7.203, 8.102(1), 8.103(2)-(4), 10.5(J) eff. 06/01/2016.

Rule 2.13 eff. 07/01/2019.

Rules 1.16, 1.22, 1.23, 1.34, 1.45, 7.1.1(Q), 7.1.3, Appendix A emer. rules eff. 01/01/2020.

Entire rule eff. 01/14/2020.

Rules 2.5.5, 2.5.6 emer. rules eff. 04/10/2020; expired 08/08/2020.

Rules 1.16, 1.22, 1.23, 1.34, 1.45, 7.1.1(Q), 7.1.3, Appendix A eff. 04/14/2020.

Rule 2.12 eff. 07/01/2020.

Rules 2.6.2, 7.2.1, 9.2.1(A) eff. 02/14/2021.

Rules 2.1.1, 2.2.2, 2.3.3(F), 2.9.6(A)(4), 3.2.3, 3.2.4, 3.3.1, 9.2.2, 9.2.3 eff. 06/14/2021.

Rules 11.2.3(C)(1), Part 12 emer. rules eff. 08/30/2021.

APP 155

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-2451-NYW-MDB

Jessica Sweeney, Roxie Blue, Erika Bode, Amber Cano, Julie Deters-Frank, Karen
Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard,
Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton,
Stephanie Silvers, Patricia Spoerl, Loni Thalheimer, Alisha Torbeck,

       Plaintiffs,

v.

University of Colorado Hospital Authority, Elizabeth Concordia, Margaret Reidy, Michael
Randle, Jill Hunsaker Ryan, D. Randy Kuykendall, Patricia Hammon, Raymond Estacio,
Daniel Pastula, Shawn Turk, Tom Butts, Evelinn Borrayo, Kendall Alexander,

       Defendants.

---

## CDPHE DEFENDANTS' MOTION TO DISMISS

Defendants, Executive Director of the Colorado Department of Public Health and

Environment ("CDPHE") Jill Hunsaker Ryan; former CDPHE Director of Health Facilities

and Emergency Medical Services D. Randy Kuykendall; and current and former

Colorado Board of Health members Patricia Hammon, Raymond Estacio, Daniel

Pastula, Shawn Turk, Tom Butts, Evelinn Borrayo, and Kendall Alexander, (collectively,

"CDPHE Defendants"),[1] through counsel, respectfully move to dismiss Plaintiffs'

Complaint, ECF No. 1, under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). In support thereof,

the CDPHE Defendants state as follows.

---

[1] The Complaint misspells Patricia Hammon's and Shawn Turk's names.

**Certificate of Conferral.** Undersigned counsel conferred with counsel for Plaintiffs on January 5 and 8, 2024. Plaintiffs oppose the relief requested herein.

## INTRODUCTION

This suit is the latest in a series of recent actions filed across the country alleging a novel theory to support Plaintiffs' refusal, as healthcare workers, to receive a COVID-19 vaccine as a condition of continued employment.[2] Plaintiffs are former employees of University of Colorado Hospital Authority ("UCHealth") or one of its entities. ECF No. 1, ¶ 18. Plaintiffs bring six claims under 42 U.S.C. § 1983, alleging Defendants violated the Fourteenth Amendment's Due Process and Equal Protection Clauses, the Unconstitutional Conditions Doctrine, 21 U.S.C. § 360bbb-3 ("EUA Statute"), 10 U.S.C. § 980, 42 U.S.C. 247d-6d, 6e ("PREP Act"), 45 CFR § 46.116, 45 CFR § 46.122, and various documents that discuss the informed-consent requirement for medical research. *Id.* at ¶¶ 321-89. Plaintiffs also bring a breach of contract claim under a third-party beneficiary theory, a state "employment torts" claim, a claim for extreme and outrageous conduct, and an implied right of action under the EUA Statute. *Id.* at ¶¶ 391-415.

---

[2] *Curtis v. Inslee*, No. 3:23-CV-05741-RJB, 2023 WL 8828753 (W.D. Wash. Dec. 21, 2023); *Bridges v. Houston Methodist Hosp.*, 543 F. Supp. 3d 525 (S.D. Tex. 2021), *aff'd sub nom Bridges v. Methodist Hosp.*, 21-20311, 2022 WL 2116213 (5th Cir. June 13, 2022); *Bridges v. Methodist Hosp.*, No. 4:23-cv-01699 (S.D. Tex.); *Boysen v. Peacehealth*, No. 6:23-cv-01229 (D. Or.); *Roberts v. Shriners Hosps. for Children*, No. 2:23-cv-00295 (E.D. Wash.); *Timken v. S. Denver Cardiology Assoc.*, No. 23-cv-02859 (D. Colo.); *Horsley v. Kaiser Found. Hosps., Inc.*, No. 4:23-cv-05628 (N.D. Cal.); *McMahon v. City of Los Angeles*, No. 2:23-cv-09815 (C.D. Cal.); *Abrigo v. Kaiser Found. Hosps.*, No. 6:23-cv-01804 (D. Or.); *Boyd v. Shriners Hosps. for Children*, No. 1:23-cv-00342 (W.D. Pa.).

APP 157

The Eleventh Amendment bars Plaintiffs' official capacity claims. Similarly, the Colorado Governmental Immunity Act ("CGIA"), § 24-10-101, et seq, C.R.S. (2023), bars the state law tort claims. The Court thus lacks subject matter jurisdiction over the claims, and they must be dismissed. The Complaint also fails to state claims for relief. Lastly, the CDPHE Defendants are also entitled to qualified immunity as to the individual capacity claims. Therefore, the Complaint must be dismissed it its entirety.

**RELEVANT FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS**

For nearly three years, COVID-19, an infectious disease caused by the SARS-CoV-2 virus, upended most of the world's normal functioning. As of January 11, 2024, just in the United States, COVID-19 has hospitalized over 6.6 million people and has killed more than 1.1 million people.[3] In Colorado, those numbers are 103,534 and 15,388 respectively.[4] As of August 30, 2021, in Colorado, 36,449 people had been hospitalized and 7,327 people had died from COVID-19, with 2,625 of deaths occurring in licensed healthcare facilities. Ex. A (Chart of Hospitalizations); Ex. B (Board of Health Emergency Rule Justification).[5]

---

[3] https://covid.cdc.gov/covid-data-tracker/#datatracker-home, last accessed January 11, 2024.

[4] https://covid.cdc.gov/covid-data-tracker/#maps_deaths-total, last accessed January 11, 2024; https://covid.cdc.gov/covid-data-tracker/#maps_total-admissions-state, last accessed January 11, 2024.

[5] The CDPHE Defendants request the Court take judicial notice of all attached exhibits without converting the motion to one for summary judgment. FRE 201(b); Bird v. Wyoming, 22-CV-152-NDF, 2022 WL 17550097, at *7 (D. Wyo. Dec. 8, 2022) (taking judicial notice of documents on the FDA's website); *Faircloth v. CDOC*, No. 20-CV-03202-RM-STV, 2020 WL 7055448, at *1 (D. Colo. Dec. 2, 2020) (taking judicial notice of COVID-19 statistics).

APP 158

As of July 2021, the Federal Drug Administration ("FDA") had issued an emergency use authorization ("EUA") for three COVID-19 vaccines, Pfizer-BioNTech mRNA ("Pfizer Vaccine"), Moderna mRNA ("Moderna Vaccine"), and Johnson/Janssen viral vector vaccine ("J&J Vaccine"). *Johnson v. Brown*, 567 F. Supp. 3d 1230, 1238-39 (D. Or. 2021). On August 23, 2021, the FDA reissued the EUA for the Pfizer mRNA vaccine. Ex. C (August 23rd EUA). That same day the FDA issued a full approval for the Pfizer Vaccine under the proprietary name, COMIRNATY. Ex. D (August 23, 2021 COMIRNATY Authorization). The August 23rd EUA stated the Pfizer mRNA vaccine is the identical formulation as the COMIRNATY vaccine and may be used interchangeably. Ex. C, p. 2; *see also Johnson*, 567 F. Supp 3d at 1240.

On August 30, 2021, amid continuing high infection and hospitalization rates, CDPHE, through the Board of Health, promulgated an emergency rule ("Rule 12") requiring all Colorado healthcare facilities, as a condition of licensure, to implement policies designed to ensure 100% of employees were vaccinated against COVID-19[6] no later than October 31, 2021, with the first dose to be completed by September 30, 2021.

---

[6] The only conduct by CDPHE occurred more than two years before Plaintiffs filed suit, ECF No. 1-7, p. 1, and Plaintiffs knew they could lose their jobs no later than September 3, 2021, ECF No. 1, ¶ 8; ECF No. 1-4, p. 2. Thus, their claims accrued on that date and all but Claim Seven (breach of contract) are time barred. § 13-80-102(1)(a), (i), C.R.S. (2023) (general tort actions and actions with no specified limitations period subject to two-year limitations period); § 13-80-101(1)(a), C.R.S. (2023) (contract actions subject to three-year limitations period); *Blake v. Dickason*, 997 F.2d 749, 750 (10th Cir. 1993) (§ 1983 claims governed by the two-year limitations period in § 13-80-102); *see also Indus. Constrs. Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 968-69 (10th Cir. 1994) (actions accrue "when the plaintiff knows or has reason to know of the existence and cause of the injury [that] is the basis of his action").

4

6 CCR 1011-1, Chapter 2, Part 12.2.1. Rule 12 required the policies to allow employees to request exemptions for religious or medical reasons. *Id.* at Part 12.2.4, 12.3.

Plaintiffs are former employees of UCHealth who were terminated for failing to comply with UCHealth's vaccine policy, implemented to comply with Rule 12. ECF No. 1, ¶ 406. That policy required UCHealth employees to be fully vaccinated by October 1, 2021. ECF No. 1-4. Plaintiffs allege the three COVID-19 vaccines available in September 2021 were approved only for emergency use and therefore were "investigational new drugs." *Id.* at ¶¶ 2-5. From that initial premise, Plaintiffs conclude they were subjected to medical research without informed consent. *See, e.g.*, *id.* at ¶¶ 60-91, 197-200, 268. In support of that conclusion, Plaintiffs rely on a slew of "authorities" including federal law (the EUA Statute, 10 U.S.C. § 980, the PREP Act), *id.* at ¶¶ 47, 102-29, 150-71; federal regulations (45 CFR § 46.116, 45 CFR § 46.122), *id.* at ¶¶ 36-50; a Congressional report on ethical principles of research on human subjects (the Belmont Report), *id.* at ¶¶ 25-35; a treaty (the International Covenant on Civil and Political Rights Treaty or "ICCPR Treaty"), *id.* at ¶¶ 92-101; agreements between healthcare entities and the U.S. government that require the entities to obtain informed consent (the Federal Wide Assurance agreement or "FWA," the CDC COVID-19 Vaccination Program Provider Agreement or "Provider Agreement,"), *id.* at ¶¶ 138-49, 172-89; and the EUA Letters issued by the FDA approving use of the COVID-19 vaccines, *id.* at ¶¶ 21-22, 81, 85, 130-33. Plaintiffs allege that, according to these "authorities," the pressure of threatened loss of employment meant they could not give

5

informed consent and thus Defendants violated their right to give informed consent before being subjected to medical research. *E.g.*, *id.* at ¶¶ 205, 328, 392, 398, 402.

At bottom, the Complaint equates CDPHE's healthcare facility licensing condition to implement a policy ensuring 100% COVID-19 vaccination at Colorado healthcare facilities to subjecting employees of a private entity separate from CDPHE to human research and experimentation. This novel theory stretches the cited authorities beyond any reasonable interpretation and the Complaint must be dismissed.

## STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(1) allows courts to dismiss a complaint for lack of subject matter jurisdiction. A Rule 12(b)(1) motion may attack the facts upon which subject matter jurisdiction depends. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). In reviewing such an attack, the Court may not presume the allegations are true. *Id.* A factual attack may go beyond the complaint, and district courts have wide discretion to consider affidavits and other documents. *Id.* Eleventh Amendment immunity is an issue of subject matter jurisdiction. *Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 559 (10th Cir. 2000). It is Plaintiff's burden to establish subject matter jurisdiction. *See Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Rule 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The factual allegations must be enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). To survive a 12(b)(6) motion, a party must state

APP 161

allegations sufficient to "plausibly" support a legal claim for relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). The plausibility standard requires more than a sheer possibility a defendant acted unlawfully. *Id.* Courts take a two-prong approach to evaluating the sufficiency of a complaint. *Id.* at 678-79. First, the court identifies which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id*. at 678. Second, the court assumes the truth of the well-pleaded factual allegations and "determine[s] whether they plausibly give rise to an entitlement to relief," a context-specific inquiry. *Id*. at 679.

## LEGAL ARGUMENT

I.    **Sovereign and governmental immunity bar Plaintiffs' claims.**

A.  **The Eleventh Amendment bars the official capacity claims against CDPHE Defendants.**

The Eleventh Amendment to the United States Constitution bars federal jurisdiction over private claims for money damages against a state, its instrumentalities, and state officials acting in their official capacity. *Tennessee v. Lane*, 541 U.S. 509, 517-19 (2004). A plaintiff bringing claims against a state employee in his official capacity essentially brings claims against the State itself. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Unless a state has waived its Eleventh Amendment immunity, which Colorado has not, absolute immunity applies regardless of the relief sought. *See Higganbotham v. Okla. Transp. Comm'n*, 328 F.3d 638, 644 (10th Cir. 2003); *Griess v. Colo.*, 841 F.2d 1042, 1044-45 (10th Cir. 1988). Congress may abrogate such immunity, but it "must have 'unequivocally expresse[d] its intent to abrogate the immunity' and

7

'acted pursuant to a valid exercise of power.'" *Union Pac. R. Co. v. Utah*, 198 F.3d 1201, 1203 (10th Cir. 1999). Congress may only validly abrogate immunity pursuant to its Fourteenth Amendment, Section 5 power. *Id.* And it is well-established that states and government employees acting in their official capacities are not "persons" that can be sued under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64-66 (1989).

Because Plaintiffs have sued the CDPHE Defendants in their official capacities, the suit is essentially against the State and the CDPHE Defendants are entitled to Eleventh Amendment immunity. *Fox-Rivera v. Colo. Dep't of Pub. Health & Env't, Lab. Servs. Div.*, No. 14-CV-00737-RBJ, 2014 WL 3359320, at *3 (D. Colo. July 9, 2014), *aff'd sub nom. Fox-Rivera v. Colo. Dep't of Pub. Health & Env't*, 610 F. App'x 745 (10th Cir. 2015) (finding Eleventh Amendment barred claims against CDPHE).[7] Colorado has not waived its immunity and Congress has not abrogated it. 21 U.S.C. § 360bbb-3(a)(1) (indicating EUA Statute enacted pursuant to Congress Commerce Clause power); *Will*, 491 U.S. at 64-66 (holding Congress did not abrogate sovereign immunity through § 1983); *Griess*, 841 F.2d at 1044-45. And as it concerns Claims One through Six, none of the CDPHE Defendants can be considered "persons" that can be sued under § 1983. *Will*, 491 U.S. at 64-66. Thus, all federal claims are barred.

---

[7] *Fox-Rivera* also found that the individual CDPHE employees sued in their official capacities were not entitled to Eleventh Amendment immunity because the plaintiff sought prospective relief. *Fox-Rivera*, 2014 WL 3359320, at *2. Here, Plaintiffs do not seek prospective relief, ECF No. 1, ¶¶ 416-22.

Eleventh Amendment immunity equally bars Plaintiffs' state law claims (Claims Seven through Nine).[8] Where a defendant is entitled to such immunity, "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 121 (1984). And the Tenth Circuit has specifically held the CGIA does not waive Colorado's Eleventh Amendment immunity. *Griess*, 841 F.2d at 1044-45. Thus, Claims Seven, Eight, and Nine are barred. *Smith v. Plati*, 56 F. Supp. 2d 1195, 1202 (D. Colo. 1999), *aff'd*, 258 F.3d 1167 (10th Cir. 2001) (finding public official sued in official capacity immune from state law claims); *see also Irions v. Colo. Dep't of Corr.*, No. 05-CV-00094-PSF-OES, 2005 WL 8172204, at *4 (D. Colo. Sept. 30, 2005) (Eleventh Amendment barred contract claim).

For the reasons stated above, the Eleventh Amendment bars all official capacity claims against the CDPHE Defendants. *See Curtis, et al., v. Inslee, et al.*, No. 3:23-CV-05741-RJB, 2023 WL 8828753, at *4 (W.D. Wash. Dec. 21, 2023) (dismissing nearly identical claims against Washington State's governor). Accordingly, this Court does not have subject matter jurisdiction and the claims must be dismissed with prejudice.

---

[8] The Complaint does not specify whether Claim Seven, for breach of contract, is brought under state or federal law. But federal common law contract claims are actionable only for breaches of collective bargaining agreements, *see e.g.*, *E. Mountain Energy, LLC v. United Mine Workers of Am., Local Union 1769*, No. 2:16-CV-00018-DAK, 2016 WL 3747585, at *1-2 (D. Utah July 11, 2016), or contracts that raise questions as to the liability or responsibility of the United States, *see Miree v. DeKalb Cnty., Ga.*, 433 U.S. 25, 28-29 (1977). Because that is not the case here, the court must analyze the claim under state law. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (stating limited instances in which federal common law applies).

APP 164

### B.  The CGIA bars Claims Eight and Nine.

The CGIA creates immunity for public entities and public employees against all claims that "lie in tort or could lie in tort."  § 24-10-106(1), C.R.S. (2023); *Fogg v. Macaluso*, 892 P.2d 271, 273 (Colo. 1995); *see also Glasser v. King*, 721 F. App'x 766, 769 (10th Cir. 2018) (where court would exercise supplemental jurisdiction over state law claims, court applies the forum state's substantive law). Claims Eight and Nine lie in tort. § 13-80-102(1)(a), C.R.S. (2023) (setting statute of limitations for tort of outrageous conduct); *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1003 (Colo. 2008) (claim lies in tort when injury arises out of tortious conduct and relief seeks to compensate plaintiff for that injury); ECF No. 1, p. 96 (describing Claim Eight as bringing an Employment Torts" claim); *id.* at ¶ 408 (seeking compensatory damages for Claim Eight). Therefore, they are subject to the CGIA's requirements.

Under the CGIA, any person claiming to have suffered an injury as a result of a tort committed by a public entity or public employee in the course of his or her employment must file with the Attorney General a notice of the person's claim for damages within 182 days of the date of discovery of the injury. § 24-10-109(1), (3), C.R.S. (2023); *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 923 (Colo. 1993). The notice requirement applies even where a plaintiff alleges a public employee acted willfully and wantonly. *First Nat'l Bank of Durango v. Lyons*, 349 P.3d 1161, 1163 (Colo. App. 2015). Timely filing of the notice is a jurisdictional prerequisite requiring strict compliance. § 24-10-109(1); § 24-10-118(1)(a), C.R.S. (2023); *East Lakewood Sanitation Dist. v. Dist. Court*, 842 P.2d 233, 236 (Colo. 1992).

APP 165

Plaintiffs did not file notices of claim regarding the allegations in the Complaint. Ex. E (Declaration of Tammy Adams); *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (court has wide discretion to consider affidavits and other documents when considering a motion to dismiss under Rule 12(b)(1)). Therefore, Plaintiffs' state law claims are barred forever. § 24-10-109(1). Because Plaintiff did not provide the notice required to bring state law tort claims against the CDPHE Defendants, this Court does not have jurisdiction over Claims Eight and Nine.  Thus, the claims must be dismissed with prejudice. *Orendorf v. Office of Behavioral Health*, No. 21-CV-01000-RM-NRN, 2022 WL 1018708, at *6 (D. Colo. Mar. 18, 2022), *report and recommendation adopted*, 21-CV-01000-RM-NRN, 2022 WL 1015185 (D. Colo. Apr. 5, 2022).

## II.    The Complaint fails to state claims upon which relief can be granted.

As a threshold matter, the basic premise of this case is inaccurate. Plaintiffs allege all COVID-19 vaccines available at the time UCHealth mandated Plaintiffs be vaccinated had only emergency use approval, making the vaccines an investigational drug. Plaintiffs further allege the vaccine mandate constituted coercion into being subjected to medical research in human trials. Neither allegation has a basis in fact.

First, it is undisputed COMIRNATY, which is formulaically identical to the Pfizer Vaccine, received full approval on August 23, 2021, before the deadline to be fully vaccinated. Ex. D; *Johnson*, 567 F. Supp. 3d at 1252; *Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1171 (D.N.M. 2021), *aff'd*, 21-2105, 2022 WL 2129071 (10th Cir. June 14, 2022) (*Valdez I*). Thus, Plaintiffs had available a fully approved, and therefore not "investigational," vaccine available before they faced disciplinary action.

11

Second, even ignoring that a fully approved vaccine was available, Plaintiffs were not subjected to medical research; they were not participants in a human trial. *Bridges v. Houston Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021), *aff'd sub nom. Bridges v. Methodist Hosp.*, 21-20311, 2022 WL 2116213 (5th Cir. June 13, 2022).

Third, as there is no unfettered right to continued employment without conditions such as vaccination, there was no coercion. *Kheriaty v. Regents of the Univ. of Cal.*, No. 22-55001, 2022 WL 17175070, at *1 (9th Cir. Nov. 23, 2022); *Norris v. Stanley*, No. 1:21-CV-756, 2022 WL 247507, at *5 (W.D. Mich. Jan. 21, 2022). Plaintiffs had a choice: receive the vaccine or lose their employment. *Jensen v. Biden*, No. 4:21-CV-5119-TOR, 2022 WL 18860405, at *2 (E.D. Wash. Jan. 7, 2022); *Bridges*, 543 F. Supp. 3d at 528. But even if this action's premise were correct, Plaintiffs claims still fail.

### A. The cited authorities Plaintiffs rely on are inapplicable and do not create a private right enforceable through § 1983.

Claim One alleges Plaintiffs were deprived of their "legal right" to give informed consent. ECF No. 1, ¶¶ 321-30. Claims One and Six allege several authorities create this "right," which Plaintiffs seek to enforce through § 1983. *Id.* at ¶¶ 321, 375, 384. Claim Four relies on many of the same authorities but adds that they provide Plaintiffs with a specific monetary entitlement, thus creating rights conferred under the Spending Clause. *Id.* at ¶¶ 345. But the cited "authorities" are inapplicable and create no legal right enforceable through § 1983, under the Spending Clause power or otherwise.[9]

---

[9] The Fourteenth Amendment, which Plaintiffs also cite, *id.* at ¶¶ 321, 345, can support a § 1983 claim. But they fail to allege a Fourteenth Amendment violation. *See* §§ II.B-C.

APP 167

**1.  The authorities cited in Claims One and Six are inapplicable.**

Plaintiffs rely on the EUA Statute, the EUA Letters, the PREP Act, the Provider Agreement, 10 U.S.C. § 980, 45 CFR § 46.122, the FWA, the Belmont Report, and the ICCPR, arguing that each "unambiguously create[s] rights enforceable pursuant to 42 U.S.C. § 1983." ECF No. 1, ¶¶ 321, 375. As explained below, that proposition is incorrect. But importantly, the cited authorities are not even applicable in this situation.

First, as noted above, the FDA had fully approved the Pfizer vaccine before Plaintiffs were required to receive the vaccine as a condition of their continued employment. That alone makes the EUA Statute inapplicable as to that vaccine. *Valdez I*, 559 F. Supp. 3d at 1171. Even for the Moderna and J&J Vaccines, the EUA Statute does not apply to state agencies or its employees or agents such as the CDPHE Defendants. *Id.* at 1171-72; *Valdez v. Lujan Grisham*, No. 21-CV-783 MV/JHR, 2022 WL 3577112, at *5 (D.N.M. Aug. 19, 2022); *Rhoades v. Savannah River Nuclear Sols., LLC*, 574 F. Supp. 3d 322, 344-45 (D.S.C. 2021); *Bridges*, 543 F. Supp. 3d at 527. The statute imposes obligations only on the Department of Health and Human Services Secretary, and even for the Secretary, it must do nothing more than establish conditions on an emergency authorization designed to, among other things, ensure recipients of the vaccine are given certain information. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). And the EUA Letters issued pursuant to the EUA Statute impose obligations upon only the vaccine manufacturers and those who actually provide the vaccine to recipients, *e.g.*, ECF No. 1-3, p. 5-8, not anyone promulgating a licensing requirement upon healthcare facilities — the only action taken by the CDPHE Defendants. Similarly, the Provider

13

Agreement applies only to signatories, and the CDPHE Defendants do not fall in that category. ECF No. 1-2, p. 2 ("I understand this is an agreement between Organization and CDC.") And Plaintiffs do not allege as much. Even if the CDPHE Defendants had signed the Provider Agreement, any failure to comply with its terms would be nothing more than a breach of contract, which cannot form the basis of a § 1983 claim. *Andree v. Hoy*, No. 11-CV-02020-CMA-KMT, 2012 WL 5989466, at *7 (D. Colo. Nov. 30, 2012).

Turning to the PREP Act, while it clearly applies to the COVID-19 vaccines, it does so only in the context of providing immunity for injuries caused by the administration of the vaccine. 42 U.S.C. § 247d-6d(a)(1). Because the statute protects those who administer the vaccine, not recipients, it does not apply. Even if it could apply to recipients, Plaintiffs do not fall in that category. ECF No. 1, ¶ 407.

For the remaining authorities, they apply only to research or experimentation with human subjects, or when federal funds have been appropriated for such research. 10 U.S.C. § 980(a) ("Funds appropriated to the Department of Defense may not be used for *research involving a human being as an experimental subject* [.]") (emphasis added); 45 CFR § 46.122 ("Federal funds administered by a Federal department or agency may not be expended for *research involving human subjects* [.]") (emphasis added); Int. Covenant on Civil & Political Rights Treaty art. VII, Oct. 5, 1977[10] ("[N]o one shall be subjected without his free consent to *medical or scientific experimentation*.") (emphasis

---

[10] https://treaties.un.org/doc/Treaties/1976/03/19760323%2006-17%20AM/Ch_IV_04.pdf.

APP 169

added); *Belmont Report: Ethical Principles & Guidelines for the Protection of Human Subjects of Research, Report of the Nat. Comm. for the Protection of Human Subjects of Biomedical & Behavioral Research*, 44 Fed. Reg. 23192, 23192 ("[T]he Commission was [charged with identifying] the basic ethical principles that should underlie the conduct of biomedical and behavioral *research involving human subjects* [.]") (emphasis added); *Federalwide Assurance for the Protection of Human Subjects*, Term 2: Applicability, https://www.hhs.gov/ohrp/register-irbs-and-obtain-fwas/fwas/fwa-protection-of-human-subjecct/index.html ("These terms apply whenever the Institution becomes engaged *in human subjects research* [.]") (emphasis added). Despite the creative attempt, Plaintiffs do not plausibly allege the CDPHE Defendants engaged in such research or that Plaintiffs were subjects of it. *Bridges*, 543 F. Supp 3d at 527.

Because none of Plaintiffs' cited authorities apply to the CDPHE Defendants, they cannot support a § 1983 claim. Thus, Claims One and Six must be dismissed. *See Curtis*, 2023 WL 8828753, at *5 (finding the EUA Statute, 45 CFR Part 46, the Belmont Report, the ICCPR Treaty, 10 U.S.C. § 980, the FWA, and the Provider Agreement inapplicable to Washington State's vaccine mandate for healthcare workers).

**2.  The cited authorities create no rights enforceable through § 1983.**

Even if the cited authorities applied, they do not create private rights enforceable through § 1983. "Section 1983 speaks in terms of '*rights*, privileges, or immunities,' not violations of federal law." *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989) (emphasis added). "Private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). While "federal

15

statutes have the potential to create § 1983-enforceable rights, they do not do so as a matter of course." *Health & Hosp. Corp. of Marion Cnty. v. Tavelski*, 599 U.S. 166, 183 (2023). Without evidence of congressional intent to create a private right, "a cause of action does not exist[,] and courts may not create one, no matter how desirable it might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87. Not only must Congress have created "a private right, but also a private remedy." *Id.*

The cited authorities create neither a private right nor a private remedy. Beginning with the EUA Statute, multiple courts have concluded it does not confer a private right. *Snyder v. Chicago Transit Auth.*, No. 22 CV 6086, 2023 WL 7298943, at *5 (N.D. Ill. Nov. 6, 2023); *Anderson v. United Airlines, Inc.*, No. 23 C 989, 2023 WL 5721594, at *2 (N.D. Ill. Sept. 5, 2023); *Jackson v. Methodist Health Servs. Corp.*, No. 22-CV-1307, 2023 WL 2486599, at *5 (C.D. Ill. Feb. 10, 2023); *Johnson v. Tyson Foods, Inc.*, 607 F. Supp. 3d 790, 806-07 (W.D. Tenn. 2022); *Crosby v. Austin*, No. 8:21-CV-2730-TPB-CPT, 2022 WL 603784, at *1 (M.D. Fla. Mar. 1, 2022). Indeed, as part of the Federal Drug and Cosmetic Act, the EUA Statute can only be enforced by the United States. *Bird v. Martinez-Ellis*, 22-8012, 2022 WL 17973581, at *5 (10th Cir. Dec. 28, 2022); *Moomey v. Express Messenger Sys., Inc.*, No. 221CV00575DAKJCB, 2022 WL 1785520, at *8 (D. Utah May 9, 2022), *report and recommendation adopted*, 2:21-CV-575-DAK-JCB, 2022 WL 1773018 (D. Utah June 1, 2022), and *report and recommendation adopted*, 2:21-CV-575-DAK-JCB, 2022 WL 2181685 (D. Utah June 16, 2022); *Navy Seal 1 v. Biden*, 574 F. Supp. 3d 1124, 1130 (M.D. Fla. 2021)*.*

APP 171

Turning to 10 U.S.C. § 980, nothing in that statute's language provides any enforcement mechanism, let alone a private right of action. 10 U.S.C. § 980. Next, as a regulation promulgated by a federal agency, rather than a statute enacted by Congress, 45 CFR § 46.122 cannot create a private right. *Sandoval*, 532 U.S. at 286 ("[P]rivate rights of action to enforce federal law must be created *by Congress*.") (emphasis added); *Thurman v. Med. Transp. Mgmt., Inc.*, 982 F.3d 953, 957 (5th Cir. 2020) ("It follows from *Sandoval* . . . that agency regulations cannot independently confer federal rights enforceable under § 1983 for one simple reason: . . . it is Congress . . . that creates federal rights"); *Thomas v. Catlin*, 141 F. App'x 673, 674 (9th Cir. 2005) (affirming dismissal of claim seeking to enforce 45 CFR Part 46); *Quarrie v. Wells*, No. CV 17-350 MV/GBW, 2018 WL 5149416, at *8 (D.N.M. Oct. 22, 2018), *report and recommendation adopted*, CV 17-350-MV-GBW, 2018 WL 6804485 (D.N.M. Dec. 27, 2018), *aff'd*, 21-2090, 2022 WL 2299105 (10th Cir. June 27, 2022) (collecting circuit court cases holding regulations not enforceable through § 1983)[11]; *Robertson ex rel. Robertson v. McGee*, No. 01CV60, 2002 WL 535045, at *3 (N.D. Okla. Jan. 28, 2002) (dismissing claims seeking to enforce 45 CFR Part 46).

---

[11] *Quarrie* noted that the Tenth Circuit has not expressly addressed this issue. *Quarrie v. Wells*, 2018 WL 5149416, at *8. The Tenth Circuit previously stated that regulations may create privately enforceable rights in some instances. *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 725 (10th Cir. 1988). However, the Tenth Circuit decided *DeVargas* long before the Supreme Court decided *Sandoval*, which stated only Congress can create enforceable federal rights. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

APP 172

Next, "the PREP Act does not provide a federal cause of action for covered claims; indeed, it provides no cause of action at all." *Hudak v. Elmcroft of Sagamore Hills*, 566 F. Supp. 3d 771, 782 (N.D. Ohio 2021); *see also Schuster v. Percheron Healthcare, Inc.*, 493 F. Supp. 3d 533, 537 (N.D. Tex. 2021) ("The PREP Act is, at its core, an immunity statute; it creates no rights, duties, or obligations."). The only exception is an action for death or serious physical injury brought exclusively in the United States District Court for the District of Columbia. 42 U.S.C. § 247d-6d(d)(1), (e)(1). Plaintiffs do not allege death or serious physical injury and did not bring their claims in the proper court. 42 U.S.C. § 247d-6d(d)(1), (e)(1).

Lastly, neither the FWA, the Belmont Report, the EUA Letters, nor the ICCPR Treaty are enforceable legal authority. *See Kriley v. Nw. Mem'l Healthcare*, No. 22-1606, 2023 WL 371643, at *2 (7th Cir. Jan. 24, 2023) (Belmont Report is a statement of principles, not authority creating private right of action); *Romero v. Bellevue Hosp.*, No. 23-CV-3706 (LTS), 2023 WL 4081540, at *4 (S.D.N.Y. June 20, 2023) ("[T]here is no private right of action to enforce alleged violations of the emergency use authorization itself . . . ."); *Beswick v. Barr*, No. 5:20-CV-98-DCB-MTP, 2020 WL 3520312, at *2 (S.D. Miss. June 29, 2020) ("The ICCPR did not create individually enforceable rights."); *Andree*, 2012 WL 5989466, at *7 (breach of contract cannot support § 1983 claim).

Because none of the authorities Plaintiffs cite provide for a private right of action, Claims One and Six must be dismissed. *See Curtis*, 2023 WL 8828753, at *5 (finding neither the EUA Statute, 45 CFR Part 46, the Belmont Report, the ICCPR Treaty, 10

18

U.S.C. § 980, the FWA, nor the Provider Agreement provide a private cause of action as to Washington State's healthcare worker vaccine mandate).

### 3. The cited authorities do not create any rights conferred under the Spending Clause.

Plaintiffs assert the EUA Statute, the Provider Agreement, 45 CFR § 46.122, and 10 U.S.C. § 980 "create[] a specific monetary entitlement for individuals considering whether or not to" receive the COVID-19 vaccine, in the form of free medical counseling regarding the vaccine. ECF No. 1, ¶¶ 360-61, 365. Plaintiffs further assert that, under Supreme Court precedent, when a specific monetary entitlement exists pursuant to legislation enacted under Congress' Spending Clause power, a plaintiff may bring a private right of action to enforce that monetary entitlement. *See id.* at ¶¶ 346-65. Plaintiffs are mistaken. As a threshold matter, out of the cited authorities, only 10 U.S.C. § 980 was enacted pursuant to Congress' Spending Clause power.

"In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002). Absent congressional intent to "unambiguously confer" an individual right through Spending Clause legislation, there can be no § 1983 action. *Id.* at 281. To confer an individual right, the statute "must be 'phrased in terms of the persons benefited,'" and have "an *unmistakable* focus on the benefited class." *Id.* at 284. Where a statute "focus[es] on the person regulated rather than the individuals protected" there is no intent to confer an individual right. *Id.* at 287.

19

In *Health and Hospital Corporation of Marion County v. Talevski*, 599 U.S. 166 (2023), the Supreme Court found that two provisions of the Federal Nursing Home Reform Act met the "significant hurdle" stated above. *Id.* at 184. Those provisions repeatedly referred to the residents themselves, their medical symptoms, safety, welfare, health, needs, and "rights." *Id.* at 184-85. Because those "provisions use clear 'rights-creating language,' speak 'in terms of the persons benefited,' and have an 'unmistakable focus on the benefited class,'" the Supreme Court held the provisions create a right enforceable under § 1983. *Id.* at 186.

By contrast, 10 U.S.C. § 980 never mentions any "rights" of the human subjects. Instead, the statute focuses on the regulated person — someone using funds appropriated to the Department of Defense for research on human subjects — rather than the research subject itself. 10 U.S.C. § 980(a). Nothing in the statute indicates an 'unmistakable focus" on the subjects of the research. Therefore, the statute cannot create an enforceable right and Claim Four must be dismissed.

### B.  Rule 12 did not violate the Equal Protection Clause.

In Claim Two, Plaintiffs allege an Equal Protection violation. ECF No. 1, ¶¶ 332-35. But Plaintiffs do not contend they are members of a suspect class. *See id.*; *Exxon Mobil Corp. v. Norton*, 206 F. Supp. 2d 1085, 1097 (D. Colo. 2002). And professional classifications, such as healthcare workers, are not suspect classifications. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Therefore, this Court applies only rational basis review. *Landmark Land Co. of Okla., Inc. v. Buchanan*, 874 F.2d 717, 722 (10th Cir. 1989); *Exxon Mobil*, 206 F. Supp. 2d at 1097. Under this

APP 175

standard, courts uphold government action under the Equal Protection Clause "if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *Maehr v. U.S. Dep't of State*, 5 F.4th 1100,1122 (10th Cir. 2021) (quoting *F.C.C. v. Beach Comm'ns, Inc.*, 508 U.S. 307, 313 (1993). "This requires 'no more than a reasonable fit between governmental purpose and the means chosen to advance that purpose.'" *Id.* (quoting *Reno v. Flores*, 507 U.S. 292, 305 (1993)) (cleaned up).

Here, as numerous courts have said, protecting the public health is just such a purpose, and requiring that healthcare workers be vaccinated is just such a means. *See, e.g.*, *Biden v. Missouri*, 595 U.S. 87, 93 (2022). COVID-19 vaccine mandates for healthcare workers "substantially reduce the likelihood that healthcare workers will contract the virus and transmit it to their patients." *Id.* Because of the significant number of COVID-19 cases, hospitalizations, and deaths at the time Rule 12 was enacted, CDPHE had a rational basis to promulgate it. *See, e.g.*, *Curtis*, 2023 WL 8828753, at *4.

### C. Rule 12 did not violate Plaintiffs' due process rights.

In Claim Three, Plaintiffs allege their substantive and procedural due process rights were violated. ECF No. 1, ¶¶ 337-43. Plaintiffs are wrong on both counts.

#### 1. Plaintiffs' Substantive Due Process Claim Fails.

Government action may amount to a substantive due process violation when it (1) "infringes a fundamental right without a compelling governmental interest" or (2) it "deprives a person of life, liberty, or property in a way that shocks the conscience." *Maehr*, 5 F.4th at 1117. Neither is present here.

APP 176

First, courts have consistently held there is no fundamental right to refuse vaccination. *See, e.g.*, *Jacobsen v. Mass.*, 197 U.S. 11 (1905) (affirming criminal conviction based on refusal to be vaccinated); *Klaasen v. Trustees of Indiana Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) ("Given *Jacobsen*, . . . there can't be a constitutional problem with vaccination against SARS-CoV-2.") (internal citation omitted); *Norris v. Stanley*, 567 F. Supp. 3d 818, 821 (W.D. Mich. 2021) ("[T]here is no fundamental right to decline a vaccination."). There is no fundamental right implicated in this case.

Second, requiring that healthcare workers receive vaccines does not shock the conscience. "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lindsey v. Hyler*, 918 F.3d 1109, 1116 (10th Cir. 2019) (internal quotations and citations omitted). Courts have routinely found that COVID-19 vaccine mandates do not shock the conscience. *See, e.g.*, *Legaratta v. Macias*, 603 F. Supp. 3d 1050, 1061-62 (D.N.M. 2022); *Guettlein v. U.S. Merchant Marine Academy*, 577 F. Supp. 3d 96, 105 (E.D.N.Y. 2021); *Bauer v. Sumney*, 568 F. Supp. 3d 573, 591-92 (D.S.C. 2021). This Court should do the same and dismiss Claim Four.

## 2.  Plaintiffs' Procedural Due Process Claim Fails.

Plaintiffs' procedural due process claim fares no better. To state a procedural due process claim, Plaintiffs must show that they have a constitutionally protected property or liberty interest and that they were deprived of that interest by the state without due process of law. *See Washington v. Unified Gov't of Wyandotte Cnty., Ks.*, 847 F.3d 1192, 1201 (10th Cir. 2017). "[T]o establish a procedural due process claim, plaintiffs must have a property interest in their continued employment." *Bauer*, 568 F.

22

Supp. 3d at 587. At-will employees lack such a property interest. *Washington*, 847 F.3d at 1201-02. "Absent a property interest, there can be no violation of Due Process." *Id.* at 1202. And here, Plaintiffs concede that they were at-will employees and make no effort to claim they had a property interest in continued employment. ECF No. 1, ¶¶ 161, 171. Thus, Plaintiffs cannot pursue procedural due process claims after being terminated for failing to comply with COVID-19 vaccine mandates. *See, e.g.*, *Bauer*, 568 F. Supp. 3d at 586-8; *Clark v. Jackson*, No. 22-5553, 2023 WL 2787325, at *7-8 (6th Cir. Apr. 5, 2023) (affirming dismissal of procedural due process claim brought by at-will employee).

### D.  Rule 12 did not constitute an unconstitutional condition.

Claim Five alleges that "the Part 12 Rules established a condition requiring Plaintiffs to surrender their equal protection and due process rights before they could engage in the Constitutionally protected activity of selling their labor to Colorado healthcare facilities, violating the well-established Unconstitutional Conditions Doctrine." ECF No. 1, ¶ 371. This doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). But as shown above, there are neither equal protection nor due process violations here, so no unconstitutional conditions exist. Further, "it is within the police power of a state to provide for compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176 (1922). Because Plaintiffs "have not plausibly alleged that the state could not directly impose a vaccination requirement as part of the state's police power," they have necessarily "failed to allege a required 'predicate' of an unconstitutional conditions claim." *Andre-Rodney v. Hochul*,

23

618 F. Supp. 3d 72, 85 (N.D.N.Y. 2022); *see also Legaratta*, 603 F. Supp. 3d at 1070-71 (without a fundamental right at issue, "Plaintiffs' challenge to the Vaccine Mandate as an unconstitutional condition necessarily fails"); *Curtis*, 2023 WL 8828753, at *7 (dismissing similar claim). Thus, Claim Five must be dismissed.

**E.  Plaintiffs fail to state a claim for breach of contract.**

Claim Seven alleges Plaintiffs are third-party beneficiaries under the Provider Agreement, and Defendants breached that agreement, depriving Plaintiffs of that agreement's benefits. ECF No. 1, ¶¶ 391-93. But CDPHE Defendants are not parties to that agreement and Plaintiffs are not third-party beneficiaries under it.

First, Plaintiffs do not allege the CDPHE Defendants were parties to the Provider Agreement, the agreement attached to the Complaint lists no signatories, and indeed, the CDPHE Defendants were not parties to it. ECF No. 1-2, p. 2 ("I understand this is an agreement between Organization and CDC.") And under Colorado law, a breach of contract claim cannot be maintained against a non-party to the contract. *E.g.*, *Gorab v. Equity General Agents, Inc.*, 661 P.2d 1196, 1198 (Colo. App. 1983). Another district court has dismissed a nearly identical claim against Washington State's governor. *Curtis*, 2023 WL 8828753, at *8.

Second, Plaintiffs do not explain how the Provider Agreement or EUA Letters create third-party rights. In Colorado, a third party may enforce an agreement against the contracting parties only if those parties intended the third party to be a direct — and not merely incidental — beneficiary. *E.g.*, *McManus v. Zurich Am. Ins. Co.*, 488 F. Supp. 3d 1035, 1040 (D. Colo. 2020) (citing *Parrish Chiro. Ctrs., P.C. v. Progressive Cas. Ins.*

APP 179

*Co.*, 874 P.2d 1049, 1056 (Colo. 1994)). But the Provider Agreement's purpose, as is clear from its face, is to ensure those who administer the vaccines to the public would comply with certain requirements to permit a near-uniform federal vaccine response to the pandemic. ECF No. 1-2. There is no evidence in the Provider Agreement that Plaintiffs — as healthcare workers declining a vaccine — were contemplated by the agreement, let alone intended to directly benefit under it. And the EUA Letters are not contracts and therefore cannot have third-party beneficiaries. Plaintiffs have thus failed to state a breach of contract and Claim Seven must be dismissed.

### F. Plaintiffs fail to state an employment torts claim.

In Count Eight, Plaintiffs vaguely allege Defendants violated "Colorado State's at-will employment laws" or "Colorado State Common Law Employment Torts." ECF No. 1, ¶¶ 395-408. But the claim fails for a very simple reason: this claim relates to the conditions of their employment, and Plaintiffs were not CDPHE employees. ECF No. 1, ¶ 18 (alleging Plaintiffs were employees of UCHealth or one of its entities); ¶ 398 ("creating a hostile work environment"), ¶ 401 ("unlawfully altered Plaintiffs' employment schedules"), ¶ 406 ("unlawfully terminated Plaintiffs' employment"). Even construing Plaintiffs' claim as one of wrongful discharge in violation of public policy, that claim requires that "the plaintiff was employed by the defendant" and that "the defendant discharged the plaintiff," among other elements. *Cejka v. Vectrus Sys. Corp.*, 292 F. Supp. 3d 1175, 1187-88 (D. Colo. 2018); *see also Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 659 (D. Colo. 2005); *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 527 (Colo. 1996). As the court said in *Curtis* about a similarly vague

25

"common law employment torts" claim: "Plaintiffs fail to explain the 'employment torts' claim. There is no allegation that [Washington's governor] was the Plaintiffs' employer. This claim should be dismissed." 2023 WL 8828753, at *8. So too here.

**G.  Plaintiffs fail to state a claim for outrageous conduct.**

Claim Nine brings a claim for extreme and outrageous conduct. ECF No. 1, ¶¶ 410-12. That claim requires, among other things, that "the defendant engaged in extreme and outrageous conduct" and did so "recklessly or with the intent of causing the plaintiff severe emotional distress." *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994). "Outrageous conduct is defined as conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

The conduct here — requiring healthcare facilities to ensure their workers be vaccinated to help slow the spread of a virus that had killed millions worldwide — hardly fits that bill. As one district court explained when examining a similar vaccine mandate:

> In mandating COVID-19 vaccines for first responders, Defendants' conduct was neither egregious nor outrageous. The Vaccine Directive was adopted to safeguard the health of the County's employees, their families, the customers they serve, and the community at large, and follows guidance from [the health department] that the currently available vaccines are safe and the most effective way of preventing infection, serious illness, and death. Thus intended to mitigate the risks from COVID-19 and grounded in public health guidelines, Defendants' implementation and enforcement of the Vaccine Directive do not rise to the level of conscience-shocking.

*Legaratta*, 603 F. Supp. 3d at 1062; *see also Bauer*, 568 F. Supp. 3d at 591-92. In *Curtis*, the district court dismissed a similar claim regarding the Washington State vaccine mandate and concluded the mandate could not be considered "beyond all

26

possible bounds of decency considering the circumstances at the time." 2023 WL 8828753, at *8. This Court should do the same.

### H.  The EUA Statute does not create an implied private right of action.

In Count Ten, Plaintiffs assert an implied right of action under the EUA Statute. ECF No. 1, ¶ 414-15. But as numerous courts have held in the context of challenging COVID-19 vaccine mandates, there is no such implied right of action. *See, e.g.*, *Johnson*, 607 F. Supp. 3d at 806-07 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001)); *Navy Seal 1*, 574 F. Supp. 3d at 1131. Thus, Claim Ten fails.

### I.  Qualified immunity bars Plaintiffs' federal individual capacity claims.

A public official acting in their individual capacity is presumed to be immune, *Schalk v. Gallemore*, 906 F.2d 491, 499 (10th Cir. 1990), and is entitled to qualified immunity in all but the most exceptional cases. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). When a defendant asserts a qualified immunity defense, a heavy burden shifts to the plaintiff to overcome the presumption of immunity and show the defendant violated a federally protected right clearly established at the time of the conduct. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). "[I]f a reasonable [official] might not have known for certain that the conduct was unlawful — then the [official] is immune from liability." *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). For a constitutional right to be clearly established, a Supreme Court or Tenth Circuit decision on point, or a

APP 182

clearly established robust weight of authority from other circuits, must exist. *Washington*, 847 F.3d at 1197; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

First, as explained above, the Complaint fails to state either constitutional or statutory violations that could support a claim for relief. Thus, Plaintiffs cannot satisfy prong one of the qualified immunity analysis. Even assuming Plaintiffs could satisfy prong one, there is no Tenth Circuit or Supreme Court decision on point clearly establishing a blanket right to refuse a vaccine during a global pandemic. Indeed, multiple courts have found the opposite. *Kheriaty*, 2022 WL 17175070, at *1; *Norris*, 2022 WL 247507, at *5. Therefore, the CDPHE Defendants are entitled to qualified immunity, and the individual capacity federal claims must be dismissed. *See Curtis*, 2023 WL 8828753, at *5 (finding Washington State's governor entitled to qualified immunity against claims regarding the state's healthcare worker vaccine mandate).

## CONCLUSION

For the reasons stated herein, and pursuant to the cited authorities, the CDPHE Defendants respectfully request this Court dismiss Plaintiffs' Complaint in its entirety.

APP 183

Respectfully submitted January 12, 2024,

PHILIP J. WEISER
Attorney General

*s/ Lauren Davison*

LAUREN DAVISON, 51260*
Assistant Attorney General
CHRISTOPHER DIEDRICH, 45213*
Senior Assistant Attorney General
Civil Litigation and Employment Law Section
RYAN LORCH, 51450*
Assistant Attorney General
State Services Section
*Attorneys for CDPHE Defendants*

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, Colorado  80203
Telephone:  720-508-6631; 720-508-6406
E-Mail:  Lauren.Davison@coag.gov
          Christopher.Diedrich@coag.gov
          Ryan.lorch@coag.gov

*Counsel of Record

APP 184

## CERTIFICATE OF SERVICE

I certify that I served the foregoing CDPHE DEFENDANTS' MOTION TO DISMISS upon all parties herein by filing copies of same using the ECF System, this 12th day of January, 2024 causing notification to the following:

David J. Schexnaydre
2895 Highway 190 • Suite 212
Mandeville, LA 70471
david@schexnaydre.com

*Attorney for Plaintiffs*

Aja Rose Robbins
Andrew Christopher Lillie
Christopher M. Jackson
Nathan Alexander Lilly
Nicholas W. Katz
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201
arrobbins@hollandhart.com
aclillie@hollandhart.com
cmjackson@hollandhart.com
nalilly@hollandhart.com
nwkatz@hollandhart.com

*Attorneys for Defendants University of Colorado Hospital Authority, Elizabeth Concordia, Margaret Reidy, and Michael Randle*

*s/ Linda Ruth Carter*
Linda Ruth Carter, Paralegal

MATTER ID: 2023-PERM-147684

APP 185

**Data Table for Weekly COVID-19 Hospital Admissions and Weekly % Deaths Due to COVID-19 - Colorado**
**Date generated: Thu Jan 04 2024 09:36:46 GMT-0700 (Mountain Standard Time)**

EXHIBIT A

| Geography | Date | Weekly COVID-19 Hospital Admissions | Weekly % Deaths Due to COVID-19 | Death Data As Of |
|---|---|---|---|---|
| Colorado | Sep 16 2023 | 299 | 1.5 | Dec 28 2023 |
| Colorado | Sep  9 2023 | 258 | 1.3 | Dec 28 2023 |
| Colorado | Sep  2 2023 | 238 | 1.2 | Dec 28 2023 |
| Colorado | Aug 26 2023 | 191 | 2.1 | Dec 28 2023 |
| Colorado | Aug 19 2023 | 145 | Counts 1-9 | Dec 28 2023 |
| Colorado | Aug 12 2023 | 134 | Counts 1-9 | Dec 28 2023 |
| Colorado | Aug  5 2023 | 113 | Counts 1-9 | Dec 28 2023 |
| Colorado | Jul 29 2023 | 83 | 1.3 | Dec 28 2023 |
| Colorado | Jul 22 2023 | 91 | Counts 1-9 | Dec 28 2023 |
| Colorado | Jul 15 2023 | 84 | Counts 1-9 | Dec 28 2023 |
| Colorado | Jul  8 2023 | 60 | Counts 1-9 | Dec 28 2023 |
| Colorado | Jul  1 2023 | 83 | Counts 1-9 | Dec 28 2023 |
| Colorado | Jun 24 2023 | 98 | 1.1 | Dec 28 2023 |
| Colorado | Jun 17 2023 | 76 | 1.5 | Dec 28 2023 |
| Colorado | Jun 10 2023 | 98 | 1.6 | Dec 28 2023 |
| Colorado | Jun  3 2023 | 104 | Counts 1-9 | Dec 28 2023 |
| Colorado | May 27 2023 | 128 | Counts 1-9 | Dec 28 2023 |
| Colorado | May 20 2023 | 143 | 1.9 | Dec 28 2023 |
| Colorado | May 13 2023 | 138 | 1.6 | Dec 28 2023 |
| Colorado | May  6 2023 | 170 | 2 | Dec 28 2023 |
| Colorado | Apr 29 2023 | 148 | 2 | Dec 28 2023 |
| Colorado | Apr 22 2023 | 202 | 2.2 | Dec 28 2023 |
| Colorado | Apr 15 2023 | 262 | 2.6 | Dec 28 2023 |
| Colorado | Apr  8 2023 | 247 | 2.8 | Dec 28 2023 |
| Colorado | Apr  1 2023 | 267 | 3.4 | Dec 28 2023 |
| Colorado | Mar 25 2023 | 298 | 2.8 | Dec 28 2023 |
| Colorado | Mar 18 2023 | 305 | 2.7 | Dec 28 2023 |
| Colorado | Mar 11 2023 | 306 | 3 | Dec 28 2023 |
| Colorado | Mar  4 2023 | 338 | 3 | Dec 28 2023 |
| Colorado | Feb 25 2023 | 351 | 2.3 | Dec 28 2023 |
| Colorado | Feb 18 2023 | 327 | 2.1 | Dec 28 2023 |
| Colorado | Feb 11 2023 | 305 | 2.5 | Dec 28 2023 |
| Colorado | Feb  4 2023 | 277 | 2.6 | Dec 28 2023 |
| Colorado | Jan 28 2023 | 271 | 2.9 | Dec 28 2023 |
| Colorado | Jan 21 2023 | 284 | 4.2 | Dec 28 2023 |
| Colorado | Jan 14 2023 | 315 | 5 | Dec 28 2023 |
| Colorado | Jan  7 2023 | 439 | 5.8 | Dec 28 2023 |
| Colorado | Dec 31 2022 | 514 | 5 | Dec 28 2023 |
| Colorado | Dec 24 2022 | 564 | 4.9 | Dec 28 2023 |
| Colorado | Dec 17 2022 | 590 | 4.8 | Dec 28 2023 |
| Colorado | Dec 10 2022 | 695 | 6.3 | Dec 28 2023 |

**Data Table for Weekly COVID-19 Hospital Admissions and Weekly % Deaths Due to COVID-19 - Colorado**
**Date generated: Thu Jan 04 2024 09:36:46 GMT-0700 (Mountain Standard Time)**

| Geography | Date | Weekly COVID-19 Hospital Admissions | Weekly % Deaths Due to COVID-19 | Death Data As Of |
|---|---|---|---|---|
| Colorado | Dec  3 2022 | 850 | 6 | Dec 28 2023 |
| Colorado | Nov 26 2022 | 782 | 5.5 | Dec 28 2023 |
| Colorado | Nov 19 2022 | 693 | 6.7 | Dec 28 2023 |
| Colorado | Nov 12 2022 | 596 | 5.8 | Dec 28 2023 |
| Colorado | Nov  5 2022 | 501 | 4.6 | Dec 28 2023 |
| Colorado | Oct 29 2022 | 376 | 3.9 | Dec 28 2023 |
| Colorado | Oct 22 2022 | 301 | 3.2 | Dec 28 2023 |
| Colorado | Oct 15 2022 | 265 | 3.3 | Dec 28 2023 |
| Colorado | Oct  8 2022 | 236 | 3.2 | Dec 28 2023 |
| Colorado | Oct  1 2022 | 271 | 3.4 | Dec 28 2023 |
| Colorado | Sep 24 2022 | 265 | 4.9 | Dec 28 2023 |
| Colorado | Sep 17 2022 | 321 | 3.4 | Dec 28 2023 |
| Colorado | Sep 10 2022 | 308 | 3.7 | Dec 28 2023 |
| Colorado | Sep  3 2022 | 352 | 4.1 | Dec 28 2023 |
| Colorado | Aug 27 2022 | 359 | 2.6 | Dec 28 2023 |
| Colorado | Aug 20 2022 | 370 | 4 | Dec 28 2023 |
| Colorado | Aug 13 2022 | 445 | 4.4 | Dec 28 2023 |
| Colorado | Aug  6 2022 | 496 | 3.9 | Dec 28 2023 |
| Colorado | Jul 30 2022 | 510 | 5.7 | Dec 28 2023 |
| Colorado | Jul 23 2022 | 598 | 6 | Dec 28 2023 |
| Colorado | Jul 16 2022 | 631 | 4.2 | Dec 28 2023 |
| Colorado | Jul  9 2022 | 682 | 3.7 | Dec 28 2023 |
| Colorado | Jul  2 2022 | 587 | 5.2 | Dec 28 2023 |
| Colorado | Jun 25 2022 | 579 | 4.5 | Dec 28 2023 |
| Colorado | Jun 18 2022 | 566 | 5.5 | Dec 28 2023 |
| Colorado | Jun 11 2022 | 640 | 4.5 | Dec 28 2023 |
| Colorado | Jun  4 2022 | 482 | 5.3 | Dec 28 2023 |
| Colorado | May 28 2022 | 381 | 3 | Dec 28 2023 |
| Colorado | May 21 2022 | 346 | 3.2 | Dec 28 2023 |
| Colorado | May 14 2022 | 259 | 2.3 | Dec 28 2023 |
| Colorado | May  7 2022 | 255 | 1.9 | Dec 28 2023 |
| Colorado | Apr 30 2022 | 183 | 2.4 | Dec 28 2023 |
| Colorado | Apr 23 2022 | 185 | 2.1 | Dec 28 2023 |
| Colorado | Apr 16 2022 | 111 | 2.2 | Dec 28 2023 |
| Colorado | Apr  9 2022 | 101 | 2.7 | Dec 28 2023 |
| Colorado | Apr  2 2022 | 123 | 2.9 | Dec 28 2023 |
| Colorado | Mar 26 2022 | 133 | 4.8 | Dec 28 2023 |
| Colorado | Mar 19 2022 | 150 | 5.9 | Dec 28 2023 |
| Colorado | Mar 12 2022 | 230 | 6.7 | Dec 28 2023 |
| Colorado | Mar  5 2022 | 279 | 8.6 | Dec 28 2023 |
| Colorado | Feb 26 2022 | 443 | 12 | Dec 28 2023 |

**Data Table for Weekly COVID-19 Hospital Admissions and Weekly % Deaths Due to COVID-19 - Colorac**
**Date generated: Thu Jan 04 2024 09:36:46 GMT-0700 (Mountain Standard Time)**

| Geography | Date | Weekly COVID-19 Hospital Admissions | Weekly % Deaths Due to COVID-19 | Death Data As Of |
|---|---|---|---|---|
| Colorado | Feb 19 2022 | 603 | 14.4 | Dec 28 2023 |
| Colorado | Feb 12 2022 | 871 | 18.1 | Dec 28 2023 |
| Colorado | Feb  5 2022 | 1247 | 21.8 | Dec 28 2023 |
| Colorado | Jan 29 2022 | 1804 | 23.6 | Dec 28 2023 |
| Colorado | Jan 22 2022 | 2091 | 22.9 | Dec 28 2023 |
| Colorado | Jan 15 2022 | 2429 | 20.6 | Dec 28 2023 |
| Colorado | Jan  8 2022 | 2317 | 16.4 | Dec 28 2023 |
| Colorado | Jan  1 2022 | 1654 | 17.5 | Dec 28 2023 |
| Colorado | Dec 25 2021 | 1161 | 19.6 | Dec 28 2023 |
| Colorado | Dec 18 2021 | 1043 | 22.3 | Dec 28 2023 |
| Colorado | Dec 11 2021 | 1315 | 25.1 | Dec 28 2023 |
| Colorado | Dec  4 2021 | 1489 | 24.8 | Dec 28 2023 |
| Colorado | Nov 27 2021 | 1590 | 23.1 | Dec 28 2023 |
| Colorado | Nov 20 2021 | 1690 | 25.3 | Dec 28 2023 |
| Colorado | Nov 13 2021 | 1650 | 25.8 | Dec 28 2023 |
| Colorado | Nov  6 2021 | 1521 | 21.3 | Dec 28 2023 |
| Colorado | Oct 30 2021 | 1359 | 20.3 | Dec 28 2023 |
| Colorado | Oct 23 2021 | 1341 | 18.5 | Dec 28 2023 |
| Colorado | Oct 16 2021 | 1235 | 14.9 | Dec 28 2023 |
| Colorado | Oct  9 2021 | 1061 | 17.1 | Dec 28 2023 |
| Colorado | Oct  2 2021 | 970 | 14.9 | Dec 28 2023 |
| Colorado | Sep 25 2021 | 993 | 13.8 | Dec 28 2023 |
| Colorado | Sep 18 2021 | 955 | 12.1 | Dec 28 2023 |
| Colorado | Sep 11 2021 | 984 | 10.9 | Dec 28 2023 |
| Colorado | Sep  4 2021 | 1000 | 10.1 | Dec 28 2023 |
| Colorado | Aug 28 2021 | 835 | 10 | Dec 28 2023 |
| Colorado | Aug 21 2021 | 852 | 8.9 | Dec 28 2023 |
| Colorado | Aug 14 2021 | 640 | 6.9 | Dec 28 2023 |
| Colorado | Aug  7 2021 | 579 | 4.4 | Dec 28 2023 |
| Colorado | Jul 31 2021 | 459 | 5.1 | Dec 28 2023 |
| Colorado | Jul 24 2021 | 389 | 5.1 | Dec 28 2023 |
| Colorado | Jul 17 2021 | 323 | 4.8 | Dec 28 2023 |
| Colorado | Jul 10 2021 | 371 | 6.5 | Dec 28 2023 |
| Colorado | Jul  3 2021 | 329 | 5 | Dec 28 2023 |
| Colorado | Jun 26 2021 | 294 | 5.5 | Dec 28 2023 |
| Colorado | Jun 19 2021 | 313 | 4.7 | Dec 28 2023 |
| Colorado | Jun 12 2021 | 374 | 5.4 | Dec 28 2023 |
| Colorado | Jun  5 2021 | 469 | 8.2 | Dec 28 2023 |
| Colorado | May 29 2021 | 526 | 7.6 | Dec 28 2023 |
| Colorado | May 22 2021 | 646 | 8.4 | Dec 28 2023 |
| Colorado | May 15 2021 | 677 | 10.3 | Dec 28 2023 |

**Data Table for Weekly COVID-19 Hospital Admissions and Weekly % Deaths Due to COVID-19 - Colorad**
**Date generated: Thu Jan 04 2024 09:36:46 GMT-0700 (Mountain Standard Time)**

| Geography | Date | Weekly COVID-19 Hospital Admissions | Weekly % Deaths Due to COVID-19 | Death Data As Of |
|---|---|---|---|---|
| Colorado | May  8 2021 | 839 | 8.6 | Dec 28 2023 |
| Colorado | May  1 2021 | 782 | 6.4 | Dec 28 2023 |
| Colorado | Apr 24 2021 | 676 | 6.6 | Dec 28 2023 |
| Colorado | Apr 17 2021 | 555 | 7.2 | Dec 28 2023 |
| Colorado | Apr 10 2021 | 601 | 3.3 | Dec 28 2023 |
| Colorado | Apr  3 2021 | 490 | 5.7 | Dec 28 2023 |
| Colorado | Mar 27 2021 | 438 | 5.1 | Dec 28 2023 |
| Colorado | Mar 20 2021 | 426 | 4.9 | Dec 28 2023 |
| Colorado | Mar 13 2021 | 373 | 6 | Dec 28 2023 |
| Colorado | Mar  6 2021 | 414 | 5.8 | Dec 28 2023 |
| Colorado | Feb 27 2021 | 475 | 7.2 | Dec 28 2023 |
| Colorado | Feb 20 2021 | 508 | 7.6 | Dec 28 2023 |
| Colorado | Feb 13 2021 | 540 | 12.1 | Dec 28 2023 |
| Colorado | Feb  6 2021 | 626 | 12.8 | Dec 28 2023 |
| Colorado | Jan 30 2021 | 681 | 15.4 | Dec 28 2023 |
| Colorado | Jan 23 2021 | 837 | 16 | Dec 28 2023 |
| Colorado | Jan 16 2021 | 908 | 16.3 | Dec 28 2023 |
| Colorado | Jan  9 2021 | 957 | 19.3 | Dec 28 2023 |
| Colorado | Jan  2 2021 | 1054 | 24.1 | Dec 28 2023 |
| Colorado | Dec 26 2020 | 1150 | 27.5 | Dec 28 2023 |
| Colorado | Dec 19 2020 | 1396 | 33.3 | Dec 28 2023 |
| Colorado | Dec 12 2020 | 1677 | 34.3 | Dec 28 2023 |
| Colorado | Dec  5 2020 | 1882 | 35.4 | Dec 28 2023 |
| Colorado | Nov 28 2020 | 1886 | 28 | Dec 28 2023 |
| Colorado | Nov 21 2020 | 1850 | 23.6 | Dec 28 2023 |
| Colorado | Nov 14 2020 | 1544 | 21.7 | Dec 28 2023 |
| Colorado | Nov  7 2020 | 1096 | 16.3 | Dec 28 2023 |
| Colorado | Oct 31 2020 | 742 | 10 | Dec 28 2023 |
| Colorado | Oct 24 2020 | 562 | 6.9 | Dec 28 2023 |
| Colorado | Oct 17 2020 | 458 | 4.3 | Dec 28 2023 |
| Colorado | Oct 10 2020 | 281 | 4.6 | Dec 28 2023 |
| Colorado | Oct  3 2020 | 204 | 4.6 | Dec 28 2023 |
| Colorado | Sep 26 2020 | 207 | 2.9 | Dec 28 2023 |
| Colorado | Sep 19 2020 | 145 | 2.6 | Dec 28 2023 |
| Colorado | Sep 12 2020 | 118 | 3.7 | Dec 28 2023 |
| Colorado | Sep  5 2020 | 139 | 2.6 | Dec 28 2023 |
| Colorado | Aug 29 2020 | 137 | 3.3 | Dec 28 2023 |
| Colorado | Aug 22 2020 | 147 | 2.6 | Dec 28 2023 |
| Colorado | Aug 15 2020 | 256 | 3 | Dec 28 2023 |
| Colorado | Aug  8 2020 | 316 | 4.4 | Dec 28 2023 |
| Colorado | Aug  1 2020 | N/A | 4.9 | Dec 28 2023 |

**Data Table for Weekly COVID-19 Hospital Admissions and Weekly % Deaths Due to COVID-19 - Colorado**
**Date generated: Thu Jan 04 2024 09:36:46 GMT-0700 (Mountain Standard Time)**

| Geography | Date | Weekly COVID-19 Hospital Admissions | Weekly % Deaths Due to COVID-19 | Death Data As Of |
|---|---|---|---|---|
| Colorado | Jul 25 2020 | N/A | 3.9 | Dec 28 2023 |
| Colorado | Jul 18 2020 | N/A | 5.2 | Dec 28 2023 |
| Colorado | Jul 11 2020 | N/A | 3.7 | Dec 28 2023 |
| Colorado | Jul  4 2020 | N/A | 3.1 | Dec 28 2023 |
| Colorado | Jun 27 2020 | N/A | 2.3 | Dec 28 2023 |
| Colorado | Jun 20 2020 | N/A | 4.1 | Dec 28 2023 |
| Colorado | Jun 13 2020 | N/A | 7.2 | Dec 28 2023 |
| Colorado | Jun  6 2020 | N/A | 7.5 | Dec 28 2023 |
| Colorado | May 30 2020 | N/A | 9 | Dec 28 2023 |
| Colorado | May 23 2020 | N/A | 11 | Dec 28 2023 |
| Colorado | May 16 2020 | N/A | 10.8 | Dec 28 2023 |
| Colorado | May  9 2020 | N/A | 15.3 | Dec 28 2023 |
| Colorado | May  2 2020 | N/A | 18.7 | Dec 28 2023 |
| Colorado | Apr 25 2020 | N/A | 20.8 | Dec 28 2023 |
| Colorado | Apr 18 2020 | N/A | 19.6 | Dec 28 2023 |
| Colorado | Apr 11 2020 | N/A | 19.3 | Dec 28 2023 |
| Colorado | Apr  4 2020 | N/A | 13.2 | Dec 28 2023 |
| Colorado | Mar 28 2020 | N/A | 5.3 | Dec 28 2023 |
| Colorado | Mar 21 2020 | N/A | 1.7 | Dec 28 2023 |
| Colorado | Mar 14 2020 | N/A | Counts 1-9 | Dec 28 2023 |
| Colorado | Mar  7 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Feb 29 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Feb 22 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Feb 15 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Feb  8 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Feb  1 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Jan 25 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Jan 18 2020 | N/A | 0 | Dec 28 2023 |
| Colorado | Jan 11 2020 | N/A | 0 | Dec 28 2023 |

6 CCR 1011-1, Standards for Hospitals and Health Facilities
Chapter 2 – General Licensure Standards

| EXHIBIT |
| --- |
| **B** |

**Emergency rules adopted by the Board of Health on August 31, 2021. Effective August 31, 2021.**

## Emergency Justification

**Findings Pursuant to Section 24-4-103(6), C.R.S.**
In response to COVID-19, Governor Polis verbally declared a disaster emergency on March 10, 2020, and issued the corresponding Executive Order D 2020 003 on March 11, 2020. Since that time there have been 7,327 deaths due to COVID-19 in Colorado, 2,625 of which occurred in licensed healthcare facilities. Although the COVID-19 vaccine is now widely available, approximately 30% of the healthcare workforce in these facilities and agencies remain unvaccinated. With the rise in the Delta variant, ensuring that all workers in licensed healthcare facilities are vaccinated is one of the most effective means the state can take to protect the public health, safety, and welfare of all Coloradans and end this ongoing pandemic. Studies show that the rate of hospitalization due to COVID-19 infection is greatest in the unvaccinated. As Colorado approaches the back-to-school and influenza seasons, it is imperative the Department takes all available measures to increase vaccination rates to keep as many Coloradans as healthy as possible in order to reduce the burden on the already overstretched healthcare system and workforce. Therefore, the Board finds that immediate adoption of these revisions is imperative to preserve the public health, safety and welfare, and that compliance with the normal rulemaking requirements of Section 24-4-103, C.R.S. would be contrary to the public interest.



EXHIBIT
C

August 23, 2021

Pfizer Inc.
Attention:  Ms. Elisa Harkins
500 Arcola Road
Collegeville, PA  19426

Dear Ms. Harkins:

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the FD&C Act or the Act), the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes Coronavirus Disease 2019 (COVID-19).[1]  On the basis of such determination, the Secretary of HHS on March 27, 2020, declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to Section 564 of the Act (21 U.S.C. 360bbb-3), subject to terms of any authorization issued under that section.[2]

On December 11, 2020, the Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) for emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 for individuals 16 years of age and older pursuant to Section 564 of the Act.  FDA reissued the letter of authorization on: December 23, 2020,[3] February 25, 2021,[4] May

---

[1] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. February 4, 2020.

[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 18250 (April 1, 2020).

[3] In the December 23, 2020 revision, FDA removed reference to the number of doses per vial after dilution from the letter of authorization, clarified the instructions for vaccination providers reporting to VAERS, and made other technical corrections.  FDA also revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to clarify the number of doses of vaccine per vial after dilution and the instructions for reporting to VAERS. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and the Fact Sheet for Recipients and Caregivers were revised to include additional information on safety monitoring and to clarify information about the availability of other COVID-19 vaccines.

[4] In the February 25, 2021 revision, FDA allowed flexibility on the date of submission of monthly periodic safety reports and revised the requirements for reporting of vaccine administration errors by Pfizer Inc. The Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers) was revised to provide an update to the storage and transportation temperature for frozen vials, direct the provider to the correct CDC website for information on monitoring vaccine recipients for the occurrence of immediate adverse reactions, to include data from a developmental toxicity study, and add adverse reactions that have been identified during post authorization use.  The Fact Sheet for Recipients and Caregivers was revised to add adverse reactions that have been identified during post authorization use.

Page 2 – Pfizer Inc.

10, 2021,[5] June 25, 2021,[6] and August 12, 2021.[7]

On August 23, 2021, FDA approved the biologics license application (BLA) submitted by BioNTech Manufacturing GmbH for COMIRNATY (COVID-19 Vaccine, mRNA) for active immunization to prevent COVID-19 caused by SARS-CoV-2 in individuals 16 years of age and older.

On August 23, 2021, having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the August 12, 2021 letter of authorization in its entirety with revisions incorporated to clarify that the EUA will remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses, and to authorize use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved BLA.  In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to provide updates on expiration dating of the authorized Pfizer-BioNTech COVID-19 Vaccine and to update language regarding warnings and precautions related to myocarditis and pericarditis.  The Fact Sheet for Recipients and Caregivers was updated as the Vaccine Information Fact Sheet for Recipients and Caregivers, which comprises the Fact Sheet for the authorized Pfizer-BioNTech COVID-19 Vaccine and information about the FDA-licensed vaccine, COMIRNATY (COVID-19 Vaccine, mRNA).

Pfizer-BioNTech COVID-19 Vaccine contains a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2 formulated in lipid particles.  COMIRNATY (COVID-19 Vaccine, mRNA) is the same formulation as the Pfizer-BioNTech COVID-19 Vaccine and can be used interchangeably with the Pfizer-BioNTech COVID-19 Vaccine to provide the COVID-19 vaccination series.[8]

---

[5] In the May 10, 2021 revision, FDA authorized Pfizer-BioNTech Vaccine for the prevention of COVID-19 in individuals 12 through 15 years of age, as well as for individuals 16 years of age and older.  In addition, FDA revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to include the following Warning: "Syncope (fainting) may occur in association with administration of injectable vaccines, in particular in  adolescents. Procedures should be in place to avoid injury from fainting."  In addition, the Fact Sheet for Recipients and Caregivers was revised to instruct vaccine recipients or their caregivers to tell the vaccination provider about fainting in association with a previous injection.

[6] In the June 25, 2021 revision, FDA clarified terms and conditions that relate to export of Pfizer-BioNTech COVID-19 Vaccine from the United States.  In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to include a Warning about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine.  The Fact Sheet for Recipients and Caregivers was updated to include information about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine.

[7] In the August 12, 2021 revision, FDA authorized a third dose of the Pfizer-BioNTech COVID-19 Vaccine administered at least 28 days following the two dose regimen of this vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

[8] The licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

Page 3 – Pfizer Inc.

For the December 11, 2020 authorization for individuals 16 years of age and older, FDA
reviewed safety and efficacy data from an ongoing phase 1/2/3 trial in approximately 44,000
participants randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control.
The trial has enrolled participants 12 years of age and older.  FDA's review at that time
considered the safety and effectiveness data as they relate to the request for emergency use
authorization in individuals 16 years of age and older.  FDA's review of the available safety data
from 37,586 of the participants 16 years of age and older, who were followed for a median of
two months after receiving the second dose, did not identify specific safety concerns that would
preclude issuance of an EUA.  FDA's analysis of the available efficacy data from 36,523
participants 12 years of age and older without evidence of SARS-CoV-2 infection prior to 7 days
after dose 2 confirmed the vaccine was 95% effective (95% credible interval 90.3, 97.6) in
preventing COVID-19 occurring at least 7 days after the second dose (with 8 COVID-19 cases in
the vaccine group compared to 162 COVID-19 cases in the placebo group).  Based on these data,
and review of manufacturing information regarding product quality and consistency, FDA
concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be
effective.  Additionally, FDA determined it is reasonable to conclude, based on the totality of the
scientific evidence available, that the known and potential benefits of Pfizer-BioNTech
COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of
COVID-19 in individuals 16 years of age and older.  Finally, on December 10, 2020, the
Vaccines and Related Biological Products Advisory Committee voted in agreement with this
conclusion.

For the May 10, 2021 authorization for individuals 12 through 15 years of age, FDA reviewed
safety and effectiveness data from the above-referenced, ongoing Phase 1/2/3 trial that has
enrolled approximately 46,000 participants, including 2,260 participants 12 through 15 years of
age.  Trial participants were randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or
saline control.  FDA's review of the available safety data from 2,260 participants 12 through 15
years of age, who were followed for a median of 2 months after receiving the second dose, did
not identify specific safety concerns that would preclude issuance of an EUA.  FDA's analysis of
SARS-CoV-2 50% neutralizing antibody titers 1 month after the second dose of Pfizer-
BioNTech COVID-19 Vaccine in a subset of participants who had no serological or virological
evidence of past SARS-CoV-2 infection confirm the geometric mean antibody titer in
participants 12 through 15 years of age was non-inferior to the geometric mean antibody titer in
participants 16 through 25 years of age.  FDA's analysis of available descriptive efficacy data
from 1,983 participants 12 through 15 years of age without evidence of SARS-CoV-2 infection
prior to 7 days after dose 2 confirm that the vaccine was 100% effective (95% confidence
interval 75.3, 100.0) in preventing COVID-19 occurring at least 7 days after the second dose
(with no COVID-19 cases in the vaccine group compared to 16 COVID-19 cases in the placebo
group).  Based on these data, FDA concluded that it is reasonable to believe that Pfizer-
BioNTech COVID-19 Vaccine may be effective in individuals 12 through 15 years of age.
Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific
evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19
Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19
in individuals 12 through 15 years of age.

Page 4 – Pfizer Inc.

For the August 12, 2021 authorization of a third dose of the Pfizer-BioNTech COVID-19 Vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise, FDA reviewed safety and effectiveness data reported in two manuscripts on solid organ transplant recipients.  The first study was a single arm study conducted in 101 individuals who had undergone various solid organ transplant procedures (heart, kidney, liver, lung, pancreas) a median of 97±8 months earlier.  A third dose of the Pfizer-BioNTech COVID-19 Vaccine was administered to 99 of these individuals approximately 2 months after they had received a second dose.  Levels of total SARS-CoV-2 binding antibodies meeting the pre-specified criteria for success occurred four weeks after the third dose in 26/59 (44.0%) of those who were initially considered to be seronegative and received a third dose of the Pfizer-BioNTech COVID-19 Vaccine; 67/99 (68%) of the entire group receiving a third vaccination were subsequently considered to have levels of antibodies indicative of a significant response.  In those who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 events were reported.  A supportive secondary study describes a double-blind, randomized-controlled study conducted in 120 individuals who had undergone various solid organ transplant procedures (heart, kidney, kidney-pancreas, liver, lung, pancreas) a median of 3.57 years earlier (range 1.99-6.75 years).  A third dose of a similar mRNA vaccine (the Moderna COVID-19 vaccine) was administered to 60 individuals approximately 2 months after they had received a second dose (i.e., doses at 0, 1 and 3 months); saline placebo was given to 60 individuals or comparison.  The primary outcome was anti-RBD antibody at 4 months greater than 100 U/mL.  This titer was selected based on NHP challenge studies as well as a large clinical cohort study to indicate this antibody titer was  protective.  Secondary outcomes were based on a virus neutralization assay and polyfunctional T cell responses.  Baseline characteristics were comparable between the two study arms as were pre-intervention anti-RBD titer and neutralizing antibodies.  Levels of total SARS-CoV-2 binding antibodies indicative of a significant response occurred four weeks after the third dose in 33/60 (55.0%) of the Moderna COVID-19 vaccinated group and 10/57 (17.5%) of the placebo individuals.  In the 60 individuals who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 adverse events were reported. Despite the moderate enhancement in antibody titers, the totality of data (i.e., supportive paper by Hall et al. demonstrated efficacy of the product in the elderly and persons with co-morbidities) supports the conclusion that a third dose of the Pfizer-Moderna COVID-19 vaccine may be effective in this population, and that the known and potential benefits of a third dose of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine for immunocompromised individuals at least 12 years of age who have received two doses of the Pfizer-BioNTech COVID-19 Vaccine and who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19, as described in the Scope of Authorization section of this letter (Section II) and subject to the terms of this authorization.  Additionally, as specified in subsection III.BB, I am authorizing use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA when used to provide a two-dose regimen for individuals aged 12 through 15 years, or

Page 5 – Pfizer Inc.

to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

## I.      Criteria for Issuance of Authorization

I have concluded that the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19 when administered as described in the Scope of Authorization (Section II) meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

   A. SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

   B. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19, and that, when used under the conditions described in this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks; and

   C. There is no adequate, approved, and available[9] alternative to the emergency use of Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19.[10]

## II.     Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

   • Pfizer Inc. will supply Pfizer-BioNTech COVID-19 Vaccine either directly or through authorized distributor(s),[11] to emergency response stakeholders[12] as directed by the U.S.

---

[9] Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA.  Additionally, there are no products that are approved to prevent COVID-19 in individuals age 12 through 15, or that are approved to provide an additional dose to the immunocompromised population described in this EUA.

[10] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[11] "Authorized Distributor(s)" are identified by Pfizer Inc. or, if applicable, by a U.S. government entity, such as the Centers for Disease Control and Prevention (CDC) and/or other designee, as an entity or entities allowed to distribute authorized Pfizer-BioNTech COVID-19 Vaccine.

[12] For purposes of this letter, "emergency response stakeholder" refers to a public health agency and its delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundary lines (e.g., city, county, tribal, territorial, State, or Federal), or functional (e.g., law enforcement or public health range) or sphere of authority to administer, deliver, or distribute vaccine in an emergency situation.  In some cases (e.g., depending on a state or local jurisdiction's COVID-19 vaccination response organization and plans), there might be overlapping roles and responsibilities among "emergency response stakeholders" and "vaccination providers" (e.g., if a local health department is administering COVID-19 vaccines; if a pharmacy is acting in an

Page 6 – Pfizer Inc.

government, including the Centers for Disease Control and Prevention (CDC) and/or other designee, for use consistent with the terms and conditions of this EUA;

- The Pfizer-BioNTech COVID-19 Vaccine covered by this authorization will be administered by vaccination providers[13] and used only to prevent COVID-19 in individuals ages 12 and older; and
- Pfizer-BioNTech COVID-19 Vaccine may be administered by a vaccination provider without an individual prescription for each vaccine recipient.

This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide a two-dose regimen for individuals aged 12 through 15 years, or to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

**Product Description**

The Pfizer-BioNTech COVID-19 Vaccine is supplied as a frozen suspension in multiple dose vials; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine.  The Pfizer-BioNTech COVID-19 Vaccine does not contain a preservative.

Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine contains 30 mcg of a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2. Each dose of the Pfizer-BioNTech COVID-19 Vaccine also includes the following ingredients: lipids (0.43 mg (4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose.  The diluent (0.9% Sodium Chloride Injection) contributes an additional 2.16 mg sodium chloride per dose.

---

official capacity under the authority of the state health department to administer COVID-19 vaccines).  In such cases, it is expected that the conditions of authorization that apply to emergency response stakeholders and vaccination providers will all be met.

[13] For purposes of this letter, "vaccination provider" refers to the facility, organization, or healthcare provider licensed or otherwise authorized by the emergency response stakeholder (e.g., non-physician healthcare professionals, such as nurses and pharmacists pursuant to state law under a standing order issued by the state health officer) to administer or provide vaccination services in accordance with the applicable emergency response stakeholder's official COVID-19 vaccination and emergency response plan(s) and who is enrolled in the CDC COVID-19 Vaccination Program. If the vaccine is exported from the United States, a "vaccination provider" is a provider that is authorized to administer this vaccine in accordance with the laws of the country in which it is administered. For purposes of this letter, "healthcare provider" also refers to a person authorized by the U.S. Department of Health and Human Services (e.g., under the PREP Act Declaration for Medical Countermeasures against COVID-19) to administer FDA-authorized COVID-19 vaccine (e.g., qualified pharmacy technicians and State-authorized pharmacy interns acting under the supervision of a qualified pharmacist).  See, e.g., HHS. *Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration*. 85 FR 79190 (December 9, 2020).

Page 7 – Pfizer Inc.

The dosing regimen is two doses of 0.3 mL each, 3 weeks apart.  A third dose may be administered at least 28 days following the second dose of the two dose regimen of this vaccine to individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

The manufacture of the authorized Pfizer-BioNTech COVID-19 Vaccine is limited to those facilities identified and agreed upon in Pfizer's request for authorization.

The Pfizer-BioNTech COVID-19 Vaccine vial label and carton labels are clearly marked for "Emergency Use Authorization." The Pfizer-BioNTech COVID-19 Vaccine is authorized to be distributed, stored, further redistributed, and administered by emergency response stakeholders when packaged in the authorized manufacturer packaging (i.e., vials and cartons), despite the fact that the vial and carton labels may not contain information that otherwise would be required under the FD&C Act.

Pfizer-BioNTech COVID-19 Vaccine is authorized for emergency use with the following product-specific information required to be made available to vaccination providers and recipients, respectively (referred to as "authorized labeling"):

- Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers): Emergency Use Authorization (EUA) of Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)

- Vaccine Information Fact Sheet for Recipients and Caregivers About COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease (COVID-19).

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine, when used to prevent COVID-19 and used in accordance with this Scope of Authorization (Section II), outweigh its known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that Pfizer-BioNTech COVID-19 Vaccine (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of Pfizer-BioNTech COVID-19 Vaccine under this EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III).  Subject to the terms of this EUA and

Page 8 – Pfizer Inc.

under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), Pfizer-BioNTech COVID-19 Vaccine is authorized to prevent COVID-19 in individuals 12 years of age and older as described in the Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

## III.    Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

Pfizer Inc. and Authorized Distributor(s)

A.   Pfizer Inc. and authorized distributor(s) will ensure that the authorized Pfizer-BioNTech COVID-19 Vaccine is distributed, as directed by the U.S. government, including CDC and/or other designee, and the authorized labeling (i.e., Fact Sheets) will be made available to vaccination providers, recipients, and caregivers consistent with the terms of this letter.

B.   Pfizer Inc. and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until delivered to emergency response stakeholders' receipt sites.

C.   Pfizer Inc. will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., emergency response stakeholders, authorized distributors, and vaccination providers) involved in distributing or receiving authorized Pfizer-BioNTech COVID-19 Vaccine.  Pfizer Inc. will provide to all relevant stakeholders a copy of this letter of authorization and communicate any subsequent amendments that might be made to this letter of authorization and its authorized labeling.

D.   Pfizer Inc. may develop and disseminate instructional and educational materials (e.g., video regarding vaccine handling, storage/cold-chain management, preparation, disposal) that are consistent with the authorized emergency use of the vaccine as described in the letter of authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs during an emergency. Any instructional and educational materials that are inconsistent with the authorized labeling are prohibited.

E.   Pfizer Inc. may request changes to this authorization, including to the authorized Fact Sheets for the vaccine.  Any request for changes to this EUA must be submitted to Office of Vaccines Research and Review (OVRR)/Center for Biologics Evaluation and Research (CBER).  Such changes require appropriate authorization prior to implementation.[14]

---

[14] The following types of revisions may be authorized without reissuing this letter: (1) changes to the authorized labeling; (2) non-substantive editorial corrections to this letter; (3) new types of authorized labeling, including new fact sheets; (4) new carton/container labels; (5) expiration dating extensions; (6) changes to manufacturing

Page 9 – Pfizer Inc.

F. Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):
- Serious adverse events (irrespective of attribution to vaccination);
- Cases of Multisystem Inflammatory Syndrome in children and adults; and
- Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer Inc.

These reports should be submitted to VAERS as soon as possible but no later than 15 calendar days from initial receipt of the information by Pfizer Inc.

G. Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals in accordance with a due date agreed upon with the Office of Biostatistics and Epidemiology (OBE)/CBER beginning after the first full calendar month after authorization. Each periodic safety report is required to contain descriptive information which includes:
- A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations (e.g., pregnant women), and adverse events of special interest;
- A narrative summary and analysis of vaccine administration errors, whether or not associated with an adverse event, that were identified since the last reporting interval;
- Newly identified safety concerns in the interval; and
- Actions taken since the last report because of adverse experiences (for example, changes made to Healthcare Providers Administering Vaccine (Vaccination Providers) Fact Sheet, changes made to studies or studies initiated).

H. No changes will be implemented to the description of the product, manufacturing process, facilities, or equipment without notification to and concurrence by FDA.

I. All manufacturing facilities will comply with Current Good Manufacturing Practice requirements.

J. Pfizer Inc. will submit to the EUA file Certificates of Analysis (CoA) for each drug product lot at least 48 hours prior to vaccine distribution. The CoA will include the established specifications and specific results for each quality control test performed on the final drug product lot.

K. Pfizer Inc. will submit to the EUA file quarterly manufacturing reports, starting in July 2021, that include a listing of all Drug Substance and Drug Product lots produced after issuance of this authorization. This report must include lot number, manufacturing site, date of manufacture, and lot disposition, including those lots that

---

processes, including tests or other authorized components of manufacturing; (7) new conditions of authorization to require data collection or study. For changes to the authorization, including the authorized labeling, of the type listed in (3), (6), or (7), review and concurrence is required from the Preparedness and Response Team (PREP)/Office of the Center Director (OD)/CBER and the Office of Counterterrorism and Emerging Threats (OCET)/Office of the Chief Scientist (OCS).

Page 10 – Pfizer Inc.

were quarantined for investigation or those lots that were rejected.  Information on the reasons for lot quarantine or rejection must be included in the report.

L.  Pfizer Inc. and authorized distributor(s) will maintain records regarding release of Pfizer-BioNTech COVID-19 Vaccine for distribution (i.e., lot numbers, quantity, release date).

M.  Pfizer Inc. and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

N.  Pfizer Inc. will conduct post-authorization observational studies to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, along with deaths and hospitalizations, and severe COVID-19.  The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (12 years of age and older), populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities.  The studies should be conducted in large scale databases with an active comparator.  Pfizer Inc. will provide protocols and status update reports to the IND 19736 with agreed-upon study designs and milestone dates.

Emergency Response Stakeholders

O.  Emergency response stakeholders will identify vaccination sites to receive authorized Pfizer-BioNTech COVID-19 Vaccine and ensure its distribution and administration, consistent with the terms of this letter and CDC's COVID-19 Vaccination Program.

P.  Emergency response stakeholders will ensure that vaccination providers within their jurisdictions are aware of this letter of authorization, and the terms herein and any subsequent amendments that might be made to the letter of authorization, instruct them about the means through which they are to obtain and administer the vaccine under the EUA, and ensure that the authorized labeling [i.e., Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Vaccine Information Fact Sheet for Recipients and Caregivers] is made available to vaccination providers through appropriate means (e.g., e-mail, website).

Q.  Emergency response stakeholders receiving authorized Pfizer-BioNTech COVID-19 Vaccine will ensure that appropriate storage and cold chain is maintained.

Vaccination Providers

R.  Vaccination providers will administer the vaccine in accordance with the authorization and will participate and comply with the terms and training required by CDC's COVID-19 Vaccination Program.

Page 11 – Pfizer Inc.

S.  Vaccination providers will provide the Vaccine Information Fact Sheet for Recipients and Caregivers to each individual receiving vaccination and provide the necessary information for receiving their second dose and/or third dose.

T.  Vaccination providers administering the vaccine must report the following information associated with the administration of the vaccine of which they become aware to VAERS in accordance with the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers):
   - Vaccine administration errors whether or not associated with an adverse event
   - Serious adverse events (irrespective of attribution to vaccination)
   - Cases of Multisystem Inflammatory Syndrome in children and adults
   - Cases of COVID-19 that result in hospitalization or death

   Complete and submit reports to VAERS online at https://vaers.hhs.gov/reportevent.html.  The VAERS reports should include the words "Pfizer-BioNTech COVID-19 Vaccine EUA" in the description section of the report.  More information is available at vaers.hhs.gov or by calling 1-800-822-7967.  To the extent feasible, report to Pfizer Inc. by contacting 1-800-438-1985 or by providing a copy of the VAERS form to Pfizer Inc.; Fax: 1-866-635-8337.

U.  Vaccination providers will conduct any follow-up requested by the U.S government, including CDC, FDA, or other designee, regarding adverse events to the extent feasible given the emergency circumstances.

V.  Vaccination providers will monitor and comply with CDC and/or emergency response stakeholder vaccine management requirements (e.g., requirements concerning obtaining, tracking, and handling vaccine) and with requirements concerning reporting of vaccine administration data to CDC.

W.  Vaccination providers will ensure that any records associated with this EUA are maintained until notified by FDA.  Such records will be made available to CDC, and FDA for inspection upon request.

Conditions Related to Printed Matter, Advertising, and Promotion

X.  All descriptive printed matter, advertising, and promotional material, relating to the use of the Pfizer-BioNTech COVID-19 Vaccine shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in section 502(a) and (n) of the FD&C Act and FDA implementing regulations.

Y.  All descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech COVID-19 Vaccine clearly and conspicuously shall state that:

Page 12 – Pfizer Inc.

- This product has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 12 years of age and older; and
- The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner.

Condition Related to Export

Z.  If the Pfizer-BioNTech COVID-19 Vaccine is exported from the United States, conditions C, D, and O through Y do not apply, but export is permitted only if 1) the regulatory authorities of the country in which the vaccine will be used are fully informed that this vaccine is subject to an EUA and is not approved or licensed by FDA and 2) the intended use of the vaccine will comply in all respects with the laws of the country in which the product will be used.  The requirement in this letter that the authorized labeling (i.e., Fact Sheets) be made available to vaccination providers, recipients, and caregivers in condition A will not apply if the authorized labeling (i.e., Fact Sheets) are made available to the regulatory authorities of the country in which the vaccine will be used.

Conditions With Respect to Use of Licensed Product

AA. COMIRNATY  (COVID-19 Vaccine, mRNA) is now licensed for individuals 16 years of age and older.  There remains, however, a significant amount of Pfizer-BioNTech COVID-19 vaccine that was manufactured and labeled in accordance with this emergency use authorization.  This authorization thus remains in place with respect to that product for the previously-authorized indication and uses (i.e., for use to prevent COVID-19 in individuals 12 years of age and older with a two-dose regimen, and to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise).

BB. This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide a two-dose regimen for individuals aged 12 through 15 years, or to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise. Conditions A through W in this letter apply when COMIRNATY (COVID-19 Vaccine, mRNA) is provided for the uses described in this subsection III.BB, except that product manufactured and labeled in accordance with the approved BLA is deemed to satisfy the manufacturing, labeling, and distribution requirements of this authorization.

## IV.     Duration of Authorization

Page 13 – Pfizer Inc.

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____

RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Enclosures

 **U.S. FOOD & DRUG** ADMINISTRATION

**EXHIBIT D**

Our STN:  BL 125742/0

**BLA APPROVAL**

BioNTech Manufacturing GmbH
Attention:  Amit Patel
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

August 23, 2021

Dear Mr. Patel:

Please refer to your Biologics License Application (BLA) submitted and received on May 18, 2021, under section 351(a) of the Public Health Service Act (PHS Act) for COVID-19 Vaccine, mRNA.

**LICENSING**

We are issuing Department of Health and Human Services U.S. License No. 2229 to BioNTech Manufacturing GmbH, Mainz, Germany, under the provisions of section 351(a) of the PHS Act controlling the manufacture and sale of biological products.  The license authorizes you to introduce or deliver for introduction into interstate commerce, those products for which your company has demonstrated compliance with establishment and product standards.

Under this license, you are authorized to manufacture the product, COVID-19 Vaccine, mRNA, which is indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

The review of this product was associated with the following National Clinical Trial (NCT) numbers:  NCT04368728 and NCT04380701.

**MANUFACTURING LOCATIONS**

Under this license, you are approved to manufacture COVID-19 Vaccine, mRNA drug substance at Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC, 1 Burtt Road, Andover, Massachusetts.  The final formulated product will be manufactured, filled, labeled and packaged at Pfizer Manufacturing Belgium NV, Rijksweg 12, Puurs, Belgium and at Pharmacia & Upjohn Company LLC, 7000 Portage Road, Kalamazoo, Michigan.  The diluent, 0.9% Sodium Chloride Injection, USP, will be manufactured at Hospira, Inc., (b) (4)                              and at Fresenius Kabi USA, LLC, (b) (4)                              .

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

Page 2 – STN BL 125742/0 – Elisa Harkins

You may label your product with the proprietary name, COMIRNATY, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials.

We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion.

**DATING PERIOD**

The dating period for COVID-19 Vaccine, mRNA shall be 9 months from the date of manufacture when stored between -90ºC to -60ºC (-130ºF to -76ºF).  The date of manufacture shall be no later than the date of final sterile filtration of the formulated drug product (at Pharmacia & Upjohn Company LLC in Kalamazoo, Michigan, the date of manufacture is defined as the date of sterile filtration for the final drug product; at Pfizer Manufacturing Belgium NV in Puurs, Belgium, it is defined as the date of the (b) (4) Following the final sterile filtration, (b) (4) , no reprocessing/reworking is allowed without prior approval from the Agency.  The dating period for your drug substance shall be (b) (4) when stored at (b) (4)  We have approved the stability protocols in your license application for the purpose of extending the expiration dating period of your drug substance and drug product under 21 CFR 601.12.

**FDA LOT RELEASE**

Please submit final container samples of the product in final containers together with protocols showing results of all applicable tests.  You may not distribute any lots of product until you receive a notification of release from the Director, Center for Biologics Evaluation and Research (CBER).

**BIOLOGICAL PRODUCT DEVIATIONS**

You must submit reports of biological product deviations under 21 CFR 600.14.  You should identify and investigate all manufacturing deviations promptly, including those associated with processing, testing, packaging, labeling, storage, holding and distribution.  If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to the Director, Office of Compliance and Biologics Quality, electronically through the eBPDR web application or at the address below. Links for the instructions on completing the electronic form (eBPDR) may be found on CBER's web site at https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/biological-product-deviations:

       Food and Drug Administration
       Center for Biologics Evaluation and Research
       Document Control Center

Page 3 – STN BL 125742/0 – Elisa Harkins

> 10903 New Hampshire Ave.
> WO71-G112
> Silver Spring, MD 20993-0002

**MANUFACTURING CHANGES**

You must submit information to your BLA for our review and written approval under 21 CFR 601.12 for any changes in, including but not limited to, the manufacturing, testing, packaging or labeling of COVID-19 Vaccine, mRNA, or in the manufacturing facilities.

**LABELING**

We hereby approve the draft content of labeling including Package Insert, submitted under amendment 74, dated August 21, 2021, and the draft carton and container labels submitted under amendment 63, dated August 19, 2021.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content of labeling must be identical to the Package Insert submitted on August 21, 2021.  Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

**CARTON AND CONTAINER LABELS**

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on August 19, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

All final labeling should be submitted as Product Correspondence to this BLA STN BL 125742 at the time of use and include implementation information on Form FDA 356h.

**ADVERTISING AND PROMOTIONAL LABELING**

Page 4 – STN BL 125742/0 – Elisa Harkins

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

> Food and Drug Administration
> Center for Biologics Evaluation and Research
> Document Control Center
> 10903 New Hampshire Ave.
> WO71-G112
> Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

**ADVERSE EVENT REPORTING**

You must submit adverse experience reports in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80), and you must submit distribution reports at monthly intervals as described in 21 CFR 600.81.  For information on adverse experience reporting, please refer to the guidance for industry *Providing Submissions in Electronic Format —Postmarketing Safety Reports for Vaccines* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-submissions-electronic-format-postmarketing-safety-reports-vaccines.  For information on distribution reporting, please refer to the guidance for industry *Electronic Submission of Lot Distribution Reports* at http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/ucm061966.htm.

**PEDIATRIC REQUIREMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies for ages younger than 16 years for this application because this product is ready for approval for use in individuals 16 years of age and older, and the pediatric studies for younger ages have not been completed.

Page 5 – STN BL 125742/0 – Elisa Harkins

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FDCA) are required postmarketing studies. The status of these postmarketing studies must be reported according to 21 CFR 601.28 and section 505B(a)(4)(C) of the FDCA. In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

Label your annual report as an "**Annual Status Report of Postmarketing Study Requirement/Commitments**" and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements under section 506B of the FDCA are released or fulfilled. These required studies are listed below:

1.  Deferred pediatric Study C4591001 to evaluate the safety and effectiveness of COMIRNATY in children 12 years through 15 years of age.

    Final Protocol Submission:  October 7, 2020

    Study Completion:  May 31, 2023

    Final Report Submission:  October 31, 2023

2.  Deferred pediatric Study C4591007 to evaluate the safety and effectiveness of COMIRNATY in infants and children 6 months to <12 years of age.

    Final Protocol Submission:  February 8, 2021

    Study Completion:  November 30, 2023

    Final Report Submission:  May 31, 2024

3.  Deferred pediatric Study C4591023 to evaluate the safety and effectiveness of COMIRNATY in infants <6 months of age.

    Final Protocol Submission:  January 31, 2022

    Study Completion:  July 31, 2024

    Final Report Submission:  October 31, 2024

Submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND. Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.
Submit final study reports to this BLA STN BL 125742. In order for your PREA PMRs to be considered fulfilled, you must submit and receive approval of an efficacy or a labeling

Page 6 – STN BL 125742/0 – Elisa Harkins

supplement.  For administrative purposes, all submissions related to these required pediatric postmarketing studies must be clearly designated as:

- **Required Pediatric Assessment(s)**

We note that you have fulfilled the pediatric study requirement for ages 16 through 17 years for this application.

## POSTMARKETING REQUIREMENTS UNDER SECTION 505(o)

Section 505(o) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute (section 505(o)(3)(A), 21 U.S.C. 355(o)(3)(A)).

We have determined that an analysis of spontaneous postmarketing adverse events reported under section 505(k)(1) of the FDCA will not be sufficient to assess known serious risks of myocarditis and pericarditis and identify an unexpected serious risk of subclinical myocarditis.

Furthermore, the pharmacovigilance system that FDA is required to maintain under section 505(k)(3) of the FDCA is not sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, we have determined that you are required to conduct the following studies:

4. Study C4591009, entitled "A Non-Interventional Post-Approval Safety Study of the Pfizer-BioNTech COVID-19 mRNA Vaccine in the United States," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  August 31, 2021

   Monitoring Report Submission:  October 31, 2022

   Interim Report Submission:  October 31, 2023

   Study Completion:  June 30, 2025

   Final Report Submission:  October 31, 2025

5. Study C4591021, entitled "Post Conditional Approval Active Surveillance Study Among Individuals in Europe Receiving the Pfizer-BioNTech Coronavirus

Disease 2019 (COVID-19) Vaccine," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  August 11, 2021

Progress Report Submission:  September 30, 2021

Interim Report 1 Submission:  March 31, 2022

Interim Report 2 Submission:  September 30, 2022

Interim Report 3 Submission:  March 31, 2023

Interim Report 4 Submission:  September 30, 2023

Interim Report 5 Submission:  March 31, 2024

Study Completion:  March 31, 2024

Final Report Submission:  September 30, 2024

6. Study C4591021 substudy to describe the natural history of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  January 31, 2022

   Study Completion:  March 31, 2024

   Final Report Submission:  September 30, 2024

7. Study C4591036, a prospective cohort study with at least 5 years of follow-up for potential long-term sequelae of myocarditis after vaccination (in collaboration with Pediatric Heart Network).

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission:  November 30, 2021

   Study Completion:  December 31, 2026

APP 211

Page 8 – STN BL 125742/0 – Elisa Harkins

Final Report Submission:  May 31, 2027

8. Study C4591007 substudy to prospectively assess the incidence of subclinical myocarditis following administration of the second dose of COMIRNATY in a subset of participants 5 through 15 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this assessment according to the following schedule:

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

9. Study C4591031 substudy to prospectively assess the incidence of subclinical myocarditis following administration of a third dose of COMIRNATY in a subset of participants 16 to 30 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission:  November 30, 2021

Study Completion:  June 30, 2022

Final Report Submission:  December 31, 2022

Please submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Please submit final study reports to the BLA.  If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement to this BLA STN BL 125742.  For administrative purposes, all submissions related to these postmarketing studies required under section 505(o) must be submitted to this BLA and be clearly designated as:

- **Required Postmarketing Correspondence under Section 505(o)**
- **Required Postmarketing Final Report under Section 505(o)**
- **Supplement contains Required Postmarketing Final Report under Section 505(o)**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section.  This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise

Page 9 – STN BL 125742/0 – Elisa Harkins

undertaken to investigate a safety issue.  In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

You must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing requirement;
- the original milestone schedule for the requirement;
- the revised milestone schedule for the requirement, if appropriate;
- the current status of the requirement (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status for the study or clinical trial.  The explanation should include how the study is progressing in reference to the original projected schedule, including, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

We will consider the submission of your annual report under section 506B of the FDCA and 21 CFR 601.70 to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in section 505(o) and 21 CFR 601.70.  We remind you that to comply with section 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue.  Failure to periodically report on the status of studies or clinical trials required under section 505(o) may be a violation of FDCA section 505(o)(3)(E)(ii) and could result in regulatory action.

**POSTMARKETING COMMITMENTS SUBJECT TO REPORTING REQUIREMENTS UNDER SECTION 506B**

We acknowledge your written commitments as described in your letter of August 21, 2021 as outlined below:

10. Study C4591022, entitled "Pfizer-BioNTech COVID-19 Vaccine Exposure during Pregnancy: A Non-Interventional Post-Approval Safety Study of Pregnancy and Infant Outcomes in the Organization of Teratology Information Specialists (OTIS)/MotherToBaby Pregnancy Registry."

   Final Protocol Submission:  July 1, 2021

Page 10 – STN BL 125742/0 – Elisa Harkins

Study Completion:  June 30, 2025

Final Report Submission:  December 31, 2025

11. Study C4591007 substudy to evaluate the immunogenicity and safety of lower dose levels of COMIRNATY in individuals 12 through <30 years of age.

Final Protocol Submission:  September 30, 2021

Study Completion:  November 30, 2023

Final Report Submission:  May 31, 2024

12. Study C4591012, entitled "Post-emergency Use Authorization Active Safety Surveillance Study Among Individuals in the Veteran's Affairs Health System Receiving Pfizer-BioNTech Coronavirus Disease 2019 (COVID-19) Vaccine."

Final Protocol Submission:  January 29, 2021

Study Completion:  June 30, 2023

Final Report Submission:  December 31, 2023

13. Study C4591014, entitled "Pfizer-BioNTech COVID-19 BNT162b2 Vaccine Effectiveness Study - Kaiser Permanente Southern California."

Final Protocol Submission:  March 22, 2021

Study Completion:  December 31, 2022

Final Report Submission:  June 30, 2023

Please submit clinical protocols to your IND 19736, and a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND.  Please refer to the PMC sequential number for each study/clinical trial and the submission number as shown in this letter.

If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement.  Please use the following designators to prominently label all submissions, including supplements, relating to these postmarketing study commitments as appropriate:

- **Postmarketing Commitment – Correspondence Study Update**
- **Postmarketing Commitment – Final Study Report**
- **Supplement contains Postmarketing Commitment – Final Study Report**

Page 11 – STN BL 125742/0 – Elisa Harkins

For each postmarketing study subject to the reporting requirements of 21 CFR 601.70, you must describe the status in an annual report on postmarketing studies for this product.  Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released.  The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing commitment;
- the original schedule for the commitment;
- the status of the commitment (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status including, for clinical studies, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

**POST APPROVAL FEEDBACK MEETING**

New biological products qualify for a post approval feedback meeting.  Such meetings are used to discuss the quality of the application and to evaluate the communication process during drug development and marketing application review.  The purpose is to learn from successful aspects of the review process and to identify areas that could benefit from improvement.  If you would like to have such a meeting with us, please contact the Regulatory Project Manager for this application.

Sincerely,


Mary A. Malarkey                           Marion F. Gruber, PhD
Director                                   Director
Office of Compliance                       Office of Vaccines
  and Biologics Quality                      Research and Review
Center for Biologics                       Center for Biologics
  Evaluation and Research                    Evaluation and Research

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

<div style="border:1px solid black; display:inline-block; padding:8px;">

**EXHIBIT E**

</div>

Civil Action No. 23-cv-2451-NYW-MDB

Jessica Sweeney, Roxie Blue, Erika Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren, John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Loni Thalheimer, Alisha Torbeck,

      Plaintiffs,

v.

University of Colorado Hospital Authority, Elizabeth Concordia, Margaret Reidy, Michael Randle, Jill Hunsaker Ryan, D. Randy Kuykendall, Patricia Hammon, Raymond Estacio, Daniel Pastula, Shawn Turk, Tom Butts, Evelinn Borrayo, Kendall Alexander,

      Defendants.

---

## DECLARATION OF TAMMY ADAMS

---

I, Tammy Adams, state as follows:

1. I am currently employed as an Administrative Assistant in the Department of Law, Civil Litigation & Employment Law Section of the Office of the Attorney General, State of Colorado.

2. In this capacity, serve as custodian of the records for all notices of claims and intents to sue filed pursuant to § 24-10-109, C.R.S. (2023), with the Office of the Attorney General, State of Colorado.

3. I have reviewed the records of all notices of claims and intents to sue filed pursuant to § 24-10-109 with the Office of the Attorney General, State of Colorado to determine whether persons named Jessica Sweeney, Roxie Blue, Erika Bode, Amber Cano, Julie Deters-Frank, Karen Donelson, Jennifer Eddins, Polly Goodwin, Gabriel Hergenreter, Mary Lou Howard, Gwenn Hren,

John Lansford, Jaime Montgomery, Erin Phipps, Kinga Shelton, Stephanie Silvers, Patricia Spoerl, Loni Thalheimer, and Alisha Torbeck has filed any such notices concerning any matter.

4. A search of our records in our electronic database shows that our office has not received any Notice of Claim from any of the above persons from July 2021 to present.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 11th day of January 2024.

Tammy Adams

_____

Tammy Adams

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-02451-NYW-MDB

JESSICA SWEENEY, et al.,

        Plaintiffs,

    v.

UNIVERSITY OF COLORADO HOSPITAL AUTHORITY,
ELIZABETH CONCORDIA,
MARGARET REIDY,
MICHAEL RANDLE,
JILL HUNSAKER RYAN,
D. RANDY KUYKENDALL,
PATRICIA HAMMOND,
RAYMOND ESTACIO,
DANIEL PASTULA,
SEAN TURK,
TOM BUTTS;
EVELINN BORRAYO, and
KENDALL ALEXANDER,

        Defendants.

---

## UCHA DEFENDANTS' MOTION TO DISMISS

---

    Defendants University of Colorado Hospital Authority ("UCHA"), Elizabeth Concordia, Margaret Reidy, and Michael Randle (collectively, "UCHA Executives," and together with UCHA, "UCHA Defendants") respectfully move to dismiss Plaintiffs' Complaint (ECF No. 1) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

---

[1] **Conferral Certificate:** Per NYW Civ. Practice Standard 7.1B(b), undersigned counsel conferred with Plaintiffs' counsel, and Plaintiffs oppose this Motion.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................. 1

COMPLAINT ALLEGATIONS ......................................................................... 1

LEGAL STANDARDS..................................................................................... 2

ARGUMENT .................................................................................................. 3

I.      The UCHA Executives in their individual capacities are entitled to qualified immunity for the federal claims. ............................................................. 4

II.     The Court should dismiss Plaintiffs' § 1983 claims under Rule 12(b)(6) for failure to state a claim........................................................................... 6

      A.     *The statute of limitations bars Plaintiffs' § 1983 claims.*.............................. 7

      B.     *Plaintiffs' "Informed Consent" claim (Count I) fails because Plaintiffs identify no individual rights enforceable through § 1983.* ........................... 8

            1.    Plaintiffs cannot rely on Section 564. .............................................. 9

                   a.    Section 564 includes no private right of action. .................... 9

                   b.    Plaintiffs have no enforceable rights under Section 564. ................................................................................. 10

                   c.    Because a fully authorized vaccine was available, Section 564 is inapplicable to the Vaccine Policy. .............. 12

            2.    Plaintiffs identify no other source of enforceable rights. ............... 13

      C.     *Plaintiffs' equal-protection claim (Count II) fails because UCHA's Vaccine Policy satisfies rational-basis review.* .......................................... 15

      D.     *Plaintiffs' due-process claim (Count III) fails because there was neither a substantive- nor a procedural-due-process violation*................. 16

            1.    There was no substantive-due-process violation. ......................... 16

                   a.    Under the fundamental-rights approach, UCHA's Vaccine Policy satisfies rational-basis review..................... 16

                   b.    UCHA's Vaccine Policy is not conscience shocking........... 18

             2.    Plaintiffs received appropriate procedural due process................. 18

      E.     *Plaintiffs' Spending Clause claim (Count IV) fails.* .................................... 19

APP 219

      F.     *Plaintiffs' unconstitutional-conditions claim (Count V) fails because they have not identified a fundamental right that UCHA burdened.* ......... 20

      G.    *Plaintiffs' PREP Act claim (Count VI) fails because the PREP Act does not apply.* ...................................................................................... 20

      H.    *Plaintiffs' implied-right-of-action claim (Count X) fails for lack of an implied right of action.* ............................................................................... 21

III.   Plaintiffs' state-law claims are barred by the CGIA and fail to state a claim under Rule 12(b)(6).* .......................................................................... 21

      A.    *The CGIA bars Plaintiffs' tort claims (Counts VIII and IX) because Plaintiffs did not provide timely notice of their claims.* .............................. 22

      B.    *Plaintiffs' contract claim (Count VII) fails because Plaintiffs were not intended beneficiaries of a contract, and UCHA did not breach a contract.* ........................................................................................................ 23

      C.    *Plaintiffs' "employment torts" claim (Count VIII) fails because Plaintiffs weren't terminated in violation of public policy* .......................... 24

      D.    *Plaintiffs' outrageous-conduct claim (Count IX) fails.* ............................... 26

IV.   Plaintiffs' request for punitive damages is improper. ........................................... 27

      A.    *Punitive damages are unavailable for Plaintiffs' § 1983 claims.* ................ 27

      B.    *Punitive damages are unavailable for Plaintiffs' state-law claims.* ........... 28

CONCLUSION ............................................................................................................ 28

CERTIFICATE OF SERVICE ...................................................................................... 30

## **TABLE OF AUTHORITIES**

### **Cases**

*A Just Cause v. United States*,
45 F. Supp. 3d 1258 (D. Colo. 2014)............................................................. 12

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .................................................................................... 13

*Alvarado v. KOB-TV, LLC*,
493 F.3d 1210 (10th Cir. 2007)..................................................................... 3

*Anderson v. Eby*,
998 F.2d 858 (10th Cir. 1993)...................................................................... 23

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ....................................................................................... 5

*Aspen Orthopaedics & Sports Med., LLC v. Aspen Valley Hosp. Dist.*,
353 F.3d 832 (10th Cir. 2003)...................................................................... 22

*Baker v. USD 229 Blue Valley*,
979 F.3d 866 (10th Cir. 2020)........................................................................ 2

*Bauer v. Summey*,
568 F. Supp. 3d 573 (D.S.C. 2021) ....................................................... 17, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... 3

*Bird v. Martinez-Ellis*,
2022 U.S. App. LEXIS 35749 (10th Cir. Dec. 28, 2022) .................... 6, 9, 10

*Bird v. Wyoming*,
2022 U.S. Dist. LEXIS 224424 (D. Wyo. Dec. 8, 2022) ........................ 9, 10

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
81 F. Supp. 2d 1090 (D. Colo. 2000)........................................................... 28

*Braxton v. Zavaras*,
614 F.3d 1156 (10th Cir. 2010)...................................................................... 7

*Bridges v. Hous. Methodist Hosp.*,
543 F. Supp. 3d 525 (S.D. Tex. 2021)........................................... 11, 14, 24

APP 221

*Brnovich v. Biden*,
    562 F. Supp. 3d 123 (D. Ariz. 2022) ........................................................... 11

*Brock v. Nyland*,
    955 P.2d 1037 (Colo. 1998) ...................................................................... 22

*C.M. v. Urbina*,
    640 F. App'x 825 (10th Cir. 2016) ............................................................... 5

*Chardon v. Fernandez*,
    454 U.S. 6 (1981) ...................................................................................... 7

*Chauvin v. Terminix Pest Control, Inc.*,
    2023 U.S. Dist. LEXIS 87798 (E.D. La. May 16, 2023) ............................. 10

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*,
    111 F.3d 1485 (10th Cir. 1997) ................................................................. 13

*Colo. C.R. Comm'n v. Big O Tires, Inc.*,
    940 P.2d 397 (Colo. 1997) ...................................................................... 26

*Coors Brewing Co. v. Floyd*,
    978 P.2d 663 (Colo. 1999) ...................................................................... 25

*Crawford Rehab. Servs. v. Weissman*,
    938 P.2d 540 (Colo. 1997) ...................................................................... 25

*Crocker v. Glanz*,
    752 F. App'x 564 (10th Cir. 2018) ............................................................... 4

*Curtis v. Inslee*,
    2023 U.S. Dist. LEXIS 227987 (W.D. Wash. Dec. 21, 2023) ................. 1, 12

*Davis v. W. Cmty. Hosp.*,
    755 F.2d 455 (5th Cir. 1985) .................................................................... 27

*Doe v. Bd. of Regents*,
    2022 U.S. Dist. LEXIS 177706 (D. Colo. Sept. 29, 2022) ........................... 6

*Doe v. Mills*,
    566 F. Supp. 3d 34 (D. Me. 2021) ............................................................ 25

*Doe v. Sullivan*,
    756 F. Supp. 12 (D.D.C. 1991) ................................................................. 14

APP 222

*Eisenhour v. Weber County*,
   897 F.3d 1272 (10th Cir. 2018) ........................................................ 27

*Finkbeiner v. Geisinger Clinic*,
   623 F. Supp. 3d 458 (M.D. Pa. 2022) ............................................... 27

*Finnie v. Jefferson Cnty. Sch. Dist. R-1*,
   79 P.3d 1253 (Colo. 2003) ................................................................ 22

*Frisone v. Deane Auto. Ctr.*,
   942 P.2d 1215 (Colo. App. 1996) ..................................................... 23

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ...................................................................... 8, 13

*Guttman v. Khalsa*,
   669 F.3d 1101 (10th Cir. 2012) ........................................................ 17

*Halley v. Huckaby*,
   902 F.3d 1136 (10th Cir. 2018) ........................................................ 16

*Harris v. Univ. of Mass.*,
   557 F. Supp. 3d 304 (D. Mass. 2021) ............................................... 19

*Hernandez v. Grisham*,
   508 F. Supp. 3d 893 (D.N.M. 2020) ................................................. 18

*Hernandez v. Ridley*,
   734 F.3d 1254 (10th Cir. 2013) ........................................................ 18

*Hoffsetz v. Jefferson Cnty. Sch. Dist.*,
   757 P.2d 155 (Colo. App. 1988) ...................................................... 26

*Hughes v. Terminix Pest Control, Inc.*,
   2023 U.S. Dist. LEXIS 136544 (E.D. La. Aug. 7, 2023) .................... 21

*Hull v. Colo. Bd. of Governors*,
   805 F. Supp. 2d 1094 (D. Colo. 2011) ................................................ 7

*Hutton v. Memorial Hosp.*,
   824 P.2d 61 (Colo. App. 1991) ........................................................ 26

*In re Interrogatory on House Joint Resol. 20-1006*,
   500 P.3d 1053 (Colo. 2020) ............................................................. 25

v

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905) ................................................................................ 5, 17

*Johnson v. Brown*,
    567 F. Supp. 3d 1230 (D. Or. 2021) ........................................... 10, 12, 14

*Johnson v. Tyson Foods, Inc.*,
    607 F. Supp. 3d 790 (W.D. Tenn. 2022)........................................................ 9

*Khalek v. S. Denver Rehab.*,
    543 F. Supp. 3d 1019 (D. Colo. 2021) ...................................................... 21

*Khalik v. United Air Lines*,
    671 F.3d 1188 (10th Cir. 2012) .................................................................. 3

*Klaassen v. Trs. of Ind. Univ.*,
    7 F.4th 592 (7th Cir. 2021)................................................................. 17, 20

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999)................................................................... 23

*Klein v. State Farm Fire & Cas. Co.*,
    2009 U.S. Dist. LEXIS 6366 (D. Colo. Jan. 29, 2009)............................... 28

*Kriley v. Nw. Mem'l Healthcare*,
    2023 U.S. App. LEXIS 1766 (7th Cir. Jan. 24, 2023)............................... 14

*Legaretta v. Macias*,
    603 F. Supp. 3d 1050 (D.N.M. 2022)...............................................passim

*Lloyd v. Sch. Bd.*,
    570 F. Supp. 3d 1165 (S.D. Fla. 2021) ...................................................... 9

*Lochner v. New York*,
    198 U.S. 45 (1905) .................................................................................. 17

*Maniscalco v. N.Y.C. Dep't of Educ.*,
    563 F. Supp. 3d 33 (E.D.N.Y. 2021)................................................... 17, 18

*Manyweather v. Woodlawn Manor, Inc.*,
    40 F.4th 237 (5th Cir. 2022)..................................................................... 21

*Matthews v. Bergdorf*,
    889 F.3d 1136 (10th Cir. 2018) ................................................................. 4

APP 224

*Mayfield v. Harvey Cnty. Sheriff's Dep't*,
   731 F. App'x 685 (10th Cir. 2018) ................................................. 4

*Mesa Cnty. Valley Sch. Dist. No. 51 v. Kelsey*,
   8 P.3d 1200 (Colo. 2000) ............................................................ 22

*Middleton v. Hartman*,
   45 P.3d 721 (Colo. 2002) ............................................................ 22

*Molla v. Colo. Serum Co.*,
   929 P.2d 1 (Colo. App. 1996) ..................................................... 26

*Mullenix v. Luna*,
   577 U.S. 7 (2015) ......................................................................... 5

*Newport v. Fact Concerts, Inc.*,
   453 U.S. 247 (1981) ................................................................... 27

*Norris v. Stanley*,
   73 F.4th 431 (6th Cir. 2023) ...................................................... 10

*Norris v. Stanley*,
   567 F. Supp. 3d 818 (W.D. Mich. 2021) .................................... 20

*Oklahoma v. Biden*,
   577 F. Supp. 3d 1245 (W.D. Okla. 2021) ................................... 17

*Onyx Props. LLC v. Bd. of Cnty. Comm'rs*,
   838 F.3d 1039 (10th Cir. 2016) .................................................. 18

*Pahls v. Thomas*,
   718 F.3d 1210 (10th Cir. 2013) .................................................... 4

*Powers v. Harris*,
   379 F.3d 1208 (10th Cir. 2004) .................................................. 15

*Quigley v. Jobe*,
   851 P.2d 236 (Colo. App. 1992) ................................................ 23

*Reigel v. SavaSeniorCare LLC*,
   292 P.3d 977 (Colo. App. 2011) ................................................ 26

*Robinson v. City & County of Denver*,
   30 P.3d 677 (Colo. App. 2000) .................................................. 26

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) ........................................................................... 17, 25

*Save Palisade FruitLands v. Todd*,
   279 F.3d 1204 (10th Cir. 2002) ................................................................. 15

*Smith v. Colo. Interstate Gas Co.*,
   794 F. Supp. 1035 (D. Colo. 1992) ........................................................... 26

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ................................................................................. 13

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................................................. 19

*Stewart v. City of Oklahoma City*,
   47 F.4th 1125 (10th Cir. 2022) ................................................................. 16

*Stewart v. Justice*,
   502 F. Supp. 3d 1057 (S.D. W. Va. 2020) ............................................... 17

*Tatten v. Bank of Am. Corp.*,
   562 F. App'x 718 (10th Cir. 2014) .............................................................. 3

*Thomas v. Catlin*,
   141 F. App'x 673 (9th Cir. 2005) .............................................................. 13

*Thornton v. Kaplan*,
   937 F. Supp. 1441 (D. Colo. 1996) ......................................................... 28

*Trujillo v. Milyard*,
   2008 U.S. Dist. LEXIS 122670 (D. Colo. July 11, 2008) ........................... 27

*Valdez v. Grisham*,
   2022 U.S. Dist. LEXIS 148815 (D.N.M. Aug. 19, 2022) ......................passim

*Valdez v. Grisham*,
   559 F. Supp. 3d 1161 (D.N.M. 2021) ....................................................... 15

*Walker v. Mohiuddin*,
   947 F.3d 1244 (10th Cir. 2020) ................................................................... 4

*Williams v. Brown*,
   567 F. Supp. 3d 1213 (D. Or. 2021) .................................................. 15, 20

*Zucht v. King*,
   260 U.S. 174 (1922) ............................................................................... 17

**Statutes**

10 U.S.C. § 980 ...................................................................................... 13, 20

21 U.S.C. § 360bbb-3 ................................................................................ passim

42 U.S.C. § 1983 ...................................................................................... passim

42 U.S.C. § 247d-6d ..................................................................................... 21

42 U.S.C. § 247d-6e ..................................................................................... 21

C.R.S. § 13-21-102 ...................................................................................... 28

C.R.S. § 24-10-109(1) .................................................................................. 22

C.R.S. § 24-10-114 ................................................................................... 26, 28

C.R.S. § 8-40-101 ........................................................................................ 26

C.R.S. § 8-41-301 ........................................................................................ 26

**Other Authorities**

45 C.F.R. Part 46 ............................................................................... 13, 19, 24

Belmont Report ............................................................................................ 13

COVID-19 Vaccination Program Provider Agreement ............................... 13, 19, 23, 24

EUA Authorization Letters ........................................................................ 13, 23

*FDA Approves First COVID-19 Vaccine: Approval Signifies Key Achievement for Public
   Health* (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-
   approves-first-covid-19-vaccine (last visited Jan. 11, 2024) ................................. 2, 12

Federal Wide Assurance ................................................................................ 13

Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, 52 Stat. 1040 (1938) .................... 19

ICCPR Treaty .............................................................................................. 13

APP 227

Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555 (Nov. 5, 2021) .......................................................................... 25

U.S. EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (May 15, 2023), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Jan. 11, 2024)................................................................................................... 6

Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization, 45 Op. O.L.C. __ (July 6, 2021), https://www.justice.gov/olc/file/1415446/download ........ 6, 11

**Rules**

Fed. R. Evid. 201(b) ........................................................................................................ 12

Fed. R. Civ. P. 12(b)(1) ..................................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1, 6, 21, 28

**INTRODUCTION**

Plaintiffs are part of a nationwide litigation campaign, spearheaded by their counsel, that attacks public and private health institutions and governmental entities for requiring healthcare employees to be vaccinated against COVID-19.[2] *See* ECF Nos. 27, 40. Here, as in each case in that effort, Plaintiffs claim the right to refuse to comply with their employer's vaccine policy without consequence. Based on that claimed entitlement, Plaintiffs assert myriad federal and state-law claims against the UCHA Defendants. But as every court to consider these sorts of claims has concluded, no such right exists. For that and the other reasons set out here, the Court should dismiss the Complaint with prejudice.

**COMPLAINT ALLEGATIONS[3]**

On February 4, 2020, the U.S. secretary of Health and Human Services ("HHS") determined that COVID-19 had become a public-health emergency. Compl. Ex. B at 1. Because COVID-19 posed a risk to national security, the secretary subsequently "declared that circumstances exist[ed] justifying the authorization of emergency use of drugs and biological products." *Id.* Thus, in December 2020, the Food and Drug Administration ("FDA") began issuing emergency-use authorizations ("EUAs") for the distribution of lifesaving vaccines. Compl. ¶¶ 75–76, 80. By summer 2021, about 3.8 billion vaccine doses had been administered across the globe. Compl. Ex. C at 1. All

---

[2] One such case has already been dismissed in its entirety on many of the grounds the UCHA Defendants assert here. *See Curtis v. Inslee*, 2023 U.S. Dist. LEXIS 227987 (W.D. Wash. Dec. 21, 2023).

[3] These allegations are assumed true only for Rule 12(b)(6) purposes.

available data showed that these vaccines were "safe and highly effective at preventing serious COVID-19 cases, hospitalizations and death." *Id.*

On July 28, 2021—more than eight months after the FDA issued its first EUA (and less than a month before the FDA fully authorized Pfizer's vaccine[4])—UCHA issued a policy requiring its employees to be vaccinated against COVID-19 ("Vaccine Policy"). Compl. ¶ 194(1); Compl. Ex. C at 1. UCHA's leadership explained that it enacted the policy to "[p]rovid[e] the highest level of safety for [its] patients, staff and providers." Compl. Ex. C at 1. The Vaccine Policy allowed UCHA employees to seek a religious or medical exemption. Compl. ¶ 194(2). Exempted, unvaccinated employees would have to wear a mask and take regular COVID-19 tests. *Id.* Only if an employee chose to disregard the Vaccine Policy—by refusing both vaccination and masking/testing—would that employee face disciplinary action. *Id.* ¶ 194(3).

Plaintiffs, 19 former UCHA employees, assert that the UCHA Defendants violated federal and state law by terminating their employment because Plaintiffs failed to comply with the Vaccine Policy. *Id.* ¶¶ 18.1–18.19, 19.1–19.4, 320–423. Plaintiffs assert ten claims against UCHA and the UCHA Executives. *Id.*

## **LEGAL STANDARDS**

Under Rule 12(b)(1), the UCHA Defendants contest subject-matter jurisdiction based on the Colorado Governmental Immunity Act ("CGIA"). The Court must take Plaintiffs' allegations as true and determine whether they fail to establish jurisdiction. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).

---

[4] FDA News Release, *FDA Approves First COVID-19 Vaccine: Approval Signifies Key Achievement for Public Health* (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (last visited Jan. 11, 2024).

To avoid Rule 12(b)(6) dismissal, "a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Tatten v. Bank of Am. Corp.*, 562 F. App'x 718, 720 (10th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation omitted). But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

Plaintiffs assert seven federal claims and three state-law claims. Through 42 U.S.C. § 1983, they claim violations of "Legally Effective Informed Consent" (Count I), equal protection (Count II), due process (Count III), the Spending Clause (Count IV), the unconstitutional-conditions doctrine (Count V), and the PREP Act (Count VI). Plaintiffs also assert a duplicative claim for implied private right of action under 21 U.S.C. § 360bbb-3 (Count X). Under Colorado law, they assert claims for breach of contract (Count VII), "Employment Torts" (Count VIII), and "Extreme and Outrageous Conduct" (Count IX). Plaintiffs also seek punitive damages.

For the reasons discussed below, (i) the UCHA Executives in their individual capacities are entitled to qualified immunity for the federal claims; (ii) the § 1983 claims are untimely and fail to state a claim; (iii) the state-law claims either are barred by the CGIA, fail to state a claim, or both; and (iv) Plaintiffs cannot seek punitive damages.

I.     **The UCHA Executives in their individual capacities are entitled to qualified immunity for the federal claims.**

"[P]ublic officials enjoy qualified immunity in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties." *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). Once a public official asserts qualified immunity, it presumptively applies, and the burden shifts to plaintiffs "to demonstrate the complaint['s] factual allegations establish[] their right to recover against *each* [public official]." *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018). To overcome this presumption, Plaintiffs must show both that the complaint adequately alleges that each state-official defendant "violated a statutory or constitutional right," *and* "that the right was clearly established at the time of the challenged conduct." *Walker v. Mohiuddin*, 947 F.3d 1244, 1248 n.3 (10th Cir. 2020) (quotation omitted).

The Court should dismiss Counts I, II, III, IV, V, VI, and X as against the UCHA Executives in their individual capacities under both qualified-immunity prongs.

*First*, Plaintiffs haven't sufficiently alleged any federal constitutional or statutory violation, as explained below in Section II. *See, e.g.*, *Crocker v. Glanz*, 752 F. App'x 564, 567 (10th Cir. 2018) ("Because we hold that the complaint inadequately alleges a constitutional violation by [the defendant], we need not address the clearly-established requirement."). Nor are there sufficiently individualized allegations that any of the UCHA Executives caused a constitutional or statutory violation. *See Mayfield v. Harvey Cnty. Sheriff's Dep't*, 731 F. App'x 685, 688 (10th Cir. 2018) (dismissal of § 1983 claims warranted where plaintiff failed to "allege that each defendant, through his own actions, violated the constitution"). Here, the only specific factual allegation regarding Concordia is that she issued and enforced the Vaccine Policy as CEO of University of Colorado

APP 232

Health. *See* Compl. ¶¶ 8, 258.[5] The allegations targeted at Reidy and Randle identify no wrongdoing. *See id.* ¶¶ 7, 9, 19.3, 19.4, 214.

   *Second*, the UCHA Executives didn't violate clearly established law by enforcing the Vaccine Policy. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate" such that "every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alteration in original). "[T]here must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *C.M. v. Urbina*, 640 F. App'x 825, 830 (10th Cir. 2016) (quotation omitted). "The dispositive question is 'whether the violative nature of [the] *particular* conduct [at issue] is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted).

   Here, Plaintiffs had no right—let alone a clearly established one—to continued UCHA employment after refusing to comply with UCHA's Vaccine Policy, which was consistent with COVID-19 vaccine mandates across the country. Neither the Supreme Court nor the Tenth Circuit has held that a public health institution violates its employees' federal constitutional or statutory rights when it requires vaccination against COVID-19 as a requirement of continued employment. To the contrary, the Supreme Court, Tenth Circuit courts, and courts across the country have routinely upheld such policies. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 25–26 (1905) (upholding

---

[5] University of Colorado Health, d/b/a UCHealth, is a joint venture between UCHA and Poudre Valley Healthcare, Inc. Compl. ¶ 19.1.

state statute mandating smallpox vaccination); *Bird v. Martinez-Ellis*, 2022 U.S. App. LEXIS 35749, at *11–12 (10th Cir. Dec. 28, 2022) (rejecting argument that vaccination without informed consent gives rise to "an actionable claim for violation of § 360bbb-3"); *Doe v. Bd. of Regents*, 2022 U.S. Dist. LEXIS 177706, at *13–17 (D. Colo. Sept. 29, 2022) (vaccination policy at University of Colorado Anschutz Medical Campus not a violation of clearly established rights); *Legaretta v. Macias*, 603 F. Supp. 3d 1050, 1060 (D.N.M. 2022) (vaccination requirement doesn't violate informed-consent requirements); *Valdez v. Grisham*, 2022 U.S. Dist. LEXIS 148815, at *26–28 (D.N.M. Aug. 19, 2022) (collecting cases upholding the vaccine-mandate constitutionality).[6]

Thus, under either prong, the UCHA Executives are entitled to qualified immunity from Plaintiffs' individual-capacity claims in Counts I, II, III, IV, V, VI, and X.

## II.   The Court should dismiss Plaintiffs' § 1983 claims under Rule 12(b)(6) for failure to state a claim.

Plaintiffs' § 1983 claims are difficult to parse, presenting overlapping allegations, all based on the flawed premise that Plaintiffs had a federally protected right to

---

[6] *See also, e.g.*, *Rolovich v. Wash. State Univ.*, 2023 U.S. Dist. LEXIS 93926, at *19–20 (E.D. Wash. May 30, 2023) ("This Court and many others around the country have consistently found … terminating an employee for failing to comply with a vaccine mandate is a permissible employment action."); *Penna v. N. Clackamas Sch. Dist.*, 2023 U.S. Dist. LEXIS 166885, at *9–10 (D. Or. Aug. 11, 2023) (similar); Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization, 45 Op. O.L.C. __, slip op. at 1, 7–8 (July 6, 2021) [hereinafter OLC Opinion], https://www.justice.gov/olc/file/1415446/download (21 U.S.C. § 360bbb-3(e)(1)(A) "does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an [EUA]"); U.S. EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* §§ K.5–K.7 (May 15, 2023), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Jan. 11, 2024) (addressing mandatory vaccination policies).

continued employment with UCHA despite their noncompliance with the Vaccine Policy. Courts nationwide have consistently rejected such claims. Plaintiffs fare no better; all their § 1983 claims are both time-barred and fail to state a claim.

**A.      *The statute of limitations bars Plaintiffs' § 1983 claims.***

In a § 1983 action, state law governs the statute of limitations, and federal law determines when the action accrues. *Braxton v. Zavaras*, 614 F.3d 1156, 1159 (10th Cir. 2010). The applicable Colorado statute of limitations is two years from accrual. *Id.* at 1160. Under federal law, a claim accrues when the plaintiff gains notice of the illegal act, "not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (per curiam); *see also Hull v. Colo. Bd. of Governors*, 805 F. Supp. 2d 1094, 1104 (D. Colo. 2011) (employee's § 1983 claim accrued when he received notice that training grant wouldn't be renewed, not on final day of employment).

Here, Plaintiffs' claims accrued more than two years before they filed suit. UCHA issued the Vaccine Policy on July 28, 2021, notifying all employees that they would "face disciplinary action up to and including termination" if they failed to comply. Compl. Ex. C. at 2. That triggered commencement of the limitations period, which expired on July 28, 2023. *See Hull*, 805 F. Supp. 2d at 1104. Plaintiffs didn't file suit until September 20, 2023.[7] The Court should dismiss Plaintiffs' tardy § 1983 claims.

---

[7] At the latest, Plaintiffs' claims accrued on September 3, 2021, when they received notice of disciplinary action for their noncompliance. *See* Compl. Ex. C at 2; Compl. ¶ 240 (Plaintiffs required to mask and undergo weekly testing due to noncompliance).

**B.**    ***Plaintiffs' "Informed Consent" claim (Count I) fails because Plaintiffs identify no individual rights enforceable through § 1983.***

Plaintiffs spend most of their 101-page Complaint claiming that a vaccination policy designed to confront a global pandemic constitutes coercive medical experimentation on human subjects. Grasping at every disparate and improbable source they can think of—including statutes, regulations, the Fourteenth Amendment, an international treaty, a scientific-commission report, and a mishmash of less-than-authoritative others—Plaintiffs try to create a § 1983 claim for "Deprivation of Legally Effective Informed Consent." Compl. ¶¶ 320–30. They frame this claim as a breach of a purported duty to "obtain Plaintiffs' legally effective informed consent," *id.* ¶ 328, but because Plaintiffs don't allege that they ever received a COVID-19 vaccination, what they're actually contending is that they could contravene the Vaccine Policy without consequence. Either way, no such claim exists.

Not all federal statutes create individual rights enforceable under § 1983. Enforceable rights don't exist unless Congress has "unambiguously conferred" them "upon a class of beneficiaries" that includes the plaintiff. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 285–86 (2002). A plaintiff cannot simply fall "within the general zone of interest that the statute is intended to protect"; rather, Congress must have "intended to create a federal right" for the identified class. *Id.* at 283 (emphasis omitted). Thus, the statute in question must be "phrased in terms of the persons benefitted" and contain "rights-creating," individual-centric language with an "unmistakable focus on the benefited class." *Id.* at 284 (emphasis omitted). Here, Plaintiffs identify no enforceable federal right implicated by UCHA's Vaccine Policy.

1.   **<u>Plaintiffs cannot rely on Section 564</u>**.

Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C.

§ 360bbb-3 ("Section 564"), is the lynchpin of Plaintiffs' Complaint. Governing

"emergency use" medications, Section 564 requires the HHS secretary to "establish

such conditions on an [EUA] … to ensure that individuals to whom the [emergency use]

product is administered are informed of the option to accept or refuse administration of

the product, [and] of the consequences, if any, of refusing administration of the product."

§ 360bbb-3(e)(1)(A)(ii). Plaintiffs argue that Section 564 gives them the right to refuse

vaccination without consequence, but for three reasons, it affords them no such right.

a.   **Section 564 includes no private right of action.**

To start, there is no private right of action under Section 564. The FDCA

expressly provides that it may be enforced only by the U.S. government (or by states in

certain cases), so "'[p]rivate parties may not bring enforcement suits' under the FDCA."

*Bird*, 2022 U.S. App. LEXIS 35749, at *11–12 (quotation omitted). Courts nationwide

have consistently agreed, including in COVID-19 vaccination cases. *See, e.g.*, *Bird v.*

*Wyoming*, 2022 U.S. Dist. LEXIS 224424, at *18–19 (D. Wyo. Dec. 8, 2022); *Johnson v.*

*Tyson Foods, Inc.*, 607 F. Supp. 3d 790, 807 (W.D. Tenn. 2022); *Lloyd v. Sch. Bd.*,

570 F. Supp. 3d 1165, 1175 (S.D. Fla. 2021) ("[T]he availability of private relief under

the FDCA is 'foreclosed by express provision [] of the statute itself ….'" (second

alteration in original) (quotation omitted)). Because Plaintiffs' Section 564-based § 1983

claim seeks to enforce the FDCA, that claim must be dismissed.[8]

---

[8] This result is nothing new for Plaintiffs' counsel. Prior to embarking on his national
crusade, he asserted the same Section 564 claim at least five times in 2023 in his local
federal court. That court rejected the claim each time, explaining that Section 564 "does

### b.   Plaintiffs have no enforceable rights under Section 564.

Section 564 likewise confers no "individual rights that might otherwise support § 1983 liability." *Bird*, 2022 U.S. App. LEXIS 35749, at *12.

*First*, Section 564 imposes obligations on only the HHS secretary, not employers. *Bird*, 2022 U.S. Dist. LEXIS 224424, at *18; *see also Legaretta*, 603 F. Supp. 3d at 1060 ("[Section 564] requires that, for medical products under an EUA, 'HHS must establish conditions to facilitate informed consent.'" (quotation omitted)).

*Second*, Section 564 "addresses the interaction between the medical provider and the person receiving the vaccine, not the interaction between an employer and an employee receiving a vaccine." *Norris v. Stanley*, 73 F.4th 431, 438 (6th Cir. 2023). And although UCHA is also a medical provider, Plaintiffs don't allege (nor could they) that it required its employees to be vaccinated *by UCHA personnel* or that UCHA made any representations that it would or could govern the interactions between a vaccine provider and the recipient–employee. Rather, those who sign up for the vaccine are "informed of the risks and benefits of the vaccine and of the option to accept or refuse the vaccine *by their medical providers*," thus satisfying Section 564. *Valdez*, 2022 U.S. Dist. LEXIS 148815, at *16 (emphasis added) (quotation omitted). Put another way, because the UCHA Defendants "are not 'directly administering the vaccine'" to their employees, Section 564 doesn't apply to them. *See id.* (quotation omitted); *accord Johnson v. Brown*, 567 F. Supp. 3d 1230, 1256 (D. Or. 2021) (Section 564 "conditions

---

not confer a private right to sue." *E.g.*, *Chauvin v. Terminix Pest Control, Inc.*, 2023 U.S. Dist. LEXIS 87798, at *5 (E.D. La. May 16, 2023).

of informed consent" apply to only "the medical providers who administer the vaccine, not those who issue vaccine mandates"); *Legaretta*, 603 F. Supp. 3d at 1060 (same).[9]

    *Third*, Section 564 doesn't prevent employers from implementing COVID-19 vaccination requirements. *See, e.g.*, *Brnovich v. Biden*, 562 F. Supp. 3d 123, 161 (D. Ariz. 2022) ("The statute confers no substantive right to refuse a vaccine or other medical product approved under an EUA."); *Legaretta*, 603 F. Supp. 3d at 1060; *Valdez*, 2022 U.S. Dist. LEXIS 148815, at *17; *Bridges v. Hous. Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021) (all similar).[10]

    *Fourth*, "[a]t most, [Section 564] requires only that 'individuals to whom the [vaccine] is administered … are informed … of the option to accept or refuse administration of the product.'" *Brnovich*, 562 F. Supp. 3d at 161 (third alteration in original) (emphasis omitted) (quoting 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)). Thus, "as long as individuals receiving the vaccine are informed, the statutory requirement is met." *Id.* Plaintiffs apparently never received the vaccine. At the very least, however, they don't allege that they received the vaccine without being provided with the required information. Instead, Plaintiffs complain that they couldn't refuse vaccination without penalty. Section 564 provides no such right.[11]

---

[9] *See also* OLC Opinion at 8–9 (although Section 564 "effectively require[s] parties administering the products to do so in particular ways … and some of those entities, such as universities, might also impose vaccination requirements," "[t]here is no indication … that Congress intended to regulate such entities except with respect to the circumstances of their administration of the product itself").

[10] *See also* OLC Opinion at 7 ("[Section 564] concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for vaccines that are subject to EUAs.").

[11] Even if Section 564 did confer a right to refuse vaccination, the Vaccine Policy "does not abridge that right" because employees *could still refuse vaccination*, as Plaintiffs apparently did. *See Brnovich*, 562 F. Supp. 3d at 162. "A hard choice, for which there

### c. Because a fully authorized vaccine was available, Section 564 is inapplicable to the Vaccine Policy.

Finally, and in any event, Plaintiffs' argument rests on the premise that UCHA's Vaccine Policy required them to take an investigational drug. Wrong. Plaintiffs could have complied with the Vaccine Policy by accepting the Pfizer-BioNTech vaccine, fully FDA-approved months before the Vaccine Policy's deadline. *See* FDA News Release, *supra* note 4; *see also Legaretta*, 603 F. Supp. 3d at 1055–56 (ruling that Pfizer vaccine's full approval rendered Section 564 inapplicable); *Valdez*, 2022 U.S. Dist. LEXIS 148815, at *15; *Curtis*, 2023 U.S. Dist. LEXIS 227987, at *21.

To the extent Plaintiffs assert that only an investigational Pfizer drug was publicly available to comply with the Vaccine Policy and the licensed Pfizer vaccine (branded as "Comirnaty" after FDA approval) was not, *see* Compl. ¶¶ 67, 221–22, the two are the same, *see* FDA News Release, *supra* note 4 ("The vaccine has been known as the Pfizer-BioNTech COVID-19 Vaccine[] and will now be marketed as Comirnaty …."). This Court "need not accept as true a factual allegation plainly contrary to facts established by records of which the Court can take judicial notice." *A Just Cause v. United States*, 45 F. Supp. 3d 1258, 1261 n.1 (D. Colo. 2014); *see also Legaretta*, 603 F. Supp. 3d at 1059–60 (taking judicial notice of FDA News Release); Fed. R. Evid. 201(b). Plaintiffs don't dispute that what they call the Pfizer investigational drug was both publicly available and that its use would have satisfied UCHA's Vaccine Policy. *See* Compl. ¶ 194(1) (employees may comply with the Vaccine Policy by obtaining Pfizer vaccine).

---

may be significant consequences, is still a choice. [UCHA] employees may choose 'either get the vaccine, apply for an exception, or look for employment elsewhere.'" *See id.* (quotation omitted); *accord Johnson*, 567 F. Supp. 3d at 1257 ("The Vaccine Orders present[] Plaintiffs with a difficult choice, but it is nevertheless a choice.").

2.    **Plaintiffs identify no other source of enforceable rights**.

Plaintiffs mine a hodgepodge of other sources to fabricate an individual right, enforceable through § 1983, to refuse vaccination without employment consequences. As courts universally have concluded, no such right exists.

To start, 10 U.S.C. § 980 bestows no enforceable rights on Plaintiffs. *First*, that Defense Authorization Act statute is a funding provision. It contains no unambiguous congressional intent to establish a right to sue to enforce regulations governing funds appropriated to the Department of Defense. Hence, it creates no private right of action or rights enforceable under § 1983. *See Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (Defense Authorization Act doesn't imply private right of action); *Gonzaga*, 536 U.S. at 289 (similar spending provision lacked the "requisite congressional intent to confer individual rights enforceable by § 1983"). And *second*, Plaintiffs don't allege that any Department of Defense funds were used to experiment on them without their informed consent, much less explain how UCHA would be responsible.

As for Plaintiffs' remaining sources—45 C.F.R. Part 46, Federal Wide Assurance, the ICCPR Treaty, the Belmont Report, the COVID-19 Vaccination Program Provider Agreement, and the EUA Authorization Letters—Plaintiffs cannot rely on regulations, agency guidance, international treaties, or statements of principles as "laws" enforceable through § 1983. *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Language in a regulation … may not create a right that Congress has not."); *see also Thomas v. Catlin*, 141 F. App'x 673, 674 (9th Cir. 2005) (unsigned) (45 C.F.R. Part 46); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) (ICCPR Treaty); *Kriley v. Nw.*

*Mem'l Healthcare*, 2023 U.S. App. LEXIS 1766, at *6 (7th Cir. Jan. 24, 2023) (unsigned) (Belmont Report).

Moreover, these sources apply only to medical experimentation and scientific research on humans. They're inapplicable here. UCHA's "employees are not participants in a human trial," and UCHA "has not applied to test the COVID-19 vaccines on its employees, it has not been approved by an institutional review board, and it has not been certified to proceed with clinical trials." *See Bridges*, 543 F. Supp. 3d at 528; *see also Johnson*, 567 F. Supp. 3d at 1248 ("Plaintiffs here do not contend that they are being forced to be part of the *clinical trials* for the Pfizer-BioNTech Vaccine or that they are being forcibly injected while being physically held against their will."); *Doe v. Sullivan*, 756 F. Supp. 12, 15–16 (D.D.C. 1991) (finding § 980 inapplicable because "[t]he FDA … does not view every use of unapproved drugs as research"). Plaintiffs don't plausibly allege that they were part of a clinical trial[12] (or even that they ever received a COVID-19 vaccine). UCHA's Vaccine Policy isn't experimental research, so these sources are irrelevant.

\*       \*       \*

In sum, Plaintiffs identify no enforceable federal right to continued employment with UCHA after refusing to comply with UCHA's Vaccine Policy.[13] Because this § 1983 claim isn't based on an enforceable right, the Court should dismiss it.

---

[12] Plaintiffs' conclusory assertions to the contrary are legal conclusions that the Court cannot accept as true. *See Valdez*, 2022 U.S. Dist. LEXIS 148815, at *13.

[13] Plaintiffs also include an unexplained reference to the Fourteenth Amendment. Compl. ¶ 321. That amendment is inapplicable to Plaintiffs' claim for "informed consent." To the extent that Plaintiffs are reiterating their due-process and equal-protections claims, those claims fail for the reasons discussed below.

**C.**    ***Plaintiffs' equal-protection claim (Count II) fails because UCHA's Vaccine Policy satisfies rational-basis review.***

Plaintiffs in their equal-protection claim allege differential treatment based on their status as individuals who refuse a vaccine. This claim rests on their (1) having to wear a mask and test for COVID-19 weekly, unlike vaccinated employees; (2) being unable to "enjoy employment in their chosen profession without consequence"; and (3) inability to refuse the vaccine without consequence. Compl. ¶¶ 96, 195, 240, 265, 284, 332–35. These allegations don't present an equal-protection violation.

To evaluate equal-protection claims, courts employ the familiar tiers of scrutiny. Only differential treatment based on a suspect class (race, religion, national origin, or alienage) or that burdens a fundamental right receives strict scrutiny. *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). Otherwise, the classification need only be "rationally related to a legitimate government purpose." *Id.*

Courts have resoundingly held that COVID-19 vaccine mandates receive only rational-basis review and don't trigger heightened scrutiny. *E.g.*, *Williams v. Brown*, 567 F. Supp. 3d 1213, 1229 (D. Or. 2021) (calling this a "growing consensus"). This is because vaccine mandates neither implicate a suspect class nor burden a fundamental right. *Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1178 (D.N.M. 2021). Like substantive-due-process claims, equal-protection claims turn on the existence of a fundamental right, apply the same tiers of scrutiny, and thus "proceed[] along the same lines." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). Because no fundamental right exists here, and because the Vaccine Policy satisfies rational-basis review, *see infra* Section II.D.1, the Court should dismiss this claim.

15

**D.**   ***Plaintiffs' due-process claim (Count III) fails because there was neither a substantive- nor a procedural-due-process violation.***

Plaintiffs next claim that the Vaccine Policy violates their substantive- and procedural-due-process rights. Both species of due-process claims are deficient.

**1.**   **There was no substantive-due-process violation.**

Courts analyze challenged legislative actions under a "fundamental-rights approach" and challenged executive actions under a "shocks-the-conscience approach." *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018). Vaccine mandates "do[] not fit comfortably into either category," *Legaretta*, 603 F. Supp. 3d at 1061, but Plaintiffs' claim fails under either approach.

**a.**   **Under the fundamental-rights approach, UCHA's Vaccine Policy satisfies rational-basis review.**

The first approach, the fundamental-rights approach, has three steps. *First*, the court considers "whether a fundamental right is at stake," which requires Supreme Court or Tenth Circuit precedent or proof that the right "is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1138 (10th Cir. 2022). *Second*, the court considers "whether the claimed right 'has been infringed.'" *Id. Third*, the court applies strict scrutiny for fundamental rights and rational-basis review for non-fundamental rights. *Id.*

Plaintiffs allege fundamental rights to (1) refuse "medical experimentation," (2) refuse "mandated products," (3) refuse to take an unlicensed vaccine, (4) refuse to mask and test weekly, (5) "contract in relation to labor," and (6) work "in their chosen profession without consequence." Compl. ¶¶ 96, 241–42, 265, 339, 341. None of these are fundamental rights. *First*, UCHA's Vaccine Policy isn't a medical experiment.

*See supra* Section II.B.2. *Second*, settled law dating back to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), upholds state vaccine mandates and rejects any right to refuse vaccination (or "mandated products"). *Zucht v. King*, 260 U.S. 174, 176 (1922).[14] *Third*, any right "to contract in relation to labor" was repudiated when the Supreme Court overturned *Lochner v. New York*, 198 U.S. 45 (1905). *Stewart v. Justice*, 502 F. Supp. 3d 1057, 1067–68 (S.D. W. Va. 2020). *Fourth*, as at-will employees, Plaintiffs had no protected interest in continued employment. *Bauer v. Summey*, 568 F. Supp. 3d 573, 587 (D.S.C. 2021). *Fifth*, the "right to practice in [one's] chosen profession" is not fundamental, so it is "subject to reasonable government regulation." *Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012).

Courts that have confronted due-process challenges to COVID-19 vaccine mandates have held that vaccine mandates pass muster under rational-basis review. *Legaretta*, 603 F. Supp. 3d at 1064–65, 1067 (collecting cases). "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese*, 141 S. Ct. at 67 (per curiam). UCHA's requiring employees to be vaccinated rationally relates to that goal because the COVID-19 vaccines have been "remarkably effective in mitigating the effects of the pandemic." *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1265 (W.D. Okla. 2021); *accord Maniscalco v. N.Y.C. Dep't of Educ.*, 563 F. Supp. 3d 33, 40 (E.D.N.Y. 2021) ("Of these new tools [to reduce COVID-19 transmission], one of the

---

[14] Under *Jacobson*, there is no fundamental right to refuse a vaccine. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) (noting that *Jacobson* applied an early version of rational-basis review). "[V]accination requirements, like other public-health measures, have been common in this nation." *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021). Thus, there is no "constitutional problem with vaccination against SARS-CoV-2." *Id.* Likewise, being required to wear masks and test for COVID-19 is "not constitutionally problematic." *Id.*

most highly regarded is vaccination."). Plaintiffs fail to state a claim under the fundamental-rights approach.

> **b.** **UCHA's Vaccine Policy is not conscience shocking.**

This second approach asks "whether the challenged government action shocks the conscience of federal judges"—an extremely high bar that applies to "only the most egregious official conduct." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013).

UCHA implemented its Vaccine Policy to preserve the lives and health of its patients, staff, and providers, and to enable hospitals to continue operating. Compl. Ex. C at 1. Courts have universally agreed that vaccine mandates don't shock the judicial conscience. *E.g.*, *Maniscalco*, 563 F. Supp. 3d at 39 ("Although plaintiffs argue that there are other proven means of preventing the spread of COVID-19 in schools, among them frequent testing and mask wearing, it is not shocking for the City to conclude that vaccination is the best way to do so …."); *Bauer*, 568 F. Supp. 3d at 591. Plaintiffs thus fail to state a claim under this approach, too.

> **2.** **Plaintiffs received appropriate procedural due process.**

"The essence of procedural due process is the provision to the affected party of *some* kind of notice and … *some* kind of hearing." *Onyx Props. LLC v. Bd. of Cnty. Comm'rs*, 838 F.3d 1039, 1044 (10th Cir. 2016) (alteration in original). But individual hearings are required only when government actions have a "limited focus … based on grounds that are individually assessed." *Hernandez v. Grisham*, 508 F. Supp. 3d 893, 981 (D.N.M. 2020) (quotation omitted). When government actions "are not directed at one or a few individuals[,] … general notice as provided by law is sufficient." *Id.*

Plaintiffs allege that UCHA violated their rights to due process by failing to offer them an impartial hearing to defend their assumed right to refuse the vaccine. Compl.

¶¶ 340, 342. But UCHA's Vaccine Policy applied equally to "all employees." *Id.* ¶ 194(1); Compl. Ex. C at 1 (UCHA email to all employees noting that "[e]veryone must be compliant"). Thus, UCHA's general notice suffices, and the Plaintiffs weren't entitled to a hearing. *See Harris v. Univ. of Mass.*, 557 F. Supp. 3d 304, 312 (D. Mass. 2021) (students not entitled to any more process than "enactment and publication" of their university's vaccine policy). Plaintiffs admit that they received ample notice about the Vaccine Policy, its deadlines, and their ability to pursue exemptions. Compl. ¶¶ 194, 278; Compl. Ex. C. Because UCHA had no obligation to provide individual hearings, the Court should dismiss Plaintiffs' procedural-due-process claim.

### E.   *Plaintiffs' Spending Clause claim (Count IV) fails.*

Plaintiffs' Spending Clause claim fares no better. Plaintiffs again identify no enforceable rights, let alone a Spending Clause violation.

Because the federal government invested billions to ensure that COVID-19 vaccines could be administered for free, Plaintiffs claim this gives them a "specific monetary entitlement" to a vaccine. Compl. ¶¶ 347–49, 354–56. From this, Plaintiffs claim that congressional restrictions on those federal funds create individual rights that are enforceable through § 1983. Compl. ¶¶ 345, 365. Yet of the five sources on which Plaintiffs rely, four (Section 564, the Fourteenth Amendment, the COVID-19 Vaccination Program Provider Agreement, and 45 C.F.R. § 46.122) cannot support a Spending Clause claim because they aren't laws passed under Congress's spending power. *See South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987); *Gonzaga*, 536 U.S. at 280.[15]

---

[15] Section 564 was passed under Congress's Commerce Clause power. *See* 21 U.S.C. § 360bbb-3(a)(1) ("[T]he Secretary may authorize the introduction into interstate commerce … of a drug, device, or biological product intended for use in an actual or potential emergency …."); FDCA, Pub. L. No. 75-717, 52 Stat. 1040, 1040 (1938)

Plaintiffs' fifth source, 10 U.S.C. § 980, does meet this threshold requirement, but for the reasons discussed above in Section II.B.2, § 980 isn't enforceable through § 1983. And even if it were, UCHA didn't violate the statute. *See supra* Section II.B.2. Thus, however sliced, Plaintiffs' Spending Clause claim fails.

> **F.**    ***Plaintiffs' unconstitutional-conditions claim (Count V) fails because they have not identified a fundamental right that UCHA burdened.***

The unconstitutional-conditions doctrine "forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Norris v. Stanley*, 567 F. Supp. 3d 818, 822 (W.D. Mich. 2021) (quotation omitted). Plaintiffs assert that to be exempt from the Vaccine Policy, they were forced to relinquish their rights to not wear masks or test for COVID-19. Compl. ¶¶ 244, 372. They also contend that the Vaccine Policy forced them to abandon their "right to refuse" as a condition to keep working for UCHA. *Id.* ¶ 284. But as explained above in Section II.D.1.a, Plaintiffs' self-professed rights to refuse the vaccine, not mask, not test for COVID-19, and continue working in an at-will job don't exist. *See Williams*, 567 F. Supp. 3d at 1227; *Klaassen*, 7 F.4th at 593. Thus, because Plaintiffs fail to "identify[] a fundamental right, Plaintiffs' challenge to the [Vaccine Policy] as an unconstitutional condition necessarily fails." *Legaretta*, 603 F. Supp. 3d at 1071.

> **G.**    ***Plaintiffs' PREP Act claim (Count VI) fails because the PREP Act does not apply.***

As with Plaintiffs' "Informed Consent" claim, Plaintiffs' § 1983 claim based on the PREP Act, Compl. ¶¶ 374–89, fails because Plaintiffs lack any enforceable rights under

---

(described as an Act "[t]o prohibit the movement in interstate commerce of adulterated and misbranded food, drugs, devices, and cosmetics, and for other purposes").

the Act. "The PREP Act is, at its core, an immunity statute; it does not create rights, duties, or obligations." *Khalek v. S. Denver Rehab.*, 543 F. Supp. 3d 1019, 1025 (D. Colo. 2021) (quotation omitted). The only private right of action under the PREP Act is to sue "a covered person for death or serious physical injury proximately caused by [that person's] willful misconduct" related to the administration of public-health countermeasures. *Manyweather v. Woodlawn Manor, Inc.*, 40 F.4th 237, 243 (5th Cir. 2022) (alteration in original) (quoting 42 U.S.C. § 247d-6d(d)(1)). And those claims must be brought in the U.S. District Court for the District of Columbia, and only after exhaustion of administrative remedies. 42 U.S.C. §§ 247d-6d(e)(1), -6e(d). Plaintiffs cannot satisfy these requirements, so they cannot assert a claim under the PREP Act.

Plaintiffs also aver that the PREP Act preempts Colorado's at-will employment laws. *See* Compl. ¶¶ 377, 395. But because the PREP Act doesn't apply here, it has no preemptive effect. *See Hughes v. Terminix Pest Control, Inc.*, 2023 U.S. Dist. LEXIS 136544, at *16 & n.60 (E.D. La. Aug. 7, 2023) (rejecting a PREP Act preemption argument in a similar lawsuit brought by Plaintiffs' counsel).

### H.   *Plaintiffs' implied-right-of-action claim (Count X) fails for lack of an implied right of action*.

Finally, Plaintiffs assert a standalone claim for "Implied Private Right of Action 21 U.S.C. § 360bbb-3." Compl. ¶¶ 413–15. Plaintiffs have no claim under that statute for the reasons given above in Section II.B.1.

### III.   Plaintiffs' state-law claims are barred by the CGIA and fail to state a claim under Rule 12(b)(6).

Plaintiffs' state-law claims are procedurally barred and substantively deficient.

**A.      *The CGIA bars Plaintiffs' tort claims (Counts VIII and IX) because Plaintiffs did not provide timely notice of their claims.***

The Court should dismiss Plaintiffs' tort claims (Counts XIII and IX) for failure to abide by the CGIA's notice requirement. *See* C.R.S. § 24-10-109(1). Under the CGIA, "[a]ny person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment … shall file a written notice … within one hundred eighty-two days after the date of the discovery of the injury." *Id.* This is a "jurisdictional prerequisite" to suit, and failure to comply is an absolute bar. *Id.*

Importantly, "[t]he application of the notice-of-claim provision" doesn't "turn on the existence of immunity." *Middleton v. Hartman*, 45 P.3d 721, 731 (Colo. 2002). Whether or not a public entity or its employees enjoy CGIA immunity, a plaintiff must comply with the CGIA's notice provision. *Id.*; *see also Brock v. Nyland*, 955 P.2d 1037, 1041–45 (Colo. 1998) (CGIA immunity-exception claims require notice), *overruled in part on other grounds by Finnie v. Jefferson Cnty. Sch. Dist. R-1*, 79 P.3d 1253, 1258 (Colo. 2003). And *formal* notice is required; even a governmental entity's actual knowledge of a potential claim is insufficient. *Mesa Cnty. Valley Sch. Dist. No. 51 v. Kelsey*, 8 P.3d 1200, 1205 (Colo. 2000). Compliance with the notice provision must be apparent from the face of the complaint. *See Aspen Orthopaedics & Sports Med., LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832, 840–42 (10th Cir. 2003).

Plaintiffs haven't satisfied this jurisdictional prerequisite. The Complaint doesn't mention the CGIA, let alone its notice-of-claim provision. The Vaccine Policy specified that all employees not in compliance would face disciplinary action in late fall 2021. Compl. ¶ 194(3). Because Plaintiffs' alleged terminations are the injuries on which their tort claims depend, the deadline for Plaintiffs to provide notice of their claims passed in

early to mid-2022.[16] The UCHA Defendants received no CGIA notice. Accordingly, the Court should dismiss Plaintiffs' state-law tort claims.

> **B.**    ***Plaintiffs' contract claim (Count VII) fails because Plaintiffs were not intended beneficiaries of a contract, and UCHA did not breach a contract.***

To devise a contract claim, Plaintiffs invoke the third-party-beneficiary doctrine, under which "intended" beneficiaries directly benefiting from a contract can sue for breach. *Quigley v. Jobe*, 851 P.2d 236, 238 (Colo. App. 1992).[17] They assert that the COVID-19 Vaccination Program Provider Agreement, EUA Scope of Authorization letter, and various statutes and regulations vest third-party-beneficiary rights in them to choose whether to participate in a federally funded EUA test and to avoid losing benefits for refusing to participate. Compl. ¶¶ 391–92. By implementing the Vaccine Policy, their theory goes, the UCHA Defendants deprived Plaintiffs of those benefits. *Id.* ¶ 393.

Their proposition fails. Plaintiffs aren't intended beneficiaries of any applicable contract. *See Frisone v. Deane Auto. Ctr.*, 942 P.2d 1215, 1217 (Colo. App. 1996). "Parties that benefit from a government contract are generally assumed to be incidental beneficiaries[] and may not enforce the contract absent a clear intent to the contrary." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999). Here, the COVID-19 Vaccination Program Provider Agreement is a contract between UCHA and the CDC by which UCHA received free vaccine doses, Compl. Ex. A, without "clear intent" to "direct[ly] benefit" Plaintiffs, *Klamath*, 204 F.3d at 1210–11.

---

[16] For example, 182 days past October 31, 2021—the date by which noncompliant employees would face disciplinary action per the Vaccine Policy—is May 1, 2022.

[17] The Court should assess Plaintiffs' third-party-beneficiary claim under Colorado contract law. *See Anderson v. Eby*, 998 F.2d 858, 864 (10th Cir. 1993).

The only condition pertaining to patients is that "[b]efore administering COVID-19 Vaccine, Organization must provide an approved [EUA] fact sheet or vaccine information statement (VIS), as required, to each vaccine recipient." Compl. Ex. A at 2. Therefore, before UCHA *medical providers* administer vaccines to their *patients*, they must provide certain information to them. Compl. ¶¶ 119, 184–85. But Plaintiffs never claim to have received the vaccine, so they had no right to receive an EUA fact sheet. They thus lack third-party beneficiary rights under the Provider Agreement.

Plaintiffs also don't identify any federal statutes or regulations conferring third-party contract rights on them. 45 C.F.R. Part 46 is irrelevant because UCHA's employees "are not participants in a human trial." *See Bridges*, 543 F. Supp. 3d at 528. Nor do Section 564 or the EUA Scope of Authorization letters confer contract rights. Although medical providers are to inform "individuals to whom the [vaccine] is administered … of the option to accept or refuse administration," 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III), Plaintiffs don't allege that UCHA administered them a vaccine. Regardless, Section 564 doesn't afford a private right of action and so cannot create contractual rights. *See supra* Section II.B.1. The Court should dismiss this claim.

### C.   *Plaintiffs' "employment torts" claim (Count VIII) fails because Plaintiffs weren't terminated in violation of public policy.*

Plaintiffs' eighth claim is a vague reference to unidentified "Colorado State Common Law Employment Torts." Compl. ¶¶ 397–408. That's not a cognizable claim. Regardless, the UCHA Defendants committed no employment torts.

The only discernible employment claim in Plaintiffs' Complaint is one for wrongful discharge in violation of public policy. *Id.* ¶ 406 n.100. To state it, Plaintiffs must plausibly allege that they (1) refused to engage in conduct that would violate public

policy, or (2) engaged in conduct that is protected or encouraged as a matter of public policy." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666–67 (Colo. 1999). But that public policy must "affect[] society at large rather than a purely personal or proprietary interest of the plaintiff or employer, lead[] to an outrageous result clearly inconsistent with a stated public policy, or strike[] at the heart of a citizen's social rights, duties, and responsibilities." *Crawford Rehab. Servs. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997) (citations omitted).

Plaintiffs declare a public policy of promoting "the right to bodily integrity." Compl. ¶ 136. Yet their purely personal interests in refusing the vaccine, masks, or testing *contravene* public policy by increasing the risk of COVID-19 transmission. Colorado has always signaled its public policy of fighting COVID-19. *See In re Interrogatory on House Joint Resol. 20-1006*, 500 P.3d 1053, 1057–58 (Colo. 2020) (cataloging the state's early statewide pandemic response). Indeed, the Department of Public Health & Environment's healthcare-worker vaccine mandate is a strong indication of Colorado's public policy to promote COVID-19 mitigation measures.[18] Thus, even if Plaintiffs' interests were valid, preventing COVID-19 exposure is more compelling. *E.g.*, *Roman Cath. Diocese*, 141 S. Ct. at 67 ("Stemming the spread of COVID-19 is unquestionably a compelling interest …."); *Doe v. Mills*, 566 F. Supp. 3d 34, 58 (D. Me.) ("[T]he vaccine mandate is directly aimed at promoting the public interest.") (collecting cases), *aff'd*, 16 F.4th 20 (1st Cir. 2021).[19] The Court should dismiss this claim.

---

[18] CDC's healthcare-worker vaccine mandate is also evidence of a shared public policy against the spread of COVID-19. Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555, 61576–77 (Nov. 5, 2021).

[19] Also, discrimination, retaliation, and hostile-work-environment claims must be tied to a protected class like race or sex. *Colo. C.R. Comm'n v. Big O Tires, Inc.*, 940 P.2d 397,

### D.   *Plaintiffs' outrageous-conduct claim (Count IX) fails.*

Plaintiffs allege that UCHA's Vaccine Policy caused them severe emotional distress. Compl. ¶ 410. This claim is barred under two statutes and fails regardless.

*First*, the Workers' Compensation Act of Colorado, C.R.S. § 8-40-101 *et seq.*, provides the "exclusive remedy" for employees claiming intentionally inflicted emotional distress arising out of and in the course of their employment. *See, e.g.*, *Hoffsetz v. Jefferson Cnty. Sch. Dist.*, 757 P.2d 155, 159 (Colo. App. 1988); C.R.S. § 8-41-301(1) (the Act's compensation scheme is "in lieu of any other liability to any person"). Because Plaintiffs allege to have suffered emotional distress from UCHA's Vaccine Policy, which was part of their employment, any remedy lies solely in workers' compensation. *See Smith v. Colo. Interstate Gas Co.*, 794 F. Supp. 1035, 1042–43 (D. Colo. 1992).

*Second*, the CGIA bars damages for outrageous conduct against any public entity. C.R.S. § 24-10-114(4)(a). This includes UCHA and the UCHA Executives in their official capacities. *Hutton v. Memorial Hosp.*, 824 P.2d 61, 65 (Colo. App. 1991) (barring outrageous-conduct claim against municipal defendants under CGIA).

In any case, Plaintiffs' claim fails on the merits because "[t]he level of outrageousness required to constitute extreme and outrageous conduct is extremely high." *Reigel v. SavaSeniorCare LLC*, 292 P.3d 977, 990 (Colo. App. 2011). Employee COVID-19 vaccination mandates don't give rise to claims for intentional infliction of

---

400 (Colo. 1997) (discrimination); *Molla v. Colo. Serum Co.*, 929 P.2d 1, 2–3 (Colo. App. 1996) (retaliation); *Robinson v. City & County of Denver*, 30 P.3d 677, 682 (Colo. App. 2000) (hostile work environment). Vaccination status isn't a recognized protected class, so being fired for refusing to take a vaccine cannot support an employment claim. Finally, Plaintiffs sprinkle in other legal buzzwords—coercion, undue influence, and duress—but these aren't elements of any Colorado employment tort. They're also legal conclusions that the Court should disregard.

emotional distress. *E.g.*, *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 469 (M.D. Pa. 2022) ("[I]t is not extreme and outrageous for a health system to present employees with the choice of a jab, a swab, or their job."). The Court should dismiss Plaintiffs' outrageous-conduct claim.

## IV.   Plaintiffs' request for punitive damages is improper.

Finally, Plaintiffs request punitive damages, Compl. ¶¶ 417–20, but punitive damages are unavailable to them.

### A.   *Punitive damages are unavailable for Plaintiffs' § 1983 claims.*

Punitive damages aren't recoverable against public entities or their employees in their official capacities under § 1983. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Davis v. W. Cmty. Hosp.*, 755 F.2d 455, 459 (5th Cir. 1985) (reversing punitive-damages award against public hospital). As for Plaintiffs' individual-capacity § 1983 claims, to sufficiently plead entitlement to punitive damages, Plaintiffs must *plausibly* allege that the UCHA Executives acted with "reckless or callous indifference to the federally protected rights of others" or an "evil motive or intent." *Eisenhour v. Weber County*, 897 F.3d 1272, 1280 (10th Cir. 2018) (quotation omitted). Although Plaintiffs recite the applicable terminology, Compl. ¶¶ 418–20, they don't make the "adequate threshold showing" necessary to avoid dismissal, *Trujillo v. Milyard*, 2008 U.S. Dist. LEXIS 122670, at *13 (D. Colo. July 11, 2008) (quotation omitted).

*First*, Plaintiffs fail to allege that the UCHA Executives violated *any* federally protected right. *See supra* Section II. And *second*, Plaintiffs' Complaint lacks allegations that satisfy the "additional required *mens rea*—that [the UCHA Executives] *perceived* that [they were] violating [Plaintiffs'] federal rights." *Eisenhour*, 897 F.3d at 1280 (emphasis added). Plaintiffs simply haven't alleged any viable basis for an award of

punitive damages under § 1983, warranting striking their request. *See, e.g.*, *Thornton v. Kaplan*, 937 F. Supp. 1441, 1450 (D. Colo. 1996).

   **B.**   ***Punitive damages are unavailable for Plaintiffs' state-law claims.***

   Colorado law precludes punitive damages in any suit against a public entity. C.R.S. § 24-10-114(4)(a). The Court should thus strike Plaintiffs' request for punitive damages on all state-law claims against UCHA and the UCHA Executives in their official capacities. *E.g.*, *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 81 F. Supp. 2d 1090, 1101 (D. Colo. 2000).

   Moreover, under Colorado law, punitive damages "may not be included in any initial claim for relief" and "may be allowed by amendment to the pleadings only after the exchange of initial disclosures." C.R.S. § 13-21-102(1.5)(a). Including a request for punitive damages in an original complaint is grounds for striking the request. *Klein v. State Farm Fire & Cas. Co.*, 2009 U.S. Dist. LEXIS 6366, at *1–2 (D. Colo. Jan. 29, 2009) (applying § 13-21-102(1.5)(a)). The Court should do so here.

<u>**CONCLUSION**</u>

   In sum, Plaintiffs' Complaint is in all respects fatally flawed. The UCHA Executives in their individual capacities are entitled to qualified immunity, so the Court should dismiss the federal claims against them under Rule 12(b)(6). Plaintiffs' Section 1983 claims are untimely, and Plaintiffs fail to state those claims under Rule 12(b)(6). Plaintiffs' state-law contentions either are jurisdictionally barred by the CGIA, fail to state a claim, or both. And Plaintiffs cannot seek punitive damages. For those reasons, the UCHA Defendants respectfully request that the Court dismiss Plaintiffs' Complaint with prejudice.

Dated: January 12, 2024

Respectfully submitted,

*/s/ Christopher M. Jackson*
Andrew C. Lillie
Christopher M. Jackson
Nicholas W. Katz
Aja R. Robbins
Nathan A. Lilly
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
aclillie@hollandhart.com
cmjackson@hollandhart.com
nwkatz@hollandhart.com
arrobbins@hollandhart.com
nalilly@hollandhart.com

*Counsel for Defendants University of Colorado Hospital Authority, Elizabeth Concordia, Margaret Reidy, and Michael Randle*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2024, I have caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.


*/s/ Christopher M. Jackson*

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

JESSICA SWEENEY, *et al,*                      *
                                               *
      *Plaintiffs*,                       *
                                               *
VERSUS                                         *   NO. 1:23-CV-2451-NYM-MDB
                                               *
UNIVERSITY OF COLORADO HOSPITAL                *
AUTHORITY, ELIZABETH CONCORDIA,                *
MARGARET REIDY, MICHAEL RANDLE,                *
JILL HUNSAKER RYAN, D. RANDY                   *
KUYKENDALL, PATRICIA HAMMOND,                  *
RAYMOND ESTACIO, DANIEL PASTULA,               *
SEAN TURK,TOM BUTTS, EVELINN                   *
BORRAYO, KENDALL ALEXANDER                     *
                                               *
      *Defendants*,                       *
*   *   *   *   *   *   *   *   *   *   *   *   *

## <u>PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS</u><br><u>FILED BY CDPHE DEFENDANTS[1]</u>

      The executive branch of the federal government purchased all COVID-19 drugs and recruited States to assist in distributing the federal property through each State's Immunization Information Systems (IIS). (Doc 1-2) The executive branch was bound to comply with 21 U.S.C. §360bbb-3, 10 U.S.C. § 980, 45 C.F.R. §§ 46.122,116, and the Belmont Report (45 C.F.R. §§ 46.101(c),(i)), and, because the federal property was also a PREP Act countermeasure, they had to ensure persons were involved only under "voluntary" conditions (42 U.S.C. § 247d-6e(c)). The executive branch chose to use a "state, local, or territorial immunization's cooperative agreement with CDC" because each

---

[1] Throughout this opposition, to preserve space, CDPHE refers to Jill Hunsaker Ryan, D. Randy Kuykendall, Patricia Hammond, Raymond Estacio, Daniel Pastula, Sean Turk, Tom Butts, Evelinn Borrayo, and Kendall Alexander.

state had a Federal Wide Assurance agreement to comply with the same laws. (Doc 1-2)

The State of Colorado willfully participated in the program, owed constitutional obligations to Plaintiffs, and could not delegate its State function to UCHealth without also delegating its constitutional obligations. CDPHE required all volunteer organizations to become authorized by the State to receive, administer, and bill for administering federal property.[2] To become authorized, the State required, at a minimum, all persons to sign the Provider Agreement, thereby incorporating it into State policy. *Id*. The only drugs available consisted of drugs and biologics under EUA and the PREP Act. The Provider Agreement placed an additional layer of duties upon the State and did not exempt the State from its duties under the EUA statute or the PREP Act. (Doc 1-1)

CDPHE issued its Rule ("Rule") outside the scope of its discretionary authority because it required medical facilities to terminate Plaintiffs employment should they exercise their right under the EUA statute to refuse the administration of the federal COVID-19 EUA drugs. This was a violation of paragraph 12(a) of the Provider Agreement. Therefore, CDPHE knew or should have known that it lacked authority to require the exclusive use of EUA/PREP Act investigational drugs for compliance with the Rule.

Instead, shockingly, CDPHE implies in its Motion to Dismiss that it had the authority to misbrand the legally distinct unlicensed drug, "Pfizer-BioNTech COVID-19 Vaccine," as if it were the same as the legally distinct FDA-licensed drug "COMIRNATY®" because they shared the same formulation on paper. CDPHE essentially asserts, without citing to any statute or case, that it can violate federal law and deny the Plaintiffs their right to

---

[2] Exhibit A, CDPHE Website from September 2021.

refuse EUA/PREP Act drugs without losing a benefit, such as continued use of their state-issued medical licenses and continued employment in the healthcare industry.

CDPHE does not dispute that the only drugs available to Plaintiffs for compliance with the Rule were federally owned, FDA-classified as investigational, under EUA authorization, and countermeasures under the PREP Act. Moreover, CDPHE does not dispute that its authority to issue its Rule was preempted by Congress because it conflicted with the CDC Vaccination Program and applicable laws, (Doc 1, Section XV).

CDPHE's citation to cases holding that states had a lawful right to issue a "vaccine mandate" is inapplicable because Plaintiffs do not argue otherwise. Plaintiffs only assert the right to enjoy the right to work as medical professionals under the State's licensing requirement without being subjected to EUA/PREP Act drugs.

Finally, CDPHE had a ministerial duty to perform under the CDC Vaccination Program and the Fourteenth Amendment—they failed in both respects. A failure in their ministerial duty prevents qualified immunity from being granted. CDPHE was authorized and empowered to conduct the affairs of the CDC COVID-19 Vaccination Program.

***Objection to Request for Judicial Notice.*** Plaintiffs object to CDPHE's request for judicial notice (FN 5) on the grounds that the data cited is unreliable and is contested by Plaintiffs. The CDC's website itself states that only 5.1% of reported Covid hospitalizations occurred in people with no comorbidities. (https://www.cdc.gov/pcd/issues/2021/21_0123.htm)[3] Moreover, using the CARES Act,

---

[3] Plaintiffs request that this Court take judicial notice of the CDC's website information at (https://www.cdc.gov/pcd/issues/2021/21_0123.htm).

the federal government offered huge financial incentives to hospitals and doctors who coded patients as "Covid" cases. Thus, the number of reported Covid cases, hospitalizations, and deaths is unreliable. Additionally, a significant number of hospital deaths were not caused by Covid itself, but rather by the hospital protocol of administering remdesivir to Covid positive hospital patients, even after specific rejection of said drug by the patient. As a result, Plaintiffs urge this court to require Defendants to prove the controversial and contested statistics upon which they rely because Plaintiffs intend to disprove them with expert testimony and documentation at trial.

**Response to CDPHE's Arguments.**  Plaintiffs' theory is not "novel" because the right to accept or refuse under the EUA statute and the right to be educated about the voluntary nature of PREP Act programs have existed since 2003 and 2005, respectively. Additionally, CDPHE continues to focus on the Plaintiffs' employment relationship with UCHA, which is misplaced because the source of the duties being sued upon is not Plaintiffs' employment relationship with UCHA, but Defendants' voluntary assumption of duties under the Provider Agreement, which incorporates the EUA statute and the PREP Act. While the penalties and punishment may have been exacted by UCHA as an employer, the duty to NOT penalize Plaintiffs comes from the EUA statute and PREP Act (i.e., UCHA had no right to penalize non-employees who refused a COVID shot, so UCHA had no right to deny its employees that same "equal protection" of the laws when exercising that same right.)

**Interchangeability of COMIRNATY® and Pfizer-BioNTech COVID-19 Vaccine**

CDPHE's statement on p. 4 that "The August 23rd EUA stated the Pfizer mRNA

vaccine is the identical formulation as the COMIRNATY vaccine and may be used interchangeably" is misleading and incomplete because it omits the crucial "legally distinct" language in footnote 8 of that very same letter and further is irrelevant to Plaintiffs' claims because CDPHE focuses on chemical formulations and not each drug's label. A drug is always regulated according to its labeling and applicable laws. (21 U.S.C. 331) The FDCA laws applicable to vials labeled as COMIRNATY® are entirely different from EUA laws applicable to the "Pfizer-BioNTech COVID-19 Vaccine."

In fact, the Director of the Center for Biologics Evaluation and Research ("CBER"), United States Food and Drug Administration ("FDA"), Mr. Peter Marks submitted a declaration in the USDC, NDFL case of *Coker v. Austin*, 3:21-cv-1211, that:

> "FDA determined that '[t]he licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns.' FDA provided this information in the authorization letter to make clear that pharmacies and other healthcare practitioners could provide the vaccination series to recipients using Pfizer- BioNTech, Comirnaty, or both (e.g., first dose of Pfizer-BioNTech followed by second dose of Comirnaty, or vice versa), since the formulation was the same and both products are made by the same manufacturer under current good manufacturing practice requirements. FDA included the interchangeability information in the authorization letter to avoid the unnecessary operational complications that may have resulted if pharmacies or other healthcare practitioners had believed that individuals who had received Pfizer-BioNTech for the first dose were not authorized to receive Comirnaty for the second dose, or vice versa." (¶ 10)

> "While FDA determined Comirnaty and the Pfizer-BioNTech COVID-19 vaccine are medically interchangeable, there are legal distinctions between BLA-approved and EUA-authorized products. For example, products approved under BLAs are required to have the labeling that was approved as part of the BLA, whereas products authorized under the EUA would have the EUA labeling, and there may also be differences in manufacturing sites for the BLA and EUA vaccine." (¶ 11) (See Exhibit B, Declaration of Marks)

CDPHE has cited to no authority that medical interchangeability means legal interchangeability.

*Plaintiffs' Claims Are Not Time-Barred.* On p. 4 at footnote 6, CDPHE incorrectly asserts that Plaintiffs' claims are time-barred because "Plaintiffs knew they could lose their jobs no later than September 3, 2021." CDPHE's use of the word "could" means "conditional." CDPHE mischaracterizes *Industrial Constructors v. Bu. of Reclamation,* 15 F.3d 963, 969 (10th Cir. 1994), in which the 10th Circuit, like many other Circuits, held that "The statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of **the injury** which is the basis of his action" (emphasis added). Plaintiffs were not injured the day CDPHE issued their Rule. Plaintiffs were injured the day they were terminated, and no Plaintiff could have sued Defendants for monetary damages until they sustained injury. CDPHE provided Plaintiffs with the condition that if they received the unlicensed drug (the only one "available") by October 31, 2021, they would comply with the Rule. Thus, if Plaintiffs decided to be injected on October 30, 2021, they would have sustained no economic damage and would not have been able to file a lawsuit for those non-existent damages on September 3, 2021, CDPHE's imaginary statute of limitations.

*Research Activities.* Throughout its opposition (pp. 5, 6, 11, 12, 14,15, 20) CDPHE mischaracterizes "medical research on humans" in an effort to obfuscate the issue, but the CDC Vaccination Program, as designed, involves medical research involving human subjects. Plaintiffs were very detailed in Doc 1, Section VII, on the definition of "research." Rather than repeat those allegations here, see Doc 1, ¶¶36–49.

Put simply, while the CDC Vaccination Program was not created for the "purpose" of research, it meets the definition of research as defined under 45 CFR § 46.102(1). In fact, CDPHE's website from September 2021 identifies the data being collected, the data CDPHE sends daily to the CDC, and the reporting requirements. Also, fitting nicely with the Provider Agreement, CDPHE's website confirms the use of Colorado's Immunization Information Systems (CIIS) "to collect and consolidate COVID-19 vaccine administration data from all enrolled providers." Moreover, Peter Marks confirmed that COMIRNATY® was approved based on clinical trials AND "safety information from the millions of vaccine doses administered under the emergency use authorization ("EUA") for the Pfizer-BioNTech Covid-19 vaccine." (Exhibit B, Marks, ¶ 6)

*Curtis v. Inslee.*  Throughout its Opposition (pp. 2, 9, 15, 18, 21, 24, 25, 26, 28), CDPHE refers to the *Curtis v. Inslee* case. In addition to this out-of-state, district court case being nonbinding on this court, its rulings are currently the subject of a Motion to Alter or Amend, and, failing that, will be appealed to the 9th Circuit Court of Appeals, as undersigned counsel represents the plaintiffs. Moreover, the *Curtis* court did not rule on whether the drugs were federally funded or investigational under EUA, PREP Act, or the CDC Vaccination Program. The failure of the *Curtis* court to accept the Plaintiffs' allegations and federal government documentation as true caused the court to rule in error.

*COMIRNATY® v Pfizer-BioNTech COVID-19 Vaccine.*  Drugs are regulated according to their labeling. (21 U.S.C. 331) Calling the products "Pfizer's vaccine" only sows confusion. "Pfizer BioNTech vaccine" (lowercase v) refers to Pfizer's vaccine

technology. "Pfizer-BioNTech COVID-19 Vaccine" (upper case V) refers to Pfizer's formal name for its investigational new drug under application 19736. "COMIRNATY®" is Pfizer's FDA-licensed COVID-19 drug.

On p. 11, CDPHE asserts that the formulations of COMIRNATY® and Pfizer-BioNTech COVID-19 Vaccine are identical, but the products' formulations are irrelevant because drugs are governed by their labels, not their formulations. As a "cabinet-level department" that provides public health services, CDPHE knows, or should know, that it is a violation of federal misbranding laws to present an investigational drug as though it is a licensed drug with the intent to cause an individual to consent to the drug's administration. CDPHE is literally asking this court to upend 100 years of drug labeling laws and affirm that CDPHE can misbrand the Pfizer-BioNTech COVID-19 Vaccine simply because another legally distinct drug, COMIRNATY®, was FDA-licensed on paper, but not available in the marketplace.

CDPHE's website from September 2021 (Exhibit A), actually acknowledges that EUA drugs are not to be used beyond the scope of what is described in the EUA:

> Therefore, if a vaccine is authorized for use under an EUA, any use beyond the scope of what is described in the EUA would not be eligible for applicable liability protections under the PREP Act…

Thus, if a provider used the EUA version as if it were COMIRNATY®, it would be using the EUA version "beyond the scope of what is described in the EUA." (Exhibit A, p. 23)

Pfizer-BioNTech COVID-19 Vaccine was manufactured, distributed, administered, and regulated under investigational drug laws, the EUA statute, and according to the terms of the Provider Agreement. One cannot apply FDA-licensing of COMIRNATY®

retroactively to vials of a legally distinct drug that are already manufactured and in the marketplace, which is why CDPHE offers no legal support for its position that it should be allowed to violate federal drug labeling laws. CDPHE's assertion, if affirmed by this court, would automatically and retroactively transform the unlicensed version of each licensed drug in this nation into a licensed drug and immediately upend the legal and regulatory environment of a $600 billion pharmaceutical industry.

Moreover, CDPHE's implication that the Pfizer-BioNTech COVID-19 Vaccine was also FDA-licensed the same day as COMIRNATY® implies that the HHS Secretary has violated federal law for more than two years (August 23, 2021 through present) because the Secretary continued issuing EUAs for the Pfizer-BioNTech COVID-19 Vaccine drug for emergency use. Such an act is prohibited if a licensed drug (COMIRNATY®) exists in the marketplace meeting that emergency use. [4] Defendants cannot cite any FDA documentation stating that the Pfizer-BioNTech COVID-19 Vaccine was FDA-licensed because COMIRNATY® was FDA-licensed. The assertion is baseless and frivolous.

Moreover, CDPHE knew or should have known, that the FDA informed States on August 23, 2021, immediately after it licensed COMIRNATY®, that they could not treat the Pfizer-BioNTech COVID-19 Vaccine drug differently after that date simply because COMIRNATY® was licensed. Specifically, the FDA's unambiguous intent is outlined in its August 23, 2021, EUA letter for the "Pfizer-BioNTech COVID-19 Vaccine" drug (Doc 46-3) in which the FDA informed Defendants that there are two "legally distinct" drugs under the EUA, stating, "COMIRNATY (COVID-19 Vaccine, mRNA) is the same formulation as

---

[4] 21 U.S.C. §360bbb-3(c)(3)

the Pfizer- BioNTech COVID-19 Vaccine" (emphasis added) (Doc 46-3, p.2, last paragraph) and "the products are legally distinct" (Doc 46-3, FN 8). In that same letter, the FDA issued its "Criteria for Issuance of Authorization" (Doc 46-3, p.5) because, among other things,

> "There is no adequate, approved, and available alternative to the emergency use of Pfizer-BioNTech COVID-19 Vaccine. Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA. Additionally, there are no products that are approved to prevent COVID-19 in individuals age 12 through 15, or that are approved to provide an additional dose to the immunocompromised population described in this EUA."

On p. 10 of that same letter (Doc 46-3, Letters P, R, X), the FDA required the following:

> P.      "Emergency response stakeholders [5] [i.e., UCDPHE] will ensure that vaccination providers [6] [i.e., UCHealth] within their jurisdictions are aware of this letter of authorization, and the terms herein and any subsequent amendment that might be made to the letter of authorization, **instruct** them about the means through which they are to obtain and administer the vaccine under the EUA, and

---

[5] "For purposes of this letter, "emergency response stakeholder" refers to a public health agency and its delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundary lines (e.g., city, county, tribal, territorial, State, or Federal), or functional (e.g., law enforcement or public health range) or sphere of authority to administer, deliver, or distribute vaccine in an emergency situation." (Doc 46-3, FN 12)

[6] "For purposes of this letter, "vaccination provider" refers to the facility, organization, or healthcare provider licensed or otherwise authorized by the emergency response stakeholder (e.g., non-physician healthcare professionals, such as nurses and pharmacists pursuant to state law under a standing order issued by the state health officer) to administer or provide vaccination services in accordance with the applicable emergency response stakeholder's official COVID-19 vaccination and emergency response plan(s) and who is enrolled in the CDC COVID-19 Vaccination Program." (Doc 46-3, FN 13)

> ensure that the authorized labeling is made available to vaccination providers through appropriate means." (Emphasis added)
>
> R.    "Vaccination provider will administer the vaccine in accordance with the authorization."
>
> X.    "All descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech COVID-19 Vaccine **clearly and conspicuously shall state that: This product has not been approved or licensed by FDA**, but has been authorized for emergency use by FDA…" (emphasis added)

The Provider Agreement also states, "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine" (emphasis added) (Doc 1-1, Provider Agreement, p.3, Line 12(a)). Therefore, CDPHE already knew or should have known that parties recruited to participate with it in distributing the federal COVID-19 drugs had to comply with "any EUA" issued by the FDA. Therefore, the FDA's licensing of COMIRNATY® has no bearing on the instant case because Pfizer did not manufacture any COMIRNATY®, and Defendants were informed that they could not administer Pfizer-BioNTech COVID-19 Vaccine any differently after August 23, 2021, than they did before that date. Moreover, the FDA expressly informed CDPHE that "Pfizer Inc. must submit to Investigational New Drug (IND) application number 19736 (letter G)" for the Pfizer-BioNTech COVID-19 Vaccine drug.  An investigational new drug is not an FDA-licensed drug, and the FDA's intent is assigned by the drug's labeling and not its formulation. CDPHE's implication that the two drugs are legally the same is without legal merit. Moreover, at no time did the FDA, CDC, HHS, or Pfizer state that the Pfizer-BioNTech COVID-19 Vaccine drug was legally the same as COMIRNATY®.

Therefore, CDPHE's claim that "Plaintiffs had available a fully approved, and therefore not 'investigational,' vaccine available before they faced disciplinary action" is irrefutably false. CDPHE should have known, given its authority to regulate all health-related matters within the State, that Pfizer must continue to submit data to its Investigational New Drug (IND) application number 19736. If the Pfizer-BioNTech COVID-19 Vaccine drug was not investigational as CDPHE asserts, then FDA would not have instructed Pfizer to continue reporting to its IND application number.

To the extent CDPHE is asserting that COMIRNATY® was physically available to the Plaintiffs, Plaintiffs can dispose of that fallacy.  An investigational new drug (IND) is assigned an identification number (e.g., IND 19736). By contrast, an FDA-licensed drug made available for general commercial marketing is assigned a National Drug Code (NDC) that must be printed on the drug vials, containers, and promotional materials. (21 C.F.R. § 201) Pfizer received a license for its vaccine technology, and the FDA assigned it the marketing name "COMIRNATY" under NDC 0069-1000-XX.  According to Exhibit C, p. 4, dated September 28, 2022, COMIRNATY® is listed in the section for NDCs "that will not be manufactured or made available in the near term even if authorized."[7]

---

[7] While external to the Complaint, Exhibits A, B, and C are properly subject to consideration on a motion to dismiss. See *Metzler Investment GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1061 (9th Cir. 2008) Judicial notice is proper where the evidence "is not subject to reasonable dispute[.]" Fed. R. Evid. 201(b). A court on a motion to dismiss may consider "records and reports of administrative bodies," *Mack v. S. Bay Beer Distribs., Inc*., 798 F.2d 1279, 1282 (9th Cir. 1986), the content of state and federal regulations, *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1132 (9th Cir. 2021), and public records and government documents available from reliable sources on the Internet, *U.S. ex rel. Modglin v. DJO Glob. Inc*., 114 F. Supp. 3d 993, 1008 (C.D. Cal. 2015); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information on the websites of two school districts).

Pfizer confirmed CDC's report and is quoted on p. 4 of Exhibit C (Second Row, Last Column) stating,

> "Pfizer received initial FDA BLA license on 8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed two new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename. **These NDCs will not be manufactured**. Only NDCs for the subsequently BLA-approved tris-sucrose formulation will be produced." (Emphasis added)

Pfizer informed the CDC that it never manufactured COMIRNATY® and would not manufacture it. That is why the FDA continued issuing EUAs for Pfizer-BioNTech COVID-19 Vaccine – because Pfizer was not manufacturing, and did not manufacture, COMIRNATY® at any time prior to CDPHE's Rule deadline.

***Responses to Various Arguments by CDPHE.*** CDPHE mischaracterizes Plaintiffs' claim when stating on p. 12, "there is no unfettered right to continued employment without conditions such as vaccination." The problem with this argument is that CDPHE fails to distinguish between "vaccination with an FDA-licensed vaccine" and "vaccination with an EUA/PREP Act drug." Plaintiffs have a right to not be penalized when exercising the option to refuse an EUA drug. Defendants were completely preempted from issuing its Rule conflicting with that right, which Defendants do not dispute. Defendants only claim the right to misbrand the drugs.

CDPHE cites to *Valdez v. Grisham*, 559 F. Supp. 3d 1161 (D.N.M. 2021) on p. 12 as proof of their assertions that the EUA drug was no longer an EUA drug because COMIRNATY® received its license. Put another way, CDPHE claims that Pfizer-BioNTech COVID-19 Vaccine, an EUA drug, was no longer an EUA drug because a legally distinct

drug, COMIRNATY®, received its FDA-license, despite the FDA issuing another EUA to Pfizer-BioNTech COVID-19 Vaccine on the same day COMIRNATY® was licensed. In any event, the *Valdez* court did not consider the facts as presented in the instant action and thus is inapplicable.

CDPHE cites on p. 12 to *Bridges v. Methodist Hosp.*, 21-20311, 2022 WL 2116213 (5th Cir. June 13, 2022), which does not apply because the 5th Circuit only answered the question of the *Sabine Pilot* doctrine holding that an employee does not commit an unlawful act if they do decide to receive an EUA drug. That is not the question at bar.

CDPHE cites on p. 12 to the unpublished *Kheriaty v. Regents of the Univ. of Cal.*, No. 22-55001, 2022 WL 17175070, at *1 (9th Cir. Nov. 23, 2022) but the ruling applied to questions of vaccine mandate authority only and not the facts as presented in the instant action.  Similarly, CDPHE cites *Norris v. Stanley*, No. 1:21-CV-756, 2022 WL 247507, at *5 (W.D. Mich. Jan. 21, 2022) and *Jensen v. Biden*, No. 4:21-CV- 5119-TOR, 2022 WL 18860405 but those courts only considered the authority to issue a mandate, not the authority to require a person to inject an EUA/PREP Act product into their bodies.

CDPHE uses vague wording on p. 13 when it states, "First, as noted above, the FDA had fully approved the Pfizer vaccine before Plaintiffs were required to receive the vaccine as a condition of their continued employment. That alone makes the EUA Statute inapplicable regarding that vaccine." CDPHE does not define "the Pfizer vaccine," and it uses the inadequate descriptor of "fully approved." Approved for what? Approved for emergency use? Approved for FDA-licensing? Those are two very different things. Whatever CDPHE is saying is inaccurate because the meaning of the sentence cannot

be discerned. The FDA issued a license for commercial marketing to COMIRNATY® and it issued repeat EUAs to Pfizer-BioNTech COVID-19 Vaccine. So, when CDPHE says, "That alone makes the EUA Statute inapplicable regarding that vaccine," the reader is left thoroughly confused. What alone makes the EUA statute inapplicable? Inapplicable to what vaccine? If CDPHE is saying, "The FDA-licensing of COMIRNATY® makes the EUA statute inapplicable to COMIRNATY®," then it would be correct. If CDPHE is saying, "The FDA-licensing of COMIRNATY® makes the EUA statute inapplicable to Pfizer-BioNTech COVID-19 Vaccine, then it is woefully incorrect. But no matter what CDPHE is trying to say, it cannot be reasonably disputed that the only Pfizer product available to Plaintiffs was Pfizer-BioNTech COVID-19 Vaccine. COMIRNATY® was not available. It was not manufactured. So, realizing that it mandated the use of EUA/PREP Act products, CDPHE's only escape is to now try and figuratively peel the FDA label from COMIRNATY® and place it on vials of Pfizer-BioNTech COVID-19 Vaccine. If that were to physically happen, the person would be committing a felony.

CDPHE incorrectly states on p. 13 that "The [EUA] statute imposes obligations only on the Department of Health and Human Services Secretary" The statute specifically states, in pertinent part,

> "**the Secretary**…**shall**, for a person who carries out any activity for which the authorization is issued, **establish** such **conditions** as the Secretary finds…necessary or appropriate to protect the public health." (emphasis added)

Thus, the EUA statute, through the Secretary, imposes conditions on persons who carry out EUA activities to protect public health. The Secretary sets forth his conditions in the EUA Scope of Authorization letter sent to the manufacturer. (Doc 1-3, ¶ P for CDPHE and

¶ R for UCHA) Then, CDPHE and UCHA agreed to comply with those conditions when they entered into the Provider Agreement (Doc 1-2, ¶ 12(a)): "Organization must comply with…any EUA that covers COVID-19 Vaccine." Thus, the CDC Vaccination Program, the Provider Agreement, and the EUA letters work together to impose obligations on not just the Secretary, but every person who carries out an EUA activity.

CDPHE claims on p. 13 that "the EUA Letters issued pursuant to the EUA Statute impose obligations upon only the vaccine manufacturers and those who actually provide the vaccine to recipients." Incorrect, as referenced in the preceding paragraph and in Footnote 3, supra, CDPHE is an "emergency response stakeholder" under the EUA letter, and duties are set forth therein, including Letters O, P, Q, X, and Y. Moreover, since it held the police power of the State to issue licensing requirements, it had ministerial duties to ensure its Rule did not cause the "Organization" (vaccination providers) to violate federal law under letters R, S,T, U, V, W, X, and Y of the EUA letter.

Therefore, by issuing its Rule, CDPHE violated Letter O of the EUA letter ("ensure…distribution and administration, consistent with the terms of this letter and CDC's COVID-19 Vaccination Program,") and Letter P ("instruct [UCHealth] about the means through which they are to obtain and administer the vaccine under the EUA.")

Therefore, CDPHE's claims on page 13 fail because it only had ministerial duties to perform, requiring no discretionary authority, yet failed to perform those duties, causing Plaintiffs to be damaged.

CDPHE's claim on p. 14 that "any failure to comply with its terms would be nothing more than a breach of contract, which cannot form the basis of a § 1983 claim" misstates

Plaintiffs' claims. Plaintiffs do not claim that rights conferred by the Provider Agreement serve as the basis of a § 1983 claim. Rather, the Provider Agreement establishes CDPHE's duty to comply with the EUA statute and the PREP Act, both of which contain rights conferred upon Plaintiffs that do serve as the basis for a § 1983 claim.

CDPHE's claim on p. 14 that the PREP Act only applies to the COVID-19 drugs in the context of providing immunity for injuries caused by the administration of the vaccine is incorrect. As Plaintiffs pled in their Complaint (Doc 1, p.44, Section XV), the PREP Act expressly preempts CDPHE from establishing, enforcing, or continuing in effect any law or legal requirement that is different from, or in conflict with, any requirement under the FDCA, including the option to accept or refuse under 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III). That rights-creating language serves as the basis of an enforceable § 1983 action.

*Talevski, § 1983, and Private Rights of Action.*  CDPHE's analysis on p. 16 of *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) is curious because discussion is limited to its applicability to 10 U.S.C. 980, but Plaintiffs aver that rights-creating language as discussed in *Talevski* exists in both the EUA statute (the option to accept to refuse) and the PREP Act (the right to be informed of the voluntary nature of the program and the right to refuse under the EUA statute), deprivation of which forms the basis of an enforceable § 1983 action.  Moreover, the very recent 7-2 Supreme Court decision in *Talevski* involved the Spending Clause and contracts issued by the federal government under that Clause, having rights creating language for individuals in the spending statute, as in the case at bar.

The *Talevski* Court held,

> Gonzaga sets forth our established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. [citations omitted] Notably, it must be determined that "Congress intended to create a federal right" *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect" *Gonzaga*, 536 U.S., at 283. This paradigm respects Congress's primacy in this arena and thus vindicates the separation of powers. *Id.*, at 286. Id., at 284, 287. Conversely, we have rejected § 1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*, at 290

> We have held that the *Gonzaga* test is satisfied where the provision in question is "phrased in terms of the persons benefited" and contains "rights-creating," individual-centric language with an "unmistakable focus on the benefited class."

The Court held that the "right to be free from . . . any physical or chemical restraints" and the right to advanced notice of discharge provisions of the FNHRA statute "meet[s] this test," stating that "This framing is indicative of an individual "rights-creating" focus. Gonzaga, 536 U. S., at 284."

The *Talevski* Court made clear what CDPHE and UCHA confuse on the issue of private right of action and § 1983. The Court made clear that a private right of action and a § 1983 action are mutually exclusive. If you have one, you can't have the other. The Court held: "the statute lacks any indicia of congressional intent to preclude §1983 enforcement, such as an express private judicial right of action…," meaning that if the statute includes a private right of action, then Plaintiffs could NOT bring a § 1983 action. CDPHE, on the other hand, incorrectly argues that the statute must include a private right

of action in order for Plaintiffs to bring a § 1983 action. That is directly opposite the U.S. Supreme Court's pronouncement on the issue. So, in every place of its brief where it argues that a statute does not provide a private right of action, CDPHE is establishing that that statute is a candidate for a § 1983 action if it contains rights-creating language.

While the federal statutes involved in the instant action and *Talevski* are different, the legal analysis is identical. Plaintiffs at bar claim that Congress created a right for them under 21 U.S.C. 360bbb-3(e)(1)(A)(ii)(III), in pertinent part:

> The Secretary…shall establish…conditions…to ensure that individuals to whom the product is administered are informed…of the option to accept or refuse administration of the product…

This language "unambiguously confers" the right to be informed of the option to accept or refuse administration of the product. Also, it speaks in terms of "individual rights upon a class of beneficiaries" to which the plaintiff belongs. The provision actually uses the word "individuals" when describing to whom the right is conferred. The class of beneficiaries are those contemplating "administration of the product." By describing the right the way it did, Congress intended to create a federal right for the identified class.

CDPHE argues that § 1983 cannot be used for a deprivation of rights under 45 C.F.R. Part 46. However, they cite to *Thomas v. Catlin*, 141 F. App'x 673, 674 (9th Cir. 2005), which was not a § 1983 case, but rather an attempt by a pro se plaintiff to bring an action directly under 45 CFR 46. The 9th Circuit held that to be improper. Citation to *Quarrie v. Wells*, an unpublished New Mexico district court case, is confusing since it does not mention 45 CFR 46. Finally, *Robertson v. McGee*, an unpublished Oklahoma district level case, also confused private right of action and § 1983 claims.

CDPHE'S claim that the PREP Act does not provide a cause of action fails for reasons discussed *supra*.

On p. 19, CDPHE incorrectly asserts that the Spending Clause does not create a § 1983 cause of action. While the Spending Clause itself does not create a cause of action, the conferred rights in any spending legislation do. The option to accept or refuse under the EUA statute applies to any person (CDPHE and UCHA) engaged in the CDC Vaccination Program because the federal government fully funds that program. As such, it is spending legislation, so deprivation of the conferred rights therein provides the basis for a § 1983 action.

CDPHE incorrectly asserts on p. 20 that its Rule did not violate the Fourteenth Amendment's fundamental Equal Protection Clause. 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) provides the option to accept or refuse, and the Rule only applied consequences on the option to refuse in clear violation of federal law and the Equal Protection Clause. Defendants cannot treat persons accepting the administration of the federally funded COVID-19 drugs differently than those who refuse, which its Rule did. Moreover, Plaintiffs do not contest any "vaccine mandate" (i.e., of an available FDA-licensed vaccine), only the requirement to inject the federally funded EUA/PREP Act investigational drugs into their bodies—a right created for them by Congress.   Therefore, Defendants had ministerial duties, not discretionary authority, when issuing its Rule. There is no rational basis for violating executive agreements, federal law, and the federal constitution. *Biden v. Missouri*, 595 U.S. 87, 93 (2022) only considered the President's authority to issue a mandate, not how it might have relied on unlicensed drugs for compliance. Moreover, all

evidence considered was from before August 5, 2021, when the CDC admitted that the COVID-19 "vaccines" did not prevent infection or transmission.  Defendants cannot argue they had a rational basis to violate their legal and contractual duties and penalize Plaintiffs who exercised their federal right to refuse an EUA/PREP Act drug that does not prevent infection or transmission.

Defendants' Rule deprived all persons working in the healthcare industry of their right to use their property (state-issued medical license), which is a violation of their substantive due process rights. Moreover, the Rule deprived persons of their due process rights to seek judicial relief should they sustain injury from using the listed countermeasure as a condition to continue employment under the state's licensing requirements and for a political subdivision of the State. Moreover, the express language of the PREP Act preempts using the State's at-will employment doctrine when used to interfere with the Plaintiffs' option to refuse.

CDPHE's contention on p. 23 that the Rule did not establish an Unconstitutional Condition is incorrect. When CDPHE and UCHA demanded that Plaintiffs inject an EUA/PREP Act drug into their bodies as a condition of employment in a profession licensed by the State, i.e., healthcare, they conditioned the enjoyment of that State privilege upon the forfeiture of the Constitutional rights of due process, equal protection, and bodily autonomy. As previously discussed, the express language of the PREP Act and the Supremacy Clause preempted Defendants from issuing any law interfering with the statute's authority.

Regarding breach of contract, CDPHE incorrectly states that it is not a party to the Provider Agreement. The Provider Agreement states that the Vaccination Program is "part of collaboration under the relevant state, local, or territorial immunization's cooperative agreement with CDC," that "Organization must submit…data through…the immunization information system (IIS) of the state," that "Organization must comply with each relevant jurisdiction's immunization program guidance," and that "the jurisdiction's immunization program is required to create a unique COVID-19 ID for the organization." CDPHE is the Department in Colorado that administers the State's IIS and is the Department responsible for fulfilling the State's requirements under the Provider Agreement. CDPHE's Rule breached the Provider Agreement because it violated Plaintiffs' third-party beneficiary rights, such as the right to be informed of the option to accept or refuse (which CDPHE failed to do), the right to consider that participation without fearing or being subjected to "sanctions," "coercion," or "undue influence, and to consider participation by obtaining medical counseling from participating providers without incurring a fee.

Regarding CDPHE's arguments on p. 26 denying its outrageous conduct, there can be no dispute that CDPHE, as the State's public health department, agreed to participate in the federal government's COVID-19 drug program and coordinate with public and private entities that signed the CDC Agreement but then CDPHE turned around and mandated that those parties commit fraud against the federal government by compelling participation in the CDC Vaccination Program by placing Plaintiffs under moral duress and destroying their careers, lives, finances, health, and emotional well-being,

which is the quintessential definition of "outrageous conduct."

Defendants are not entitled to qualified immunity. "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) citing *Sims v. Adams* (5th Cir. 1976). Defendants enacted the vaccine policy, executed the vaccine policy, and enforced the vaccine policy by terminating the employment of any person exercising their 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) option to refuse.

"As a matter of public policy, qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law (Malley v. Briggs, 475 U.S. 335 (1986)). Defendants were "emergency response stakeholders" required to perform for the State when the State volunteered to distribute the federal COVID-19 drug property under the CDC Agreement and applicable laws. When discussing any matters pertaining to the Pfizer-BioNTech COVID-19 Vaccine EUA drug, Defendants were to "instruct" "vaccination providers" how to "administer the vaccine under the EUA." To administer means the physical injection but also the establishing conditions ensuring individuals within the State were informed of their lawful authority to accept or refuse the product. Moreover, Defendants required all medical facilities to sign the CDC Agreement, whereupon those parties agreed to comply with "any EUA." Therefore, it cannot be reasonably argued that Defendants did not knowingly violate federal law when issuing their policy relying on the EUA products offered only under the CDC Agreement. The only

other option is that they are "plainly incompetent." Moreover, Defendants manage the State's FWA, requiring it to ensure individuals give their informed consent anytime the State involves individuals with investigational new drugs funded by the federal government.

CDPHE informs the public[8] that an EUA (1) "There is reasonable belief, after looking at all the scientific evidence, that the product may be effective for its intended use. The phrase "may be effective" lowers the standards for scientific evidence typically required for FDA approvals," (2) "There is no adequate, **approved**, and available alternative to the product" (emphasis added). Defendants cannot claim qualified immunity on the basis they were not aware that the Pfizer-BioNTech COVID-19 Vaccine was not an approved drug since it was only under an EUA.  Moreover, each EUA for the drug informed them of the same fact.

CDPHE informed the public that (1) "In collaboration with local public health agencies, CDPHE is inviting interested providers to enroll in the CDC COVID-19 Vaccination Program, (2) Healthcare facilities are to "Sign and agree to the conditions in the CDC COVID-19 Vaccination Program Provider Agreement."[9] Defendants cannot claim qualified immunity on the basis that they were unaware of the legal requirements of medical facilities under their authority operating under the CDC Agreement.

---

[8] COVID-19 vaccine FAQ | Department of Public Health & Environment. Colorado.gov. Published 2023. Accessed February 1, 2024. https://cdphe.colorado.gov/covid-19/vaccine-faq#Top10
[9] Exhibit A, CDPHE Website from September 2021

The CDC Provider Agreement required adherence to 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) and "any EUA" and Defendants lacked any discretionary authority to issue a rule requiring Plaintiffs to inject the federally funded drugs into their bodies as a condition to continue employment. Rather, Defendants were under ministerial[10] duties to "instruct" "vaccination providers" on the "proper administration" of the federal COVID-19 EUA drugs "consistent with the terms of this letter and CDC's COVID-19 Vaccination Program." [11] The Provider Agreement is unambiguous in its intent when it states, "Organization must comply with all applicable requirements as set forth by the U.S. Food and Drug Administration, including but not limited to requirements in any EUA that covers COVID-19 Vaccine," duties to "instruct" UCHealth of Plaintiffs' rights and "inform" Plaintiffs of their lawful authorities. Still, to this day, Defendants refuse to educate the public on the CDCPHE's website of their lawful authority to refuse an EUA product without consequence for all existing EUAs, which they are lawfully bound to ensure. Moreover,

---

[10] The Ninth Circuit held that officials were only engaged in ministerial acts unprotected from qualified immunity when refusing to allow plaintiffs to apply for a license (*Groten v. California*, 251 F.3d 844 (9th Cir. 2001)). The Sixth Circuit held that the City of Dayton's "board members" were not entitled to qualified immunity when terminating a city employee, holding that board members could not "cloak themselves in [qualified] immunity simply by delegating their termination procedure decisions to their legal department….A reasonable competent public official is presumed to know the law governing his or her conduct" (*Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006)). The Tenth Circuit held that qualified immunity is not a defense for an official that "failed to actually comply with the statute upon which they purportedly relied" (*Roska v. Sneddon*, 437 F.3d 964 (10th Cir. 2006)). The Eleventh Circuit granted qualified immunity to a teacher who reprimanded a child for raising a fist in the air during the pledge of allegiance because the teacher was acting under *discretionary authority* but denied her that same immunity when encouraging children to pray because her actions were outside the scope of her authority (*Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004)).
[11] See Doc 46-3, Letter P; Doc 46-3, FN 13

Defendants are under a ministerial duty to accept a person's chosen option. There is zero discretionary function to that duty.

Defendants issued their Rule under *ultra vires* authority. Then, they required other parties to violate the Plaintiffs' constitutional and statutory rights, even though those parties signed a contract promising not to engage in the unlawful conduct Defendants mandated.   CDPHE's Rule cannot reconcile with 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), CDC Program, CDC Agreement, PREP Act preemption, Supremacy Clause of 21 U.S.C. §360bbb-3, any EUA, or the State's FWA, all of which deny CDPHE's qualified immunity under the "three-step inquiry" established by the Tenth Circuit (*Lawrence v. Reed*, 406 F.3d 1224 (10th Cir. 2005); see *Roska v. Peterson*).   Moreover, the Supreme Court held:

> "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances, a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful'" and "[T]he object of the 'clearly established' immunity standard is not different from that of 'fair warning' as it relates to law 'made specific' for the purpose of validly applying §242. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than 'clearly established' would, then, call for something beyond 'fair warning.'[12]

Defendants do not cite a statute upon which they assert a qualified immunity defense. They only claim qualified immunity for issuing a vaccine mandate, which

---

[12] *United States v. Lanier*, 520 U.S. 259 (1997), citing *Anderson v. Creighton*, 483 U.S. 635 (1987)

Plaintiffs do not even contest. Defendants knew or should have known that well-established law dictates that a person cannot promote an unlicensed drug as though it were licensed,[13] such as Defendants' Rule when treating the investigational drugs as if they were licensed by the FDA for general commercial marketing with a legal indication to treat a known virus. However, none of the available federal COVID-19 drugs under the Defendants' vaccine policy bore such a label.

Respectfully submitted,

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of February, 2024, I presented the foregoing pleading to the Clerk of Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all counsel of record.

 */s/ David J. Schexnaydre*
DAVID J. SCHEXNAYDRE

**SCHEXNAYDRE LAW FIRM**

BY:   */s/ David J. Schexnaydre*
DAVID J. SCHEXNAYDRE, T.A. (#21073)
2895 Highway 190 • Suite 212
Mandeville, Louisiana 70471
Telephone: (985) 292-2020
Fax: (985) 235-1089
Email: david@schexnaydre.com
Counsel for Plaintiffs

---

[13] In 2009, the FDA charged Pfizer with a felony for promoting four drugs outside their legal indication and fined them over $1.19 billion. The Department of Justice noted, "Under the provisions of the Food, Drug and Cosmetic Act, a company must specify the intended uses of a product in its new drug application to FDA. Once approved, the drug may not be marketed or promoted for so-called "off-label" uses – i.e., any use not specified in an application and approved by FDA."- Justice Department Announces Largest Health Care Fraud Settlement in Its History. Justice.gov. Published Sep. 2, 2009